# EXHIBIT 1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
 2                   WESTERN DIVISION

 3   LAURA BECHTEL and TROY      )
     THOENEES,                   )
 4                               )
                   Plaintiffs,   )
 5                               )
        -vs-                     )  Case No. 1:19-cv-00726
 6                               )
     FITNESS EQUIPMENT SERVICES,)
 7   LLC dba SOLE FITNESS,       )
                                 )
 8                   Defendant.  )

 9

10         ZOOM DEPOSITION OF KEITH RAYMOND UGONE,

11   Ph.D., taken by me, Susan L. Bickert, a Court

12   Reporter and Notary Public in and for the State of

13   Ohio, at large, as upon Cross Examination, on

14   Tuesday, May 4, 2021, commencing at 9:58 o'clock

15   a.m. on behalf of the Plaintiffs.

16

17

18

19

20

21

22

23

24

25
```

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

```
 1    APPEARANCES:

 2           ON BEHALF OF THE PLAINTIFFS:

 3                W.B. MARKOVITS, Esq.
                  TERENCE R. COATES, Esq.
 4                Markovits, Stock & DeMarco, LLC
                  3825 Edwards Road, Suite 650
 5                Cincinnati, Ohio 45209
                  513.651.3700
 6                bmarkovits@msdlegal.com
                  tcoates@msdlegal.com
 7
                  and
 8
                  NATHAN D. PROSSER, Esq.
 9                Hellmuth & Johnson, PLLC
                  8050 West 78th Street
10                Edina, Minnesota  55439
                  952.941.4005
11                nprosser@hjlawfirm.com

12           ON BEHALF OF THE DEFENDANT:

13                THOMAS A. GAMACHE, Esq.
                  Leahy, Eisenberg & Fraenkel, Ltd.
14                33 West Monroe, Suite 1100
                  Chicago, Illinois 60603
15                312.368.4554
                  tag@lefltd.com

16

17

18

19

20

21

22

23

24

25
```

1          INDEX TO EXAMINATION

2                                                    Page

3      Cross Examination by Mr. Markovits           5

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

1                         INDEX TO EXHIBITS

2     Depo.
      Exhibit                Description                Page
3
      Exh. 1      Declaration of Keith R. Ugone, Ph.D.,   146
4                 March 1, 2021, 218 pages

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of Keith Raymond Ugone, Ph.D.        Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 5

KEITH RAYMOND UGONE, Ph.D.,
a witness being of lawful age, having been duly
cautioned and sworn, did testify upon his oath as
follows:

CROSS EXAMINATION

BY MR. MARKOVITS:

Q   State your full name, please.

A   **Keith Raymond Ugone.  Last name is
spelled U-G-O-N-E.**

Q   Doctor, you know my name is Bill
Markovits, and I'm one of the attorneys for the
Plaintiffs in the action in which you're being
deposed.

Where are you Zooming from?

A   **Actually from my office in Dallas,
Texas.**

Q   Is anyone there with you?

A   **No.  I'm in a conference room by
myself.**

Q   Do you have any documents with you?

A   **I have four documents in front of
me.  Would you like me to state what they are?**

Q   Please.

A   **So I have a copy -- and I think this
was per your request, or at least it was**

Page 6

**communicated to me.  I have a copy of Mr. Weir's
report.  I have a copy of Mr. Gaskin's report.  I
have a copy of my report, and I also just brought
with me a copy of the deposition Notice.**

Q   All righty.  Thank you.  And do you
have a means other than talking over Zoom with
contacting your attorney?

A   **Do I have a means to do that?**

Q   Yes.

A   **I've got my cellphone here.  I can
turn it off if you would like.**

Q   Yes.  No, I'm fine with you talking
with Mr. Gamache as need be, but can we agree that
you will not talk to him or communicate with him
while I have a question pending?

A   **No, I will agree with that.  In
fact, you know, I've got my -- on computer I've got
my e-mail called up.  Let me just turn it off so
there's no wondering about that or no dings that we
hear in the background.  So hold on one second.**

Q   To the extent it's enabled, no use
of the chat function.

A   **I'm hoping I don't do something bad
while I'm disconnecting things here, but --**

Q   Always a danger.

Page 7

A   **I think we're okay.**

Q   Dr. Ugone, other than that, I know
you've been deposed hundreds of times, so I'm going
to skip the general introduction and admonitions
and get right to the substance, if that's all
right.

A   **That's fine.**

Q   Doctor, first question.  Can the
attributes of a consumer product sold at retail
ever have an influence on the market price paid by
a consumer of that product?

A   **Yes.**

Q   And everything else being equal,
would you agree that consumers are better off
paying less money rather than more money for a
product?

A   **Holding everything else constant,
yes, consumers would prefer to pay a lower price
than a higher price.**

Q   Two for two.

A   **Yes.**

Q   If we can keep this going.  Are
there methods that can be used to determine
classwide damages for consumer products sold at
retail?

Page 8

A   **I think there are methods.  It just
depends on the facts and circumstances, the nature
of the products.  So there are methods, but they
just have to be implemented properly and be
appropriate for whatever the facts and
circumstances of the matter are.**

Q   Sure.  What are the general methods
that can be used to determine classwide damages for
consumer products sold at retail?

A   **And I'm just sort of answering very
generally, but -- and to make sure I have your
question, if you could just say the question again
to make sure I answer it correctly.**

Q   Yeah.  Are there methods that can be
used to determine classwide damages for a consumer
product sold at retail?

A   **Kind of using a common proof type
approach is how I'm taking your question.**

Q   Yes.

A   **And I think there's sort of two
different considerations at least that I think
about, and one is -- has to do with, you know, the
attributes of the product and are what I would call
homogeneous in the sense that there's not much
variability, and whether that deals with issues**

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 9

1 surrounding the challenged claim or various
2 different -- the nature of the product we're
3 looking at such that it might be applicable to
4 apply, you know, a specific figure to the -- to the
5 dollars or the units that are sold. So we'll put
6 that off to the right. 'Cause that has to do with,
7 you know, when it's applicable to apply, you know,
8 a certain number or not.
9        And then on the other side of the coin
10 you've got economic analyses where you might be
11 able to look at -- you know, do a before and after
12 analysis if product attributes have changed. You
13 might be able to do, you know, hedonic regression
14 analysis, which makes it more sophisticated in
15 terms of bringing in econometric techniques. And
16 perhaps if you're trying to figure out a change in
17 market price, you would need to take into account
18 if you were going to use a survey technique, you
19 know, something that would capture both the demand
20 side of the market and the supply side of the
21 market so you could figure out if there is indeed,
22 you know, a price associated with an attribute, or
23 in this context, you know, a price associated with
24 an attribute that's in dispute. Those are just
25 some ways that off the top of my head in response

Page 10

1 to your question.
2        Q   Thank you. So to paraphrase, some
3 possible ways would be survey techniques, hedonic
4 regression and before and after?
5        A   Yeah, those are the ones that came
6 off the top of my head, but, you know, I've got to
7 add the asterisk, you know, all properly
8 implemented to make sure that they capture the full
9 extent of a change in price due to a certain
10 attribute.
11       Q   Right. Well, and that's assuming
12 the question -- because I asked the methods that
13 can be used, and we're going to assume they're
14 being used properly. Are there methods that can be
15 used -- let me ask it this way.
16       Can those same methods -- survey
17 techniques, hedonic regression, before and after --
18 be used to determine classwide damages for a
19 consumer product sold at retail that uses a
20 misleading claim?
21       A   I think given the facts and
22 circumstances they can, yes. To the extent, I
23 mean, it's all subject to -- A., we're talking
24 about, you know, at a very high level, and, B.,
25 it's subject to data availability. So we're

Page 11

1 talking about, you know, still things at a very
2 high level. But assuming that the data exists,
3 assuming that, you know, the conditions exist, and
4 there's always the issue of what are some general
5 methodologies. And then the other issue is do
6 those general methodologies fit in the particular
7 circumstance we're looking at? So, you know,
8 assuming all of those things, then you potentially
9 could use those techniques in the question you
10 asked, which I took to be a consumer products case
11 sold at retail.
12       Q   Right. So let's take that consumer
13 products case sold at retail with a misleading
14 claim. How would you apply a before and after
15 methodology to determine classwide damages?
16       A   Well, if -- if we're talking let's
17 say about a single product that has very little
18 price variability, and if there's no potential
19 different interpretations of the various claims
20 surrounding that product on the part of consumers,
21 there could be situations -- and I've seen
22 situations -- where a label was added. And so you
23 could do a before to a during. Or a label was
24 changed, and the offending claim or alleged
25 offending claim was taken off, so you could do a

Page 12

1 before and after that way. Or there's many
2 different permutations, but you basically have a
3 before, during, and after, if that makes sense. And
4 it depends, you know, which end point you might be
5 on to see whether there's any changes. Now, an
6 asterisk on that is you'd want to, you know,
7 control for market conditions or any other changes
8 that might have happened at the same time, but
9 there are times that there's just labeling changes
10 where, you know, those other items that I mentioned
11 that you need control for may not be as dominant as
12 in other times.
13       Q   Can you give me examples of
14 consumers' mislabeling where before and after was
15 used to determine classwide damages that you've
16 seen? You mentioned you've seen some.
17       A   Yeah. In fact, I've used that
18 myself. There's times that with, you know,
19 consumer products where there's been a labeling
20 change in terms of the content that's on, say, the
21 front label, and then you look at, you know, price
22 patterns over time. So, you know, I've actually
23 used that quite a bit, and if the data's available,
24 you know, I look to that. You know, I'm trying to
25 give you some examples, but a lot of times you can

Deposition of Keith Raymond Ugone, Ph.D.  Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 13

kind of see that either on food products or products that have, you know, different attributes on the front label. And one of them is a challenged claim, but for a variety of reasons that claim might have been added or taken off for any number of reasons, and then you look at price patterns. So that's one way to do it.

Q    And you've got your report in front of you, which I know has an extensive list of the cases you've been involved in. Can you point to me where a before and after in any of the cases you've been involved in you performed or someone else performed a before and after analysis to determine classwide damages?

A    Or to evaluate -- to evaluate classwide damages and whether, yeah, there was the existence of a claimed price premium or not. Do you want me to go through and find some --

Q    Yeah, just any case where classwide -- well, I guess there's two categories. I know in the consumer class action context you're primarily on the defense side; correct?

A    Generally, yes.

Q    So you're saying sometimes you would perform a before and after to evaluate a

Page 14

plaintiff's claimed classwide damages?

A    No, no, no. I'm saying regardless of the side I'm on, to evaluate whether there's the existence of a price premium or not I would use that as one of the techniques. If there was any confusion over that, that's the context in which I was providing the answer.

Q    All right. That's fine. Yeah, if you can point me to any cases where you've done that.

A    All right. Well, let me -- give me a second. Just so you know what I'm doing, I have a copy of my report. I'm turning to Exhibit 2 of my report. And Exhibit 2 of my report has my testimony experience. The first 12 pages are trial, hearing and arbitration testimony. The deposition testimony begins on page 13, and that's where I've turned to. Just so you know if you're following me. And I've got to give a -- this is going to sound strange, but I'm going to give a -- what I'll call a probabilistic answer. In other words, to the best of my recollection, if I think I did it in a case, then I'll tell you. But, you know, there could be some uncertainty depending on my memory.

Page 15

Q    Fair enough. I think we're about the same age, so I understand.

A    Yeah. So on page 13, fourth from the bottom, it says Diageo Beer, but that's really Guinness Beer. And I may have done it in that case. So on page 13, fourth from the bottom.

I believe on page 15, fourth from the top, there's a L'Oreal reference. I believe I looked at before and after in that case.

On page 17, third from the bottom, All Market. That was really Vita Coco. It's a coconut drink. I think I looked at a before and after there.

Some uncertainty, but on page 22 there's a Toshiba reference, fifth from the bottom. I may have looked at before and after there. I mean, those are just some examples.

Q    All right. And taking those examples -- well, let me ask it this way. In any of those examples, did you determine that there were classwide damages relating to a mislabeling claim based on a before and after analysis?

A    My recollection actually was that I determined that individual inquiry would be required.

Page 16

Q    So in those cases you determined that that methodology could not be used to determine classwide damages?

A    Actually, in those cases I went a little bit farther. Not only, you know, evaluating a proposal for evaluating classwide damages; but also a lot of times in these cases, you know, I not only evaluate proposals, but I look at the actual data to see whether there's any evidence of a premium. And so that's why I might be including that sort of analysis. So it's going beyond just a proposal stage. It's actually doing some of the work as well.

Q    What are the problems or confounding factors, if you will, in using a before and after analysis to determine classwide damages in a consumer class action case involving mislabeling?

A    The issue with a before and after analysis is you have to be careful to try to isolate if you do see a price change what the reasons for the price change might be. So I think I might have alluded to that in my prior answer. But, in other words, you have to make sure you're isolating -- whatever price change you observe, you want to make sure you isolate it to the alleged

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 17

1 challenged claims. That might be the easiest way
2 to say it.
3        Q    In any case that you've either been
4 involved in or become aware of, has in your view a
5 before and after analysis been appropriately used
6 to determine classwide damages in a consumer class
7 action case involving mislabeling?
8        A    In the cases that I've been retained
9 on, the approaches that had been proposed, it was
10 my opinion that those would not be reliable given
11 the facts and circumstances and the identification
12 of all of the individual inquiry reasons why you
13 couldn't just take a common proof approach. Now, I
14 guess what I'm trying to say is in a lot of the
15 cases, I then go a little bit further to see even
16 if a price premium exists or maybe to even do some
17 comparisons to what the plaintiff's expert maybe is
18 saying. So I haven't taken the answer from the
19 before and after or of any of these other
20 approaches and then applied them in a class -- on a
21 class certification methodology using common proof
22 type approach because I was of the opinion that
23 that would be unreliable given the facts and
24 circumstances of the case.
25        Q    And I understand that, but that

Page 18

1 wasn't my question, Doctor. My question was, you
2 indicated that a before and after methodology could
3 be used potentially to determine classwide damages
4 in consumer class action involving mislabeling. My
5 question is, have you ever seen it done
6 appropriately in your view?
7        A    I've seen -- I think I've seen
8 before and after, but there's also more
9 sophisticated ways because the -- when I said
10 hedonic regression --
11        Q    Before we get to that, let's just
12 stick with before and after. Have you ever seen an
13 appropriately done before and after methodology
14 used to determine classwide damages?
15        A    And I'm sorry. You did cut me off.
16 I was going to tie the two together; that hedonic
17 regression is a more sophisticated way of almost
18 doing a before and after that helps control for the
19 confounding factors. So you didn't quite let me
20 say that, but I'll just put that off as a
21 parenthetical.
22        Q    All right.
23        A    I've always -- I felt that, you
24 know, it's -- it gives insights. And there's times
25 that you have isolated changes in labeling where

Page 19

1 it's appropriate, but I don't then take it and use
2 it for classwide damages because the cases I've
3 worked on required individual inquiry.
4        Q    Right. But that's -- again, that's
5 not my question. My question is, can you point to
6 any case? You've said that this is a methodology
7 that can be used to determine classwide damages.
8 Can you point to any case where you believe that
9 was appropriately done, whether you were involved
10 or not?
11        A    Yeah, and I've said when it's
12 appropriately implemented. So I always did have
13 that asterisk. I don't know that I can give you --
14 I mean, I've used it to just evaluate whether there
15 were price premiums or not, but I don't know that I
16 could say whether I've seen it to do classwide
17 damages.
18        Q    And let's now turn to hedonic
19 regression, which you indicated was another
20 methodology that could be employed to determine
21 classwide damages in consumer class action cases.
22 Let me just cut to the chase on that one.
23        Can you point to any case that you've
24 been involved in or are aware of where in your view
25 a hedonic regression methodology was appropriately

Page 20

1 implemented to determine classwide damages?
2        A    Not that it was appropriately
3 implemented. I've seen it implemented, and I've
4 seen plaintiff experts use it, but I've always felt
5 that there were deficiencies in the implementation
6 of the hedonic. That's not saying that it couldn't
7 be done. I'm just saying when I've usually seen
8 it, I had issues with the way it was implemented.
9        Q    And then the third methodology you
10 discussed was a survey technique that could be used
11 to determine classwide damages in consumer class
12 action. Have you ever seen a survey technique
13 appropriately implemented to determine classwide
14 damages in a consumer class action?
15        A    Not where I haven't had issues with
16 a problem. Now, there -- or with the
17 implementation. There's different -- I'm a little
18 hesitant when we just kind of say, you know, just
19 survey techniques by itself because there's
20 different survey techniques, and not all of them,
21 you know, take into account what's required. But I
22 have seen -- some plaintiff experts, for example,
23 determining classwide damages have taken the survey
24 techniques farther than other experts in terms of
25 attempting to evaluate classwide damages.

Deposition of Keith Raymond Ugone, Ph.D.           Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 21

Q   Correct.  But as I understand it, you've never seen one take it far enough in your view to provide an appropriate determination of classwide damages?

A   On the cases that I have worked on, there was usually an issue with the implementation. That's correct.

Q   On any case, whether you worked on it or not, are you aware of any case where a survey technique -- any type of survey technique is appropriately implemented to determine classwide damages?

A   Yeah, I can't speak to the cases that -- you know, that I haven't worked on.  I can't speak to that.  But I know the courts have accepted, you know, various techniques.  The courts have at times accepted survey techniques, accepted hedonic regression, which I said is a more sophisticated way of thinking about a before and after in many respects.  And also benchmark products.  I probably should have included that in my answer as well, looking at benchmark products. And I've seen combinations of the two.  So I've seen all of those.

Q   And in any decision that you've

Page 22

reviewed or any case that you've been involved in, based upon your review or your involvement, did you ever come to the conclusion, yes, the plaintiff's attorneys got it right or the plaintiff's experts got it right and there are classwide damages in this consumer class action?

A   If I understand your question, on the cases I've been retained on, I've always felt that there was individual inquiry issues that prevented the evaluation -- reliable evaluation of classwide damages using common proof.  Those are the cases that I've been involved in.  But I know, you know, cases are -- you know, get approved by the courts and methodologies get approved by the courts and, you know, there's just, you know, variability in that depending on the facts and circumstances of the case.

Q   How many consumer class action cases have you been involved in where plaintiff's attorneys or plaintiff's experts attempted to use one of the methodologies that you are discussing?

A   If I could ask for one clarification.

Q   Okay.

A   When you say "attempted to use," I

Page 23

put that into two categories.  One is just sort of a proposal, "This is what we could do," but it's quite often on consumer class action cases where the plaintiff's expert will actually conduct the survey or actually do the regression.  So I wasn't -- I wasn't sure if you were talking about both of those?

Q   Both of those.

A   Okay.  And if you don't mind, if I could just have the question again.

Q   Sure.  Can you give me a rough estimate, because I know you've been in involved in a lot of cases.  Can you give me a rough estimate of how many consumer class actions you've been involved in where a plaintiff's expert has attempted to use or proposed to use any of the methodologies you've discussed to determine classwide damages?

A   I would say, frankly, in -- I want to say in all of them there's either been a proposal or the actual work involving either a survey technique or a regression technique or some sort of pricing comparison, whether it's before and after or whether it's to a benchmark product.  Just expanding my prior answer a little bit to include

Page 24

potential benchmark products.  But I think -- I think, you know, except for the -- you know, I'm trying to think if there's an exception to that, but I think it usually falls into those three buckets or so, three-plus buckets.

Q   And approximately how many cases would that be that you've been involved in that?

A   I think I've been involved over the course of my career, you know, maybe going back ten years maybe 40 or 50 different cases.

Q   And as I understand it, in those 40 or 50 consumer class action cases you've been involved in where one of those either potential or actual methodologies were either potentially used or actually used, in all of them you had some issue with respect to their use to determine classwide damages?

A   Yes.  Either it didn't fit the facts and circumstances, so it's a problem with the data, there was different interpretations of variables, there were reasons for individual inquiry.  But, yes, those are -- generally I get involved in cases where those are issues.

Q   And you mentioned some of the confounding factors or problems with regard to a

Deposition of Keith Raymond Ugone, Ph.D.                     Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 25

before and after. What are some of the confounding
factors or problems with regard to hedonic
regression?

A    Yeah, it's, you know, regression --
and tell me if I'm expanding the answer too much.
I don't want to, you know, just take up your time.
But with a regression analysis, you know, it's a
statistical analysis applied to economic data. And
so sometimes there could be problems with the
underlying data. In other words, it's not uncommon
that it's not only a before and after, but you
might be doing a before and after on other products
as well. Or you might be looking at the price of
the product in question that has a certain
attribute relative to either itself or the prices
of other products. And sometimes you may not know
if there were labeling changes on the benchmark
products, just as one example. Or there can be
confounding labeling changes in the product in
question or just changes in, you know, the
attributes of the product. You know, there can be
changes in, you know, market or macroeconomic
conditions that the equation may or may not pick
up. I mean, the whole idea -- and just bear with
me for one or two more sentences, and then I'll

Page 26

stop. But the whole idea of a regression -- which
is kind of one step removed from just the straight
before and after -- the whole idea of the
regression is you want to try to control for all
the other potentially confounding factors or
events. And so your regression tries to explain
let's just say prices as determined by a number of
different considerations. And those other
considerations are, hopefully, controlling for
changes in price that are caused by or associated
from something different than the challenged claim,
if that makes sense.

Q    Okay. And with regard to survey
techniques, what are the major problems or
confounding factors in their use to determine
classwide damages?

A    Yeah, so, you know, with survey
techniques, you know, you usually see something
like -- generally speaking, you'll see something
like a conjoint analysis done. And I want to make
sure that it's clear that I'm not saying that
conjoint analysis isn't generally accepted or
doesn't have its time and place. So that's not,
you know, what the issue is. The issue is whether
it can appropriately isolate a price premium

Page 27

associated with a particular attribute if that
attribute was no longer present in a product. And
there could be issues with different
interpretations of what one is looking at, what the
disputed claim is. There could be issues of
identifying what the real drivers of demand are for
the particular product and whether those are
included or not. The biggest thing is is that
conjoint analysis, if not appropriately adjusted,
just measures the demand side of a product let's
just say. But we all know that prices are
determined by the interaction of supply and demand.
So rather than measuring a change in price -- a
change in value is measured by price, which is how
economists measure value. If the change is in
price, it might just really be picking up a change
in, you know, willingness to buy type measures,
which in isolation would not be the same as a
change in price because it's missing the supply
side of the market. So at a very high level that's
the answer to the question. There's probably more
'cause a lot of it has to do with, you know,
getting all the right determinants of demand for
the product as well.

Q    I appreciate the high level. So for

Page 28

a high level on the benchmark -- first of all,
describe how would a benchmark analysis be used to
determine classwide damages in a consumer class
action?

A    Yeah, or it would be something to
look at to give you guidance as to the existence of
a price premium. But a benchmarking is really kind
of comparing two different -- you know, two
different products that are otherwise either
identical or very similar and to see what some of
the prices are, and can you interpret that
difference in price, if there is one, to a
difference in an attribute between the two
products. So it's very similar to a before and
after, except it's across products as opposed to
across time of the same product.

Q    All right. And what are the high
level problems or confounding factors with regard
to use of a benchmark analysis?

A    The otherwise comparability of the
products. So if you're going to use one product as
a benchmark for the other, you want to try to get a
product that's as close as possible or set of
products that would be close as possible to give
you guidance. And the issue would be are there

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 29

1  other differences between the products so that it's
2  not, you know, as good a benchmark as you could
3  get.
4       Q    Moving on.  Are you familiar with
5  the Federal Judicial Center's Reference Manual on
6  Scientific Evidence?
7       A    Yes.
8       Q    Have you read through it?
9       A    Yes.  And, in fact, one of the very
10  earliest versions, if we go back to the eighties or
11  late eighties, I actually helped somebody edit one
12  of the chapters in that.  The chapter on damages.
13  I didn't get any credit 'cause I was just a -- you
14  know, a -- you know, first- or second-year analyst
15  at the time.  But there was someone who was a
16  reviewer of one of the chapters, and I actually did
17  the work in the background.
18       Q    Isn't that always the way.
19            Are you familiar with the current section
20  on calculating economic damages?
21       A    I think so.  I've seen -- I mean,
22  from time to time I look at it.  I mean, I haven't
23  read it in its entirely, but from time to time I
24  look at it.  Sure.
25       Q    And do you consider that generally

Page 30

1  authoritative on the subject?
2       A    Yeah.  I wouldn't disagree with the
3  principles.  It always comes down to, you know, do
4  the methodologies fit the facts and circumstances
5  of the case.  In other words, there's generally
6  accepted methodologies, and there's a fork in the
7  road there that sometimes, you know, you may have
8  to look at things a little differently.  But
9  there's generally accepted methodologies, and then
10  there's the implementation of the generally
11  accepted methodologies.  So if we were to just say,
12  "Hey, you know, where does somebody hit a curve in
13  the road and go off the road," it could happen in
14  one of those two places.
15       Q    Have you done any research to
16  determine whether Sole's horsepower claims
17  influenced the price of their treadmills?
18       A    Have I done any research to -- are
19  you talking about the -- I guess the -- what they
20  tell consumers the horsepower is of the engine on
21  the treadmill?  Is that what you're asking?
22       Q    Yes.
23       A    I have not -- if I understand your
24  question, for example, some of their models I think
25  have a -- I think, if I remember correctly, whether

Page 31

1  it's a 3.0 or a 3.5 or even a 4.0 horsepower
2  engine.  I haven't isolated the change in price
3  just due to a different horsepower engine.  I've
4  looked at the prices of the products, and I
5  recognize there's eight different challenged
6  products, and I think there's either two or three
7  different horsepower capabilities, but I haven't
8  analyzed how much of the price is due to a
9  particular horsepower capability, if that's what
10  you're asking.
11       Q    Do you intend to do that?
12       A    I have not thought about sort of
13  what goes beyond, you know, where we are now.  I
14  understand we're at the class certification stage.
15  You know, sometimes -- and I guess I just say I
16  need to be a little bit careful because sometimes
17  in cases there's class certification stage.  Then
18  there's the merits.  Sometimes judges kind of
19  combine both together, and it gets very confusing
20  to me.  So I try to stay out of that.  I issued the
21  report that I've issued, and at this point I
22  haven't been asked, nor have I contemplated, doing
23  anything else.  I'm comfortable with the report I
24  have for the purpose to which it was intended, if
25  that makes sense.

Page 32

1       Q    Sure.  If you wanted to determine
2  whether Sole's horsepower claims influenced the
3  retail price of their treadmills, how would you go
4  about doing that?
5       A    Well, I think -- I think one would
6  have to -- now, I haven't done that, so I'm just
7  giving you an answer off the top of my head.
8       Q    Sure.
9       A    But I try to look at the demand
10  side, and I try to look at the -- you know, the
11  supply side.  I'd also probably look at what, you
12  know, competing models are out there because that
13  puts a constraint on, you know, a company's, you
14  know, ability to charge.  I mean, it's a
15  competitive environment.  So you've got to take
16  into account demand -- sort of general demand
17  factors in the market, demand for your product in
18  question, if your product's differentiated, the
19  supply side, cost of production.  You might take
20  into account, like I said, competing products and
21  the prices of competing products and the attributes
22  and so forth.  So I think that would be a beginning
23  point that I would try to collect, and this is just
24  all off the top of my head and subject to data
25  availability.  But if I were to say -- or just

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 33

1  respond like to the question you asked me, you
2  know, at a very high level, those would be my
3  initial thoughts of the things that I would look
4  at.
5      Q    Let me go back to an earlier line
6  for a minute.  Have you ever testified or provided
7  a report indicating in a case that classwide
8  damages could be calculated?
9      A    Yes.  So that's what I was trying to
10 say before.  The cases that I've worked on I've
11 determined that classwide damages could not be
12 reliably appropriated -- or reliably calculated
13 using a common proof approach.  So --
14     Q    And I'm trying to expand it a little
15 because we were talking before about consumer class
16 actions.  And I know you've been involved in
17 securities cases and antitrust cases and other
18 cases.  Have you ever testified that classwide
19 damages could be calculated regardless of the type
20 of case?
21     A    Yes.
22     Q    In what case, if you can recall, or
23 cases have you testified that classwide damages
24 could be calculated?
25     A    And in the interest of making sure

Page 34

1  that we're not misinterpreting my answer here, but
2  when I've worked on securities cases and one is
3  determining an inflation component in a stock
4  price, I usually -- or, frankly, always have come
5  up with a particular inflation component at least
6  for a portion of the class period.  That inflation
7  component could change over the length of a class
8  period.  So we might have different inflation
9  components across time, but at any moment in time
10 that inflation component could be applied to all
11 the shares that are being transacted at least at
12 that moment, if that all makes sense.  But what I
13 wanted to make clear that those were all in the --
14 you know, in the classwide damages phase of the
15 case.
16     Q    And are those in securities cases?
17     A    Yes.
18     Q    Any antitrust cases where you've
19 determined classwide damages were appropriate?
20     A    I want to be careful in how I phrase
21 it.  The answer is -- to the spirit of the
22 question, the answer is going to be, yes, I think
23 -- but I think -- I just need a little time to
24 think about some of the cases.  But my feeling is
25 that that would be yes.  Now, it may vary by

Page 35

1  product.  I'm not sure if I can give you an exact
2  example, but there have been times, I believe -- or
3  let me take a step back.  Here's why I'm
4  hesitating.  Some antitrust cases might just be one
5  company against another company.  Some antitrust
6  cases may be a group of companies involved.  So I
7  probably need to be careful on that.  But I don't
8  think -- I think the converse answer is easier.  I
9  don't think I've ever given an opinion that you
10 would need the individual inquiry and, hence,
11 didn't come up with a number.  Although there's
12 times that negotiating dynamics might be very
13 important in the consideration.  So I want to be a
14 little careful with my answer.  So I think I'm
15 always sensitive to that, but I don't think the
16 issues have arisen as much for me in the antitrust
17 context as in the consumer class action.  Maybe
18 that's the best answer.
19     Q    Going back, earlier I asked you
20 whether you had done any research to determine
21 whether the horsepower claims -- Sole's horsepower
22 claims had any influence on the retail price of
23 their treadmills.  Related, but slightly different
24 question.  Do you have any opinion as to whether
25 the horsepower claims of Sole have any influence on

Page 36

1  the retail price of their treadmills?
2      A    Yeah, the -- I guess where I was
3  thinking through your question, when you say "the
4  horsepower claims," there's a couple of different
5  ways, frankly, that that could be interpreted.  And
6  so like if some treadmills have a 3.0 horsepower
7  motor and some have a 3.5 horsepower motor.  Now,
8  you've been using the Sole claims phraseology, and
9  I've been thinking in terms of some of the motors
10 are just different.  Some have a rated horsepower
11 that are greater than ones that have a lesser
12 horsepower rating.  And my assumption is that a
13 3.5 horsepower motor is more expensive than a 3.0
14 horsepower motor.  So that's likely -- likely --
15 although I haven't done this empirical analysis,
16 but it's likely that that will have an impact on
17 price, that you've got a -- you know, a higher
18 rated motor in one of the treadmills versus
19 another.  So intuition in economics is telling me
20 that, but I haven't done that study.  But I've also
21 tried to communicate to you how I'm answering the
22 question.
23     Q    And as I understood your answer,
24 your general economic intuition would be that the
25 higher the horsepower, the higher the price?

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 37

A   The intuition is that the higher the horsepower probably means it's a higher cost input into the treadmill, and it's likely that that will also manifest itself in a higher price for the treadmill.

Q   And based on your review of this case and the facts in this case to date, is it likely that as Sole's claimed horsepower for its treadmills increased, the treadmill prices increased as a result?

A   I didn't -- I apologize. I didn't quite get the question. I just need it again.

Q   Based on your review of the facts in this case to date, is it likely that as Sole's claimed horsepower increased for its treadmills that the treadmill price increased as a result?

A   I think there were -- from what I understand that's many different dynamics that go into the pricing of the treadmills, including the various attributes, but also what the competitive environment is. And, you know, you've got the Sole treadmills, but you've got NordicTrack, you got the Nautilus or the Bowflex and so forth, ProForm. That those all create a competitive environment that has an impact on

Page 38

prices. And I think Sole, you know, my understanding is takes those into account. I don't know if I've seen a situation where for any particular treadmill they've gone from like a 3.0 to a 3.5, or at least I don't remember. I think my memory is for each of the individual treadmill models that I think -- but I'm not sure -- that those horsepower motors have stayed the same. So I don't think I've seen what you're asking me about, or at least I don't recall.

Q   So in that respect, from what you've seen can you say one way or another or do you have an opinion one way or another whether there's been any price premium attributable to Sole's horsepower claims on its treadmill?

A   I don't think I've seen any evidence of a price premium. Now, when you say the "claims," again, I want to make sure we're speaking the same language in a sense. 'Cause a claim could be that it's a 3.5 horsepower engine -- or motor I should say. A 3.5 horsepower motor or a 3.0 horsepower motor versus the allegations that I understand the named plaintiffs are putting forth. So when you say -- I think I just want to have a common language with you.

Page 39

Q   Sure.

A   When you're talking about Sole's horsepower claims, or whatever phraseology you're using, I'm never quite sure if you're just talking about factually what the rating on the engine is or whether you're saying what I think I saw in the complaint or others have referred to as kind of an inflated horsepower claim. So I'm not quite sure, you know, what you're referring to.

Q   I'm not getting at whether it's inflated or not inflated at this point. I'm just saying, for example, if the F80 has a label on it that says 3.5 either CHP or HP, whether you think that fact that it's being marketed as a 3.5 horsepower motor carries with it some price premium over if it was labeled as a 3.0 horsepower let's say?

A   Yeah. I mean, all I can say is my intuition tells me that that motor would cost more. But given the -- you know, the variability and the attributes of the different treadmills, I can't say, you know, whether there's a premium or what it is or whether it just all gets lost in the mix by the time you put together, you know, the hundreds of different attributes of the product.

Page 40

Q   So if I understand you, so that we are on the same page, you're not saying there isn't a price premium, but you can't say at this point that there is?

A   Well, actually, if we go back to my report, what I'm saying is that you can evaluate classwide damages using a common proof approach because of all the things that are in my report. That's what my opinion is. I haven't really gotten into the merits. That if the court were to certify the class and if someone put forth a number as to what that premium was, then I would take the next step if so retained to evaluate that and to see whether it makes economic sense. But I haven't done that part of the analysis.

Q   But going back to what you said earlier, I think you said your economic intuition would be that as you increased horsepower, the price increases as well?

A   Actually, I kind of gave some linkages that as you increase the horsepower motor rating, it's likely that that's a higher cost of the input. And probability -- or probabilistically, yes, that would have an impact on the price. But there's other dynamics like a

Deposition of Keith Raymond Ugone, Ph.D.     Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 41

competitive environment, profit margins.  So
there's all kinds of things that could impact that.
But if you just kind of took that in isolation, it
could have that sort of effect.  When an input
price increases, there could be upward pressure on
the price, but there's other dynamics you have to
take into account as well.

Q   Do you know whether any consumers
are willing to pay more for treadmills that claim
to have a higher horsepower?

A   I have not done a study of whether a
consumer is willing to pay more for a 3.5 versus a
3.0 horsepower engine.  Part of it is is that, you
know, we do see some treadmills with a 3.5
horsepower motor, and we do see treadmills with a
3.0 horsepower motor, but there is often a lot of
other differences between those treadmills as well.
So you can't just take, you know, the price
difference.

Q   But you're not ruling out the
possibility that, all other things being equal, a
consumer might be willing to pay more for a 3.5
horsepower than for a 3.0 horsepower treadmill
motor?

A   Yeah, I'm not saying -- I haven't

Page 42

done that analysis.  I haven't said that one way or
another.

Q   Okay.  Do you have any opinion as to
why Sole sells treadmills with different horsepower
claims?

A   Well, I want to be careful here.  I
don't think I've asked them that direct question.
Just as an economist and with my background and
looking at the treadmill models, I can give an
answer, but I don't know if it's the company
answer.  So I would caution it that way.

Q   All right.  And with that caution,
what's your answer?

A   Just that there -- you know,
companies -- frankly, every company -- objective of
firms are to maximize profits, and sometimes that
means that you want to hit different, you know,
market segments.  You want to hit different
segments of consumers.  Different consumers have
different tastes and preferences.  You know, just
to bring it on home here, you know, you've got
athletes, you've got, you know, sprinters, joggers
and let's say walkers in terms of how people get
their exercise.  You have different, you know,
socioeconomic backgrounds and incomes and how much

Page 43

people would want to spend on a treadmill.  You
have different people that may want to have high
tech treadmills versus ones -- you know, like my
treadmill is out in the garage, and I've got a TV
there, and I don't care if I've got Bluetooth or
not 'cause I turn on my TV.  So, you know, I put
less of a premium on that.  I'm just giving you an
example, just a survey of one on that.  And then
also, you know, there's durability aspects.  Some
people will be using it every day; some people
maybe just be sporadically.  The only point I'm
trying to make is that it often is the case where
firms will have many differentiated products to try
to increase their sales and hit different market
segments.  So this is the very long-winded way of
saying when you ask the question, "Why do they have
a 3.0 and a 3.5," it just may be that the
combination of all of the attributes when you use
the 3.0 appeals to some consumers, and a
combination of all of the attributes when you use the
3.5 horsepower or the 4.0 horsepower, you know,
appeal to a different set of consumers.  And so
they're trying to make sure that they increase the
probability that they can expand, you know, the
potential market they're selling into.

Page 44

Q   Let's shift our common understanding
of terminology for a second, and now I'm going to
talk about challenged claims.  Which let's define
if we can challenged claims as the claims of Sole
that let's say the F80 has 3.5 continuous
horsepower, or horsepower, when, in fact, according
to plaintiffs, it's much less.  All right?

Q   So when you talk about the
"challenged claims," that's what you're referring
to?

Q   Yes.  For each of the treadmills the
challenged claims as to horsepower, if you were
tasked with determining whether a price premium
exists for each of those challenged claims, how
would you go about doing it?

A   I mean, the problem is I keep going
back to the individual inquiry issue and that --
it's almost like you're asking me how would I do a
classwide damages approach using sort of a common
proof approach?  And just given my understanding of
the consumers, the demand drivers, you know, I'd
still have the issue that it needs individual
inquiry as opposed to just a common proof approach.
So that would --

Q   Okay.  I'm sorry to cut you off.  So

Deposition of Keith Raymond Ugone, Ph.D.        Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 45

are you saying that because it needs -- and I
understand your position is that it needs
individual inquiry.  So would the price premium
then in your view potentially differ for each
consumer with regards to the challenged claims?

A    I mean, theoretically, if we were
just talking theoretically, which is how I'm
interpreting your question, you could have -- if
there were a price premium, it could be different
across consumers, or it may not exist at all.  You
know, I talk a little bit in my report about, you
know, treadmills being an experience good where
people may go to the sporting goods store and
actually try out the treadmill.  It's an, it's an
expensive item.  It's a -- you know, it's -- you
know, you're not buying a loaf of bread.  You're
buying a treadmill that could range from, you know,
a thousand dollars to two or three thousand
dollars.  So it's not uncommon for people to try
those out, in which case they could be perfectly
happy with their purchase and it not have an impact
at all.

Q    Okay.  We'll talk about that a
little bit more, but since you've raised it, let's
touch on it for a second.

Page 46

You mentioned that it's an experience
good and that it's not uncommon for people to try
it out.  Do you base that on any research, or is it
just intuition?

A    Well, actually more than that.  I
mean, I'm, you know, an economist by training.  I
have my skills, knowledge, education, experience
and training.  Experience goods are a well accepted
economic concept about some goods.  And I've
observed in the marketplace that sporting goods
stores will actually have treadmills out on the
floor taking up a lot of space, and I've observed
consumers actually trying, you know, the treadmill.
You know, I don't want to overplay this, but as a
survey of one with myself, I tried out the
treadmill before I bought it.  I didn't want to
just buy it off the catalog.  So I think it's --

Q    A survey of two, I did not.

A    Okay.

Q    So now we're 50-50.  Do you have any
idea what percentage of consumers who buy
treadmills test them before purchase?

A    They either test them or maybe they
look at reviews.  I mean, it's usually not a sight
unseen type product.  So if they don't test them,

Page 47

I'm sure they're relying on either word of mouth,
friends, they've seen it in action, or there's, you
know, reviews on the attributes of the treadmill
and, you know, the performance and so forth
relative to price.  And even if we're at 50-50 with
you and I, that still says, hey, we need individual
inquiry because you didn't and I did.

Q    Well, let me go back to my question,
which was, do you have any knowledge of what
percentage of consumers generally test a treadmill
before purchase?

A    No.  I can't -- I can't speak to
that.  But that's part of the point.  We know that
you can't say it's zero.  We know that people do do
it because not only the behavior of consumers, but
also the behavior of suppliers.  The mere fact
there's a huge opportunity cost when you line up
all these treadmills on your floor.  That means
you're not selling other products.  So there's a
huge opportunity cost to the sellers, and so they
must think it's valuable to the consumer to have
them out there to be tested.

Q    With regard to that, in this
particular case how would testing it have an impact
on -- let's talk about the challenged claim now.

Page 48

How would testing it either validate the challenged
claims or invalidate the challenged claim?

A    I don't think it -- if I understand
your question, and I'm taking your words literally,
testing doesn't -- if I understand the words you're
using -- validate or invalidate claims, but it says
something about the consumers' testing of the
performance of the -- of the item, of the
treadmill, and whether the performance-to-price
ratio is acceptable to the consumer.  In other
words, were they -- did they get what they bought
and at the price that they paid?  So, in other
words, they test it.  They, you know, tested the
different speeds and other attributes to see if the
performance-price ratio was something that they
felt that they would want to buy that product.

Q    Testing wouldn't determine -- would
testing in your view allow a consumer to determine
whether or not an F80 was 3 horsepower, 3.25
horsepower, 3.5 horsepower?

A    The -- here's where I want to be
careful in our terminology again.  There's the 2.5,
3.0, 3.5 and 4.0 horsepower engines -- or motors.
I keep saying engines because I'm thinking of cars.
But motors for the treadmills.  And I think my

Deposition of Keith Raymond Ugone, Ph.D.      Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 49

1 understanding is of the -- of the challenged claims
2 by the plaintiff is that you really don't get
3 either that horsepower, or for a variety of reasons
4 -- I'm not the technical person, so this is all in
5 layman's language.
6      Q   Yeah.
7      A   But there's technical reasons
8 plaintiffs would claim that it's not at that rated
9 or stated level, the effective horsepower. And
10 what I'm saying is that a consumer may not know the
11 technicalities of it. In other words, when you buy
12 a car, you know, you don't know what's in the
13 electronic control unit. You don't know what's,
14 you know, in the engine. I mean, I've got a Honda
15 hybrid Civic, and I don't have a clue how the
16 battery works; but I like the performance of it,
17 and I was willing to pay the price for that car
18 given that it was a hybrid and, you know, the
19 benefits that I got from having a hybrid. Well,
20 it's the same thing with the treadmills. I don't
21 think any individual consumer, unless they were
22 somehow, you know, a very sophisticated engineer
23 perhaps and did some testing on the floor there of
24 the store -- I think what consumers would look at
25 is does the performance of the product meet with

Page 50

1 the price that they're paying? And that's what I'm
2 talking about with the fact that it's an experience
3 good. They tried it. They're rated. The label on
4 the motor would say 3.5. They got on it. They
5 tried it. It fit their needs, and they paid a
6 price that they thought was the appropriate price
7 to buy that product.
8      Q   Let me go back to something you said
9 a few minutes ago.
10      A   Actually, if you're going to switch,
11 if you don't mind about every hour I'd like a
12 break.
13      Q   Every hour. That's fine. I was
14 going to suggest a break shortly, but now is good.
15      A   All right. Thank you.
16      Q   Be back in about five minutes?
17      A   That will work.
18      Q   All right. Thank you.
19      (Whereupon, a recess was taken.)
20      Q   Dr. Ugone, you touched on this
21 earlier, but you would agree that Sole generally
22 seeks to maximize revenue?
23      A   Actually, maximize profits.
24      Q   What about revenue?
25      A   No, it wouldn't make sense to

Page 51

1 maximize revenue.
2      Q   Okay. If Sole had an existing
3 inventory of a hundred thousand treadmills, and the
4 prevailing market price was below Sole's cost to
5 manufacture the treadmills, would Sole have a
6 higher profit if it sold the units below its cost
7 or if it refused to sell the treadmills at any
8 price?
9      A   The -- I may need -- let me give an
10 answer, and then we'll see if this answers it or if
11 I need a clarification of the question. But
12 sometimes when an economist says something, there's
13 fuller implications or additional implications.
14      The objective of the firm is to maximize
15 profits or minimize losses. And so, yeah,
16 maximizing revenue may or may not be the profit
17 maximizing level of output. In other words, you
18 could -- there could be a profit maximizing
19 solution that gives you greater profits at a lower
20 level of revenue, and that can happen. So that's
21 why we say maximize profits. But I guess what I
22 was trying to say is -- in response to what you
23 said is the firm will maximize profits or minimize
24 losses. That's the objective of the firm. So
25 they'll follow that behavior that will achieve

Page 52

1 these objectives.
2      Q   Okay. And just in the abstract,
3 with those hypotheticals -- and assuming they can't
4 wait it out in the market, they've got a hundred
5 thousand treadmills, prevailing market price is
6 below cost -- would they maximize profits by
7 selling below cost or refusing to sell at any
8 price?
9      A   So if they -- I want to make sure I
10 have the hypothetical. So if they have a series of
11 treadmills where the cost of production is greater
12 than the existing market price, what do they do? I
13 think that's what you're asking me.
14      Q   Sounds fair.
15      A   Okay. I would say it might depend
16 on, A., expectations, but also the holding cost.
17 In other words, if this is something that's
18 perpetual, that there's not going to be any change
19 in market conditions, then, you know, they probably
20 sell those units at a loss. But if the holding
21 costs were not that great, and if you expected the
22 market to rebound, then you would analyze those
23 factors, put them into the calculus, put them, you
24 know, into the adding machine and decide, you know,
25 whether you hold or sell.

Deposition of Keith Raymond Ugone, Ph.D.          Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 53

1  Q   From your work on this case to date,
2  do you have any idea who sets the retail price for
3  Sole's treadmills?
4      A   You know, people talk about setting
5  price, but I take it as market-determined prices.
6  In other words, it's influenced by competitor
7  prices.  It's influenced by certain seasonality
8  factors.  You'll see some variability in prices.
9  So it's adjustments across time.  It's set by, you
10 know, what -- an interaction of the demand side,
11 but also, you know, kind of a rate of return or
12 profit margin that the company needs to stay in
13 business.  All of that goes into a market-
14 determining price.
15     Q   And more narrowly -- looking at it
16 more narrowly, do you have an understanding of who
17 actually sets Sole's retail prices, not in terms of
18 market determinants or how it's set, but who sets
19 it?
20     A   Yeah, I guess that's where I can't
21 separate it out.  I mean, I think companies figure
22 out a price, and there's a price -- I'm trying to
23 figure out the best phraseology to use.  There's
24 sort of the -- you know, there's a price that they
25 have, but then there's sort of the everyday price

Page 54

1  that you see the treadmills sold for.  But you see
2  variations around that.  There's, you know, sale
3  prices on, you know, Black Friday or Cyber Monday.
4  Sometimes there might be other reasons why the
5  price can vary.  But I still think it's sort of
6  market-determined.  But, you know, Sole settles in
7  on a price.  Dick's Sporting Goods settles in on a
8  price.  I know Sole monitors what Dick's and
9  perhaps Amazon is doing, and if they see those
10 entities changing their prices, I think Sole during
11 the same period of time to remain competitive may
12 change its prices as well.  So it's hard for me to
13 separate out the -- you know, the market-determined
14 factors versus just saying they're setting the
15 price.  'Cause I don't think they're setting the
16 price.  They're taking into account everything I
17 talked about.  And, yes, somebody ultimately has to
18 write with a magic marker on the price tag what's
19 the price, but that's influenced by, you know,
20 profit margins, cost of production, demand-side
21 competitive products, and then they settle into the
22 zone where they're going to sell their product.
23     Q   And with regard to Sole selling its
24 treadmills from its website, presumably, somebody
25 at Sole sets that retail price; correct?

Page 55

1      A   Again, you can say "sets it," yes.
2  Somebody has to type in the price.  But I know they
3  look to the competitive environment to make sure
4  that their product is situated, you know, where
5  they think it should be relative to competitor
6  products, but also in a sense competing against
7  itself.  In other words, what is Dick's charging
8  for the product?  And so I think Sole has a
9  philosophy they need to be at least in line with
10 what Dick's may be selling the product for.
11     Q   They don't set the price that Dick's
12 sells it, Dick's Sporting Goods?
13     A   I think Dick's has the ability to
14 vary that price, and I think they do vary the
15 price.  That doesn't mean the preponderance of the
16 prices across time aren't at a certain level, but
17 there's variations that occur within that.
18     Q   I believe in your report you may
19 have referred to the treadmills at issue in this
20 case as the challenged products; is that correct?
21     A   I might have used that phraseology,
22 sure.
23     Q   Let's continue with that.  Do you
24 have any understanding or knowledge of what range
25 of prices are paid by consumers for the challenged

Page 56

1  products?
2      A   Roughly speaking -- it's in my
3  report, but I'm going to do it from memory.  But,
4  roughly speaking, I think, you know, around 999
5  recently -- most recent prices with the tariff
6  increases and everything.  You know, could be 999
7  for the -- you know, some of the -- I don't want to
8  call them the lower end models 'cause I think even
9  the lower end models are highly rated.  But the
10 less expensive models, you know, in the past have
11 gone 799 to 999 all the way up to, you know, even
12 $2,500 or, you know, $3,000.  So we're talking
13 about a doubling or tripling of the range there,
14 depending on the attributes of the treadmills.  I
15 can look up the exact numbers, but I know my range
16 is approximately right.
17     Q   Doesn't it always end in 99?
18     A   Generally I think so, yes.
19     Q   Did you make any determination of
20 the average price paid for the challenged products?
21     A   I think -- I mean, I've got some
22 time histories.  For example, I think it's Exhibit
23 6 to my report.  Let me look.  Yeah, if you look at
24 Exhibit 6 to my report, you can see the
25 variability.  But, you know, they're clustered

Deposition of Keith Raymond Ugone, Ph.D.                Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 57

1  around that either 799 or 999 for the F63; and the
2  F80, you know, was around 1,499 to 1,599, depending
3  on the time period.  But there's variability around
4  that.  But I think those numbers that I gave you
5  would be, you know, a rough average.  I haven't
6  calculated --
7      Q    That's a question I had -- I had a
8  question about this chart, and maybe you can answer
9  it for me.  This says -- has the Monthly Average
10  Sales Price on Sole's Website; correct?
11      A    Correct.  And I should have been
12  more specific on that, but that was from the
13  website, yes.
14      Q    Okay.  So my understanding was that
15  for a long period of time the F80 was at 1,499.99,
16  and then recently, because of tariffs was the
17  stated reason, it went up to 1,599.99 as listed on
18  the website.
19      A    Yes.  With some asterisks on that.
20      Q    Okay.  And that's what I want to get
21  to.  I want to get to the asterisks because I see
22  variability in this chart on the line that
23  indicates it's the sales price for the F80, and I
24  want to -- I want to get an understanding of
25  whether the website price as listed was always

Page 58

1  1,499.99, but there was some other factors that
2  caused it to vary a little, or whether there was a
3  change in the listed price?
4      A    Yeah, I -- I'm going to give you the
5  best answer I can.  That I don't disagree with you
6  in terms of what those predominant prices are, but
7  I think there's times that Sole will monitor what
8  Dick's is doing, and they try to keep their prices
9  -- online prices in harmony with what Dick's may be
10  selling the products for.  So I gave you two
11  examples that generally -- you know, just as an
12  example, you know, on the Black Monday -- I'm
13  sorry.  The Cyber Monday and the Black Friday, it's
14  not infrequent that there's hundred dollar
15  reductions off of -- off of that price that we've
16  been talking about.  Or there could be situations
17  where I think someone may call Sole, and for a
18  variety of reasons may be successful at negotiating
19  a slightly different price.  That's my
20  understanding.  But this data that we're showing
21  here is what I'll call the weighted average price.
22  In other words, basically the revenue is divided by
23  the units, and it's showing some variability.  But
24  my understanding is that there could be that
25  variability for some of the reasons that I just

Page 59

1  said.
2      Q    Does this chart show variability
3  based on shipping, taxes or special offers,
4  something of that -- any of those?
5      A    It -- this would be the price of the
6  items is my understanding, if that's what you're
7  asking.
8      Q    Well, what I'm asking is, so the
9  price of the item, let's say, is generally 1,499.99
10  until recently.  Does this chart reflect that
11  1,499.99 with adjustments for shipping and taxes,
12  or is this chart the list price that you get on the
13  website?
14      A    Yeah, I believe it's the -- well,
15  it's actually the revenues taken in from the items
16  that are sold that have that list price of 1,499.
17      Q    Okay.  And do you know whether that
18  list price on the website prior to it going up to
19  1,599.99 during this period of time, January 2015,
20  till the 1,599.99 was it anything other than
21  1,499.99?
22      A    My understanding is, is that that
23  price could be adjusted for what Dick's is doing.
24  In other words, if Dick's is having a hundred
25  dollar off sale, my understanding is that Sole

Page 60

1  wants to make sure that -- in a sense that they're
2  not competing pricewise with their own models in a
3  sense.  So they monitor what Dick's is doing, and
4  then adjust their prices accordingly.  That's my
5  understanding.
6      Q    So they would change that on the
7  website.  If let's say Dick's was offering it at
8  1,399.99, you're saying that Sole would adjust that
9  on its website so that it's offering it at
10  1,399.99?
11      A    Or at least somehow communicate to
12  consumers that there was the hundred dollars off,
13  yes.
14      Q    Okay.  Let's go back to hedonic
15  regression.
16      A    Okay.
17      Q    You'd agree that's a generally
18  accepted technique?
19      A    Sure.
20      Q    And the general concept is that you
21  can decompose the price of a product into price
22  components that are attributable to certain
23  attributes?
24      A    Properly implemented, yes.  I think
25  I would agree.  That's the intention, yes.

Deposition of Keith Raymond Ugone, Ph.D.      Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 61

Q And I know you haven't done this, but do you have any plans to conduct a hedonic regression to determine whether the price of the challenged treadmills would be lower with a disclosure of the allegedly true horsepower amount rather than without the disclosure?

A I can even answer maybe a simpler question that I don't have any plans to do any hedonic regression at this point in time.

Q That is a simple question. Thanks.

And I may have asked you this already, and if I did I apologize, but do you believe -- I think you've already testified that the answer is no, but I'll ask it again.

Do you believe that a hedonic regression could be used in this case to determine whether the price of a challenged treadmill would be lower with disclosure of the allegedly true horsepower?

A I want to make sure I have the question properly. One of the "no" answers I gave previously was that this case from my economic training tells me that you need individual inquiry, and you can't just do a common proof approach. So that's the no answer.

Maybe -- I apologize. I might have

Page 62

really missed the thrust of your question.

Q Sure. And I assume because that answer was the no answer that it would, therefore, follow -- maybe it doesn't -- that you couldn't do a hedonic regression in your view to determine whether the price of the challenged treadmills would be lower with a disclosure of the allegedly true horsepower amount than without such a disclosure?

A Yeah, I haven't -- I haven't attempted that. I think it would be a very complicated analysis. But my ultimate opinion is that you need individual inquiry. You know, if you were going to try to do something with an econometric hedonic regression approach, I think you would -- I think that would take a lot of work with an uncertain outcome.

Q Have you ever performed a hedonic regression analysis in a consumer class action case?

A Yes. Yes, either performed or evaluated or rerun a hedonic regression. So the answer is yes to those.

Q All right. Let's take out the "evaluated or rerun" and just go with ones you

Page 63

performed from start to finish.

A Yeah, I haven't done one from scratch because in the nature of the cases I've been retained on, it was my opinion that individual inquiry dominated over a common proof approach. So I wouldn't do something that I knew was not appropriate. But that doesn't mean that I'm not well versed in it, and that doesn't mean that other experts haven't tried it. And so that's when I said I evaluated what other experts felt was appropriate that I disagreed with, and then also, you know, critiqued or evaluated those analyses.

Q Other than in the litigation context, have you ever conducted a hedonic regression analysis from ground zero?

A Actually, my profession, my career is -- I call myself a forensic economist and damage quantifier, so 95 percent of the work that I do is in a dispute environment. So it's hard to speak outside of the dispute environment 'cause that's my area of specialization.

Q Right. And in that other five percent outside of the litigation context, have you ever conducted a hedonic regression from ground zero?

Page 64

A I don't believe so, no.

Q You would agree that the function of a properly performed hedonic regression analysis is to break out the attributes of a product; correct?

A I wouldn't have phrased it that way. I might understand the spirit of what you're trying to get to, but it's trying to decompose the price of a product and that which is attributable to the various components that make up the product.

Q And the components that make up the product you're talking about, would that be the attributes?

A Yes.

Q Would you agree that a properly performed hedonic regression analysis can determine the value of a particular product attribute?

A That's what the intention of it is. I mean, we can all have varying degrees of, you know, perceptions of the success of that and does it make sense. So there's two different levels. One is, you know, can you mechanically run a hedonic regression and get the computer to spit out an equation? Yeah, absolutely. Then the next thing is, well, taking it from a mechanical result, does it make proper intuitive results and is the

Deposition of Keith Raymond Ugone, Ph.D.  Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 65

1 model properly specified? Can we rely on the
2 model? You know, that's where, obviously, judgment
3 comes into play as well, but I won't disagree that
4 that's the intention of the technique.
5   Q And to get to the point you just
6 made, while hedonic regression analysis may appear
7 to be scientific, it's, in fact, very much an art
8 form; would you agree?
9   A I'll agree 100 percent with you.
10 That's also true of a lot of econometrics in
11 general. You know, there's regressions outside of
12 hedonic regression, but there's always judgment of
13 the modeler that goes into it and which variables
14 to include. There's explanatory variables and
15 those sort of things. So, yes, it appears to be --
16 it's statistics and it's math, and so, you know, it
17 must be rigorous. But, you know, you need to take
18 care in development of the model and the
19 interpretation of the results.
20   Q And you just talked about
21 explanatory variables. Is there an industry
22 standard or anything of that nature to determine
23 what must be included as explanatory variables?
24   A Well, you would want -- let's try it
25 this way. I'm trying to figure out the best way to

Page 66

1 answer this. There's no cookbook approach that
2 gives you the answer. But I want to be careful in
3 saying that if there were a cookbook approach, the
4 cookbook approach would be, well, you need the
5 proper determinants. You need the proper
6 explanatory variables to explain whatever
7 variations you may see in the dependent variables.
8 So that's the guiding principle. But going beyond
9 that, you know, it's not like there's this list of
10 what you include, if I'm interpreting your question
11 properly. So that -- I'm sorry. Go ahead.
12   Q How would you determine the proper
13 explanatory variables for hedonic regression?
14   A I mean, I think you'd look at a lot
15 of the things that I have in my report in terms of,
16 you know, what are the drivers of, you know, price
17 variability. And so, you know, that would be, you
18 know, an important consideration.
19   Q And we may have talked about this
20 before, but you didn't do any -- have not done a
21 conjoint analysis of any type in this litigation;
22 correct?
23   A That's correct. For the reasons
24 that I said before that, you know, in my mind from
25 an economic perspective the individual inquiry

Page 67

1 dominates, and so I wouldn't do an approach that
2 yields a common proof approach.
3   Q And so based on that, would it be
4 fair to say that you don't believe a conjoint
5 analysis could be used to determine classwide
6 damages in this case?
7   A That's correct. Now, there's two
8 aspects. And you may or may not have asked this,
9 but there's the proposal of Mr. Gaskin, and there's
10 issues with that, but then there's just the overall
11 opinion that individual inquiry is required.
12   Q And so that's what I wanted to get
13 at, and part of which is to say, you may have issue
14 with how Mr. Gaskin proposes to do -- implement a
15 conjoint methodology, but the bottom line is,
16 regardless of how he implements that methodology,
17 in your view individual inquiries are necessary.
18 And, therefore, no conjoint type of analysis could
19 yield some method of common proof?
20   A I think I would agree with how you
21 stated it, yes.
22   Q I don't think we've talked about
23 this yet. Are you familiar with the survey
24 methodology contingent valuation?
25   A Yes.

Page 68

1   Q What is that?
2   A I think, you know, it's just another
3 sort of survey technique. You know, I view
4 contingent valuation of more just sort of asking
5 people what they would pay as a price versus trying
6 to tease out with a conjoint analysis through a
7 series of questions how they might value an
8 attribute. I'm sure that's not the formal answer,
9 but that's how I think about it.
10   Q Fair enough. And would it be fair
11 to say that you don't believe a contingent
12 valuation could be employed in this case to
13 determine classwide damages on a common proof
14 basis?
15   A Yes, so I would -- yes, I would
16 agree with that. Maybe just expanding on the
17 answer a little bit, 'cause a lot of these
18 techniques that we're talking about deal with sort
19 of willingness to pay as opposed to a
20 market-determined price difference, if that makes
21 sense. In other words, one way that I think about
22 it is -- I'm not sure where you're located, but I'm
23 down in Texas, and we get 30 straight days of a
24 hundred degree weather. And I'd be willing to pay
25 -- willing to pay, you know, five dollars for a

Page 69

1 bottle of water walking down the street, but I only
2 have to pay $1.25 because of competition and the
3 market environment and everything else. So the
4 point I'm trying to make is, if you asked me, I
5 might say, "Hey, I'm willing to pay five dollars
6 for that bottle of water," but I only have to pay
7 $1.25 when I go to the Circle K or the 7-Eleven.
8 And so that's the difference between willingness to
9 pay and market price or changes in price or changes
10 in willingness to pay.
11      And I'll put a punctuation point on this,
12 and then I'll stop. But market values to an
13 economist is determined by prices, and so these
14 techniques don't necessarily yield a price or a
15 change in price as opposed to a willingness to pay.
16 That's the issue, if that made sense.
17      Q   Are you familiar with treatment and
18 control experiments?
19      A   I'm not sure with the same
20 phraseology that you might have used, but, yes, I'm
21 familiar with control groups and those types of
22 phenomenon or techniques.
23      Q   And what do you understand to be the
24 nature of that technique?
25      A   And I'm not sure if we're talking

Page 70

1 about the same thing, but it's not uncommon in
2 survey techniques to have a control group and a
3 test group just to see what the differences are and
4 whether there's meaningfully different results.
5      Q   How would that differ from
6 contingent valuation?
7      A   You may or may not have a control
8 group I don't think necessarily. I mean, I think
9 it just depends, you know, on the procedures that
10 the surveyor wants to follow.
11      Q   And would it be fair to say that you
12 do not believe that a treatment and control group
13 type approach here would yield any classwide
14 determination of damages?
15      A   I mean, for all the reasons that
16 I've said before, unless -- unless there's
17 something in your question I'm missing or unless
18 there's a way you're going to tweak, you know, the
19 approach or something to take into account
20 something that would yield, you know, a claimed
21 price difference or price premium as opposed to
22 just a willingness to pay.
23      Q   Is there any type of methodology
24 that you could employ in your view in this case to
25 determine the price of the challenged product had

Page 71

1 the appropriate disclosures been made? So assuming
2 the veracity of plaintiffs' allegations --
3      A   Yeah.
4      Q   -- let's just take an example.
5 Let's suppose the plaintiffs' allegation is that no
6 matter what they say, the horsepower of the motor
7 is limited to 2.4. So let's take that. And is
8 there an analysis you could do to determine what
9 the price of the treadmills would have been had the
10 disclosure been made "when we say 3.5 horsepower,
11 you're really only going to get 2.4"?
12      A   Right. And I said this before, and
13 I think you understand this; but my prefacing
14 comment is, so now my ultimate opinion is the need
15 for individual inquiry as opposed to common proof.
16 I take your question to be put that off to the
17 side, and now we're just sort of doing this
18 analytical analysis of what are the price of
19 treadmills with 3.5 versus 2.4 horsepower motors
20 regardless of this issue of the need for individual
21 inquiry. So I'm putting that off to the side. So
22 I think that's the question you're asking me. And
23 I think I would default back to, you know, what I
24 talked about before is could you -- is there any
25 way either through a benchmarking approach or a

Page 72

1 before and after approach? I mean, those are --
2 what I told you before in terms of how you might do
3 it would sort of be the default positions to which
4 you would then try to do the analytics. So you
5 might look at -- you know, you might look at costs
6 of production. You might look at costs of input.
7 You might look at over time when there's a change
8 of an input cost does that result in the change in
9 the price of the output? 'Cause sometimes profit
10 margins can change as well, so it's not necessarily
11 a dollar-for-dollar push-through of a change in
12 costs. You might -- obviously, you need to take
13 into account not only the supply-side
14 characteristics, but the demand side. You know, is
15 there a demand for the 3.5 over the 2.4? Or once a
16 consumer understands that a 3.5 is the same as a
17 2.4, and when they get on the treadmill the speed
18 is the same and everything else is the same, it may
19 not have an impact on the price once they realize
20 that the capabilities and the output are the same,
21 if that's what you're asking me to assume. So to
22 the extent that people are buying the benefits that
23 flow from a particular product, then it may not
24 have an impact at all. So that's why you've got to
25 look, you know, at supply-side factors and

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 73

1  demand-side factors. So those are the things I
2  think about. I haven't done that separate study,
3  but those are the types of things that you would
4  think about.
5      Q   You're not offering any opinion, nor
6  do you intend to offer an opinion, as to what the
7  price of the treadmills would be had what plaintiff
8  alleges appropriate disclosures been made?
9      A   I don't think I've done -- that
10 analysis is not in my report. I haven't been asked
11 to do that analysis. But I've just tried to give
12 some guidance. You know, if I was asked, I'd give
13 the same guidance, the same answer as I gave to you
14 that -- you know, my prior answer had a lot of
15 different things that you'd consider, but I have
16 not done that analysis.
17     Q   As you sit here today, do you
18 believe that there would be any change in the price
19 of the treadmills had what plaintiff alleges to be
20 the appropriate disclosures been made?
21     A   So I haven't done that analysis, but
22 to the extent that consumers look to the
23 performance of the treadmills and may not fully
24 understand what does 3.5 mean versus 3.0 versus
25 2.6, but if there was a certain treadmill that had

Page 74

1  a certain performance level, that goes into the
2  price of the treadmill. So I don't think you're
3  telling me the performance level's changing at all.
4  The treadmill is what it is. They're getting the
5  exact same treadmill. It's just that instead of
6  saying 3.5, it might say 2.4. But if the
7  performance is identical, that's what people are
8  paying for, and so I would be very, very careful in
9  the analysis to take that into account. I've
10 reached no determination. I haven't done that
11 study. But I'm at least letting you know the pause
12 I would have or at least an area of inquiry that I
13 would be thinking about from an economic
14 perspective in the sense that the product would be
15 identical to what they're getting at the existing
16 price they paid for it.
17     Q   And based on that product's
18 identical, it's just the consumer finds out it's
19 not 3.5, it's 2.4, as you sit here today in your
20 opinion you don't believe there would be any price
21 change based on that disclosure?
22     A   Yeah, I -- no, actually I said
23 something a little bit more specific. I said I
24 haven't done that analysis, so I'm not going to sit
25 here and say one way or another. But I can answer

Page 75

1  probabilistically that as an economist the flow of
2  services from the treadmill that we're talking
3  about is the same. So, probabilistically, if I did
4  the analysis and I got a different result, I'd
5  really want to understand why because my a priori
6  expectation would be that the flow of services are
7  the same, and so I would wonder why you are getting
8  a difference. But I want to be a little careful,
9  too, because I didn't give you all of the
10 determinants of that because you'd also have to
11 look at competition in the marketplace and
12 everything else. So that's why I'm saying I
13 haven't done that study. But if everybody's had
14 the same effect, you know, again, probabilistically
15 -- or if everybody's had the same relabeling of
16 their horsepower motor, again, that would move the
17 needle towards the likelihood the price would not
18 be different.
19     Q   You haven't performed any analysis
20 to determine if any consumers would not have
21 purchased the challenged treadmills had appropriate
22 disclosures been made; correct?
23     A   I have not done an analysis -- I'm
24 sorry. I just need your -- so alleged appropriate
25 disclosures, but I need a little bit more

Page 76

1  specificity on your question. Maybe just say it
2  again. There's a reason why I'm hesitating a
3  little bit. I just need the question again.
4      Q   You haven't performed any analysis
5  to determine if any consumers would not have
6  purchased the challenged treadmills if appropriate
7  disclosures from plaintiff's perspective had been
8  made?
9      A   I have not done that analysis, no.
10     Q   Similarly, you have not done any
11 analysis to determine whether fewer units of the
12 challenged treadmills -- or how many fewer units of
13 the challenged treadmills might have been sold if
14 appropriate disclosures from the plaintiffs'
15 perspective had been made?
16     A   Those -- your two questions are
17 close cousins.
18     Q   Right.
19     A   So, yeah, I have not done that
20 analysis. But, you know, again, that all goes to
21 the individual inquiry issue, too.
22     Q   Have you performed any analysis or
23 conducted any research as to how Sole would behave
24 in the marketplace if demand for the challenged
25 products decreased by let's say 30 percent?

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 77

1    A   I'm missing -- have I done any
2 analysis of that?
3    Q   Right.
4    A   I mean, I've looked at the sales
5 patterns over time.  And, obviously, you know, with
6 the COVID-19 pandemic, I mean, sales have increased
7 substantially.  You know, I think they've like
8 doubled or tripled.  So we know that they other
9 than the China tariff -- they've increased
10 production, and except for the tariff, you know,
11 prices have remained constant.  I would note that
12 if you took that -- you know, if you went back a
13 year, there was less production, less sales, less
14 demand.  You know, prices were, you know, clustered
15 around that 1,499 level, although with some
16 variability depending on the seasonality and so
17 forth.  So if as an economist I wanted to make some
18 predictive statements, I would look to what I was
19 just talking about.  But I think we see nuggets of
20 good information there just given, you know, what's
21 happened with the pandemic.
22    Q   How would you go about determining,
23 if you could, what effect let's say a 30 percent
24 decrease in demand for the challenged product would
25 have on Sole's behavior in the marketplace?

Page 78

1    A   It's a little bit easier if I can
2 just talk generally about kind of the hypothetical.
3 But if, you know, price -- let's take it this way.
4 Some tenants of microeconomics, and within
5 microeconomics there's the theory of the firm and
6 theory of consumer behavior.  Theory of the firm is
7 the supply side of the market.  Theory of consumer
8 behavior is the demand side of the market.  So if
9 there's a decrease in demand for a particular
10 product in the marketplace, there could be downward
11 pressure on price, except that not only do firms
12 have to maximize profits, but they have to make
13 what's called a normal rate of return.  Now, what
14 does that mean?  When a firm makes a normal rate of
15 return, that's the proper return that will keep the
16 resources in a particular market.  If you don't
17 make a return to keep the resources in a particular
18 productive activity, firms exit the market, and
19 that has price effects as well.  So there's
20 long-run and short-run effects.  But depending on
21 changes in demand, that could affect the
22 profitability of the product, and then you'd also
23 look at what's happening in the price effects and
24 as firms remaximize profits.  So it's --
25 unfortunately, I've just given a tutorial on a

Page 79

1 whole semester of microeconomics in two minutes
2 there, but those are all the things you need to
3 consider.
4    Q   To your knowledge, did Sole ever
5 sell its products below its cost?
6    A   I might have to put more of a
7 description on it.  But I know that there's either
8 returned products or allegedly damaged products or
9 products with damaged packaging that got sold at
10 relatively low prices.  So that has happened, but
11 those would be under those unique circumstances.
12    Q   Do you know whether any of those
13 sales were below cost?
14    A   Well, I think I've seen some data
15 where some of them were sold for like $300.  And I
16 can't tell you exact cost of production, but I'm
17 fairly confident the cost was greater than $300.
18    Q   And that data was provided to you by
19 Sole?
20    A   I think that was in -- if you look
21 at some of the spread sheets that were produced in
22 the case, I think occasionally you see some prices
23 that appear to be very different than -- where a
24 lot of units are sold, the prices that are very
25 different are on a limited number of sales.  And so

Page 80

1 I inquired about that as to what was going on, and
2 one of the explanations I got was that occasionally
3 when a treadmill is shipped to a customer the
4 package may be damaged and the customer, you know,
5 takes that as a bad sign and wants a replacement
6 product.  And so the original product is sent back,
7 and that's when -- that may be sold at a reduced
8 price.
9    Q   Do you know whether any retailers
10 have sold Sole treadmills below cost?
11    A   I don't know one way or another.
12    Q   Has Sole asked you to estimate what
13 its exposure might be if liability is established
14 in this case?
15    A   No.
16    Q   If Sole asked you to do that, how
17 would you go about doing it?
18    A   I think it might depend on the stage
19 of the case, but one measure of good exposure is,
20 you know, what is the -- you know, what are the
21 plaintiffs saying?  You know, if they ever do their
22 analysis and multiply things out, you know, there's
23 that number.  But then you could take a
24 probabilistic approach of, okay, what's the
25 probability of various outcomes?  So that's almost

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 81

1  more of a decision tree type approach.  I know I've
2  done such things in the past.  I don't remember
3  which cases, but occasionally I'm asked to do that.
4  Haven't been asked to do that here, but those are
5  the types of things that you could do.  You could
6  even make a matrix, you know, where you have
7  various changes in prices and various units and so
8  forth.
9      Q    All right.  Let's switch topics.
10         Does what a consumer believes about Sole
11  treadmills' horsepower claims change what they pay
12  for the product at retail?
13      A    It depends.
14      Q    Would you agree with me that
15  generally consumers cannot negotiate prices for
16  consumer products in retail outlets?
17      A    Actually, I have to put an asterisk
18  on that answer because it's not quite the same.
19  You don't go into Dick's and say, "Hey, it says
20  1,599, and I only want to pay, you know, 1,500."
21  But there are ways that consumers do effectively
22  negotiate.  Now, how do they effectively negotiate?
23  They wait for the product to be on sale.  They
24  don't buy today.  I'll come back.  I'll come back
25  in a month, or I'll check every couple of months,

Page 82

1  or I'll wait till the Friday after Thanksgiving.
2  Or, you know, they usually have a sale around
3  Christmas, so I'll wait till then.  Or I'll sign up
4  for their rewards program, and I get $50 off or I
5  get 1,500 points.  So that gives me a different
6  price.  So they don't go in to negotiate, but
7  consumers effectively, you know, in a sense can
8  vote with their dollars by behaving in ways that
9  I've just suggested.  So it's not like, you know,
10  they're just always stuck with that price.
11      Q    But apart from promotions and
12  discounts which may be there from time to time, for
13  the most part places like Dick's give you a
14  take-it-or-leave-it price; right?
15      A    I think I would agree with that.  I
16  don't know that's quite true on the Sole website,
17  but, yes, I'm not -- generally speaking, you don't
18  walk into a retail store and tell 'em, "Hey, I'll
19  buy it.  Give me ten percent off" or something.
20      Q    And any coupons or rebates, those
21  would come off of the shelf price or retail price?
22      A    So a -- I want to say yes.  I want
23  to make sure I have your question.  So when I walk
24  into Dick's and it says 1,599, if it's Cyber Monday
25  or Black Friday, it might be a hundred dollars off

Page 83

1  of that price.
2      Q    Right.
3      A    Just to make sure where we're
4  speaking.  Whereas, the loyalty points and the
5  reward dollars would come off of a future purchase,
6  but you would be saying to yourself, "Hey, I'm
7  actually getting it for $50 less because they're
8  giving me a $50 store credit on another item."
9      Q    And, generally speaking -- and I
10  think we've already nailed this down -- you can't
11  go into Dick's and negotiate 'em down from the
12  1,599.99 apart from score card points or Cyber
13  whatever deals?
14      A    I'm going to say I agree with you
15  for like 99.9 percent of the occurrences.  Once in
16  a while, because I've even done this, where you
17  walk in and you say, "Hey, it's scratched," you
18  know, or you're getting rid of a floor model and
19  you might be able to strike a one-off deal, but
20  that is not a general occurrence.
21      Q    And I want you to assume, 'cause you
22  may not remember, but let's assume that a Sole F85
23  has a higher horsepower than a Sole F80.
24      A    Okay.
25      Q    All right.  Which it, in fact, does.

Page 84

1  And let's say you have a consumer who has an
2  affinity for higher horsepower treadmills like the
3  F85.  That consumer who has a preference or
4  affinity for higher horsepower pays the same amount
5  for the F85 as someone who doesn't have that
6  affinity or preference; correct?
7      A    I'm staying within the construct of
8  your hypothetical, but, yes.
9      Q    Basically the guy who cares about
10  the higher horsepower treadmills can't negotiate
11  his own price?  And that would be the same with the
12  guy who cares about it or the guy who doesn't care
13  about it, they all pay the same market price?
14      A    I think I would agree with you.  I'm
15  getting confused by the question a little bit
16  because who would be negotiating a higher price
17  versus a lower price?
18      Q    Regardless of whether you want a
19  higher horsepower or not a higher horsepower,
20  you're all going to pay the market price?
21      A    You will pay the price, although
22  consumers and the market are -- you know, to an
23  economist are marvelous things in the sense that if
24  for some reason you think the -- you don't have an
25  affinity for the 3.5, but you like the rest of the

Deposition of Keith Raymond Ugone, Ph.D.          Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 85

1  machine and you think the price is a little too
2  high, you can just wait until it's on sale. You
3  can wait to get the hundred dollars off.
4      Q    Generally speaking, individuals,
5  consumers can choose to pay the price that's being
6  offered for it that's on the shelf or choose not to
7  buy it; right?
8      A    Yeah. Sometimes when you're
9  speaking generally, I don't know if you mean not
10 buy at all or go to an alternative product. That's
11 sometimes why I hesitate. So I'm not sure which
12 direction you're going. But for a particular
13 product, it is always true that the willingness to
14 buy or your willingness to spend has to be greater
15 than or equal to the market price. Otherwise you
16 don't buy. If your willingness to spend is below
17 the market price, that's when you don't buy. So it
18 is always true that you will buy when the
19 willingness to buy is greater than the market price
20 or equal to the market price.
21     Q    And if a customer paid $2,200 --
22 let's take a more realistic number. 2,399. If a
23 customer paid 2,399 for a treadmill from a
24 particular store on a particular day, but could
25 have paid 1,999 for the same treadmill on that same

Page 86

1  day, wouldn't the customer be better off paying
2  1,999 than 2,399?
3      A    Yeah, it is always true. So I'm not
4  going to debate this or disagree with you, I guess.
5  It is always true that, yeah, you would always
6  prefer to buy it -- assuming everything else is
7  held constant and there's no quality differences,
8  you know, there aren't any differences of
9  availability or when it gets shipped to you, you
10 know, because there's always complexities; but
11 holding everything in the world constant, yes,
12 consumers would prefer lower prices rather than
13 higher prices.
14     Q    You talked a little bit earlier
15 about product differentiation.
16     A    Yes.
17     Q    And can you explain again what do
18 you mean by product differentiation?
19     A    Yeah, maybe the easiest way to give
20 it is through an example. So you could think of
21 two different farmers, and both farmers produce
22 wheat. And you take the wheat from one farmer, put
23 it in a bucket. You take the wheat from another
24 farmer, put it in a bucket. You know, you can
25 switch the buckets around, and you won't know which

Page 87

1  farmer the wheat came from. And the likelihoods
2  are that the prices for that wheat are going to
3  converge to the same price. You're not going to
4  see -- holding everything else constant, you're not
5  going to see difference in prices there. Well,
6  firms want to compete, and so now instead of
7  talking about wheat let's talk about treadmills.
8  And so I want you to buy my treadmill, you know,
9  more than the other guy's treadmill. And so you
10 may have attributes in your product that make your
11 product a little bit different than the other guy's
12 treadmill or their product. So that's what we mean
13 by product differentiation. Is there something
14 that will differentiate your product from the
15 competitive product that increases the probability
16 that the consumer will desire, demand or buy your
17 product over the competitor's product?
18     Q    So companies may engage in product
19 differentiation to either sell more product or sell
20 it at a higher price?
21     A    There could be price effects or,
22 frankly, the price effects could go either
23 direction. Could go a higher price or a lower
24 price, depending on the differentiation. I mean,
25 so the easiest way to think about it is, you know,

Page 88

1  we talk about the quality of different items.
2  That's not necessarily bad because not everybody
3  wants to buy the highest quality item. Some people
4  -- you know, there's premium products. There's the
5  regular products. And I think sometimes there's a
6  euphemism of value products, but those might be,
7  you know, the I hate to say lesser quality products
8  because people will want to pay a lower price for
9  those, but that is what they want. But, yes, I
10 mean, the differentiation can go in a lot of
11 different directions.
12     Q    Would you agree that one way for a
13 treadmill producer to differentiate its product
14 would be with regard to horsepower?
15     A    That either could be a way to
16 differentiate -- and the part that I can't speak to
17 -- or there may be a reason why certain treadmills
18 their design has a higher horsepower than other
19 treadmills. And at this point it's now getting
20 into the engineering side that I don't know, but it
21 may be that bigger treadmills require more
22 horsepower than smaller treadmills. I don't know.
23 But there could be a way to differentiate where
24 everything else is the same, but you have a
25 different horsepower, or it could be in your

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 89

1  differentiating process that it may require higher
2  horsepower. I just don't know the answer to that
3  latter point.
4      Q   And all other things being equal,
5  you'd agree that there's a difference between a
6  treadmill that makes a higher horsepower claim than
7  one that doesn't?
8      A   From a --
9      Q   From a product differentiation
10 standpoint.
11     A   Yeah, I was going to say it's almost
12 tautological. Yes, one -- you know, tautologically
13 and physically, yes, one has a 3.5 horsepower
14 motor, the other has a 3.0. So there's a
15 difference. Now, my hesitation was the perceptions
16 of consumers, the benefits that flow from it, the
17 performance of the treadmill. I'm putting that all
18 off to the side. But physically and
19 technologically, yes, that's a tautological
20 statement.
21     Q   I'm good with tautological
22 statements.
23         Doctor, it's 12:16. Do you want to take
24 a break now? We've been going about an hour.
25     A   Yeah, that's great. About every

Page 90

1  hour I like that. So appreciate it.
2      Q   Do you want to take a lunch break
3  now for maybe a half an hour, or do you want to
4  just take a short break? Either is fine by me.
5      A   You're on the East Coast, I take it?
6  Is that where you are?
7      Q   Yes. But it's up to you. I don't
8  think I'm going to be eating anything, so --
9      A   How about if we take a five- or
10 ten-minute break, come back for maybe, yeah,
11 another hour session, and then we'll take our lunch
12 break then, if that works for you.
13     Q   That's fine.
14         (Whereupon, a recess was taken.)
15     Q   Dr. Ugone, you would agree that the
16 claimed damages in this case is the difference
17 between what consumers paid for the challenged
18 treadmills as they actually existed during the
19 class periods and what consumers would have paid in
20 a but-for world where what we believe to be proper
21 horsepower disclosures were made?
22     A   I believe I agreed that it would be
23 -- to the extent that, yes, the damages are a
24 claimed price premium measure of damages, I agree
25 with you, yes.

Page 91

1      Q   Different topic. In writing your
2  report, were you given any assumptions on which to
3  rely?
4      A   I don't remember being given any
5  assumptions, no, I don't think so.
6      Q   Did you rely on any assumptions in
7  reaching your opinions?
8      A   I'm trying to figure out how far
9  you're taking that, but I'm assuming, for example,
10 when I got information as to sales or what's been
11 produced in discovery that that was accurate
12 information. That was an assumption.
13     Q   Okay. We may go into this in a
14 little more detail later, but did you make any
15 assumptions with regard to liability in this case?
16     A   I don't think I -- it's sort of an
17 open question. Regardless of whether there's
18 liability or not, you know, the question is -- that
19 I was trying to evaluate is have the plaintiff
20 experts, Mr. Gaskin and Mr. Weir, you know,
21 proposed reliable methodology for evaluating
22 classwide damages using common proof? And, you
23 know, I didn't need to -- I don't think I needed to
24 make any liability assumptions associated with
25 that. And then my investigation as to whether I

Page 92

1  felt whether individual inquiry would be required
2  to analyze that concept, I don't think I had to
3  make any assumptions. It's not like in other
4  cases. Sometimes in other cases you assume
5  liability, or you never get to the damages
6  question. Here it's a slightly different question
7  that's being asked.
8      Q   In making your -- giving your
9  opinions with regard to damages, did you assume
10 that plaintiffs could prove liability?
11     A   I'm assuming there's a dispute, and
12 that the plaintiffs view that they have a valid
13 case, and that's what they're going to try to set
14 out to do, yes. But, again, I don't know that I --
15 I view this class certification stage a little bit
16 different than if you're, you know, in a merits
17 phase. I don't know if that explains it or not,
18 but, I mean, I don't know whether you can prove it
19 or not. The question is -- you know, is does the
20 difference you're talking about has that created a
21 price effect?
22     Q   Trust me. We got this on liability,
23 so we can just -- Thomas may disagree. I don't
24 know.
25         With regard to the Gaskin survey, if I

Deposition of Keith Raymond Ugone, Ph.D.      Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 93

1 understand it, one of your opinions is that his
2 post survey would be a measure of willingness to
3 pay?
4     A   Correct.  Yes.  And before I kind of
5 said "willingness to buy" a couple of times.  I
6 just was using those interchangeably, but
7 willingness to pay is a better thing to say, yes.
8     Q   And would that be -- is it your
9 understanding that his survey would give you a
10 calculation of an individual willingness to pay?
11     A   No.  I think he's coming up -- I
12 think it ultimately will yield sort of an average
13 -- an average willingness to pay across all the
14 consumers from -- as dictated by his survey
15 results.
16     Q   And how do you define the term
17 "willingness to pay" generally so we're on the same
18 wave length?
19     A   I'm trying to put this in a layman's
20 way to think about it, but if you might have demand
21 for a particular product that has a set of
22 attributes.  And where it's a little bit harder,
23 when you're talking about the demand for a product,
24 you're talking about, you know, a whole bunch of
25 different prices and a whole bunch of different

Page 94

1 quantities demanded.  In other words, how much
2 would be demanded at each of those prices.  But
3 when you talk about demand, that's giving you the
4 entire schedule.  It's not just one price and one
5 quantity demanded.  So that makes it a little
6 confusing.  But you might think of demand for
7 product A, and then you might think of demand for
8 product A primed, where A primed is the same as A,
9 except for one attribute.  And let's just say the
10 demand for product A primed, so minus an attribute,
11 is less than the demand for product A.  Generally
12 when you're talking about willingness to pay,
13 you're talking about that willingness to pay that
14 difference between the demand curves.  Now, that's
15 not a difference in market price 'cause you don't
16 have supply in there 'cause you need supply and
17 demand to interact to determine the market price.
18 So when you're looking at differences in
19 willingness to pay, that's sort of the difference
20 in the demand curves for the two products.
21     Maybe an easy way to say it is, you know,
22 like I said before, you know, that, you know, under
23 one set of circumstances people might be willing to
24 pay five dollars for a bottle of water.  Under
25 another set of circumstances the demand is such

Page 95

1 that they might be willing to pay four dollars.
2 But, again, that's a willingness to pay.  That's
3 not a market-determined price.
4     Q   Using Mr. Gaskin's survey results,
5 could you calculate an individual's willingness to
6 pay?
7     A   I think in the deep down inside of
8 his results he might have that because there's --
9 he'll have a number of survey participants that are
10 ultimately being aggregated together for his final
11 number, but he has the individual results.  So I
12 don't know if he would report that, but he probably
13 could do some sort of calculation to figure that
14 out.
15     Q   Switching topics.  Do you believe
16 that a product can be produced for a cost of X and
17 have a market value that's less than X?
18     A   Yes.  And that's -- in the long run,
19 that's when that product isn't produced anymore.
20     Q   And how does that generally happen?
21     A   Which part of it?  Companies go out
22 of business.
23     Q   I mean, how does that generally
24 happen that you have a product that's produced for
25 X and it's sold or has a market value of less than

Page 96

1 X?
2     A   I mean, if you think about it,
3 there's cost of production.  And so there's the
4 price of labor, there's the price of capital,
5 there's the price of raw materials.  And then the
6 existing level of technology is how you combine
7 your inputs to get output.  So basically from the
8 firm side you have technology, you have the labor,
9 you have the capital, and you have the raw
10 materials in a very simple way of talking about it.
11 And it could just be -- who knows? -- the price of
12 labor is too high to put the product together
13 relative to what people will spend for the product.
14 Or, you know, the price of, you know, whatever an
15 input, steel or the price of aluminum or, you know,
16 if you're having implants put in your mouth for a
17 tooth, the price of the titanium screw is too high.
18 It could just be then the cost of making the
19 product.  Unless there's future technological
20 changes, the price of making the product is higher
21 than what people want to spend to buy that product.
22     Q   Let's picture a typical graph of
23 supply and demand, and such graph usually reflects
24 the downward sloping demand curve and upward
25 sloping supply curve and winds up looking like an

Deposition of Keith Raymond Ugone, Ph.D.      Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 97

1  X?

2  A   Yes.  So to everybody, except to
3  somebody taking an economics class, it just looks
4  like an X, but there's some very important
5  implications of that X.

6  Q   All right.  And on a typical graph
7  of a supply curve, what does a Y axis represent?

8  A   Well, you have the vertical axis and
9  the horizontal axis.  So on the vertical axis,
10  which I'm taking to be your Y axis, would be the
11  price -- the potential prices of the product.  The
12  horizontal axis would represent quantity supplied.

13  Q   When you talk about supply-side
14  considerations, which comes up in your report, does
15  the, quote, unquote, "willing seller" have to be
16  the manufacturer of the good whose market value
17  you're trying to determine?

18  A   The -- there's the ultimate supply
19  curve and demand curves for the final product
20  that's purchased by final consumers.  And then if
21  you think about it, there can be stages of
22  production.  So it's not uncommon that you have a
23  manufacturer.  You might even have a wholesaler or
24  distributor.  You might even have then the final
25  retail outlet.  So all of that goes into, you know,

Page 98

1  kind of the final supply curve, but you can have
2  stages of production.  I'll stop there.

3  Q   In this case would the supply side
4  consideration include Sole itself based on its
5  internet sales as well as, let's say, Dick's?

6  A   Yeah, they're both competing for the
7  final -- to the final consumer and --

8  Q   They both fall in that seller
9  category?

10  A   I want to make sure I'm staying up
11  with the question you're asking.  But, yes, both
12  Sole and Dick's sell to final consumers, yes.

13  Q   Have you done anything to determine
14  the relevant supply curve at issue in this case?

15  A   I haven't estimated the supply
16  curve, if that's what you're asking.  No, I have
17  not.

18  Q   How would you do it?

19  A   Well, I think the one thing you take
20  into account when you're talking about supply,
21  that's heavily dependent on cost of production.
22  And so you look at, you know, raw material input
23  costs or just, you know, if they acquire -- you
24  know, what's the acquisition price of the motors
25  that they put in the treadmills, those types of

Page 99

1  things.  Or it could be that the treadmills are
2  actually, you know, contracted out, and so a
3  company could buy, you know, a product and have it
4  rebranded.  So there's a lot of different things.
5  But basically you'd kind of look at -- essentially
6  you put a heavy weight on cost of production.

7  Q   How would you determine Sole's price
8  elasticity of supply?

9  A   So there's -- just for the record,
10  when you're talking about elasticities, or here
11  you're talking about the price elasticity of
12  supply, you're talking about the responsiveness or
13  sensitivity of quantities supplied to a change in
14  price.  In other words, if price were to change --
15  if you're talking about a market supply curve, the
16  question would be if the price of the product were
17  to change, how much would suppliers in aggregate
18  respond?  So let me say one more thing.  When we
19  talk about the concept of supply, that's kind of a
20  qualitative concept.  In other words, generally
21  speaking, as the price goes up, the quantity supply
22  increases.  If the price decreases, the quantity
23  supply decreases.  Those are qualitative
24  statements.  When you talk about elasticity, then
25  that starts to be quantitative.  If price goes up,

Page 100

1  how much does quantity supply increase?  If price
2  goes down, how much does quantity supply decrease?
3  It gets a little bit more complicated 'cause you're
4  talking about relative percentage changes within
5  elasticity where you compare the percentage change
6  in price to the percentage change in quantity
7  supplied.  But the elasticity is quantitative,
8  supply is more qualitative is one way I think about
9  it.

10  Q   And I'm not sure, but I thought my
11  question was could you determine Sole's price
12  elasticity of supply?

13  A   You -- at least maybe along a
14  relative range, or you might figure out how they
15  might respond in terms of production to a change in
16  price or a change in input cost or those sort of
17  things.  So I'm not saying those are easy things to
18  do, but that's how you would do it.

19  Q   And what --

20  A   And where -- I'm sorry.  Where you'd
21  start is, you know, I would start by looking at,
22  you know, cost of production.

23  Q   And would that be the same for the
24  price elasticity of supply of treadmills generally
25  you look pretty much at the cost of production

Deposition of Keith Raymond Ugone, Ph.D.        Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 101

predominantly?

A   Yeah, the -- this is again where it gets more complicated, and we could spend weeks on this. But, yeah, you'd look at the marginal cost of production, and the supply curve of the firm is the marginal cost of production above the average variable cost curve. And you sum those across firms to get the market supply curve. So it's very closely related to marginal cost of production, yes.

Q   Appreciate the shorter response. I don't have weeks.

Do you have any idea what Sole's typical profit margin is on a treadmill?

A   No. No. All I know is that there was the discussion that their profit margins, you know, were being squeezed with the tariffs on the products from China. And their way to -- you know, to help with that phenomenon was to raise the prices by a hundred dollars, roughly speaking, of the treadmills.

Q   And we both I think used the term before "but-for world." And just to make sure, can you define that term as you understand it so we have a common understanding?

Page 102

A   Sure. So when we talk about "but-for" -- and I'll give a couple of different explanations so we can converge. But the but-for world -- this is going to sound strange to somebody that's not in litigation, but the but-for world is a world that didn't exist. The but-for world is usually described as what the world would look like in the absence of the alleged wrongful conduct. So the but-for -- sometimes you talk about a but-for reconstruction. In other words, for example, what would the market look like with this one change. But generally in an environment that we're talking about, it has to do with what would the world have looked like in the absence of the alleged wrongful conduct.

Q   And I understand that you may take issue with his methods, but do you believe that Mr. Gaskins' proposed methodology is an attempt by him to measure the change in market value of the challenged products in a but-for world?

A   Well, let's take it in baby steps if we can. I don't disagree with he's contemplating a but-for world. In other words, he's saying if we take the actual world and we make this one change, and that change has to do with -- I understand the

Page 103

claims about the -- the horsepower claims on the motors. So I think that's a foundational point is what he's trying to do. So I do agree with the concept he's trying to look at the but-for world. So no arguments there.

Q   Would you agree that the damage analysis -- if you were going to do a classwide damage analysis in this case, it has to be or involve a but-for world?

A   I think so. I think I would agree with that. I was giving a long answer, so I agree he's looking at the but-for world. And as you know, I have a disagreement with him as to how he would implement that, so I just wanted to complete that part of the answer.

Q   Sure. What things would be different in the but-for world in this case as opposed to the real world? I know, obviously, one difference would be the change in the horsepower claim, but is there anything else that would be different?

A   Well, I think my understanding is that plaintiffs are making certain allegations about representations dealing with horsepower. And if we can just broadly stay with that. Plaintiffs

Page 104

are also claiming a price premium damages approach. My understanding of plaintiffs' theory would be that if allegedly accurate information had been presented to consumers as opposed to the actual challenged claim, that consumers would have paid less. So if you're trying to isolate that, I think your question was what else would be different in the but-for world. But given my understanding of what's being claimed as damages -- and I'm not an attorney, but given my understanding of how the law might want -- allow one to get to price premium damages, I think that would be the only change to try to isolate what that alleged price premium would be. Hopefully I answered the question, but that's my understanding. So it should have been a short, yes, that the change is the information provided about the attributed dispute.

Q   And so the attributed dispute being horsepower, and in the but-for world the price might change as well?

A   Well, that would be something that would have to be analyzed, and so here's where you have to be careful. There's a couple of different ways to look at this. One is to realize that the description of the attribute might be different,

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 105

1  but it's actually holding the product the same. In
2  other words, the product's the same. It's just the
3  description of whatever the dispute is here about
4  how horsepower information is communicated. So
5  that's the only difference. Now, where you have to
6  be very, very careful -- and I don't think anybody
7  wants to go in this direction -- but if price were
8  to go down, it could be that there's incentives to
9  make other changes to the treadmills. But that
10 becomes much more complicated, but we're not going
11 in that direction. So I think what I would say is
12 you got the exact same treadmill. Description's a
13 little bit different. And then the area of inquiry
14 is does the price change at all. But that becomes
15 an empirical question. You asked me what changed.
16 For me it's just the information flow. And then
17 it's an empirical question as to whether the price
18 will change.
19        Q    So in the but-for world, would you
20 not be looking at whether features change or the
21 defendant sells fewer treadmills or whether it
22 repurposes its facilities to make different
23 treadmills? None of that you would be looking at
24 in the but-for world if you were analyzing it in
25 this case?

Page 106

1        A    I mean, that could -- that could
2  happen. It would make the analysis very, very
3  complicated. That's what I tried to say. I mean,
4  if you really think about it, you know, very rarely
5  do companies just sort of change along one
6  dimension. They may change along a number of
7  different dimensions. But I think the exercise
8  here would try to keep things as constant as
9  possible, except for the information flow revolving
10 around the description of the horsepower of the
11 motor and how that's described to the consumer.
12 But other than what impact they may have, my first
13 inclination would be to say, hey, in this
14 description of the but-for world the product's the
15 same, and people are getting the same flow of
16 benefits. This has to be -- this is why you have
17 to make sure that the analysis is correct. It's
18 not like the quality of the product is changing.
19 It's not like the performance of the product is
20 changing. The product is identical. It's just
21 that there's a description of what feature that's
22 different.
23        Q    So for analysis of the but-for world
24 in this case in terms of damages, would you say
25 that you would hold constant everything except the

Page 107

1  description? Assume it's the same product. The
2  description varies. But you're holding constant
3  the number of treadmills they manufacture, you
4  know, whether they add more features or change
5  their advertising. All that is being held
6  constant, and you're just changing the description;
7  is that correct?
8        A    No, I -- no. Because there's kind of
9  first order and second order things. So if it
10 turns out that because the performance of the
11 treadmill and the quality of the treadmill is the
12 same, you know, whether you describe the horsepower
13 as A versus B may not affect the demand curve since
14 the flow of services are the same. If that doesn't
15 affect the demand curve, and if there's no change
16 in the supply curve, then the price hasn't changed,
17 and the quantity hasn't changed. But if the demand
18 curve were to change, if the demand curve were to
19 decrease or shift down, then the price would
20 decrease, and there would be -- in a new market
21 equilibrium there would have been a different price
22 and quantity. That doesn't mean you still can't do
23 what you can do, but I'm not -- I want to be
24 careful that, you know, we just described the
25 mechanism a little bit more precisely than the way

Page 108

1  you were phrasing it.
2        Q    Have you ever seen a American
3  business draw its own supply curve before making a
4  decision to produce a product?
5        A    I think they do that every day of
6  their lives. The interesting thing about economics
7  -- and this is the hard part to understand - is
8  that we can be talking theory, and I can go in to
9  teach a class and talk about all different theories
10 like a consumer -- you know, when you talk about
11 the theory of consumer, you talk about maximizing
12 utilities subject to your budget constraint. Well,
13 I may think that way when I go into a grocery store
14 and I buy something, okay, this will up my utility,
15 because I'm an economist. But consumers don't
16 necessarily know all the theory, but they behave as
17 if they know those theories. In other words, you
18 buy products that give you the most satisfaction.
19 You don't walk around saying, "Hey, I maximized my
20 utility today." But, hopefully, when you spend
21 your income, you were getting the greatest
22 satisfaction out of that. It's the same thing with
23 firms. They may not draw the supply curve, but
24 they clearly -- I mean, this is what the whole
25 financial statements are about. They look at their

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 109

costs of production. They look at their revenues.
They look at prices that can be charged. So they
may not put it in the classroom setting of supply
and demand curves and elasticities and everything
else, but they behave as if they're doing those
concepts. So I would say companies look at those
concepts all the time.

Q    For the purposes of calculating
damages in this case, would you agree that the
number of challenged treadmills purchased by the
proposed class members is fixed as a matter of
history?

A    I would say that -- I would say you
have to be very careful with that statement. The
number of treadmills that were transacted in the
marketplace is a known quantity. I'm not
disagreeing with that. I think that there's some
plaintiff experts that take that to the extreme and
draw some incorrect conclusions. Nobody is saying
that that number is different, that the number of
actual treadmills sold is somehow different than
was actually sold. That does not mean, however,
that every one of those represents a damaged
purchase.

Q    Do you think that the supply -- if

Page 110

you were going to figure out the supply for the
purposes of determining damages in this case, as
you indicated you have to consider supply-side
considerations, would that be anything other than
the historical number of units sold in your view?

A    Yes, because when you talk about
supply, you talk about all the different prices and
all the different quantities supplied along a
supply curve. You're not just talking about one
point. There can be one point on a supply curve
where you have a given price and the corresponding
quantity supplied, but that's not what supply is.
Supply is all the different prices and all the
different quantities supplied that make your supply
relationship between price and quantity supplied.
That's what we're talking about when we talk about
the concept of supply. So there's a supply curve
that tells you that relationship, and then when you
interact demand with supply that tells you where
you are along that supply curve.

Q    Have you calculated the supply curve
for the challenged treadmills in the but-for world
here?

A    No.

Q    And how would you go about doing

Page 111

that?

A    Well, that's -- that's where just
like, you know, there's techniques -- you know,
even the conjoint analysis to try to figure out the
demand side of the market. You can look at and
take into account cost of production to try to
figure out how firms might respond to a change in
price.

Q    And then you mentioned cost of
production. Anything else to determine the supply
curve?

A    Well, you generally take into
account -- cost of production is the easy one. But
also, you know, opportunity cost and other
alternatives. In other words, sometimes companies
will not only look at the costs of making a
particular product, but you've always got to keep
an eye on, well, if I took my resources and put
them into something else, what could I make
somewhere else? Companies do that. That's when
they go out of business and they take their
resources and make a different product. So you've
got to, you know, look at your opportunity costs
and your costs of production. And the technology
tells you how you combine inputs to produce output,

Page 112

but all of that goes into the supply side.

Q    And what econometric tools, if any,
would you use to determine the supply curve?

A    You could try to figure out
elasticities of supply. So for small movements in
price, how might quantity supply change? So you
could look at that. Or, you know, you -- like I
said, you could see how your costs change as output
changes. That's -- when I was talking about
marginal costs before, that's what that concept is.
So if there's a change in price and if you were to
change output, you know, how would your costs
change relative to the change in revenue? And when
you look at a change in revenue relative to change
in costs, you know, what does it make sense to do
in terms of production? That's what companies, you
know, try to figure out.

Q    In your review of this case, have
you spoken to any consumers?

A    I have not spoken to consumers. I
have done a lot of looking at reviews, you know,
star ratings and so forth, but I haven't spoken to
any consumers.

Q    And let me give you a hypothetical.
You've got -- suppose you got 50,000 class

Deposition of Keith Raymond Ugone, Ph.D.        Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 113

1 treadmills, and let's suppose you're to do a supply
2 analysis and you determine to your satisfaction
3 that only 40,000 class treadmills would have been
4 supplied if Sole had disclosed the true horsepower
5 of those treadmills. What would be the appropriate
6 measure of economic loss for those 10,000
7 treadmills that would not have been sold?
8     A   Yeah, there's two ways to do it.
9 One is that the value of any product to an
10 economist is its market price. So you'd have a new
11 equilibrium market price, and so you could still
12 look at a price difference between what they paid
13 and what the price would have been in the absence
14 of the alleged misrepresentation. So you can still
15 take that price delta. What the damages is not, it
16 is not equal to the entire amount that they paid
17 for the treadmill. Because even though they may
18 not have bought it, they still got the flow of
19 services from the treadmill. So you can't just
20 say, oh, for all those other people we'll just take
21 the amount that they paid for the product because
22 they still got -- they still got the product, and
23 they still got the flow of services from the
24 product.
25     Q   You talked about some supply-side

Page 114

1 considerations. Would the disclosure of the true
2 horsepower in a but-for world affect the cost of
3 production?
4     A   To me that's a technical question.
5 My first response -- if you were to just say, "You
6 have zero information, tell me your best guess, and
7 then you can run off and study it," my first guess
8 would be, no, I don't think so because everything's
9 the same. You might have a labeling change, but
10 that's kind of a wash with the original labeling.
11 So my first inclination is to say, no, you know,
12 subject to analysis.
13     Q   Would the disclosure of the true
14 horsepower affect things like the cost of labor,
15 the cost of shipping?
16     A   I don't believe that there would be
17 a corresponding spillover effect to other input
18 costs unless -- you know, the only thing I'm going
19 to say is I'm not the mechanic. I'm not the
20 engineer. I don't know what spillover effects may
21 exist. But just at the first, you know,
22 inclination I'm giving you the answers that I can
23 give you. When I start to feel uncomfortable, I'll
24 let you know.
25     Q   And you have. That's fine.

Page 115

1     A   Yeah.
2     Q   As a matter of economics, do you
3 believe there's ever an occasion where a conjoint
4 analysis can be used to determine classwide
5 economic damages?
6     A   If you -- I think of it as a
7 spectrum and where the needle is on the spectrum;
8 and the more narrow some of the attributes of the
9 product, and the more narrow some of the
10 perceptions about the product, the greater the
11 probability that a conjoint analysis properly
12 modified can give guidance to an answer. But the
13 greater the dispersions you see, whether it's the
14 price variability or interpretation of the alleged
15 claim asserted, alleged misrepresented claim, then
16 it becomes harder for conjoint analysis to work.
17 But I will stick by the original position that
18 there needs to be modifications to the conjoint
19 analysis 'cause the conjoint analysis really is
20 just telling you about the demand side of the
21 market. It's not saying anything about the supply
22 side of the market. Even though I gave you this
23 description of the distribution around the
24 perceptions of the product and the interpretations,
25 even holding that constant, you've still got the

Page 116

1 problem that the conjoint analysis is a demand-side
2 analysis. It's not a market equilibrium price
3 analysis.
4     Q   Would you agree that you're not an
5 expert in conjoint analysis?
6     A   Yeah, I've always said I'm not your
7 survey person. So what -- I mean, I've done, you
8 know, 50 of these cases. I evaluate from an
9 economic and damage quantification perspective. A
10 conjoint analysis in terms of the inputs and the
11 outputs and the implications for damages, that I
12 absolutely am an expert in doing, and I've done it
13 on virtually every case. But I'm not what I would
14 call a survey expert in the sense that if you came
15 to me and said, "Hey, Doctor, I need a survey
16 done," well, I've got colleagues that specialize in
17 that area, and I direct you to them. But in terms
18 of what I'm doing in terms of economics and damages
19 and the application of the results of conjoint
20 analysis to that environment, absolutely, I'm an
21 expert.
22     Q   Have you designed and conducted
23 market research studies?
24     A   I haven't -- that's what I'm saying.
25 So I'm not the survey person, but I'm an economist,

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 117

1 and I'm well versed in the theory of -- like the
2 theory of consumer behavior.  And if there's one
3 thing an economist knows, that's demand for a
4 product and the inputs that go into a demand for a
5 product and why people buy products and studying
6 the determinants of demand.  So those are all areas
7 that are within my expertise, but I don't take that
8 next step and design a survey.  That's what I'm
9 saying.  I'd send you to my colleague for designing
10 a survey, but I clearly give inputs into here's
11 what you better look at when you're designing that
12 survey.
13     Q    But you've never designed yourself a
14 conjoint survey?
15     A    Not myself for all the reasons that
16 I've just said.
17     Q    Have you ever implemented or
18 executed a conjoint survey that someone else has
19 designed?
20     A    Same answer.
21     Q    It would be no?
22     A    Yeah, but for all the reasons.  I
23 mean, my area of specialization is a little
24 different.  I don't do the actual survey, but I
25 look at it from an economic perspective.  I know

Page 118

1 the determinants of demand.  I know when you've
2 missed the mark in your survey.  So I'm not going
3 to go out and write the question.  I'm not going to
4 go up to and ask you the question, but I'm
5 going to tell you, "Hey, your question's missing
6 all these determinants of demand."  Or if you get
7 an answer, I'm going to tell you why that's not a
8 price.  That's only a willingness to pay.
9     Q    And I'll help Susan with this later.
10 Have you run a hierarchical Bayes regression?
11     A    Yeah, the -- just in the sense of
12 reviewing, you know, what other people have done.
13 I understand that's one of the techniques -- that's
14 one of the procedures that's used to take into
15 account the full information from the survey
16 results, but, you know, I don't do that in a survey
17 technique because I'm not doing a survey.
18     Q    And other than in a survey
19 technique, have you ever run a hierarchical Bayes
20 regression?
21     A    You know, I might have done some
22 two-stage type regressions which get to be kind of
23 a close cousin.  But, you know, I don't run around
24 on a daily basis saying, "Okay, let me run a
25 hierarchial Bayesian regression today."

Page 119

1     Q    Not even on an annual basis?  Even a
2 decades basis?  Any basis?
3     A    Yeah, there's been times that I've
4 rerun, you know, the models that have been put
5 forth in cases.  So I have done that.
6     Q    So you've rerun somebody else's
7 regression.  Have you run any hierarchical Bayes
8 regressions that you've designed yourself?
9     A    Yeah, not for all the reasons that
10 I've said before.  You know, I look at it from an
11 economic perspective.  And I might be so bold as to
12 say, some of the other people they say that and
13 throw around some fancy terms, but they're letting
14 the program do the running.  They're not actually
15 designing these and running them.  They're not --
16 no matter what they try to do and put fancy words
17 in the report, they're not really doing that.
18 They're letting the program do it.
19     Q    So I shouldn't pay them as much as
20 I'm paying them?  Is that what you're saying?
21     A    Well, I'll let you decide that.
22     Q    Have you conducted yourself any
23 conjoint-based market simulations?
24     A    No.  I mean, all the answers are the
25 same that I've given you in terms of what I do.  So

Page 120

1 I approach things and I'm retained as a forensic
2 economist and damage quantifier.  So I'm not -- I'm
3 not critiquing, you know, the pure survey aspects,
4 nor do I run those surveys.  But I absolutely can
5 look at things like prices, determinants of demand
6 and either the inputs or the outputs.  I just don't
7 get into the, you know, mechanics of actually doing
8 the survey.
9     Q    And in this case you're critiquing
10 in part a proposed contract market simulation;
11 correct?
12     A    Sure.  Yes.  For all the reasons
13 that I've just said.
14     Q    And in approximately how many cases
15 have you done that?
16     A    Probably -- you know, I would say
17 out of the 40 or 50 cases I've worked on, I've got
18 to say at least three-quarters of them probably had
19 a conjoint analysis where I've done this exact same
20 analysis.  So I'm sure 40 different times I've
21 looked at that to the extent -- now, I don't mean
22 to take up your time.  But, you know, earlier we
23 talked about the different cases.  Sometimes people
24 propose an analysis.  Sometimes they do the
25 analysis.  Sometimes they sort of just say, "I can

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 121

1 do it," without really proposing even an analysis.
2 But it's not infrequent, if that makes sense, that
3 I see a conjoint analysis and evaluate it the same
4 way that I'm doing here.
5     Q    Have you taken any courses with
6 respect to conjoint analysis?
7     A    I've actually, you know, read books.
8 I've read what other experts. I've listened to
9 deposition transcripts. I've listened to marketing
10 professors. I've worked on the same side as
11 marketing professors. So the knowledge I've
12 obtained has come through, you know, all of that
13 work experience. So sometimes I may just do one
14 side of a case, and there may be a marketing
15 professor on the same side of the case as well. So
16 I've had those interactions. And like I've said,
17 I've read, you know, some of the literature and
18 also listened to what, you know, opposing experts
19 have said. So I've actually got a wealth of input
20 into, you know, what I know about it.
21     Q    Have you taken any courses with
22 respect to conjoint analysis?
23     A    Not any particular courses, no.
24     Q    Have you published any articles with
25 respect to conjoint analysis?

Page 122

1     A    No. And, frankly, probably in the
2 last ten years I haven't published any articles at
3 all. So even though I've been doing damage
4 quantification for 35 years, I don't -- that's not
5 what my job is. I don't publish articles.
6     Q    And you mentioned that there are
7 individuals in the analysis group who do have
8 expertise in designing and implementing conjoint
9 analysis?
10     A    Yes.
11     Q    Did you consult with any of those
12 colleagues regarding the proposed conjoint analysis
13 in this case?
14     A    Not in this case. In other cases I
15 have. So I have relied on input from my colleagues
16 in other cases, but in this case it wasn't
17 necessary because this was pretty much a -- you
18 know, a standard type description of what was being
19 described. There wasn't any special aspects that
20 required me to consult with a colleague. 'Cause I
21 also even just looked at the reference materials
22 that Mr. Gaskin was relying upon, and it supported,
23 A, what I knew, and, B, you know, what my position
24 was here, and actually was counter to what he was
25 saying. So I did all of those things.

Page 123

1     Q    How was it counter?
2     A    Well, he keeps saying that he's
3 calculating the market price, or at least that's
4 the inference, the change in price, when the
5 literature doesn't support that. And the documents
6 that he's relying upon don't say that. They talk
7 about it -- you know, a willingness to pay. They
8 talk about it being the demand side. They're
9 saying you have to be careful because it doesn't
10 take into account the supply side. All of those
11 things are in the documents that he's relying upon,
12 and which I've cited in my report.
13     Q    And, in particular, what documents
14 are you relying upon or are you saying that he's
15 relying upon?
16     A    Well, I think he's got some
17 references to some Sawtooth software descriptions
18 and so forth. So Sawtooth-related or Orme-related.
19 That's an author.
20     Q    Would you be able to conduct and
21 perform the conjoint analysis proposed by Mr.
22 Gaskin?
23     A    I think I would, but, frankly,
24 that's where I would turn it over to a colleague.
25 If I was asked to do it, I think I could do it, but

Page 124

1 I wouldn't do it. I'd turn it over to a colleague.
2     Q    You would turn it over to a
3 colleague who had expertise in conjoint?
4     A    No, not expertise in conjoint. In
5 actually performing it, the mechanics of it. That
6 doesn't mean I'd abdicate the -- you know, the
7 inputs or the output, what it's telling you, what
8 determinants of demand are. All of the things that
9 I'm critiquing on Mr. Gaskin, I would still feel
10 that I could comment on and provide guidance to my
11 colleague. But the actual running of the survey
12 and running of the software, I would have my
13 colleague do that.
14     Q    And the design of a survey, if it
15 needed it to be done, you would have a colleague do
16 that as well?
17     A    I want to be careful here, you know,
18 because we're using very broad terms. When you say
19 "design," you mean picking attributes, or do you
20 mean, you know, do I survey a thousand people, do I
21 use an internet survey, do I use a mall survey? I
22 mean, all of those issues I would probably leave up
23 to my colleague. But things like attributes,
24 attribute levels, competing products, things like
25 that I would definitely have input to just like I'm

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 125

1 evaluating here.  You know, what are the important
2 determinants of demand?  Can you, you know, really
3 measure what Mr. Gaskin's doing without ever
4 mentioning that these are highly rated award-
5 winning products and not even having that piece of
6 information for the consumer, but still trying to
7 figure out how one change might affect, you know,
8 the price or the willingness to pay for a product?
9 Those are all things that squarely fit in with my
10 skills, knowledge, education, experience and
11 training.
12      I think we've -- if it's a good breaking
13 point, it's been about an hour, but whatever is
14 convenient for you.
15      Q   No, that's fine.  Let's do it.
16 Lunch half an hour enough time for everybody?
17      A   I think that will work for me, yeah.
18      Q   All right.  1:45?
19      A   If it works for the court reporter.
20      THE COURT REPORTER:  I'm fine.  Thank
21 you.
22      Q   All right, 1:45.  We'll see you back.
23 Thanks.
24      (Whereupon, the deposition was recessed
25 for lunch at 1:15 o'clock p.m. and reconvened at

Page 126

1 1:47 o'clock p.m.)
2 BY MR. MARKOVITS (Continuing):
3      Q   Doctor, do you have a license for
4 Sawtooth software?
5      A   I don't know if -- I do not.  I
6 don't know if the firm does.
7      Q   Do you know -- do you have a license
8 for any Sawtooth product or conjoint analysis
9 product?
10      A   Not me, no, but I can't speak for
11 the firm.
12      Q   Are there -- have you used -- you
13 personally used the software, the Sawtooth
14 software?
15      A   I have -- I believe I think on other
16 cases I've had -- I've had people do some
17 sensitivities on the analyses that have been
18 presented by others.  So either on that or a very
19 close cousin, but I've had other people under my
20 direction do some of that type of work on other
21 cases.
22      Q   You haven't done anything with
23 regard to Sawtooth software in this case; correct?
24      A   That's correct.  That's correct.
25      Q   Are there any --

Page 127

1      A   'Cause there hasn't been -- there
2 hasn't been anything done by Mr. Gaskin.
3      Q   Right.  Are there any objective
4 measures of the accuracy of a conjoint analysis?
5      A   Objective measures of the accuracy
6 of a conjoint analysis.  Well, I mean, you can do
7 some of the things that I'm, you know, talking
8 about in terms of, you know, measuring the accuracy
9 of the inputs or measuring the accuracy of the
10 outputs.  In other words, if you're not getting the
11 proper determinants of demand for a product, you
12 know, that will make the conclusions that are drawn
13 to be suspect and may not be usable.  You know, I
14 think --
15      Q   Well, you're -- you're talking --
16 sorry to interrupt.  But as I understood it, your
17 critiques with regard to inputs and outputs is one
18 might say subjective rather than objective for the
19 most part.  Do you know whether there are any
20 objective measures to determine the accuracy of a
21 conjoint analysis?
22      A   Yeah, I mean, I'll disagree with the
23 subjective/objective.  I mean, they go to basic
24 economic theory.  But with respect to measuring the
25 -- you mean if -- I guess maybe I didn't understand

Page 128

1 your question.  If somebody were to actually
2 perform the conjoint analysis and the corresponding
3 market simulations, are you saying how would you
4 test whether they are right or not?
5      Q   Yes.
6      A   Is that what you're asking?
7      Q   That is what I'm asking.
8      A   Well, I think, you know, an easy way
9 to do it is if you have an issue with some of the
10 inputs, you know, just re-perform the analysis with
11 the proper inputs and see what kind of change you
12 get.
13      Q   Apart from -- can you test the
14 accuracy of an analysis performed with the inputs
15 that Mr. Gaskins wants to use?  So he does his
16 proposed conjoint analysis using the inputs he
17 proposes.  Are there objective measures that can be
18 taken to test the accuracy of his determinations?
19      A   In general about conjoint or on this
20 particular issue?  Because one could -- one could
21 use conjoint analysis on an attribute of a
22 treadmill that we know changed and see what the
23 conjoint analysis gives you versus what happened in
24 the real world and to see if it's close or not.  So
25 that would be a proxy approach.  And if it doesn't

Deposition of Keith Raymond Ugone, Ph.D.         Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 129

1  perform well on changes in attributes that we know
2  actually happened where we saw results, that would
3  call into question the use of the conjoint analysis
4  for a different attribute on the same machine.
5      Q    Let's suppose Mr. Gaskin his
6  conjoint analysis here. Is there anything -- any
7  test that you can run to your knowledge to test the
8  accuracy of his determinations?
9      A    Well, I know one can kind of look at
10 the underlying data. So one could just look at the
11 underlying data to see if the results are making
12 sense. And other times when you look at the
13 underlying data you can see some of the results
14 that aren't making sense in terms of, you know, the
15 magnitude of the underlying numbers that are coming
16 out of the survey or the range or whether they're
17 positive or negative. So you can look at some of
18 those next-layer-down results to see that when you
19 get the final -- you know, the final determination
20 whether that's making sense or it's just an average
21 that it's kind of, you know, washing all of those
22 issues aside. That's one thing you can do. You
23 could do, you know, subsets of it. You could run
24 other experiments. You could do all of those
25 things that I'm saying.

Page 130

1      Q    Have you ever heard of the term
2  "root likelihood" in conjunction with conjoint
3  analysis?
4      A    Yeah, I mean, it's just -- yes. I
5  mean, I think it's a statistical -- you know, a
6  statistical measure that you might look at.
7      Q    What's your understanding of it
8  beyond that it's a statistical measure?
9      A    Yeah, I don't know that I can give
10 you a formal definition as I sit here right now.
11     Q    Are you familiar with the concept of
12 holdout performance with respect to conjoint
13 analysis?
14     A    Yeah. And, in fact, that's what I
15 described to you on one of those was working on a
16 subset in trying to make a prediction with respect
17 to the remainder. So I already described that.
18     Q    And are you familiar with the
19 concept of mean absolute error?
20     A    Yes. It's another statistical
21 measure you're looking at. I mean, basically this
22 all goes to statistics in terms of means, variances
23 and dispersions and seeing how, you know, wide
24 variances you get and things like that in the
25 results.

Page 131

1      Q    How is mean absolute ever used by
2  conjoint practitioners?
3      A    You know, my -- I would say that
4  they would probably look at dispersions and see how
5  wide the dispersions are. Just kind of what I
6  talked about previously about, you know, the range.
7  I wasn't using statistical language, but I was
8  trying to just talk about some of the ranges you
9  might get.
10     Q    Do conjoint analysis need to involve
11 every attribute of the product being studied?
12     A    I don't believe that it's generally
13 accepted that every attribute has to be included,
14 but I think important attributes to the
15 decision-making process that help with the
16 mimicking of the actual purchase behavior of, you
17 know, customers or respondents is a guiding
18 principle.
19     Q    And what do you base that on?
20     A    My skills, knowledge, education,
21 experience and training as an economist. Plus, you
22 know, my understanding of what I've seen in some of
23 the literature for conducting these types of
24 surveys.
25     Q    And can you point me to any

Page 132

1  literature which would suggest that important
2  attributes have to be part of a conjoint analysis?
3      A    I think all of the literature would
4  say that. I mean, you can look at all the -- look
5  at all the citations that I have in my report,
6  especially the Sawtooth documents themselves.
7      Q    All right. So you believe the
8  Sawtooth documents, the Orme document would
9  indicate that if you're running a conjoint analysis
10 all important attributes have to be part of that
11 analysis?
12     A    Yeah, I think they might talk about
13 a tradeoff that you don't want to have so many that
14 are overwhelming for the survey participant, but I
15 think you need to have the important determinants
16 of the purchase behavior so you don't -- so you
17 accurately in a sense get an indicator of the value
18 of various components of the product in question.
19     Q    Can a conjoint be used to study
20 products that have not yet been introduced in the
21 market?
22     A    I think that's -- that can be done,
23 sure.
24     Q    Can a conjoint be used to study
25 attributes of products that are not yet in the

Deposition of Keith Raymond Ugone, Ph.D.      Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 133

1  market -- the attributes are not yet in the market?
2  The product may be.
3       A   Yeah, I think that's -- a lot of
4  times that's what it's used for.  Gives you an
5  indication of perhaps the demand for the product.
6  But then, you know, the whole point is you look at
7  that demand, you know, relative to the costs of
8  production before you ultimately make a
9  determination.  So, again, what you're saying is
10  it's a demand-side consideration unless modified,
11  as I said, which is the whole point I'm making in
12  my report.
13       Q   And you can include an attribute in
14  a conjoint analysis that's a new attribute, whether
15  it's important or not important; correct?
16       A   You could, sure.
17       Q   What is orthogonal design within the
18  context of a choice-based conjoint?
19       A   Yeah, I think that -- you know,
20  that's a survey type word, but the whole idea of
21  the orthogonal design is -- I think basically it
22  just helps out to make sure that you're not
23  getting, you know, answers that don't make sense.
24  You're not getting biased answers,  that some of
25  the question are independent and so forth.  I think

Page 134

1  at a very high level that's how I might describe
2  it.
3       Q   And is orthogonal design recommended
4  for choice-based conjoint?
5       A   Yes.
6       (Whereupon, the court reporter asked for
7  clarification.)
8       Q   Is orthogonal design recommended for
9  choice-based conjoint?
10       A   The answer is yes.  I had said yes,
11  then he repeated the question.  But the yes still
12  applies.
13       Q   Dr. Ugone, have you reviewed the
14  complaint in this case?
15       A   Yes, I have.
16       Q   Are you generally familiar with it?
17       A   Yes.
18       Q   And in your own words, can you tell
19  me what you understand plaintiffs' theory of
20  liability to be?
21       A   I might put it -- well, I think a
22  shorthand way I think about it is allegedly
23  inflated horsepower claims.  And I think there can
24  be -- I think it can fall into two buckets, but
25  basically they all boil down to -- I'm not a

Page 135

1  technical person, but they boil down to the output
2  of the motor of the treadmill and whether you're
3  getting the, you know, sort of effective horsepower
4  or not or whether it's continuous horsepower as
5  opposed to not.
6       Q   Is it your understanding that
7  plaintiffs are alleging that the treadmills are
8  defective?
9       A   I don't -- I had never thought of it
10  that way.  I just thought of it as dealing with
11  more of a description of the motor itself and the
12  output of it and how it works as opposed to any
13  defect.  I've never taken it as a defect type case.
14       Q   You've taken it as a mislabeling
15  type case?
16       A   I think that would be a shorthand
17  way of saying it, sure.
18       Q   And for the purposes of damages
19  analysis, would it be appropriate for an expert
20  such as yourself or the plaintiffs' experts to
21  assume liability?
22       A   You know, we talked about this
23  before.  In damages you can assume liability,
24  although it depends on the nature of the
25  presentation that one is making to the trier of

Page 136

1  fact.  But a lot of times if you're talking about
2  damages, you are making assumption that liability
3  is found or you don't get to the damages question
4  at all.  And that's often explained, you know, to
5  the jury or to the trier of fact.  Here it's a
6  little murky because, you know, at the class
7  certification stage in many respects you're trying
8  to figure out does a change in an attribute cause a
9  change in a price, which, frankly, could be
10  independent of a damages question.  You're just
11  trying to see whether a change in an attribute
12  causes a price.  That's why I don't think you have
13  to say you're making an assumption as to damages or
14  liability.
15       Q   Do you agree that a historic market
16  price reflects the then extant demand conditions?
17       A   A market price is determined by the
18  interaction of supply and demand.  So there is a
19  demand side to a market price.  It's an equilibrium
20  price.  It's generally, unless there's other
21  constraints, a market clearing price.
22       Q   And part of that is demand, so that
23  historic market price would reflect the then extant
24  demand conditions; correct?
25       A   Yeah, I want to make sure I

Deposition of Keith Raymond Ugone, Ph.D.     Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 137

1 understand your question.

2     Q   Wouldn't necessarily give you the

3 demand curve, but the then extant market price

4 would reflect the demand conditions at that time in

5 history?

6     A   **Embedded in the determination of**

7 **that price would be, in part, demand conditions, if**

8 **that's what you're asking.**

9     Q   And embedded in the historic market

10 price would also be a supply condition; correct?

11     A   **Well, it's the interaction of supply**

12 **and demand that determine market price. So it's a**

13 **market equilibrium price, and you only get a price**

14 **when you have supply and demand interacting**

15 **together in a competitive market.**

16     Q   So the answer would be, yes, the

17 historic market price reflects, in part, the then

18 extant supply condition?

19     A   **So you would have the price taking**

20 **into account people's tastes and preferences, the**

21 **price of substitute goods, the price of**

22 **complementary goods, income, price of labor, price**

23 **of capital, price of raw materials. All of that**

24 **goes into the market price that we see. That**

25 **doesn't mean it gives you the demand curve or a**

Page 138

1 supply curve.

2     Q   Right.

3     A   **But those considerations all go into**

4 **a price we see.**

5     Q   So it, in part, reflects the then

6 extant supply?

7     A   **I would be careful. It would be**

8 **everything that I said. When you said "supply,"**

9 **it's not giving you the whole supply curve. It's**

10 **giving you one point on the supply curve.**

11     Q   Okay. If you ask a consumer, "Would

12 you be willing to buy product X for 999?" and the

13 consumer responds with either a "yes" or a "no,"

14 can you determine from that "yes" or "no" answer

15 what the willingness to pay for that consumer is?

16     A   **Not without a few more words.**

17     Q   What other words?

18     A   **Well, if they said "no," you don't**

19 **know the willingness to pay. If they said "yes,"**

20 **you don't know if the willingness to pay is that**

21 **market price or some higher amount.**

22     Q   So if they answer "yes," you don't

23 know the consumer's maximum willingness to pay;

24 correct?

25     A   **That's what I'm saying. You know**

Page 139

1 that they're willing to pay that price, but you

2 don't know if they would be willing to pay more.

3     Q   If they say "no," do you know the

4 consumer's maximum willingness to pay?

5     A   **I already answered that. I said no**

6 **because they didn't -- they didn't want to pay at**

7 **least that price. So it's something less than**

8 **that, but you don't know what that is.**

9     Q   Are you familiar with the phrase

10 "willingness to pay of the marginal consumer"?

11     A   **Yes.**

12     Q   And could you define that as you

13 understand it?

14     A   **So imagine a demand curve. Imagine**

15 **a supply curve. So you have a market equilibrium**

16 **price. When you talk about the marginal consumer,**

17 **that's that last person that buys along the demand**

18 **curve. All the intramarginal consumers -- so**

19 **everybody that would have bought earlier on the**

20 **demand curve -- their willingness to pay was**

21 **higher. When you talk the marginal consumer,**

22 **you're talking about that very last consumer that**

23 **buys at the equilibrium price.**

24     Q   And so the market price of a product

25 is equal to the willingness to pay of the marginal

Page 140

1 consumer?

2     A   **When you're interacting supply and**

3 **demand, I would agree with that.**

4     Q   Can you replicate real world

5 conditions in an online survey?

6     A   **I mean, I think the idea is --**

7 **depending on the nature of the survey, I mean --**

8 **actually, I put a whole bunch of assumptions on**

9 **your question: that we're talking about purchasing**

10 **behavior, and not figuring out who's going to vote**

11 **for whom. You just said sort of a survey. So if**

12 **we're talking about purchasing patterns, I think**

13 **that survey -- in conducting a survey you try to**

14 **replicate that to get the most information you can**

15 **about the survey. That's valuable information.**

16     Q   And how do you do that? How do you

17 try to replicate real world conditions in let's say

18 a purchasing survey?

19     A   **Yeah, for all the reasons that I**

20 **said. I mean, you're giving -- you give product**

21 **attributes. You try to identify the important, you**

22 **know, determinants of demand. You give consumer**

23 **options. So all of those -- you know, all of those**

24 **things we've kind of been talking about.**

25     Q   As the terms are used in economics,

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 141

1  can you give a brief definition of "scarcity" and
2  "abundance"?
3      A   Well, the term "economics" itself
4  has to do with the allocation of scarce resources
5  across competing uses or ends in an attempt to
6  satisfy unlimited human wants. That's the
7  definition of economics. And resources are not
8  unlimited. So there's always the concept of
9  scarcity. And so the issue with economics is,
10  yeah, how do you allocate scare resources across
11  our unlimited kind of human wants, and usually it's
12  the price mechanism that will do that.
13      Q   And I assume you'd agree that the
14  scarcity or abundance of a good or service can
15  influence the prevailing market price?
16      A   Let's be a little more precise how
17  we say this. But, generally speaking, holding
18  everything else constant, including the demand for
19  a product, the greater the supply, holding
20  everything else constant, the lower the price. The
21  smaller, the lesser the supply, the higher the
22  price.
23      Q   So holding everything else equal,
24  goods that are relatively scarce will have a higher
25  price than goods that are in relative abundance?

Page 142

1      A   Yeah, I want to be a little careful
2  'cause you're talking about goods that are scare
3  and abundant, and I'm thinking in terms of where
4  that supply curve is. But to the extent that
5  there's a greater supply holding price constant --
6  I'm sorry -- holding demand constant, the lower the
7  price.
8      And let's be a little bit careful
9  because, obviously, you know, we're talking about a
10  scarcity, but on the supply side there's cost of
11  production, like I was saying before, and the
12  prices of inputs and everything else.
13      Q   So, for example, if I asked you to
14  estimate the value of a 1952 Mickey Mantle baseball
15  card, would you want to know how many of those are
16  in existence?
17      A   Actually, you'd want to know two
18  things. You'd want to know the demand side and the
19  supply side. I mean, I'll give you a perfect
20  example. I have a 2001 BMW M5, and this is like to
21  me the greatest car in the world, and it's 20 years
22  old and in perfect condition. And I keep thinking
23  this thing should be worth a lot of money, but
24  every time I look it up in the Kelley Blue Book
25  it's like $8,000. You know, I'm thinking it should

Page 143

1  be, you know, $100,000. But there must be a lot of
2  2001 BMW M5's out there or a lot of substitutes for
3  it such that the price is low. So but it's a
4  combination of what's the demand for the product
5  and, yes, what's the supply of the product. I
6  won't disagree with that.
7      Q   What does the term "convergence"
8  mean in the context of a hierarchial Bayes
9  estimation?
10      A   Yeah, I think it's running different
11  iterations until you get convergence to a result.
12      Q   What is a randomized first choice
13  analysis?
14      A   Yeah, I think that deals with --
15  now, this all has to do with the survey stuff, but
16  a lot of times if you make certain assumptions of
17  how people will behave, you're always going to get
18  the same outcome that people will always buy the
19  product that gives them the greatest utility. But
20  there may be reasons why that may not happen, and
21  so you make certain assumptions in the model that
22  don't give you sort of the same outcome each time.
23  That's my understanding.
24      Q   And what does the term "error
25  distributed Gumbel" mean to you, if anything?

Page 144

1      A   I don't know that I can describe
2  that. That's not necessary for what I'm doing.
3      Q   In the context of a hierarchial
4  Bayes estimation, what does the word "priors" mean?
5      A   Yeah, the "priors" would be
6  basically your prior expectations. But, you know,
7  in a hierarchial Bayesian analysis there's sort of
8  posterior results that you can use to adjust your
9  priors, and, hopefully, in a Bayesian approach that
10  gives you -- a hierarchial Bayesian approach would
11  say that that gives you, at least from their
12  perspective, a better estimate when you're taking
13  into account the priors plus certain other results.
14      Q   And what is "degrees of freedom" in
15  the context of a hierarchial Bayes regression?
16      A   Yeah, well, degrees of freedom just
17  goes into, you know, part of the statistical test
18  as well.
19      Q   Can you study a product attribute in
20  a conjoint analysis without mentioning the
21  attribute?
22      A   I really missed your question. It
23  sounded -- it sounded like another one of your
24  tautological questions.
25      Q   It may be. Can you study a product

Deposition of Keith Raymond Ugone, Ph.D.　　　　　Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 145

1　attribute in a conjoint survey without mentioning
2　the attribute?
3　　　**A　Sometimes there's economics or, I**
4　**suppose, statistical techniques where you use**
5　**proxies for what you're talking about.  There may**
6　**be a number of reasons for doing that.  But**
7　**generally I would think the direct approach, unless**
8　**there's a reason to use a proxy, would be to, you**
9　**know, clearly identify what that attribute is, but**
10　**making sure that the consumer puts the proper**
11　**weight on that attribute in the purchase decision.**
12　　　Q　And just to make sure I understand
13　your position, and I understand you disagree with
14　what Mr. Gaskin proposes to do, but if he
15　appropriately married a conjoint analysis with
16　appropriate analysis of supply-side considerations,
17　could that be used to estimate the value of a
18　product attribute?
19　　　**A　So he would need to make sure he has**
20　**the right determinants of demand, in other words,**
21　**what are all the attributes that are important**
22　**considerations in the purchase decision.  He would**
23　**need to make sure that the descriptions of those**
24　**attributes are accurate.  Because sometimes you can**
25　**have an attribute, but it may not really have the**

Page 146

1　**proper description to say what's going on.  The**
2　**important demand-side factors, the important**
3　**supply-side factors.  If you include all of that,**
4　**that would be, you know, a quantum leap in terms of**
5　**what's being, you know, proposed here.  So at a**
6　**minimum, yes, you have to bring in the supply side,**
7　**but you have to make sure you have the proper**
8　**demand considerations as well.**
9　　　MR. MARKOVITS:  And, Susan, I don't know
10　if I provided this to you.  Did I provide you the
11　exhibits I intended to use?
12　　　THE COURT REPORTER:  No, I have not
13　received them.
14　　　MR. MARKOVITS:  I will get you one.
15　　　Q　But we're going to look now -- in
16　fact, Dr. Ugone has in front of him your report; is
17　that correct?
18　　　A　I have my report, yes.
19　　　MR. MARKOVITS:  Let's label that as
20　Exhibit 1.
21　　　　　(WHEREUPON, Deposition
22　　　　　Exhibit Number 1 was
23　　　　　marked for purposes of
24　　　　　identification.)
25　　　Q　And that's your Declaration dated

Page 147

1　March 1st, 2021; correct?
2　　　A　Yes.
3　　　Q　What were you asked to do when you
4　were engaged in this case?
5　　　**A　What I was asked to do was two**
6　**things.  And it's explicitly stated in paragraph 3**
7　**of my report, which carries over to page 3, but it**
8　**was to evaluate the proposed methodology for**
9　**evaluating classwide damages using common proof**
10　**put forth by Mr. Gaskin and Mr. Weir, but then also**
11　**evaluate whether -- you know, the issue of whether**
12　**that's even feasible or you need individual**
13　**inquiry.  So if you go to page 2 that starts in**
14　**paragraph 3 that I was requested to do the**
15　**following, and that's listed at the top of page 3**
16　**in subparagraphs a. and b. to paragraph 3.**
17　　　Q　And your report is dated March 1st,
18　2021.  When were you first contacted about this
19　engagement?
20　　　**A　I believe, roughly speaking, I want**
21　**to say in February at some point or maybe a little**
22　**earlier.  It was after the first of the year, but**
23　**clearly before March 1st.  I believe it was in --**
24　　　Q　That's one of those tautologies, I
25　think.

Page 148

1　　　**A　I think it may have been in early**
2　**February roughly.  Right around that time.**
3　　　Q　How were you contacted?
4　　　**A　I'm sorry.  How was I contacted?**
5　　　Q　Yes.
6　　　**A　By phone I think it was.  Phone or**
7　-- I believe to the best of my recollection.
8　　　Q　Who contacted you?
9　　　**A　I believe it was Dan Offenbach, I**
10　**believe.**
11　　　Q　And had you worked with --
12　　　**A　But it was -- a lot of times it was**
13　**Mr. Offenbach and Tom as well.**
14　　　Q　And had you worked with either Dan
15　or Tom before?
16　　　**A　No.**
17　　　Q　Do you know how they got your name?
18　　　**A　No.**
19　　　Q　Since you prepared this report on
20　March 1st, other than your extensive deposition
21　preparation, have you done any work on this matter?
22　　　**A　I'm sorry.  Are you saying after I**
23　**issued my report on March 1st have I done any**
24　**subsequent work?**
25　　　Q　Yes.

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 149

1    A    No, other than preparing for the
2  deposition.
3    Q    Which I assume didn't take much
4  preparation given your history of depositions?
5    A    Well, I still had to reread
6  everything and look at the documents and everything
7  else. So I did have to come in mentally prepared.
8    Q    There you go. And you said you've
9  prepared or provided similar analyses maybe 40 to
10  50 times in consumer class actions?
11    A    I have conducted analyses that asked
12  similar questions. It's usually in different, you
13  know, facts and circumstances, markets and
14  products. So I have to do all that work, but the
15  nature of the questions is often the same.
16    Q    In fact, you've been involved in
17  cases both with Mr. Weir and Mr. Gaskin in the
18  past, haven't you?
19    A    Yes, their names are well known to
20  me.
21    Q    Was anyone else involved on this
22  assignment who assisted you from Analysis Group
23  let's say?
24    A    Yes.
25    Q    Who would that be?

Page 150

1    A    So there's Na Dawson. First name is
2  spelled N-A, and Dawson is D-A-W-S-O-N. Raffi,
3  R-A-F-F-I, Snow, and Doris Li, L-I. Those would be
4  the -- that's the team, four of us.
5    Q    And what did Na Dawson have
6  responsibility for? What did he do?
7    A    Yeah, so she's --
8    Q    She.
9    A    -- kind of my First Lieutenant.
10  She's -- I was the leader of the project. She's a
11  vice president. I've worked with Na probably 20
12  years. And, you know, generally I'll conceptualize
13  everything that needs to be done, and she also
14  helps, you know, on a day-to-day basis to make sure
15  that my requests actually get completed.
16    Q    And what is her area of expertise?
17    A    She's Dr. Dawson, and she has a
18  Ph.D. in economics.
19    Q    How about Raffi Snow?
20    A    So Raffi Snow and Doris Li are both
21  what's known as senior analysts in the firm. So,
22  you know, a position right out of college with an
23  undergraduate degree would be as an analyst, and
24  then after maybe two years or three years you might
25  get promoted to what's called a senior analyst.

Page 151

1  They're both senior analysts, and they do, you
2  know, financial analysis like we see here or, you
3  know, at that level they'll also be putting
4  together the charts and the graphs and the spread
5  sheets and so forth.
6    Q    Did Na or Raffi or Doris write any
7  portion of your report?
8    A    So here's the way I would describe
9  this. This is my report. These are my words, and
10  I've edited it. It's what I'm comfortable with.
11  But I find that you do your best work when you work
12  in a team environment so everybody can contribute
13  to the proper analytics. So it's not uncommon that
14  I have some help in an initial typing of certain
15  paragraphs. So if somebody's got to describe --
16  you know, if there's got to be a description in the
17  report, I might say, "Why don't you type the first
18  paragraph, then give it to me, and I'll edit it and
19  put it in my words." So, absolutely, I had
20  assistance in writing it, but it always came to me,
21  and I did the editing. It's my -- you know, my
22  words. That's just the team environment that I
23  found helps provide the best work product.
24    Q    And as we discussed a little bit
25  earlier, you've written similar reports in the past

Page 152

1  in terms of critiquing plaintiffs' experts in these
2  areas?
3    A    I -- yes, I've authored reports that
4  answer the same or ask the same questions.
5    Q    Was any of this report essentially a
6  cut and paste from earlier reports?
7    A    My qualifications and background
8  that section is always the same.
9    Q    Other than that, any substance that
10  was cut and paste?
11    A    You know, I think -- you know, there
12  was so much that was unique about this. I mean,
13  there -- I don't know that it was a cut and paste
14  because, you know, I have certain viewpoints and
15  the certain words I use that are naturally going to
16  occur as I describe something. But as I'm thinking
17  through this, I can't say that we didn't do that,
18  but I would say -- I would say 90 percent of the
19  words are case-specific to this case. I don't
20  remember like taking wholesale sections from
21  another report. I just don't think we did that.
22    Q    Okay. Did you consult with anyone
23  outside of the Analysis Group regarding this
24  report?
25    A    Not that I recall.

Deposition of Keith Raymond Ugone, Ph.D.       Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 153

Q   And I believe it says in your report that you talked to Mr. Macfarlane and Babcock and Larsen; is that correct?

A   Yes. And I clearly say that. I want to make sure -- I don't know if this is a new question or if you're challenging what I just said. In terms of the opinions and stuff, I didn't consult with another person in terms of what I'm putting in the report, but I did have conversations with the client, yes.

Q   Yeah. And apart from the conversations with Larsen, Babcock, Macfarlane, did you talk with anyone else for input or information that might have found its way into the report?

A   I don't believe so. And, again, let's try it this way. As an ongoing process -- and I don't know if you're including them or not, but, obviously, I would keep the attorneys for Sole informed as to my progress. So I would do that.

Q   Yeah.

A   I did have the conversation with the client -- the three individuals that you mentioned to get input. But in terms of the generation of the opinions, that would have come just from the team I mentioned to you. So hopefully that makes

Page 154

it all clear.

Q   I'm talking about whether you might have talked to somebody from Dick's Sporting Goods or from Dyaco, which is the parent company, let's say, or from the motor manufacturer, whoever?

A   No. No, I would have -- I would have told you. 'Cause it's my understanding if I -- yeah, if I'm having those conversations that I need to reveal that as the basis for my opinion. So I've given you the three individuals and the source documents.

Q   And do you know whether either Na, Raffi, Doris or anyone else in Analysis Group talked to anyone other than Macfarlane, Larsen or Babcock?

A   I would say I am 99.99999 percent sure they did not. We're approaching a hundred percent. Nobody ever said to me that they did that, and just the way I run engagements, I would be shocked if they had -- had not told me.

Q   In terms of your discussions with Mcfarlane, Larsen and Babcock, did that occur all three at once, three separately? How did those discussions occur?

A   Boy, I'm trying think. I think

Page 155

generally it was at the same time, I think, if I remember correctly. It's been a couple of months, but I think I remember talking to all of them together.

Q   Was there more than one discussion or just one?

A   There might have been more than one. One or two. But it's in that, you know -- not that this is an empirical measure, but less than a handful. I think it was like one or two.

Q   And for how long roughly did you speak with those gentlemen?

A   Probably -- you know, it could have been a half an hour to an hour each time. I know -- my little hesitation is we spent more time when we were trying to understand the Google data, and I still think the others were on the line when we were doing that. I don't think that was a conversation just in isolation. But generally I think each time -- if I had two conversations, they would have been a half an hour to an hour each.

Q   Did you take notes during those conversations?

A   Anything we have, we put into the report. I mean, that's sort of the notes. In

Page 156

other words, what did we talk about? We knew what we were going to talk about, and then we footnoted, you know, that we had the conversation. So I did not take notes.

Q   So there's no notes separate from what's in the report?

A   That's correct. I tried to identify for you that which we got, frankly, from the depositions, that which we got from conversations. Sometimes it was an overlap, so I might just reference the deposition because what they told us was consistent with the deposition that I got independently.

Q   Does Exhibit 1, this report, contain all the facts and data considered by you in coming to your opinions?

A   Just so there's no confusion, Exhibit 3 to Ugone Exhibit 1 contains all the facts, data and other information relied upon. But I would say just in an abundance of caution, you would either find that in Exhibit 3 to Exhibit 1 or in the footnotes to the narrative or the footnotes to the associated exhibits, but you have everything I'm relying upon.

Q   Okay. And in terms of exhibits,

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 157

1 does this report contain any exhibit that you
2 intend to use to summarize or support your
3 opinions?
4    A   Now or later?  That's what I'm
5 missing.
6    Q   Now.
7    A   Maybe I don't understand the
8 question.  My opinions are based upon -- first let
9 me take a step back.  When I talk about my report,
10 in my report there's the narrative section, which
11 is 62 pages, and then there's the exhibits.  I call
12 the exhibits the exhibits, the narrative the
13 narrative, and it's the exhibits plus the narrative
14 is what makes up my report.  And so all of the
15 support for that is in the self-contained document.
16 I don't know if that answers your question or not.
17    Q   Well, are there any other exhibits
18 that you intend to use -- let's say there's a class
19 certification hearing, and you're being asked about
20 this report.  Are there any other exhibits that you
21 would intend to use to summarize or support your
22 opinions in this report?
23    A   Okay.  That's why I was asking
24 whether you were talking about now or later.
25 That's why I was --

Page 158

1    Q   Fair enough.
2    A   -- asking that question.  Those
3 exhibits -- if I were to do something at a hearing
4 and if the judge wanted to hear the testimony of
5 the experts at the hearing, I would probably put
6 some demonstrative exhibits together, but I have
7 not done that, so they don't exist.  But I could
8 see having an exhibit that, you know, has a supply
9 and demand curve on it and show the demand curve
10 moving.  But I haven't put that together for this
11 hearing, nor anticipated about that or been asked
12 to do that, so that hasn't been done, so they don't
13 exist.  But I could see a situation where what's in
14 my report I might turn into demonstratives.
15    Q   How many hours have you billed --
16 you personally billed on this matter through the
17 filing of the report?
18    A   Yeah, I got kind of a request
19 yesterday to take a look at that, and so things are
20 happening quick.  But I was able -- I had somebody
21 look at it to give me a rough estimate.  But I
22 think up into the filing of the report I think it
23 was about 60 hours for me -- me personally.
24    Q   Right.  And then how much for Na,
25 Raffi, Doris or anybody else at Analysis Group?

Page 159

1    A   I don't have their total -- I don't
2 have Miss Snow or Li.  I think Dr. Dawson might
3 have had -- I'm doing this off the top of my head,
4 but I think she might have had double the amount of
5 hours I had.  She might have like 120.
6    Q   Do you know -- in terms of dollars,
7 do you know how much you billed versus the total
8 bill?
9    A   Yeah, actually I don't -- I sort of
10 don't look at that.  I mean, if anything, you know,
11 we submit a bill to the client.  I will admit that
12 we're late doing that.  So I -- you know, that's a
13 bad.  But I don't have the individual for me.  I
14 have, you know, roughly that this total project up
15 to issuing might be around $200,000 or so.
16    Q   If you'd turn to page 3 of your
17 report.  In 5.a. you state as your first conclusion
18 that neither Mr. Gaskin nor Mr. Weir have actually
19 performed or implemented the methodologies they
20 proposed.
21    A   In this matter.
22    Q   Yes.  Do you see that?
23    A   Yes.  So whether you call that a
24 conclusion or an observation, you know, I'm just
25 putting that up front and center that they're

Page 160

1 making a proposal, but they haven't implemented it
2 yet.
3    Q   Well, you say that "I concluded
4 that" they made a proposal that hasn't been
5 implemented.  What's the import of that to you?
6    A   That a lot of times -- a couple of
7 things.  One, they've proposed something.  And it's
8 my experience you make a proposal, but that when
9 you actually implement it, you uncover things you
10 may not have thought of.  And a lot of times what
11 you end up doing is different from, you know, what
12 you're proposing.
13    Q   And I just want to make sure.  Are
14 you opining in any way that they should have
15 implemented what they're proposing at this stage in
16 the case?
17    A   I think it would -- I mean, I
18 actually believe that it would have been helpful
19 for them to implement to see if you're getting
20 reasonable answers.  I know Mr. Gaskin and Mr. Weir
21 in prior cases have actually implemented the
22 proposed methodologies in these sort of cases at
23 this stage of the engagement.  So I have seen
24 situations where they have implemented, and so
25 that's why I'm saying here that they haven't

Page 161

1  implemented. But I think the biggest concern would
2  be, you know, would they implement exactly like
3  they're saying or not? You know, they're -- I'm
4  just saying there's more certitude when you
5  actually do the implementation, and then, you know,
6  you can have a better understanding of what's going
7  on.
8      Q    And if you look at 5.c. on page 3,
9  you state, "The claimed injury and/or claimed
10 damages (if any) experienced by the putative class
11 members as a result of the challenged claims cannot
12 be evaluated reliably using a classwide or common
13 proof approach (i.e., individual inquiry is
14 required)."
15     Did I read that correctly?
16     A    Yes.
17     Q    And I just want to make sure I
18 understand it. We've been over this a little bit.
19 But essentially you're saying that regardless of
20 the methodology employed, it would be impossible in
21 your view in this case to determine classwide
22 damages?
23     A    Reliably using a common proof
24 approach.
25     Q    If you turn to page 4, romanette v.

Page 162

1      A    I'm there.
2      Q    Talks about the length of the class
3  period, and you say, "Given the length of the
4  claimed class period, and especially given the
5  underlying change in market conditions with the
6  COVID-19 pandemic, Mr. Gaskin's proposed CBC
7  analysis cannot provide a result that is applicable
8  to the entire length of the putative class period."
9      A    Yes. I'm sorry. I didn't mean to
10 --
11     Q    That's okay. Assuming an otherwise
12 appropriate CBC analysis, for what period of time
13 would it be applicable in your view?
14     A    My view is that with a survey that
15 gives you current -- actually, I'm going to give an
16 answer, and you tell me if I understood your
17 question properly.
18     With a survey you're getting current
19 viewpoints. It's very difficult to say to
20 somebody, you know, "What were your thoughts five
21 years ago?" So that's tough to do in a survey.
22 But you can try to get their -- their perceptions
23 as of today. My point is that the ability to use
24 today's results for a prior time period degrades
25 with if there's greater changes in underlying

Page 163

1  conditions. In other words, it could be the tastes
2  and preferences are changing over time. If tastes
3  and preferences are, in fact, changing over time,
4  then it's hard to do a survey today and say that's
5  what people believed five years ago. So my point
6  is that, A, it's just tough to take today's results
7  and say that that reliably tells you something
8  about yesterday, meaning five years ago. And it's
9  particularly difficult when the underlying
10 conditions have changed. The greater the stability
11 in the underlying conditions, perhaps the greater
12 reliability of backcasting.
13     Q    And is the primary change in
14 conditions that you're positing here the COVID-19,
15 or are there other changes and conditions during
16 the class period that you're alluding to?
17     A    I'm just giving that as an example
18 'cause that's kind of the obvious one and one that
19 everybody would understand. There may be other
20 ones, but there's been no -- I guess part of the
21 point would be there's no testing, you know, on the
22 part of plaintiffs' experts to say that nobody's
23 tastes and preferences have changed in the last
24 five years.
25     Q    And what testing could they do to

Page 164

1  determine whether anybody's taste or preferences
2  have changed in the last five years?
3      A    Well, they could -- you know, there
4  could be other -- you know, there could have been
5  other surveys done in the normal course of
6  business. There could be -- you know, looking at
7  the introduction of new products. There could be
8  even looking if products have changed over time.
9  They could be looking at, you know, who knows,
10 various tradeoffs between going to a gym or working
11 at home. I mean, those are all off the top of my
12 head in response to your question. But there could
13 be a number of indicators as to whether, you know,
14 there's been an underlying change in taste and
15 preferences that would invalidate taking today's
16 result and backcasting those results to an earlier
17 period in time.
18     Q    Is there any literature that you can
19 cite to with regard to the appropriateness of
20 backcasting a CBC analysis, when it can and can't
21 be done and for what time periods?
22     A    Yeah, I'm not -- I'm not aware of
23 any.
24     Q    So you're not relying on any
25 particular research study or literature in your

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 165

1  conclusion that this five-year period may have
2  degraded the reliability of the results?
3      A   I'm just relying upon my own -- my
4  own analysis here, plus the intuition -- I think it
5  is -- I think it is recognized.  You probably will
6  see in the literature and maybe even the Sawtooth
7  literature.  So maybe I'll modify my answer a
8  little bit that the results of the survey usually
9  reflect -- and I think the surveys admit this --
10 reflect the current viewpoints or current state of
11 conditions, current environment.  I think that's
12 generally accepted by the surveys.
13     Q   It has been about an hour.  Do you
14 want to take a five-minute break?
15     A   Sure, that will work.
16     (Whereupon, a recess was taken.)
17     Q   Doctor, if you can turn to page 5 of
18 your report, looking at 8.b.i, which says,
19 "Putative class members who were satisfied with
20 their purchases and with the performance of the
21 challenged products were not harmed (i.e., they
22 received the value for which they paid.)"
23     Do you see that?
24     A   I do, yes.
25     Q   I want to explore that a bit with

Page 166

1  you because I want to make sure I understand your
2  point.  Are you saying despite the fact that there
3  may be a price premium, a consumer has not been
4  harmed if they're satisfied with their purchase?
5      A   Just one second here.  (Reviewing)
6  Yes.  So what I'm saying is -- and the only thing I
7  wanted to direct you to is that, as you know, this
8  is the Summary Of Opinions.  So you've asked me to
9  look at 8.b.i.  The detail is on page 37, 38 and
10 39, as you know, so this is just a summary.
11     But, yes, what I'm saying is, I mean,
12 when you get these treadmills, and as we talked
13 about previously the treadmills aren't defective.
14 In the but-for world the treadmills would not
15 change in terms of their performance.  All of that
16 would be identical.  And we have a situation based
17 on some of the detail that I give in page 37, 38
18 and 39 that many consumers of these treadmills, you
19 know, appear to be perfectly happy with the -- and
20 satisfied with the performance of the treadmill
21 that they received.  So it's in that sense that
22 they got the performance that they -- you know,
23 that they purchased.  The treadmill --
24     Q   Doctor, could you answer my
25 question, which was, just to focus you, if -- let's

Page 167

1  suppose it's established there's a price premium
2  related to the horsepower claims.  Are you saying
3  that despite paying a price premium, a consumer has
4  not been harmed if they're satisfied with the
5  purchase?
6      A   Yeah, I guess what I'm saying is --
7  and I apologize if I wasn't answering your
8  question.  I thought I was answering your question.
9  What I'm saying is -- is that these consumers many
10 of them appear to be very, very happy with the
11 nature of their purchase.  And so they at least
12 received value equal to or greater than that which
13 they paid.  That's what I'm saying.
14     Q   And here you have the words in 8.B.i
15 "were not harmed."  So I go back.  Are you saying
16 that despite paying a price premium, a purchaser
17 who is happy with their treadmill has not been
18 harmed?
19     A   Yeah, well, you stopped before the
20 parenthetical.  It says, "were not harmed (i.e.,
21 they received the value for which they paid)."  So
22 that's how I'm defining "harm" in that point.  It
23 wasn't like they got value less than what they
24 paid.
25     Q   And is that concept -- is that based

Page 168

1  on an established economic concept?  Is that idea
2  of damage or harm in economic terms based on any
3  established concept that you can cite to?
4      A   I'm a little confused by the
5  question.  I think all of economics goes to this.
6  So maybe I'm confused by the question you're
7  asking.  Let me think for a second.  I'm processing
8  your question.
9      I think this goes back to my point of the
10 product is no -- is no different.  They still got
11 the same value and performance, and they were
12 satisfied with that value and performance for which
13 they paid.
14     Q   Okay.  Let me try it this way.  So,
15 Doctor, and I know this from 40 years experience in
16 this area -- you probably had about the same --
17 that sometimes economics and the law part company?
18     A   I'll agree with that, yes.
19     Q   So are you saying that as a matter
20 of law a consumer who has been overcharged has not
21 been legally harmed if they're satisfied with their
22 purchase?
23     A   Yeah, and I think from both of our
24 40 years we'll know that I have to answer I'm not
25 giving any legal opinions whatsoever.  I can't

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 169

1 speak to that.
2        Q    And so you're just suggesting that
3 from an economic viewpoint a consumer who's been
4 overcharged has not been legally -- has not been
5 economically harmed in terms of they received the
6 value for which they paid if they're satisfied with
7 their purchase?
8        A    If they received the value which
9 they paid, they knew what the price was. A lot of
10 these individuals may have even tested out the
11 product before purchase. They got exactly what
12 they paid for in the sense of the performance of
13 the machine. And so in that sense the value --
14 they received the value which they paid.
15        Q    Wouldn't the consumer be more
16 satisfied if they paid less?
17        A    We've always said that it's a truism
18 that people would always prefer to pay less rather
19 than more I said at the very beginning. I wouldn't
20 argue with that concept.
21        Q    Can you provide an example of a case
22 that supports the idea that if a consumer is
23 satisfied with the purchase, they haven't suffered
24 harm from an overcharge?
25        A    I can't give you -- I'm not -- I

Page 170

1 can't give you legal citations. I'm giving an
2 economic analysis. And the way I think about it
3 is, I'm providing economic guidance to the trier of
4 fact. The trier of fact will then take whatever
5 economic guidance I give and whatever economic
6 guidance the plaintiff experts give, and then make
7 the proper determination as to whether the class
8 should be certified or not. Now, there's many
9 different dimensions. I know it doesn't hang just
10 on this. So I'm not saying that, but this is just
11 one component of that.
12        Q    And in the hundred or more --
13 hundreds probably of cases that you've either
14 consulted on or testified in, has any court adopted
15 the idea that because a consumer is satisfied that
16 despite an overcharge they have not been harmed?
17        A    Yeah, so, first of all, I mean,
18 that's the assumption of an overcharge as opposed
19 to an actual proved overcharge. So let's just put
20 that as a parenthetical off to the side. I know
21 that a lot of -- I've seen a lot of opinions,
22 although I am not giving a legal opinion. So don't
23 go running off saying I'm giving a legal opinion.
24        Q    I understand that. I understand
25 that qualification.

Page 171

1        A    But I have seen a lot of references
2 to value received versus price paid. I have seen
3 those references.
4        Q    And can you give me an example of
5 some case -- some case involving some product where
6 you've seen those references?
7        A    Yeah, I can't give you a case
8 citation. I mean, all I know is that, you know,
9 frankly, I evaluate a lot of these cases from the
10 perspective of whether classwide damages can be
11 evaluated and reliably used in common proof. And,
12 you know, there's been quite a few cases where at
13 least the totality of my analysis the courts have
14 agreed with things that I'm saying. I don't know
15 that I can point to individual sentences or
16 anything, but the types of analyses that I say
17 "here for your consideration to look at" courts
18 have agreed with some of the things that I've been
19 saying.
20        Q    And sometimes they haven't?
21        A    Yeah, no one's a hundred percent in
22 the litigation world.
23        Q    I see in your reports that you've
24 consulted on price fixing cases, and I think I
25 might have mentioned I have a background in

Page 172

1 antitrust. So let's use an example from antitrust.
2 I used to teach antitrust, so let's use -- I'm not
3 an economist. I probably deposed a hundred
4 economists and read a thousand economist reports,
5 but let's use the fictional widget.
6        A    Okay. All right.
7        Q    So two companies fix the price of a
8 widget, engage in price fixing so that the widget
9 is ten dollars higher than it would be in the
10 but-for world, and antitrust liability is found
11 let's assume. All right?
12        A    Okay.
13        Q    Wouldn't consumers who paid that ten
14 dollar overcharge for the price-fixed widget have
15 been damaged in the amount of ten dollars even if
16 they were satisfied with the performance of the
17 widget?
18        A    Yeah, I mean, I think it's a
19 different cause of action. I can't compare, you
20 know, in the antitrust sense versus in the consumer
21 class action sense, but there are times -- I'm not
22 denying that at times there's overcharge
23 calculations which serve as a basis for -- you
24 know, for damages. I'm not disputing that.
25        Q    I'm not asking for -- I'm trying not

Deposition of Keith Raymond Ugone, Ph.D.      Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 173

1 to get you into talking legalese or lawyer stuff
2 here. Just as an economist, speaking as an
3 economist, would a consumer who paid a ten dollar
4 overcharge resulting from a price-fixed product be
5 harmed from an economic point of view regardless of
6 their satisfaction with that product?
7      A I mean, they could be. The point
8 I'm trying to make in what you are asking me about
9 is is there any question about the value received
10 versus the price paid? And for those consumers,
11 the value received was greater than the price paid,
12 and that's for a large percentage of customers,
13 especially when they're experience type goods. So
14 I'm giving that information in the totality of my
15 report to the trier of fact. How that's then
16 incorporated into, you know, the many different
17 dimensions of, you know, the class certification
18 decision I leave that up to the judge.
19      Q Let me just try one more example,
20 and then maybe we'll move on. I know you said you
21 have a Honda hybrid. Do you know anybody who has a
22 Tesla?
23      A No. I've got the much cheaper Honda
24 Civic. In fact, I have two Honda Civic hybrids.
25      Q Good ecologically-sound cars.

Page 174

1      So with regard to the Tesla, I know for
2 certain models you can pay $2,000 for a software
3 upgrade that will increase your zero-to-60 time by
4 a half a second. Apparently some people pay for
5 that. I wouldn't --
6      A Okay. All right.
7      Q -- but some people care about that,
8 so they'll pay $2,000 and get a half second
9 acceleration boost. Suppose that claim was false
10 and fraudulent, that the upgrade does nothing --
11      A Right.
12      Q -- and liability is found. Hasn't
13 every consumer who paid that $2,000 been harmed,
14 even if they're satisfied with the performance of
15 their Tesla?
16      A The -- again, it depends on the
17 facts and circumstances, but you also have a
18 product that's different in terms of performance
19 relative to that which was advertised. In other
20 words, you paid to get a half second or whatever
21 you said it was, you know, a half second
22 acceleration -- speed of acceleration from zero to
23 60 when, in fact, you got an inferior product. So
24 that I think puts it in a different bucket than
25 here the product's exactly the same.

Page 175

1      Q Well, it's the same product. Here
2 you're -- it's the same idea. Here you're paying
3 for -- you may pay more for a 3.5 versus a 3
4 horsepower motor, but you may get the exact same
5 product. In which case, hasn't that consumer
6 overpaid?
7      A I mean, for some reason I'm not --
8 I'm not seeing the analogy. It seems -- it seems
9 different. The best I can do is what I've studied
10 are the treadmills here. And, you know, the point
11 I'm making is that, you know, on one rating system
12 80 percent of the people are satisfied with the
13 product. On another rating system, you know, 67
14 percent of the people are four-star or above
15 satisfied with the product. The product wouldn't
16 be any different. The performance of the product
17 is the same, and people are getting the workout
18 that they want. So it's for all of those reasons
19 that I was saying the value received is greater
20 than, you know, or equal to the price paid. So
21 that's my analysis on this particular product.
22      Q Let's suppose an economic analysis
23 would show that in a but-for world a 3.0 horsepower
24 treadmill would cost $500 less than a 3.5
25 horsepower treadmill. Right? Do you follow me so far?

Page 176

1      A I'm with you.
2      Q All right. And let's suppose that
3 there's a claim that what I've received is a 3.5
4 horsepower treadmill. So I've paid that extra
5 $500, but, in fact, I've got a 3.0 horsepower
6 treadmill. I never know the difference. I'm
7 satisfied, but I've paid $500 more. Haven't I been
8 damaged by 500?
9      A Yeah, I don't know if the answer is
10 500. I'm not going to disagree with you. There's
11 times that a price differential could show up as
12 damages. I think in that situation if there was
13 indeed a $500 difference due solely to a half -- a
14 0.5 unit increase in horsepower that there would be
15 more dynamics going on rather than you just saying,
16 "Hey, I didn't know the difference." I think if
17 there was --
18      Q So if -- I'm sorry. Go ahead.
19      A No, it's okay.
20      Q If they could have bought the same
21 treadmill for $500 less, haven't they been damaged
22 by $500?
23      A That might be -- that might be an
24 inclination that the price would have been less. I
25 mean, it's subject to empirics. I mean, you've

Deposition of Keith Raymond Ugone, Ph.D.    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 177

1 made an awful lot of assumptions just, you know,
2 that they don't notice the difference. I think you
3 might even be saying -- I don't know if you're
4 saying the performance is the same or not. You're
5 saying that there's a $500 difference that's solely
6 due to the half horsepower increment. So that's --
7 you know, it just seems like a different set of
8 facts. But I think one could set up where price
9 differentials are a measure of damages. The
10 question is, does it apply to everybody? Do you
11 say that every single person has been damaged? And
12 I'm suggesting that there's a number of different
13 dimensions to look at.
14     Q    And what I'm --
15     A    And that the court, you know, should
16 at least take those under consideration.
17     Q    And what I'm asking is if I've paid
18 $500 for a half horsepower that's not there, and I
19 could have paid $500 less, which we both agree that
20 I prefer to do --
21     A    Yeah.
22     Q    -- then regardless of whether I'm a
23 satisfied consumer or a dissatisfied consumer,
24 haven't I been damaged by that $500?
25     A    Well, I think once a price premium

Page 178

1 has been established -- maybe here's what we can
2 agree. Once a price premium's been established,
3 then one needs to look whether that's due solely to
4 whatever the alleged misrepresentation was and
5 whether it applies to all consumers or not. Those
6 are all the things that go into the determination
7 of, you know, the -- or go into the calculus of a
8 classwide damages approach. That's what I'm trying
9 to say. But there could be situations where a
10 price premium gets applied to everybody. I'm just
11 saying that you need to look at the facts and
12 circumstances of this case, and that's, you know,
13 one of the opinions I'm giving.
14     Q    I'm trying to understand. In this
15 case -- let's take this case. If there is a
16 marketwide price impact that results in a premium,
17 won't all consumers be impacted by that premium?
18     A    So everybody -- everybody -- well,
19 the answer is no. So let me go into a little bit
20 more detail. In other words, let me give you a
21 slightly -- instead of saying $500, because that's
22 almost the price of an entire treadmill. If you
23 want to bring it to treadmill, let's say that
24 plaintiff analysis -- plaintiff experts come up
25 with their analysis, and they say there's a $50

Page 179

1 difference. Okay. And so the question is, did --
2 has everybody been damaged because there's a $50
3 difference that the plaintiff economists are coming
4 up with or survey experts? Well, there's some
5 people that -- like me, I got a $50 rebate on any
6 other products I buy. Did I -- did I suffer that
7 $50 claimed overcharge? There's other people that
8 bought on Cyber Monday or Black Friday for a
9 hundred dollars less. How do you know that those
10 people wouldn't have bought except it being on sale
11 where that on-sale price will wipe out the claimed
12 overcharge? So there's a lot of individual
13 considerations. That's why I'm saying throughout
14 my report taking the totality of it, you got to
15 look at the individual inquiry. So even within the
16 example you're giving, it's not clear to me that
17 everybody would have paid -- overpaid by $50
18 because some people either got the reward dollars,
19 some people got loyalty points, some people bought
20 the product on sale that may not have bought it
21 unless it was on sale, and so the alleged premium
22 was wiped out by the sale price. I mean, there's
23 all those different things that are going on. So
24 that's why I'm saying, in part, you've got to look
25 at the value received versus the price paid. But

Page 180

1 it all goes into that. It's not clear to me that
2 everybody has paid that overcharge. That's why you
3 need to have individual inquiry.
4     One last comment, and then I'll stop.
5 Mr. Gaskin and Mr. Weir everything I've just said
6 they don't take into account at all. Mr. Weir is
7 -- Mr. Gaskin is saying he's going to come up with
8 a price premium. Mr. Weir says he's going to apply
9 that to everybody. But we have the variations in
10 prices that I talked about where it's not clear
11 that you can just take that amount and say that's
12 how much everybody was overcharged.
13     Q    Let me just explore that for one
14 second. Let's suppose that it's determined that
15 there's -- we'll use 50 instead of 500. Let's
16 suppose there's a $50 price premium that's paid for
17 a 3.5 horsepower as opposed to a 3.0 horsepower
18 treadmill; and I paid that for my 3.5, but, in
19 fact, it's a 3.0. All right?
20     A    Okay.
21     Q    If I get that on sale, a hundred
22 dollars off, haven't I still paid -- wouldn't I
23 rather pay $50 less? I mean, wouldn't the --
24     A    If you --
25     Q    Go ahead.

Deposition of Keith Raymond Ugone, Ph.D.    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 181

1  A   No, no, I'm not -- again, I'm not
2  going back or disagreeing with the concept that
3  people would prefer to pay less rather than more.
4  But the fact of the matter is, the claimed
5  overcharge is $50, and the plaintiffs' methodology
6  is saying everybody overpaid $50. And I'm saying
7  that's not true because some people got a $50
8  reward card. Other people bought the product for a
9  hundred dollars off. So they're not paying that
10 premium.
11     Q   One last question on this idea. If
12 a consumer buys an F80 treadmill from Dick's and
13 never uses it except to hang laundry, which is at
14 times what my treadmill is used for, wouldn't they
15 still be better off if they paid less for the
16 treadmill?
17     A   Yeah, I think where we've agreed
18 numerous times is that people prefer to pay less
19 rather than more. I'm not disagreeing with that
20 concept at all.
21     Q   Could you turn to page 12, please?
22     A   I'm there.
23     Q   All right. Table 1. There's a
24 chart. And the first column has the model;
25 correct?

Page 182

1      A   Yes.
2      Q   And the next column has the current
3  MSRP. Do you see that?
4      A   Yes, yes.
5      Q   What's the import of the MSRP?
6      A   I am -- maybe I don't understand
7  your question. I mean, this is how they market the
8  goods is providing information to consumers. The
9  manufacturer's suggested retail price, and then
10 they have the sales price on the Sole website. So
11 maybe I don't understand. Other than they're
12 saying here's what the MSRP is, and here's, you
13 know, basically today's price.
14     Q   Do you know whether Sole ever sells
15 its treadmills at the MSRP?
16     A   I'm not actually going to get into
17 the legal aspects of it, but I think there might be
18 some aspect of -- you know, there has to be at
19 least, you know, a period of time that a product
20 has to be sold at a certain price before you can
21 talk about a sale price. That's just from general
22 background. I haven't researched it on this case,
23 but I think I have a general understanding of
24 something like that goes on in these types of
25 environments or advertisements.

Page 183

1      Q   But you personally don't know and
2  haven't done any research as to whether Sole, for
3  example, on its website ever sells an F63 for
4  1,799.99?
5      A   Yeah, I thought that there were
6  periods of time, or at least a long enough period
7  of time, that would allow them to make that
8  statement. I think that's my understanding, but I
9  have not studied that. I'll agree with you.
10     Q   And you see under "Today's Sale
11 Price" on Sole's Website the F63 is the 999.99;
12 correct?
13     A   Yes.
14     Q   F65 is 1,399.99?
15     A   Yes.
16     Q   And F80 is 1,599.99; correct?
17     A   Yes.
18     Q   Do you know whether those have
19 different motors?
20     A   I can actually tell you.
21     Q   Are you looking at something in your
22 report?
23     A   Yeah, I turned to an exhibit. I'll
24 tell you exactly when I get there. So the -- I do
25 know the F80 has the 3.5 motor -- 3.5 horsepower.

Page 184

1  And the F63, as I understand it, has a 3.0
2  horsepower motor. I mean, I can look up the other
3  one if you want, but --
4      Q   And that's the horsepower claims;
5  correct?
6      A   Yes.
7      Q   Okay. My question was a little
8  different. Do you know if they have the same
9  motor?
10     A   Oh, oh, oh. I'm sorry. I'm sorry.
11 I believe that's somewhere in my report. So you're
12 going to have to bear with me.
13     Well, maybe I'm confused. Maybe let's do
14 it the easy way. One's 3.5 horsepower. The other
15 is 3.0 horsepower. I'm confused by the question
16 because why wouldn't that tell you it's different
17 motors, unless you're telling me they use the same
18 motor and just call one 3.0? I'm confused by the
19 question.
20     Q   All right. Let's assume they use
21 the same motor and call one 3.0 and one 3.5.
22     A   Yeah, I don't -- I don't know. I
23 think somewhere in my report I remember having like
24 model numbers or something of the motor, but I
25 don't know that I can quickly find that for you.

Deposition of Keith Raymond Ugone, Ph.D.      Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 185

1     Q   And if you look at the MSRP column
2 there, from top to bottom goes from the lower price
3 to the higher price for MSRP; correct?
4     A   It's -- I mean, the models are --
5 **the models are rank ordered in terms of sort of**
6 **attributes and price. So, yes.**
7     Q   Generally. And if we were to add
8 another column for horsepower, as the price goes up
9 from the lowest price at the top to the higher
10 prices on the bottom generally, it also goes from
11 the lower horsepower to the higher horsepower;
12 correct?
13     A   Not -- I'm going to use a fancy
14 **word. Not monotonically. In other words, I think**
15 **there's a series of them that have the same -- I**
16 **think there might be a 2.5. There might be a 4,**
17 **and then there's a 3. But I also think there's a**
18 **number of 3.5's. I mean, we can look them up. I**
19 **can try to find them in my report.**
20     Q   No, that's all right. Can you look
21 at your Exhibit 5? And let's look at page 1 of 6
22 for the F80.
23     A   I'm sorry. I lost you. We're on
24 **Exhibit 5?**
25     Q   Exhibit 5, page 1 of 6 for the F80.

Page 186

1 If you've got the --
2     A   Okay. I'm there. I'm there.
3     Q   You got it?
4     A   Yes.
5     Q   That shows for January 2015 to
6 December 2020 Monthly Unit Sales, Average Price and
7 Invoices by sales channel; is that correct?
8     A   Yes.
9     Q   Okay. Let's just take monthly
10 average price. I just want to make sure I
11 understand this. If you look at Dick's Sporting
12 Goods, the monthly average price for the F80 is
13 $945 every month; correct?
14     A   I'm sorry. I may not -- I
15 **apologize. Which model are you on?**
16     Q   F80. Page 1 of 6 for the F80.
17     A   Okay. I'm sorry. I was on the
18 **wrong one.**
19     Q   Because on this exhibit there's 1 of
20 6 for the F63 and then 1 of 6 for the F80.
21     A   I apologize. I was on the F63. I'm
22 **sorry. Yes, it's 945.**
23     Q   All right. Is that the price that
24 Dick's paid to Sole is it your understanding, or
25 what does that price reflect?

Page 187

1     A   I believe that -- just give me one
2 **second here. Just give me one second. I believe**
3 **that's the revenue received by -- derived from the**
4 **revenue received by Sole.**
5     Q   So that wouldn't be the list price
6 of Dick's or what Dick's is selling it for. That's
7 what Dick's -- the revenue Dick's is paying to Sole
8 on average for each F80 treadmill for each of those
9 months?
10     A   As I sit here, that's my
11 **understanding and recollection, yes.**
12     Q   And --
13     A   Let me -- just give me 30 seconds on
14 **one thing just real quick. It's not going to**
15 **change my answer, but I just want to look up one**
16 **thing here.**
17     Q   You can even change your answer if
18 you like. That's just how easy I am.
19     A   Yeah, I was hoping to find a
20 **sentence -- I know it's in my report somewhere --**
21 **to confirm and point you to a sentence that says**
22 **what my answer was, but I'm --**
23     Q   I'm just looking for what you
24 understand as you sit here today.
25     A   Right.

Page 188

1     Q   In terms of the column or the row
2 with regard to Internet under Monthly Average
3 Price, what do you understand that dollar amount to
4 reflect?
5     A   I believe that would be the revenue
6 **to Sole. That's Sole's price.**
7     Q   That would be the revenue --
8     A   As opposed to the wholesale price to
9 **Dick's.**
10     Q   So that would be the revenue to Sole
11 just from their website or from other internet
12 sources?
13     A   I believe it's just from Sole,
14 **'cause Amazon is separate, as one example.**
15     Q   So if in certain months the F80 is
16 being listed on the website as 1,499.99, what
17 causes it here to be an average price of less than
18 that if you know?
19     A   Because I think there's times that
20 **people -- well, this was everything that I said**
21 **previously. That Sole monitors, for example,**
22 **Dick's Sporting Goods. And Dick's Sporting Goods**
23 **from time to time will change their price. Sole**
24 **has no control over that whatsoever, but they**
25 **always try to make sure that the internet price, my**

Case: 1:19-cv-00726-KLL Doc #: 52-1 Filed: 06/15/21 Page: 52 of 104 PAGEID #: 991

Deposition of Keith Raymond Ugone, Ph.D.  Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 189

1  understanding, for Sole matches and is not higher
2  than what Dick's is doing. So if Dick's for
3  whatever reason has a sale or does something with
4  Cyber Monday or Black Friday, my understanding is
5  Sole tries to match that such that they don't have
6  a higher price than what's at Dick's. So if
7  there's any variation in what's going on at Dick's,
8  you'll see a variation in the internet price as
9  well, which leads to the weighted average price
10  kind of moving around. That's kind of what you're
11  asking.
12    Q Yeah, in part. But in some months
13  -- it's my understanding from testimony and from
14  documents I've reviewed that in some months it's
15  1,499.99, and it's offered that the whole month on
16  Sole's website. So do you have any idea if that's
17  the case how all these figures are a little bit
18  below that? For example, would that be minus
19  shipping, minus taxes? Do you know how these
20  numbers are derived?
21    A It's along the lines of I believe
22  what I told you. I don't believe that these
23  include shipping, if that's what you're asking.
24  They wouldn't include -- they wouldn't include --
25    Q I mean, how -- do you know how they

Page 190

1  get from 1,499 -- aside from trying to mimic Dick's
2  from time to time, how they would get from 1,499.99
3  down to in May of 2015 1,403?
4    A Because I think there's also times
5  that customers call and negotiate.
6    Q Okay.
7    A I mean, they explicitly told me that
8  there are some customers that call and negotiate.
9    Q And you think there's enough so that
10  -- in May of 2015, for example, that would knock
11  the average price down from 1,499.99 to 1,403? And
12  if you don't know, you don't know. That's fine.
13    A No, no, no, I'm just -- I'm just
14  looking here. No, I stand by my answer. That's
15  just my understanding. I mean, I had that
16  conversation with them, and that was the
17  explanation I got. So I've given you the extent of
18  my knowledge, but that was the explanation I
19  received.
20    Q Could you turn to page 23 of your
21  report, please?
22    A I'm there.
23    Q And I'm just looking at the heading,
24  number 3, Mr. Gaskin's Conjoint Survey Excludes
25  Important Features That Affect Consumers' Purchase

Page 191

1  Decisions. Do you see that?
2    A Yes.
3    Q We talked a little bit about this,
4  but I want to explore it a little bit more. Are
5  you aware of any literature -- can you point to any
6  literature regarding how many attributes is an
7  appropriate number for a conjoint analysis?
8    A Yes. I mean, I think I've seen that
9  that, you know, it's -- the literature is pretty
10  clear that you're not going to have a hundred
11  different attributes because that's going to
12  overwhelm the survey participant. I think I've
13  seen in the literature that it's standard to have
14  maybe five to eight attributes. So I think the
15  literature is generally accepted to limit the
16  number of attributes so that it's, you know,
17  frankly, a doable survey. But I think the emphasis
18  is to make sure that there's a -- you know, the
19  proper attributes are being communicated to the
20  survey taker and that you don't create
21  inadvertently a -- you know, a focal bias by
22  elevating something above that which would occur in
23  the actual purchase decision. So that's the
24  balancing of what a -- you know, I think a survey
25  expert has to do.

Page 192

1    Q When you say you think you've seen
2  five to eight in the literature, is that the
3  Sawtooth guide or the Orme document that you
4  reference in your report or some other literature?
5    A I think -- I just have that as
6  background knowledge in my head, but it wouldn't
7  surprise me if it's also in that literature.
8    Q Beginning on the bottom of page 23
9  to page 24, you note the eight features that Mr.
10  Gaskin proposes to use; correct?
11    A Yes.
12    Q And what more important features do
13  you believe need to be added?
14    A Well, I think with respect to why
15  people are buying the Sole product, you know, I
16  think it would be valuable information, just as one
17  example, that when you turn to the next page that
18  the F63 has been rated Best In Class, Best In Price
19  Range in 2021, Best Buy in 2021, Great Price For
20  Quality 2021. The F80 similarly has those sort of
21  accolades and types awards. So that's providing
22  additional information to the -- you know, to the
23  consumer and, you know, frankly, goes into, you
24  know, the demand for the product and the pricing of
25  the product. I think the Sole products are known

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 193

1 as, you know, quality products, you know, at a very
2 reasonable price. So, you know, that's just one
3 example. But what I tried to do is in paragraph
4 48.a.i., ii., iii. and iv., you know, give, you
5 know, indicators of additional, you know,
6 information that would be important for a survey
7 that, you know --
8      Q   Let's just take them one at a time.
9 So you're talking about ratings or accolades or
10 awards. Would that be one --
11     A   As one example.
12     Q   All right. Would you add those to
13 the eight features that Mr. Gaskin already has or
14 proposes for his conjoint survey, or would you
15 substitute that category for one of those features?
16     A   Yeah, I haven't made that
17 determination. I'm saying those are important
18 determinants of the purchase decisions of the
19 consumer.
20     Q   And do you think that those are more
21 important than the eight that he has proposed?
22     A   I think they're very important, yes.
23 I haven't -- I haven't determined what are the most
24 important, but those are very, very important that
25 inform consumers' purchase -- purchase decision.

Page 194

1 Let me look here. You know, and it also kind of
2 goes to the individual inquiry issue. I mean, like
3 the running surface area, you know, there's --
4      Q   Let me just stick with ratings,
5 accolades and awards for a second.
6      A   Sure.
7      Q   So you think that's an important
8 attribute or feature that should be included in any
9 conjoint survey?
10     A   Especially when you're talking about
11 these products, yes, 'cause they go into the
12 purchase for these products.
13     Q   Okay. How would you do that? How
14 would you structure the conjoint survey to have
15 that category?
16     A   If there -- I mean, there's
17 different -- in a conjoint survey there's different
18 what I'll call attributes that are presented, and
19 that could be -- an attribute could be awards or
20 recommendations. It could -- you know, so for the
21 other models it could be none, none, none. Then
22 when you get to the F80 it could be, you know, Best
23 In Class or something like that. So you would put
24 it in just like any other attribute.
25     Q   Or you might put some as four-star

Page 195

1 or some as five-star in terms of their reviews?
2      A   You could do that. You could put in
3 a star rating attribute that said, you know,
4 three-star, four-star, five-star.
5      Q   And what's your basis for
6 determining whether a factor such as this is more
7 important than other factors that are already
8 there?
9      A   A., my training as an economist.
10 B., my understanding of demand drivers and the
11 consumer purchase decision. And then C., the
12 reviews that I see and all the documentary evidence
13 that I provide throughout my report on this issue.
14     Q   Where is the line between important
15 and unimportant in terms of attributes or features?
16     A   That could be something that is
17 tested in a presurvey. I don't think I saw that.
18 I wasn't going to get into all the different survey
19 techniques. But one way you can handle that is you
20 could have a presurvey. You could have a focus
21 group. You could try to figure all that out.
22     Q   In the course of your review and
23 research, did you review any treadmill buying
24 guides?
25     A   I want to -- I want to say yes to

Page 196

1 your question. I wasn't sure exactly what you mean
2 by "buying guide," but I've seen like Consumer
3 Reports. I've seen other articles on "here's the
4 types of things you may want to look for." So all
5 of that if you mean that by "buying guides," the
6 answer is yes.
7      Q   And would that include -- do most of
8 the buying guides to your knowledge suggest to
9 consumers that horsepower is an important attribute
10 when buying a treadmill?
11     A   I don't -- as I sit here, I don't
12 remember any saying horsepower was an important
13 attribute.
14     Q   On page 24 at the very top of the
15 page, first full sentence, you say, "He will inform
16 survey respondents that any other features not
17 shown on the survey are assumed to be the same for
18 all of the treadmills presented."
19     Do you see that?
20     A   I do.
21     Q   Is there anything wrong with
22 informing respondents of that?
23     A   Yes, because not all of them can be
24 Best In Class. Not all can be Best In Price Range
25 in 2021. Not all can be Best Quality For Price in

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

1  **2021. Not all of them can have -- I saw in some of**
2  **the reviews no deficiencies noted.**
3     Q   And I'm getting away from ratings,
4  accolades and awards, and I'm just asking in terms
5  of conjoint analysis. When you choose eight
6  features like Mr. Gaskin proposes, is it wrong to
7  then with respect to any other possible features
8  inform respondents that they're assumed to be the
9  same for all the treadmills?
10    **A   I think that it's right when it's**
11 **not meaningful, wrong when it masks other**
12 **meaningful differences.**
13    Q   Isn't it a common practice for
14 conjoint analysis to tell survey respondents that
15 apart from the attributes that are being
16 considered, they should assume that any other
17 attribute is the same for all treadmills or
18 whatever product?
19    **A   It may be okay for a properly**
20 **developed survey. But if there's meaningful**
21 **differences that could affect the purchase decision**
22 **or the price, and you tell people that all other**
23 **attributes are the same, then that's masking,**
24 **frankly, what's the valuation -- the relative**
25 **values of the attributes in the survey process.**

1     Q   Page 24, paragraph 48, says, "From
2  an economic and claimed damages perspective" --
3     **A   I apologize. I missed where you**
4  **wanted to direct me to.**
5     Q   I'm sorry. Page 24, paragraph 48.
6     **A   Okay.**
7     Q   "From an economic and claimed
8  damages perspective, Mr. Gaskin's proposed conjoint
9  survey would cause participants to place greater
10 weight on the eight included features in the
11 conjoint survey (including CHP) as compared to what
12 they would at the time of purchase in the
13 marketplace."
14    Do you see that?
15    **A   Yes.**
16    Q   Why do you say this is from an
17 economic perspective? Isn't it from a survey
18 design perspective?
19    **A   No, we're talking about -- I mean,**
20 **one could approach it from a survey design**
21 **perspective, but I've always said I'm a forensic**
22 **economist and damage quantifier. And I want to**
23 **make it clear to the reader -- I mean, even though**
24 **you asked me a lot of survey questions, I'm**
25 **critiquing this from an economic and damages**

1  **perspective, and we're talking about the**
2  **determinants of the demand for these particular**
3  **products. That's clearly an economic concept.**
4  **We're talking about prices. That's clearly an**
5  **economic concept. So I want to make it clear to**
6  **the reader that my analysis is from an economic and**
7  **claimed damages perspective. I'm not approaching**
8  **this from a survey perspective, although there can**
9  **be -- if you know what I mean by a Venn diagram,**
10 **there's going to be an overlap between what a**
11 **survey person may look at and what an economist**
12 **will look at. It's not an either/or. Both of us,**
13 **you know, look at some of those things. But I'm**
14 **always looking at it from an economic and claimed**
15 **damages perspective.**
16    Q   And wouldn't this be a criticism of
17 Mr. Gaskin's proposed survey, not conjoint analysis
18 in general?
19    **A   I didn't quite get the question.**
20    Q   Wouldn't your criticism at the
21 beginning of paragraph 48 be a criticism of his
22 proposed survey methodology rather than conjoint
23 analysis in general?
24    **A   Yeah, if I can maybe translate a**
25 **couple of the words. It's his -- this particular**

1  **criticism goes to his implementation, if that's**
2  **what you're asking.**
3     Q   Not to conjoint analysis?
4     **A   There's others that go to the**
5  **conjoint analysis. This one goes to the**
6  **implementation.**
7     Q   Let's talk about on page 25, the
8  first bullet above romanette iii. You say,
9  "Similarly, the F80 received" various awards
10 including "Best Quality For Price 2021." Do you
11 see that?
12    **A   Yes.**
13    Q   And you're saying something like
14 that should be included as an attribute?
15    **A   Well, I'm saying it's important for**
16 **-- my understanding is that the Sole products and**
17 **the F80 -- frankly, the F80 and the F63 are the**
18 **best sellers. I think both of them combined**
19 **comprise, you know, over 80 percent of their unit**
20 **sales, maybe even 87 percent. So those are the big**
21 **sellers. So the question is, what differentiates**
22 **those products? And both of those products -- not**
23 **only has it been revealed in the marketplace that**
24 **those are highly valued products by consumers'**
25 **purchasing decisions relative to all of the Sole**

Deposition of Keith Raymond Ugone, Ph.D. Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 201

1 products, but it's also been recognized by
2 independent third parties as a quality product.
3 Those -- that type of information is important to a
4 consumer's, you know, purchase decision.
5 Q Wouldn't it be possible for a
6 different reviewer to also say that a Bowflex or
7 Nautilus or NordicTrack treadmill was Best Quality
8 For Price 2021?
9 A So you'd want to -- remember what I
10 said when you asked me, "How did you do this?" And
11 I said, "Well, you've got your attribute list."
12 And I gave you the simple example that if you have
13 four products it could go, you know, at awards "no,
14 no, no," and then when you get to the F80, "Yes,
15 and here is what they are." Well, if there's other
16 ones that have it, you put that in in the attribute
17 list. I'm not saying to the exclusion of the
18 others. I'm saying that's an attribute. It's
19 either "yes" or "no" or you describe what it is.
20 Q Can you point to any conjoint survey
21 analysis that you're aware of that included this
22 category of awards or accolades or reviews as an
23 attribute?
24 A Yeah, I don't -- I don't know that I
25 can do that. I don't remember one way or another,

Page 202

1 frankly. But I'm telling you as an economist these
2 are highly valued products that are known as
3 quality products, and that can have an influence on
4 the purchase decision and the price that's paid.
5 So quite independent of whether people put that in
6 conjoint analyses or not, I'm saying from an
7 economist point of view that's a driver of demand,
8 and that's how I'm evaluating things, as I've said
9 all along, from an economic and damage
10 quantification perspective.
11 Q Let's look at page 25, romanette
12 iii., for Consumer Reports. You note that the
13 Consumer Reports -- this is about from the middle
14 down to the bottom. You say, "Additionally,
15 Consumer Reports lists four factors consumers
16 should consider when making a treadmill purchase:
17 size, ergonomics, high-tech features and
18 adjustability. These product features are not
19 included in the survey proposed by Mr. Gaskin."
20 Do you see that?
21 A Yes.
22 Q What do you understand size to mean
23 there?
24 A Size can include actually the total
25 dimensions. I don't know if you've seen some of

Page 203

1 the Sole products, but I have the F80, and this is
2 a huge machine. So you've got to figure out, okay,
3 I may like the treadmill, but is it going to fit in
4 the space allocated for it in my house or the
5 garage or whatever? So there's size. That can be
6 the size of the actual belt. But regardless of the
7 belt size, is the -- what is the total dimensions?
8 These are tall machines, and their length and width
9 is quite big. And if you want to put in size, I
10 mean, this thing weighs, I don't know, more -- you
11 know, 300 pounds. I mean, it was a struggle. So
12 all of those things could go into the purchase
13 decision.
14 Q And when Consumer Reports is talking
15 about size here, do you have any knowledge of
16 whether they're talking about the running surface
17 area or the total dimensions?
18 A Yeah, for some reason -- and it
19 might be later in my report -- but I took the size
20 to be the total -- the total dimensions.
21 Q And the next category is ergonomics.
22 And what did you understand Consumer Reports to
23 mean by ergonomics?
24 A Yeah, that's -- I'm trying to figure
25 out a synonymous word for that. But it's almost I

Page 204

1 would say, you know, for the individual the feel of
2 the -- you know, the feel of the treadmill.
3 There's some people -- and I'll admit I don't know
4 how they do this -- don't use the handles at all.
5 I find the need to have my arms on the handles.
6 And so, you know, that's what I consider to be the
7 ergonomics. If I was not comfortable with the
8 placement, maybe the height or the length of those
9 handles, for me at least that would be, you know,
10 bad ergonomics for me. So, you know, I'm always
11 very careful when I give "here's the survey of
12 one," I jokingly say, "type example," but I'm just
13 trying to give an idea to help explain what I mean
14 by that. But that's how I take the ergonomics.
15 Q And how would you address ergonomics
16 in a conjoint survey?
17 A You know, I don't disagree that some
18 of it is -- you know, some of it is more difficult
19 to measure, but there could be -- you know, there
20 could even be, you know, statements about, you
21 know, whether they -- there could be statements
22 about the ergonomics. I mean, there's products
23 that -- out there that I think are marketed-based
24 on their ergonomics. So there might be a way to
25 implement that.

Deposition of Keith Raymond Ugone, Ph.D.　　　　Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 205

Q    The next feature discussed by Consumer Reports it says high-tech features.

A    Right.

Q    What did you understand that to mean?

A    Like does it have Bluetooth?  Can you stick your, you know, iPod in and earplugs and play music?  Those types of things.

Q    Would that include the display screen and whether it has heart rate monitoring?

A    I think it could.  You could put that under there.  But I think as time goes on -- we talked about, you know, taste and preferences of today versus six years ago, and this could be one area where there's certain technologies that have developed over time that have become relatively more important over time.  And so that's an example of, you know, making sure that you understand that currently this is what people are either interested in or Consumer Reports is saying you should evaluate because maybe this is something that you'd want.  And I think that's the point.  But that's another reason to, you know, for example, do your presurveys to make sure you're getting all the right determinants of demand.

Page 206

Q    In terms of adjustability, what did you understand that to mean?

A    I'm going to give a tautological answer, but then I'll explain.  Adjustability would be the various gradations.  So it's not just the maximum.  It's not just, you know, goes to 12 miles per hour, the belt.  Or it's just not that you get a 15 percent incline.  I think it's also the adjustability within -- within that -- within that spectrum.  'Cause not everybody is going to go to 12 miles per hour.  Not everybody is going to go to the 15 percent decline.  So that may actually be, you know, irrelevant, you know, for the consumer.  I might be too embarrassed to say what I set my treadmill at, but it's nowhere close to the 12 miles per hour.

Q    Me neither.

Apart from reviews, awards or accolades, what other features would you include on a conjoint survey in this case apart from the ones Mr. Gaskins proposes?

A    Well, I would evaluate either through a focus group or presurvey or the various reviews other items for consideration.  So, for example, if you turn to page 26, it talks about in

Page 207

the third bullet point, third line from the bottom, "Advance rolling technology" -- I take that to be the belt as the belt goes around -- "that keeps the Sole F80 much quieter during operation than most of its competitors."  And then they've got the storability, storable nature of the machine as some things that set the F80 apart from the competition.  And the point is that if -- if prices are relatively the same across comparable type models, but if the F80 has attributes that set it apart that differentiate it from its competitors and you don't put that into the survey, when you ask about one attribute you may inadvertently be valuing that one attribute you ask about and be giving it too much weight when the customer may not realize that at that price you get some other important attributes as well, such as how quiet it is.  Some people work with, you know, earplugs, so it may not matter, but other people might want to watch TV while they're on the treadmill, and if it's too loud it's hard to hear.  That may be important.  Other people may want to when they're done fold it up and roll it away into a closet.  So that could have some value and some weight.  And if you don't differentiate, you may inadvertently -- the point

Page 208

is may inadvertently have the survey respondent put too much weight on that which is included as an attribute.

Q    If you have the attributes as suggested by Mr. Gaskin, aren't any attributes that aren't in that list held constant across all product choices?

A    But that may not be true.  That's my point.  That may not be true.  Those may be additional differentiators.  That's what this is saying is that --

Q    But just -- whether it's true or not, the instructions to the respondent would say hold those constant across all product choices; correct?

A    I think that would be accurate as just a statement.  I don't think that it helps with the evaluation of the value of the attribute -- of the particular attributes.

Q    If CHP is not a valuable attribute, that will be determined from these eight factors regardless of whether Mr. Gaskin includes another factor that you believe to be more important, wouldn't it?

A    I don't think that's an accurate

Deposition of Keith Raymond Ugone, Ph.D.        Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 209

statement. The magnitude will change.

Q All right. Page --

A I lost track. Has it been an hour, or are we short of an hour?

Q It's been about an hour. Let's take five minutes, and then hopefully finish up.

A Okay. Great. Thank you.

(Whereupon, a recess was taken.)

Q So looking at page 27 of your report under romanette vi.

A Yeah, let me turn there.

Q You say that "By omitting the aforementioned features, functionalities, and attributes from his proposed conjoint survey, Mr. Gaskin will in a focus-biased way focus survey respondents' attention to the few features included in the survey (including CHP) and artificially inflate the willingness to pay for these features (relative to the significant features, functionalities, and attributes considered by consumers when actually purchasing the challenged products)."

Do you see that?

A I do, yes.

Q Do you have any basis in the

Page 210

literature that you can point to for that assertion?

A Absolutely. I mean, it's -- so, first of all, I'm going to answer it in two parts. The first part is just from the economic perspective. By just having everything else in this --

Q We've got a limited amount of time today. Not from an economics perspective. In the literature, is there any literature, any research article or article, software guide for Sawtooth software that you can point to that supports your statement?

A Yes. Everywhere in the survey literature they talk about focus bias -- focus bias or focal bias. That is a common issue in surveys. Now, I'm saying that I've seen it. I was trying to make sure we all understand I'm coming at this from an economic perspective in the relative weighting. But if you want to have my understanding of the survey literature, that is absolutely an everyday issue with surveys.

Q And is it in that literature -- in all the conjoint survey literature a suggestion that you're focus biasing the survey by having

Page 211

certain attributes, but not having what you would consider important attributes?

A Yes.

Q And can you point me to any particular article that you believe supports that notion?

A Yeah, I think -- and I can't give you a specific citation, but I don't think it would be hard to find. You just look it up. I don't have an article for you.

Q Any Orme literature, any Sawtooth literature?

A It wouldn't surprise me if it's there. I'm just saying I don't have a particular citation for you, but it's a common occurrence. You'll find it in all the literature.

Q Under heading b. you say, "Mr. Gaskin will include CHP regardless of whether respondents identify it as an important attribute."

Do you agree with that?

A I do.

Q If it's not important, won't respondents rate it at not important?

A Just one second. Give me a second here.

Page 212

Again, if you keep going until the end of that section b. at the romanette ii., the cautionary note is whether again that would create in a sense a focus bias or not. So that's where you have to be very, very careful in the design of the survey is my understanding. So that's the point of that section.

Q I don't -- I'm confused now. Are you saying that if CHP is not important that including it will create a focus bias?

A Or it could. That's where you have to be careful in the design of the survey, or from an economic perspective what are the real demand drivers. Hopefully that's uncontroversial. That if you include an attribute, you want to make sure that you don't inadvertently cause the responder to put too much weight on that attribute that they wouldn't have otherwise considered when they were deciding -- making their purchase decision.

So it's a factual statement Mr. Gaskin will include CHP regardless of whether respondents identify it as an important attribute, but then the punch line is whether you make sure that you don't inadvertently create respondents putting too much weight on it.

Page 213

1  Q  And that would just be an aspect of
2  the design of the survey; correct?
3      A  I'll agree with you, sure.
4      Q  All right.  Page 28, romanette ii.,
5  Sole's Removal Of Challenged Claims From Its
6  Website.  Do you see that?
7      A  Just a second.  Yes.
8      Q  What's the import of that paragraph?
9      A  Well, it's within section b. about
10 whether CHP is important or not.  And so I gave you
11 romanette i., which talks about how infrequent even
12 the concept of horsepower is in the Google ads, and
13 then in romanette ii. that it's been removed from
14 the Sole website.  So that's just backing up what's
15 going on in b.
16     Q  All right.  So it's been removed
17 from -- your understanding as of August 26, 2019,
18 it was removed from the Sole website, and you state
19 then, "However, sales of the challenged products
20 were not affected by this removal."  Is that
21 correct?
22     A  Yeah, that's my understanding, sure.
23     Q  Are those two statements the basis
24 for the next statement, which is that in reality
25 consumers do not appear to place weight on CHP in

Page 214

1  making their purchase decisions?
2      A  I want to see -- I don't see where
3  you're reading from.  I apologize.  I don't see
4  that next statement you said.
5      Q  Right underneath there above c.  It
6  says, "By including CHP as one of the features on
7  the survey proposed by Mr. Gaskin, Mr. Gaskin will
8  focus survey respondents to the feature even though
9  in reality they do not appear to place weight on
10 CHP in making their purchase decisions."
11     A  Yes.  I'm sorry.  I didn't mean to
12 cut you off.  But, yes, those two are supportive of
13 this as well.  Yes.
14     Q  So you're saying, if I can
15 paraphrase, in August of 2019 they removed the
16 challenged claims from their website.  They took
17 off the CHP.  And the sales for September 2019
18 through March 2020 were roughly the same as from
19 the prior year during that period, which to you
20 leads to the conclusion that consumers do not place
21 much weight on CHP in making their purchase
22 decisions?
23     A  I think your statement was too
24 narrow.
25     Q  Okay.  How?

Page 215

1      A  Well, you just quoted from romanette
2  ii. when above that is romanette i., plus there's
3  everything else in my report.  So you tried to just
4  read romanette ii. and say that was the only basis
5  for the conclusion.  No, that's not the only basis
6  for the conclusion.
7      Q  Is it one of the bases for the
8  conclusion?
9      A  It's one of the bases for the
10 conclusion.
11     Q  Okay.  And how did you conclude that
12 sales of the challenged products were not affected?
13     A  Well, I think that's also in the
14 deposition testimony of Mr. Macfarlane.
15     Q  As an economist, can you conclude
16 that sales were not affected simply by comparing
17 sales in one seven-month period to the same
18 seven-month period a year earlier?
19     A  I mean, I think you always have to
20 be careful when you're doing, you know, comparisons
21 across time.  I've already said that earlier in my
22 depo here.  But it's just one indicator that
23 there's been no -- there was no evidence of, you
24 know, price pressures or unit sales pressures
25 associated with the removal of that challenged

Page 216

1  claim.
2      Q  Did you look to see what the sales
3  trends were, that is, taking -- did you determine
4  whether taking C from the website had an effect on
5  sales in terms of sales were increasing and then
6  they stagnated from one period to the next?
7      (Pause)  Are you looking back at your
8  sales reports?
9      A  Yeah, I'm looking back at -- I mean,
10 I had that information in Exhibit 5 to Ugone
11 Exhibit 1 where I just have some charts of the F63
12 and the F80.  But I was also relying upon, you
13 know, the deposition testimony as well of Mr.
14 Macfarlane.
15     Q  Could sales also have been affected
16 by new entrants in the marketplace?
17     A  Actually, I'm a little confused.  In
18 general, sales may or may not, but can be affected
19 by new entrants.  But I'm confused by the question
20 within the context -- if it was any way related to
21 your prior questions, I'm confused.  If it was just
22 a new question --
23     Q  What I'm saying is you're saying,
24 "Look, they took the C off, and during this
25 seven-month period after they took the C off it was

Case: 1:19-cv-00726-KLL Doc #: 52-1 Filed: 06/15/21 Page: 59 of 104 PAGEID #: 998

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 217

1 the same sales roughly as the prior year
2 seven-month period when the C was on." That's what
3 I understand you to be saying; correct?
4     A   Yes. That's my understanding, yes.
5     Q   And I am saying, let's suppose there
6 was a new entrant into the marketplace during the
7 second seven-month period. Couldn't that affect
8 the sales?
9     A   It could, but you would expect sales
10 to go down. That's why I'm confused.
11    Q   Right. So they otherwise would have
12 been higher during that second month period, but
13 because of the new entrants they were the same?
14    A   Right. So that's the point. If you
15 take away the new entrant, they would have
16 higher after having taken the C off --
17    Q   Okay.
18    A   -- which is -- which is
19 diametrically opposed to the theory, as I
20 understand it, that your experts are putting forth.
21    Q   Right. Okay. And advertising can
22 also have an effect; correct?
23    A   Yeah. Sure.
24    Q   And changes in fitness trends?
25    A   Yes.

Page 218

1     Q   And you didn't examine any of that?
2     A   Actually, I did try to examine that
3 because that's why I only took it through the
4 seven-month period up to March 2020. So I tried
5 not to go into the pandemic period, which I think,
6 you know, roughly people started seeing things
7 related to the pandemic I think around March 2020.
8 So I was actually trying to control that by not
9 taking it for a longer period of time.
10    Q   Let's go to your statement that as
11 of August 26th they removed the challenged claims
12 from the website. Your understanding is they
13 removed the C from the CHP on the website; correct?
14    A   They removed the C. They -- yes, I
15 think they report just the horsepower figure now.
16 Although there's other qualitative statements about
17 certain things unrelated to the disputed
18 statements, but there's I think some other
19 statements related to the motor.
20    Q   Is it your understanding that
21 without the C the horsepower claims are accurate?
22    A   My understanding is that there's the
23 C continuous aspect. I do believe that there's
24 some claims that you don't get the absolute
25 horsepower. Irrespective of continuous, that you

Page 219

1 also don't get the absolute horsepower. I think
2 that's part of my understanding of what the
3 dispute's about.
4     Q   If the claims even without the C are
5 still false, does that affect your conclusion?
6     A   No, because it would still affect
7 the relative magnitudes.
8     Q   Do you know whether Sole removed the
9 CHP claims from its literature in August of 2019?
10    A   I can't speak to that. I know I've
11 looked -- I'm sorry.
12    Q   Go ahead.
13    A   I know I've looked at a lot of the
14 -- the website and the backup documentation, and I
15 think, you know, frankly, it gets kind of
16 complicated. But when you go to the website they
17 have the little "more" soft button, and you can
18 keep clicking that and get more detail type
19 information. And I don't think I saw the C at
20 least in those different layers or different pages
21 on the website. I can't speak totally about maybe
22 user's manuals.
23    Q   Dick's is the largest seller of Sole
24 treadmills; correct?
25    A   I believe that's accurate, yes.

Page 220

1     Q   Do you know whether Sole instructed
2 Dick's to remove the CHP claim from its website or
3 promotional materials?
4     A   I don't know if they have the
5 ability to tell Dick's what to do, so I can't speak
6 to what Sole might have said or not said to Dick's.
7 But I think Dick's makes it own decision. I don't
8 think -- I don't think Sole tells Dick's how to
9 advertise the treadmills.
10    Q   So if Dick's, the largest seller of
11 Sole treadmills as we sit here today, on its
12 website under the F80 says, "Challenge yourself on
13 a powerful 3.5 CHP motor that provides runners a
14 safer but harder routine," would that have any
15 effect on your conclusion that the removal of the C
16 had no effect on sales?
17    A   You mind just reading the quote
18 again?
19    Q   The first line of the product
20 information on Dick's website for an F80 is
21 "Challenge yourself on a powerful 3.5 CHP motor
22 that provides runners a safer but harder routine."
23    A   Yeah, I mean, I was very clear about
24 this, that it was Sole that removed the C, I guess,
25 from its website. As I said in my answer, I don't

Page 221

1 believe they have control over -- over Dick's.

2     Q   Do you know whether Sole instructed

3 Amazon to remove the CHP claim?

4     A   I have no knowledge one way or

5 another.

6     Q   I assume, like the rest of the

7 world, you've used Amazon from time to time?

8     A   I think it may be a -- a website

9 that people go to occasionally.

10     Q   Are you aware that a number of

11 products will have a section entitled "From The

12 Manufacturer"?

13     A   This is going to sound horrible, but

14 I'm not actually an Amazon buyer.  So --

15     Q   Well, on Amazon some products will

16 have a section entitled "From The Manufacturer."

17 And with regard to Sole treadmills, under that

18 section there's a chart that compares different

19 Sole treadmills and has one basis for comparison

20 CHP.  Do you know whether Sole suggested to Amazon

21 that they remove the CHP designations from the

22 descriptions on their "From The Manufacturer"

23 information?

24     A   Yeah, I don't know one way or

25 another.  It might be -- and I can't speak to

Page 222

1 whether it's out of date.  I don't know how the

2 website pages get updated.  But if it's "From The

3 Manufacturer" and if the manufacturer or Sole no

4 longer has it on its own website, there may be a

5 timing issue.  But I'm speculating.  I can't speak

6 one way or another.

7     Q   Assuming all that Sole did was

8 remove the C from CHP on its own website, but not

9 the websites of other major retailers, not on the

10 treadmill decals, would you still conclude that

11 Sole's removal of the C from CHP demonstrates, in

12 whole or part, that consumers do not appear to

13 place weight on CHP in making their purchase

14 decisions?

15     A   When you take the totality of

16 everything in my report together, yes, it's not

17 inconsistent with that.

18     Q   On page 28 under c. you say, "Mr.

19 Gaskin will include in the choice sets treadmills

20 offered by other manufacturers that allegedly

21 contain inflated CHP claims."  Do you see that?

22     A   I do.

23     Q   How would including these products

24 in his choice sets what you call "taint" the

25 profiles of the products used?

Page 223

1     A   Yeah, I'm making the point that he's

2 including tainted products.  You know, part of the

3 quandary I have is I'm not sure what that's going

4 to do.  I'm not sure I can predict which way it's

5 going to go.  But I think I understand -- just bear

6 with me here -- the NordicTrack treadmill and I

7 think the Nautilus/Bowflex treadmills have been

8 accused as well, or at least those are the ones

9 that I'm knowledgeable of.  And those were some of

10 the brands that Mr. Gaskin was including in his

11 conjoint survey, and I'm not sure which way that's

12 going to have an effect.  But let's put it this

13 way.  From a damage quantification perspective, you

14 usually don't include impacted or tainted

15 benchmarks.  That's sort of a general rule in

16 damage quantification, and I'm just noting that

17 they are -- he is including two of what I would

18 consider to be accused -- or to have accused

19 products in other lawsuits.

20     Q   You state that Mr. Gaskin does not

21 state whether he would inform survey participants

22 of the allegations relating to the CHP for other

23 products.  Should he in your view?

24     A   Let me read the sentence.  Bear with

25 me.

Page 224

1     Yeah, I'm just factually stating that

2 "Mr. Gaskin" -- let's read the sentence -- "does

3 not acknowledge or discuss that two of the other

4 brands he proposes to include in his choice sets

5 are challenged products in other matters."  That's

6 a factual statement.  So he doesn't acknowledge it.

7 "Or what the effect of such inclusions may have on

8 the reliability of his results."  That's a factual

9 statement, too.  "Or whether Mr. Gaskin would

10 inform survey participants of such allegations."

11 And so the issue there is how much of a description

12 does Mr. Gaskin provide to the survey respondents

13 on all the other -- on all the other attributes.

14 And that's part of the problem of him proposing

15 versus actually implementing.  Because when

16 somebody implements a survey, you see exactly what

17 their descriptions are going to be, what they

18 include, what they don't include, and then you can

19 give an even more complete evaluation of the

20 survey.  But without the implementation, the point

21 is -- I'm saying here is I don't know how he's

22 going to handle this or how far he's going to go.

23     Q   But my question is, should he inform

24 survey participants of the allegations relating to

25 the CHP of other products in your view?  Let's try

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 225

1 to avoid a damned if you do, damned if you don't.
2 When he implements it, if he informs the survey
3 participants, are you going to say, "Oh, you
4 shouldn't have informed the survey participants"?
5 But if he doesn't, are you going to say, "Oh, you
6 should have informed the survey participants"?  So
7 which one is it?  Should he or shouldn't he?
8      A   Yeah, I guess what I'm saying is,
9 that for general damage quantification techniques
10 you do not have tainted benchmarks.  So I can tell
11 you that for sure.  But then the issue is if you're
12 going to include the tainted benchmarks, do you put
13 some of that in the description?  Part of the
14 problem about NordicTrack and Nautilus is at least
15 I don't know where they are in their -- you know,
16 in the litigation process and whether they're going
17 to be found to not have been engaged in wrongful
18 conduct, and that would probably inform my position
19 as to whether you should include them or not.  But
20 I'm just saying something really different.  What
21 I'm saying is you need to make sure that there's a
22 proper description of -- whatever the attributes
23 are, that there's a proper description.  I think
24 that's really what I'm saying.  So if he has a
25 proper description, I'm not going to fault him for

Page 226

1 having a proper description.
2      Q   On page 29 at the bottom going over
3 to page 30 there's a sentence that says, "To the
4 extent survey respondents' interpretation of CHP is
5 different from Mr. Gaskin's definition, Mr.
6 Gaskin's proposed survey will not result in a value
7 that reflects the willingness to pay for the CHP
8 feature as defined by Mr. Gaskin."
9      Do you see that?
10      A   I do.
11      Q   If consumers are given a definition
12 for CHP, aren't they then able to make their
13 tradeoffs based on that definition?
14      A   Just one second.  Let me catch up
15 with you here.
16      If I understand your question -- and,
17 clearly, tell me if I'm missing the mark in my
18 answer -- but we say before that "Mr. Gaskin
19 defines CHP as 'how much power the treadmill motor
20 maintains throughout the workout.'"  And I think
21 that's directly quoting from his Declaration.  But
22 even that would be open to interpretation.  In
23 other words, does the belt maintain its speed, or
24 does it hesitate at times?  Are there problems when
25 it's on an incline versus being flat?  Are there

Page 227

1 problems when you up the speed versus having at a
2 lower speed?  So I'm saying that to the extent the
3 survey respondents interpret that definition
4 differently or interpret CHP differently, then
5 that's when it will not result in measuring what
6 Mr. Gaskin is attempting to measure.
7      Q   Let's move on.  Page 30.  Page 30,
8 paragraph 51, you talk about that "Sole is
9 contesting liability."  So?  What difference does
10 that make?
11      A   This goes again probably -- your
12 question why does this matter.  This might matter
13 in terms of the information flow either to a
14 consumer or to a survey respondent in terms of, you
15 know, the different views.  So it says, "I further
16 understand that the liability expert has concluded
17 that the challenged products provide the HP output
18 needed to operate the treadmills to move the
19 specific user at the desired speed during their
20 workouts, namely, 0.5 miles per hour to 12 miles
21 per hour."
22      So these treadmills can go from half a
23 mile an hour to 12 miles per hour, and the motor --
24 the motor does its job doing that.  I'm not on the
25 liability side.  I'm not the technical person.  But

Page 228

1 it just seems to me that you want to make sure in
2 the survey that the respondents get enough
3 information to make an informed decision and to
4 provide accurate information as to what the survey
5 is trying to obtain in terms of information.  I
6 think that's the point there.  It's not -- it's not
7 -- well, let me try it this way.  That's how I
8 think -- what I'm trying to say in that paragraph.
9      Q   Let's go to paragraph 52.  You talk
10 about "For consumers who researched and understood
11 the HP rating contained on Sole's marketing
12 material for the challenged products (i.e., that
13 the products do achieve the desired performance),
14 the value obtained by Mr. Gaskin would be an
15 inappropriate measure of economic harm because the
16 performance of the products would not be any
17 different than what the consumer actually is
18 achieving."
19      Are you suggesting there that a consumer
20 could research and determine that the F80 does or
21 doesn't achieve 3.5 horsepower?
22      A   I think this is what we talked about
23 previously, "For consumers who researched and
24 understood the HP rating contained on Sole's
25 marketing material for the challenged products,

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 229

1  (i.e., that the products do achieve the desired
2  performance)."  So it's just making sure that
3  ultimately, frankly, regardless of what the
4  horsepower capabilities are or the horsepower
5  ratings, if the consumer is looking for a
6  particular performance level, the consumer is
7  paying for that performance level.  And they may
8  understand the performance level they're getting.
9  That's the point.
10      Q   Okay.  Great.  Page 32 to 33,
11 paragraph 57, you're talking about the Sawtooth
12 software, and you have a sentence there that reads,
13 "However, the market simulation procedure described
14 by Mr. Gaskin does not incorporate competitors'
15 products and, hence, does not reflect the procedure
16 as described by Sawtooth software."
17      Do you see that?
18      A   I'm sorry.  Can you just point it to
19 me?  I didn't quite see it yet.
20      Q   Paragraph 57, last line on page 32,
21 middle of that line.  "However, the market
22 simulation procedure described by Mr. Gaskin does
23 not incorporate competitors' products and, hence,
24 does not reflect the procedure as described by
25 Sawtooth software."

Page 230

1      A   Right.  Okay.  I see it now, yes.
2      Q   There's no cite there.  Are you
3  suggesting that Sawtooth software or one of the
4  guides relating to it says that a simulation such
5  as the one Mr. Gaskin proposes has to include a
6  competitors' products?
7      A   I'm saying that the Sawtooth
8  software descriptions caution against getting
9  results that are less accurate when you do not
10 acknowledge in the market simulations the existence
11 of competitive products.
12      Q   All right.  So you're suggesting
13 that the Sawtooth software guides would tell us
14 that we should incorporate competitors' products
15 into the market simulation?
16      A   Yeah, and you said that I had no
17 citation.  That's not quite accurate.  If you go to
18 paragraph 60, at the end of the first sentence
19 you'll see a citation to documentation.
20      Q   Okay.  And it's your contention that
21 that documentation, paragraph -- I'm sorry.  What
22 did you say?
23      A   Paragraph 60 on page 34.
24      Q   Mm-hmm.
25      A   End of the first sentence.

Page 231

1  Unfortunately, it's a long sentence, so about
2  halfway down.
3      Q   All right.  And you're saying that
4  the Orme document, "Market Simulators for Conjoint
5  Analysis," would suggest that competitors' products
6  should be included in a market simulation?
7      A   Yes.
8      Q   Okay.  And I know you've been
9  subject to Daubert motions before.  Can you tell me
10 roughly how many times?
11      A   No, but some of it might depend on
12 the cause of action.  But also, as you know, as all
13 attorneys know, I mean, Daubert challenges are kind
14 of another weapon in the attorney's arsenal these
15 days.  So whether they have merit or not, you know,
16 you see a lot of Daubert challenges because there's
17 probably -- the only thing better than knocking out
18 the damages expert is maybe knocking out the
19 liability expert.  So you just kind of see that.
20 So I guess --
21      Q   In one instance involving this type
22 of analysis you were excluded from giving certain
23 opinions regarding conjoint survey analysis.  And I
24 know Daubert motions tend to be more common
25 nowadays.  Apart from that, have your opinions ever

Page 232

1  been excluded or limited?
2      A   Yeah, I might have missed the
3  beginning of it.  If we talk about consumer class
4  action cases -- I don't know if you want to
5  restrict me to that versus other types of cases,
6  but in consumer class action cases there's been a
7  number of Daubert challenges.  I think I know of
8  one case -- well, I certainly know of one case
9  where they challenged on the basis of me not being
10 a survey person.  But I absolutely remember the
11 judge saying, "Hey, I read the report, and he
12 absolutely is qualified to talk about what he's
13 talking about," because it's sort of the economic
14 and damage quantification issues.  So there's been
15 attempts at that.  And, like I said, I absolutely
16 saw an opinion where the judge disagreed.  So that
17 was, I think, denied in whole.  There was a
18 challenge once on a whole report, and I think it
19 was like one paragraph unrelated to survey
20 techniques where the judge had a problem with one
21 paragraph in a hundred-page report.  And I think
22 there's one other I remember where the plaintiffs
23 were complaining about four or five things that I
24 was saying, and the judge agreed with one of them.
25 But, generally speaking, I would -- you know, I'll

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 233

1  put my body of work on consumer class action cases
2  up against anybody.  And I think I've, you know,
3  been relatively unscathed.  That's not to say that
4  there hasn't been, you know, a little issue here or
5  there, but overall, I mean, the types of opinions
6  I'm giving here I give all the time.  And it's been
7  precious few times that the judges disagreed from a
8  Daubert perspective of what I was doing.  But I
9  think to the best of my ability I've also tried to
10 give you each and every occurrence in consumer
11 class action cases that I'm aware of.
12     Q    Would you agree that Sole has
13 prevalently represented in its advertising and
14 marketing that its treadmills have a specific
15 continuous horsepower, or CHP, from January 1st,
16 2014, through December 31st, 2019?
17     A    I have -- I do not have independent
18 evidence of that.  I know what the assertions are.
19 I know when they no longer had the CHP on the
20 websites as of August 2019.  I can't factually say,
21 you know, over the entire time.  I just don't know.
22 I'm accepting that assertion by the plaintiffs.
23     Q    You would agree that it's reasonable
24 for Sole treadmill purchasers to rely on Sole's
25 advertising when purchasing a treadmill?

Page 234

1     A    Sure.  I'll agree with that.  But,
2  you know, this is also a type of good that people
3  do their own independent research as well.  So I
4  think consumers look at a variety of information,
5  also an experience good, test it out.  But I'm not
6  going to walk away from, you know, if the
7  manufacturer advertises that people will look at
8  that.
9     Q    And when Sole's putting together
10 advertising, they're trying to focus on points they
11 believe will resonate with a potential purchaser to
12 induce them to purchase the product; correct?
13     A    I think I will agree with that.  But
14 if you also look at the websites, there's a wealth
15 of information there.  I mean, there's a lot of
16 different attributes.  And then they also -- my
17 understanding from Mr. Macfarlane's testimony is
18 that, you know, they basically did the experiment
19 of let's take the C off, you know, and see what
20 happens.
21     Q    You would agree that the advertising
22 and consumer products sold at retail can have an
23 influence on the market price paid by a consumer of
24 that product?
25     A    You can say -- I just missed the

Page 235

1  thrust of the -- you can say the exact same words.
2  I don't need you to change your words.  I just need
3  to hear it again.
4     Q    You would agree that advertising of
5  consumer products sold at retail can have an
6  influence on the market price paid by a consumer of
7  that product?
8     A    I think it depends.  I mean, are you
9  differentiating your product -- you know,
10 advertising provides information, and it informs
11 consumers, not only with respect to the product
12 being advertised, but perhaps differences to other
13 products.  Some advertising can be demand
14 increasing, and that could have an impact on price,
15 or it could have an impact on the unit sales.  So I
16 think it just depends on the facts and
17 circumstances and the nature of the advertising.
18     Q    I'm going to give an example.  Would
19 you generally agree that organic food products are
20 more expensive than nonorganic?
21     A    I think I would agree with that.
22 Generally speaking, sure.  For a variety of
23 reasons.  There could be a demand side, but also
24 there's the cost side as well.  So it's not all
25 demand-side driven.  Some of it is cost-side

Page 236

1  driven.
2     Q    As part of your work, did you look
3  at the question as to whether or why Sole
4  highlights horsepower attribute on its products?
5     A    I think the answer for sure on a
6  whether -- W-H-E-T-H-E-R, whether -- I mean, we
7  talked about the Google ads and how infrequent the
8  motor description is on Google ads.  But I also
9  looked at -- personally at each -- and spent a lot
10 of time on Sole's website for each and every one of
11 the models that are on the website, and they do
12 contain the horsepower statistic.  There are other
13 descriptions of the attributes of the motor, but
14 there's a ton of other information as well, all the
15 different specifications and everything else.  If
16 you go on the website there's a wealth of
17 information there.  So, you know, including some of
18 the accolades and the awards.  So I think they're
19 just providing the full range -- I mean, my
20 takeaway was they were providing the full range of
21 information about the treadmills to the consumer.
22     Q    You don't believe they were
23 highlighting horsepower in any respect in their
24 advertising?
25     A    Not any more than any other

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

Page 237

1   attribute they've got there.  It wasn't -- not --
2   when you look at the pure number of just attributes
3   they have there and the descriptions, I don't think
4   I would say they were highlighting it.  I mean,
5   it's the same as -- you know, I think some of the
6   treadmills said, hey, we can carry a 325-pound
7   person.  Other ones are saying 350 pounds, another
8   375.  Does that mean you're highlighting that or
9   just informing the consumer?  So I don't think the
10  horsepower engine was any -- motor was any more
11  than saying, "Here's the weight of the person it
12  can effectively carry and keep the performance
13  level up."
14          Q   Well, Dr. Ugone, it was a pleasure
15  speaking with you today.  I have no further
16  questions at this time.
17          A   Well, very nice meeting you.
18          Q   Nice meeting you.
19          THE COURT REPORTER:  Signature?
20          MR. GAMACHE:  We'll go ahead and reserve,
21  please.
22          THE COURT REPORTER:  Thank you.  Did you
23  want this transcribed?  I need to ask for the
24  record.
25          MR. MARKOVITS:  Yes.

 1              THE COURT REPORTER:  And, Mr. Gamache,

 2    would you like a copy?

 3              MR. GAMACHE:  Yes, copy, please.

 4              (The taking of the deposition concluded

 5    at 4:50 o'clock p.m.)

 6

 7

 8

 9              _____

10              KEITH RAYMOND UGONE, Ph.D.

11              _____

12              DATE

13

14

15

16

17

18

19

20

21

22

23

24

25

239

STATE OF OHIO      )
                   )   SS:    C-E-R-T-I-F-I-C-A-T-E
COUNTY OF MIAMI    )

      I, SUSAN L. BICKERT, a Court Reporter and

Notary Public in and for the State of Ohio at large,

duly commissioned and qualified,

      DO HEREBY CERTIFY that the above-named

KEITH RAYMOND UGONE, Ph.D. was by me first sworn to

testify to the truth, the whole truth, and nothing

but the truth; that his testimony was reduced to

writing by me stenographically in the presence of

the witness and thereafter reduced to typewriting;

that the signature of the witness to the deposition

was expressly not waived, and was taken at the time

and place hereinafter set forth, pursuant to Notice

and Agreement of Counsel.

      I FURTHER CERTIFY that I am not a rela-

tive nor attorney for either party herein, nor in

any manner interested in the event of this action.

      IN WITNESS WHEREOF, I have hereunto set my

hand and seal of office May 17, 2021.

*Susan L. Bickert*

SUSAN L. BICKERT
Notary Public, State of Ohio
My Commission expires:  8-23-23

1 1 DEPOSITION ERRATA SHEET

2 Date Taken:  May 4, 2021

3 Case Caption: LAURA BECHTEL and TROY THOENEES

4 vs. FITNESS EQUIPMENT SERVICES, LLC dba SOLE FITNESS

5 DECLARATION UNDER PENALTY OF PERJURY

6 I declare under penalty of perjury

7 that I have read the entire transcript of

8 my Deposition taken in the captioned matter

9 or the same has been read to me, and

10 the same is true and accurate, save and

11 except for changes and/or corrections, if

12 any, as indicated by me on the DEPOSITION

13 ERRATA SHEET hereof, with the understanding

14 that I offer these changes as if still under

15 oath.

16 Signed on the _____ day of

17 _____, 20____.

18 _____

19 KEITH RAYMOND UGONE, Ph.D.

20

21

22

23

24

25

1 2 DEPOSITION ERRATA SHEET

2 Page No._____Line No._____Change to:_____

3 _____

4 Reason for change:_____

5 Page No._____Line No._____Change to:_____

6 _____

7 Reason for change:_____

8 Page No._____Line No._____Change to:_____

9 _____

10 Reason for change:_____

11 Page No._____Line No._____Change to:_____

12 _____

13 Reason for change:_____

14 Page No._____Line No._____Change to:_____

15 _____

16 Reason for change:_____

17 Page No._____Line No._____Change to:_____

18 _____

19 Reason for change:_____

20 Page No._____Line No._____Change to:_____

21 _____

22 Reason for change:_____

23 SIGNATURE:_____DATE:_____

24 KEITH RAYMOND UGONE, Ph.D.

25

1 3 DEPOSITION ERRATA SHEET

2 Page No._____Line No._____Change to:_____

3 _____

4 Reason for change:_____

5 Page No._____Line No._____Change to:_____

6 _____

7 Reason for change:_____

8 Page No._____Line No._____Change to:_____

9 _____

10 Reason for change:_____

11 Page No._____Line No._____Change to:_____

12 _____

13 Reason for change:_____

14 Page No._____Line No._____Change to:_____

15 _____

16 Reason for change:_____

17 Page No._____Line No._____Change to:_____

18 _____

19 Reason for change:_____

20 Page No._____Line No._____Change to:_____

21 _____

22 Reason for change:_____

23 SIGNATURE:_____DATE:_____

24 KEITH RAYMOND UGONE, Ph.D.

25

## WORD INDEX

**< $ >**
**$1.25** 69:2, 7
**$100,000** 143:1
**$2,000** 174:2, 8, 13
**$2,200** 85:21
**$2,500** 56:12
**$200,000** 159:15
**$3,000** 56:12
**$300** 79:15, 17
**$50** 82:4 83:7, 8
178:25 179:2, 5, 7, 17
180:16, 23 181:5, 6, 7
**$500** 175:24 176:5, 7,
13, 21, 22 177:5, 18,
19, 24 178:21
**$8,000** 142:25
**$945** 186:13

**< 0 >**
**0.5** 176:14 227:20

**< 1 >**
**1** 4:2, 4 146:20, 22
156:14, 18, 21 181:23
185:21, 25 186:16, 19,
20 216:11 240:1
241:1 242:1
**1,399.99** 60:8, 10
183:14
**1,403** 190:3, 11
**1,499** 57:2 59:16
77:15 190:1
**1,499.99** 57:15 58:1
59:9, 11, 21 188:16
189:15 190:2, 11
**1,500** 81:20 82:5
**1,599** 57:2 81:20
82:24
**1,599.99** 57:17 59:19,
20 83:12 183:16
**1,799.99** 183:4
**1,999** 85:25 86:2
**1:15** 125:25
**1:19-cv-00726** 1:5
**1:45** 125:18, 22
**1:47** 126:1
**10** 240:1 241:1

242:1
**10,000** 113:6
**100** 65:9
**11** 240:1 241:1
242:1
**1100** 2:14
**12** 14:15 181:21
206:6, 11, 15 227:20,
23 240:1 241:1
242:1
**12:16** 89:23
**120** 159:5
**13** 14:17 15:3, 6
240:1 241:1 242:1
**14** 240:1 241:1
242:1
**146** 4:2
**15** 15:7 206:8, 12
240:1 241:1 242:1
**16** 240:1 241:1
242:1
**17** 15:10 239:20
240:1 241:1 242:1
**18** 240:1 241:1
242:1
**19** 240:1 241:1
242:1
**1952** 142:14
**1st** 147:1, 17, 23
148:20, 23 233:15

**< 2 >**
**2** 14:13, 14 147:13
240:1 241:1 242:1
**2,399** 85:22, 23 86:2
**2.4** 71:7, 11, 19
72:15, 17 74:6, 19
**2.5** 48:22 185:16
**2.6** 73:25
**20** 142:21 150:11
240:1 241:1 242:1
**2001** 142:20 143:2
**2014** 233:16
**2015** 59:19 186:5
190:3, 10
**2019** 213:17 214:15,
17 219:9 233:16, 20
**2020** 186:6 214:18
218:4, 7

**2021** 1:14 4:4 147:1,
18 192:19, 20 196:25
197:1 200:10 201:8
239:20 240:1
**21** 240:1 241:1
242:1
**218** 4:4
**22** 15:14 240:1
241:1 242:1
**23** 190:20 192:8
240:1 241:1 242:1
**24** 192:9 196:14
198:1, 5 240:1 241:1
242:1
**25** 200:7 202:11
240:1 241:1 242:1
**26** 206:25 213:17
**26th** 218:11
**27** 209:9
**28** 213:4 222:18
**29** 226:2

**< 3 >**
**3** 48:19 147:6, 7, 14,
15, 16 156:18, 21
159:16 161:8 175:3
185:17 190:24 240:1
241:1 242:1
**3.0** 31:1 36:6, 13
38:4, 21 39:16 41:13,
16, 23 43:17, 19
48:23 73:24 89:14
175:23 176:5 180:17,
19 184:1, 15, 18, 21
**3.25** 48:19
**3.5** 31:1 36:7, 13
38:5, 20, 21 39:13, 14
41:12, 14, 22 43:17,
21 44:5 48:20, 23
50:4 71:10, 19 72:15,
16 73:24 74:6, 19
84:25 89:13 175:3,
24 176:3 180:17, 18
183:25 184:14, 21
220:13, 21 228:21
**3.5's** 185:18
**30** 68:23 76:25
77:23 187:13 226:3
227:7

**300** 203:11
**312.368.4554** 2:15
**31st** 233:16
**32** 229:10, 20
**325-pound** 237:6
**33** 2:14 229:10
**34** 230:23
**35** 122:4
**350** 237:7
**37** 166:9, 17
**375** 237:8
**38** 166:9, 17
**3825** 2:4
**39** 166:10, 18

**< 4 >**
**4** 1:14 161:25
185:16 240:1 241:1
242:1
**4.0** 31:1 43:21 48:23
**4:50** 238:5
**40** 24:10, 11 120:17,
20 149:9 168:15, 24
**40,000** 113:3
**45209** 2:5
**48** 198:1, 5 199:21
**48.a.i** 193:4

**< 5 >**
**5** 3:3 165:17 185:21,
24, 25 216:10 240:1
241:1 242:1
**5.a** 159:17
**5.c** 161:8
**50** 24:10, 12 116:8
120:17 149:10
180:15
**50,000** 112:25
**500** 176:8, 10 180:15
**50-50** 46:20 47:5
**51** 227:8
**513.651.3700** 2:5
**52** 228:9
**55439** 2:10
**57** 229:11, 20

**< 6 >**
**6** 56:23, 24 185:21,
25 186:16, 20 240:1
241:1 242:1

Deposition of Keith Raymond Ugone, Ph.D.      Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

**60**  158:*23*  174:*23*
 230:*18, 23*
**60603**  2:*14*
**62**  157:*11*
**650**  2:*4*
**67**  175:*13*

**< 7 >**
**7**  240:*1*  241:*1*  242:*1*
**78th**  2:*9*
**799**  56:*11*  57:*1*
**7-Eleven**  69:*7*

**< 8 >**
**8**  240:*1*  241:*1*  242:*1*
**8.b.i**  165:*18*  166:*9*
 167:*14*
**80**  175:*12*  200:*19*
**8050**  2:*9*
**8-23-23**  239:*22*
**87**  200:*20*

**< 9 >**
**9**  240:*1*  241:*1*  242:*1*
**9:58**  1:*14*
**90**  152:*18*
**945**  186:*22*
**95**  63:*18*
**952.941.4005**  2:*10*
**99**  56:*17*
**99.9**  83:*15*
**99.99999**  154:*16*
**999**  56:*4, 6, 11*  57:*1*
 138:*12*
**999.99**  183:*11*

**< A >**
**a.m**  1:*15*
**abdicate**  124:*6*
**ability**  32:*14*  55:*13*
 162:*23*  220:*5*  233:*9*
**able**  9:*11, 13*  83:*19*
 123:*20*  158:*20*
 226:*12*
**above-named**  239:*6*
**absence**  102:*8, 14*
 113:*13*
**absolute**  130:*19*
 131:*1*  218:*24*  219:*1*

**absolutely**  64:*23*
 116:*12, 20*  120:*4*
 151:*19*  210:*3, 21*
 232:*10, 12, 15*
**abstract**  52:*2*
**abundance**  141:*2, 14,*
 *25*  156:*20*
**abundant**  142:*3*
**acceleration**  174:*9, 22*
**acceptable**  48:*10*
**accepted**  21:*16, 17*
 26:*22*  30:*6, 9, 11*
 46:*8*  60:*18*  131:*13*
 165:*12*  191:*15*
**accepting**  233:*22*
**accolades**  192:*21*
 193:*9*  194:*5*  197:*4*
 201:*22*  206:*18*
 236:*18*
**account**  9:*17*  20:*21*
 32:*16, 20*  38:*2*  41:*7*
 54:*16*  70:*19*  72:*13*
 74:*9*  98:*20*  111:*6, 13*
 118:*15*  123:*10*
 137:*20*  144:*13*  180:*6*
**accuracy**  127:*4, 5, 8,*
 *9, 20*  128:*14, 18*
 129:*8*
**accurate**  91:*11*
 104:*3*  145:*24*  208:*16,*
 *25*  218:*21*  219:*25*
 228:*4*  230:*9, 17*
 240:*1*
**accurately**  132:*17*
**accused**  223:*8, 18*
**achieve**  51:*25*
 228:*13, 21*  229:*1*
**achieving**  228:*18*
**acknowledge**  224:*3, 6*
 230:*10*
**acquire**  98:*23*
**acquisition**  98:*24*
**action**  5:*12*  13:*21*
 16:*17*  17:*7*  18:*4*
 19:*21*  20:*12, 14*  22:*6,*
 *18*  23:*3*  24:*12*  28:*4*
 35:*17*  47:*2*  62:*19*
 172:*19, 21*  231:*12*
 232:*4, 6*  233:*1, 11*
 239:*18*

**actions**  23:*14*  33:*16*
 149:*10*
**activity**  78:*18*
**actual**  16:*8*  23:*21*
 24:*14*  102:*24*  104:*4*
 109:*21*  117:*24*
 124:*11*  131:*16*
 170:*19*  191:*23*  203:*6*
**add**  10:*7*  107:*4*
 185:*7*  193:*12*
**added**  11:*22*  13:*5*
 192:*13*
**adding**  52:*24*
**additional**  51:*13*
 192:*22*  193:*5*  208:*10*
**Additionally**  202:*14*
**address**  204:*15*
**adjust**  60:*4, 8*  144:*8*
**adjustability**  202:*18*
 206:*1, 4, 9*
**adjusted**  27:*9*  59:*23*
**adjustments**  53:*9*
 59:*11*
**admit**  159:*11*  165:*9*
 204:*3*
**admonitions**  7:*4*
**adopted**  170:*14*
**ads**  213:*12*  236:*7, 8*
**Advance**  207:*2*
**advertise**  220:*9*
**advertised**  174:*19*
 235:*12*
**advertisements**
 182:*25*
**advertises**  234:*7*
**advertising**  107:*5*
 217:*21*  233:*13, 25*
 234:*10, 21*  235:*4, 10,*
 *13, 17*  236:*24*
**affect**  78:*21*  107:*13,*
 *15*  114:*2, 14*  125:*7*
 190:*25*  197:*21*  217:*7*
 219:*5, 6*
**affinity**  84:*2, 4, 6, 25*
**aforementioned**
 209:*13*
**age**  5:*2*  15:*2*
**aggregate**  99:*17*
**aggregated**  95:*10*

**ago**  50:*9*  162:*21*
 163:*5, 8*  205:*14*
**agree**  6:*13, 16*  7:*14*
 50:*21*  60:*17, 25*  64:*2,*
 *14*  65:*8, 9*  67:*20*
 68:*16*  81:*14*  82:*15*
 83:*14*  84:*14*  88:*12*
 89:*5*  90:*15, 24*  103:*3,*
 *6, 10, 11*  109:*9*  116:*4*
 136:*15*  140:*3*  141:*13*
 168:*18*  177:*19*  178:*2*
 183:*9*  211:*20*  213:*3*
 233:*12, 23*  234:*1, 13,*
 *21*  235:*4, 19, 21*
**agreed**  90:*22*  171:*14,*
 *18*  181:*17*  232:*24*
**Agreement**  239:*15*
**ahead**  66:*11*  176:*18*
 180:*25*  219:*12*
 237:*20*
**allegation**  71:*5*
**allegations**  38:*22*
 71:*2*  103:*23*  223:*22*
 224:*10, 24*
**alleged**  11:*24*  16:*25*
 75:*24*  102:*8, 14*
 104:*13*  113:*14*
 115:*14, 15*  178:*4*
 179:*21*
**allegedly**  61:*5, 18*
 62:*7*  79:*8*  104:*3*
 134:*22*  222:*20*
**alleges**  73:*8, 19*
**alleging**  135:*7*
**allocate**  141:*10*
**allocated**  203:*4*
**allocation**  141:*4*
**allow**  48:*18*  104:*11*
 183:*7*
**alluded**  16:*22*
**alluding**  163:*16*
**alternative**  85:*10*
**alternatives**  111:*15*
**aluminum**  96:*15*
**Amazon**  54:*9*  188:*14*
 221:*3, 7, 14, 15, 20*
**American**  108:*2*
**amount**  61:*5*  62:*8*
 84:*4*  113:*16, 21*

138:*21* 159:*4* 172:*15*
180:*11* 188:3 210:8
**analogy** 175:*8*
**analyses** 9:*10* 63:*12*
126:*17* 149:*9, 11*
171:*16* 202:*6*
**analysis** 9:*12, 14*
13:*13* 15:*22* 16:*11,*
*16, 19* 17:*5* 25:*7, 8*
26:*20, 22* 27:*9* 28:*2,*
*19* 36:*15* 40:*15* 42:*1*
62:*12, 19* 63:*15* 64:*3,*
*15* 65:*6* 66:*21* 67:*5,*
*18* 68:*6* 71:*8, 18*
73:*10, 11, 16, 21* 74:*9,*
*24* 75:*4, 19, 23* 76:*4,*
*9, 11, 20, 22* 77:*2*
80:*22* 103:*7, 8* 106:*2,*
*17, 23* 111:*4* 113:*2*
114:*12* 115:*4, 11, 16,*
*19* 116:*1, 2, 3, 5, 10,*
*20* 120:*19, 20, 24, 25*
121:*1, 3, 6, 22, 25*
122:*7, 9, 12* 123:*21*
126:*8* 127:*4, 6, 21*
128:*2, 10, 14, 16, 21,*
*23* 129:*3, 6* 130:*3, 13*
131:*10* 132:*2, 9, 11*
133:*14* 135:*19*
143:*13* 144:*7, 20*
145:*15, 16* 149:*22*
151:*2* 152:*23* 154:*13*
158:*25* 162:*7, 12*
164:*20* 165:*4* 170:*2*
171:*13* 175:*21, 22*
178:*24, 25* 191:*7*
197:*5, 14* 199:*6, 17,*
*23* 200:*3, 5* 201:*21*
231:*5, 22, 23*
**analyst** 29:*14* 150:*23,*
*25*
**analysts** 150:*21*
151:*1*
**analytical** 71:*18*
**analytics** 72:*4* 151:*13*
**analyze** 52:*22* 92:*2*
**analyzed** 31:*8* 104:*22*
**analyzing** 105:*24*
**and/or** 161:*9* 240:*1*
**annual** 119:*1*

**answer** 8:*13* 14:*7, 21*
16:*22* 17:*18* 21:*22*
23:*25* 25:*5* 27:*21*
32:*7* 34:*1, 21, 22*
35:*8, 14, 18* 36:*23*
42:*10, 11, 13* 51:*10*
57:*8* 58:*5* 61:*7, 13,*
*24* 62:*3, 23* 66:*1, 2*
68:*8, 17* 73:*13, 14*
74:*25* 81:*18* 89:*2*
103:*11, 15* 115:*12*
117:*20* 118:*7* 134:*10*
137:*16* 138:*14, 22*
152:*4* 162:*16* 165:*7*
166:*24* 168:*24* 176:*9*
178:*19* 187:*15, 17, 22*
190:*14* 196:*6* 206:*4*
210:*4* 220:*25* 226:*18*
236:*5*
**answered** 104:*14*
139:*5*
**answering** 8:*10*
36:*21* 167:*7, 8*
**answers** 51:*10* 61:*20*
114:*22* 119:*24*
133:*23, 24* 157:*16*
160:*20*
**anticipated** 158:*11*
**antitrust** 33:*17*
34:*18* 35:*4, 5, 16*
172:*1, 2, 10, 20*
**anybody** 105:*6*
158:*25* 173:*21* 233:*2*
**anybody's** 164:*1*
**anymore** 95:*19*
**apart** 82:*11* 83:*12*
128:*13* 153:*11*
197:*15* 206:*18, 20*
207:*7, 10* 231:*25*
**apologize** 37:*11*
61:*12, 25* 167:*7*
186:*15, 21* 198:*3*
214:*3*
**Apparently** 174:*4*
**appeal** 43:*22*
**appeals** 43:*19*
**appear** 65:*6* 79:*23*
166:*19* 167:*10*
213:*25* 214:*9* 222:*12*

**APPEARANCES** 2:*1*
**appears** 65:*15*
**applicable** 9:*3, 7*
162:*7, 13*
**application** 116:*19*
**applied** 17:*20* 25:*8*
34:*10* 178:*10*
**applies** 134:*12* 178:*5*
**apply** 9:*4, 7* 11:*14*
177:*10* 180:*8*
**appreciate** 27:*25*
90:*1* 101:*11*
**approach** 8:*18* 17:*13,*
*22* 33:*13* 40:*7* 44:*19,*
*20, 23* 61:*23* 62:*15*
63:*5* 66:*1, 3, 4* 67:*1,*
*2* 70:*13, 19* 71:*25*
72:*1* 80:*24* 81:*1*
104:*1* 120:*1* 128:*25*
144:*9, 10* 145:*7*
161:*13, 24* 178:*8*
198:*20*
**approaches** 17:*9, 20*
**approaching** 154:*17*
199:*7*
**appropriate** 8:*5*
19:*1* 21:*3* 34:*19*
50:*6* 63:*7, 11* 71:*1*
73:*8, 20* 75:*21, 24*
76:*6, 14* 113:*5*
135:*19* 145:*16*
162:*12* 191:*7*
**appropriated** 33:*12*
**appropriately** 17:*5*
18:*6, 13* 19:*9, 12, 25*
20:*2, 13* 21:*11* 26:*25*
27:*9* 145:*15*
**appropriateness**
164:*19*
**approved** 22:*13, 14*
**approximately** 24:*6*
56:*16* 120:*14*
**arbitration** 14:*16*
**area** 63:*21* 74:*12*
105:*13* 116:*17*
117:*23* 150:*16*
168:*16* 194:*3* 203:*17*
205:*15*
**areas** 117:*6* 152:*2*

**argue** 169:*20*
**arguments** 103:*5*
**arisen** 35:*16*
**arms** 204:*5*
**arsenal** 231:*14*
**art** 65:*7*
**article** 210:*11* 211:*5,*
*10*
**articles** 121:*24* 122:*2,*
*5* 196:*3*
**artificially** 209:*17*
**aside** 129:*22* 190:*1*
**asked** 10:*12* 11:*10*
31:*22* 33:*1* 35:*19*
42:*7* 61:*11* 67:*8*
69:*4* 73:*10, 12* 80:*12,*
*16* 81:*3, 4* 92:*7*
105:*15* 123:*25* 134:*6*
142:*13* 147:*3, 5*
149:*11* 157:*19*
158:*11* 166:*8* 198:*24*
201:*10*
**asking** 30:*21* 31:*10*
38:*9* 44:*18* 52:*13*
59:*7, 8* 68:*4* 71:*22*
72:*21* 98:*11, 16*
128:*6, 7* 137:*8*
157:*23* 158:*2* 168:*7*
172:*25* 173:*8* 177:*17*
189:*11, 23* 197:*4*
200:*2*
**aspect** 182:*18* 213:*1*
218:*23*
**aspects** 43:*9* 67:*8*
120:*3* 122:*19* 182:*17*
**asserted** 115:*15*
**assertion** 210:*2*
233:*22*
**assertions** 233:*18*
**assignment** 149:*22*
**assistance** 151:*20*
**assisted** 149:*22*
**associated** 9:*22, 23*
26:*10* 27:*1* 91:*24*
156:*23* 215:*25*
**assume** 10:*13* 62:*2*
72:*21* 83:*21, 22* 92:*4,*
*9* 107:*1* 135:*21, 23*
141:*13* 149:*3* 172:*11*
184:*20* 197:*16* 221:*6*

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

**assumed** 196:*17* 197:*8*

**assuming** 10:*11* 11:*2, 3, 8* 52:*3* 71:*1* 86:*6* 91:*9* 92:*11* 162:*11* 222:*7*

**assumption** 91:*12* 136:*2, 13* 170:*18*

**assumptions** 91:*2, 5, 6, 15, 24* 92:*3* 140:*8* 143:*16, 21* 177:*1*

**asterisk** 10:*7* 12:*6* 19:*13* 81:*17*

**asterisks** 57:*19, 21*

**athletes** 42:*22*

**attempt** 102:*18* 141:*5*

**attempted** 22:*20, 25* 23:*16* 62:*11*

**attempting** 20:*25* 227:*6*

**attempts** 232:*15*

**attention** 209:*16*

**attorney** 6:*7* 104:*10* 239:*17*

**attorneys** 5:*11* 22:*4, 20* 153:*18* 231:*13*

**attorney's** 231:*14*

**attributable** 38:*14* 60:*22* 64:*8*

**attribute** 9:*22, 24* 10:*10* 25:*15* 27:*1, 2* 28:*13* 64:*16* 68:*8* 94:*9, 10* 104:*25* 124:*24* 128:*21* 129:*4* 131:*11, 13* 133:*13, 14* 136:*8, 11* 144:*19, 21* 145:*1, 2, 9, 11, 18, 25* 194:*8, 19, 24* 195:*3* 196:*9, 13* 197:*17* 200:*14* 201:*11, 16, 18, 23* 207:*13, 14* 208:*3, 18, 20* 211:*19* 212:*15, 17, 22* 236:*4* 237:*1*

**attributed** 104:*17, 18*

**attributes** 7:*9* 8:*23* 9:*12* 13:*2* 25:*21* 32:*21* 37:*20* 39:*21, 25* 43:*18, 20* 47:*3* 48:*14* 56:*14* 60:*23* 64:*4, 12* 87:*10* 93:*22*

**115:*8* 124:*19, 23** 129:*1* 131:*14* 132:*2, 10, 25* 133:*1* 140:*21* 145:*21, 24* 185:*6* 191:*6, 11, 14, 16, 19* 194:*18* 195:*15* 197:*15, 23, 25* 207:*10, 17* 208:*4, 5, 19* 209:*14, 20* 211:*1, 2* 224:*13* 225:*22* 234:*16* 236:*13* 237:*2*

**August** 213:*17* 214:*15* 218:*11* 219:*9* 233:*20*

**author** 123:*19*

**authored** 152:*3*

**authoritative** 30:*1*

**availability** 10:*25* 32:*25* 86:*9*

**available** 12:*23*

**average** 56:*20* 57:*5, 9* 58:*21* 93:*12, 13* 101:*6* 129:*20* 186:*6, 10, 12* 187:*8* 188:*2, 17* 189:*9* 190:*11*

**avoid** 225:*1*

**award** 125:*4*

**awards** 192:*21* 193:*10* 194:*5, 19* 197:*4* 200:*9* 201:*13, 22* 206:*18* 236:*18*

**aware** 17:*4* 19:*24* 21:*9* 164:*22* 191:*5* 201:*21* 221:*10* 233:*11*

**awful** 177:*1*

**axis** 97:*7, 8, 9, 10, 12*

**< B >**

**Babcock** 153:*2, 12* 154:*15, 22*

**baby** 102:*21*

**back** 24:*9* 29:*10* 33:*5* 35:*3, 19* 40:*5, 16* 44:*17* 47:*8* 50:*8, 16* 60:*14* 71:*23* 77:*12* 80:*6* 81:*24* 90:*10* 125:*22* 157:*9* 167:*15* 168:*9* 181:*2* 216:*7, 9*

**backcasting** 163:*12* 164:*16, 20*

**background** 6:*20* 29:*17* 42:*8* 152:*7* 171:*25* 182:*22* 192:*6*

**backgrounds** 42:*25*

**backing** 213:*14*

**backup** 219:*14*

**bad** 6:*23* 80:*5* 88:*2* 159:*13* 204:*10*

**balancing** 191:*24*

**base** 46:*3* 131:*19*

**baseball** 142:*14*

**based** 15:*22* 22:*2* 37:*6, 13* 59:*3* 67:*3* 74:*17, 21* 98:*4* 157:*8* 166:*16* 167:*25* 168:*2* 226:*13*

**bases** 215:*7, 9*

**basic** 127:*23*

**basically** 12:*2* 58:*22* 84:*9* 96:*7* 99:*5* 130:*21* 133:*21* 134:*25* 144:*6* 182:*13* 234:*18*

**basis** 68:*14* 118:*24* 119:*1, 2* 150:*14* 154:*9* 172:*23* 195:*5* 209:*25* 213:*23* 215:*4, 5* 221:*19* 232:*9*

**battery** 49:*16*

**Bayes** 118:*10, 19* 119:*7* 143:*8* 144:*4, 15*

**Bayesian** 118:*25* 144:*7, 9, 10*

**bear** 25:*24* 184:*12* 223:*5, 24*

**BECHTEL** 1:*3* 240:*1*

**Beer** 15:*4, 5*

**beginning** 32:*22* 169:*19* 192:*8* 199:*21* 232:*3*

**begins** 14:*17*

**behalf** 1:*15* 2:*2, 12*

**behave** 76:*23* 108:*16* 109:*5* 143:*17*

**behaving** 82:*8*

**behavior** 47:*15, 16* 51:*25* 77:*25* 78:*6, 8*

**117:*2* 131:*16* 132:*16* 140:*10**

**believe** 15:*7, 8* 19:*8* 35:*2* 55:*18* 59:*14* 61:*12, 15* 64:*1* 67:*4* 68:*11* 70:*12* 73:*18* 74:*20* 90:*20, 22* 95:*15* 102:*17* 114:*16* 115:*3* 126:*15* 131:*12* 132:*7* 147:*20, 23* 148:*7, 9, 10* 153:*1, 15* 160:*18* 184:*11* 187:*1, 2* 188:*5, 13* 189:*21, 22* 192:*13* 208:*23* 211:*5* 218:*23* 219:*25* 221:*1* 234:*11* 236:*22*

**believed** 163:*5*

**believes** 81:*10*

**belt** 203:*6, 7* 206:*7* 207:*3* 226:*23*

**benchmark** 21:*20, 22* 23:*24* 24:*1* 25:*17* 28:*1, 2, 19, 22* 29:*2*

**benchmarking** 28:*7* 71:*25*

**benchmarks** 223:*15* 225:*10, 12*

**benefits** 49:*19* 72:*22* 89:*16* 106:*16*

**best** 14:*22* 35:*18* 53:*23* 58:*5* 65:*25* 114:*6* 148:*7* 151:*11, 23* 175:*9* 192:*18, 19* 194:*22* 196:*24, 25* 200:*10, 18* 201:*7* 233:*9*

**better** 7:*14* 86:*1* 93:*7* 117:*11* 144:*12* 161:*6* 181:*15* 231:*17*

**beyond** 16:*11* 31:*13* 66:*8* 130:*8*

**bias** 191:*21* 210:*15, 16* 212:*4, 10*

**biased** 133:*24*

**biasing** 210:*25*

**Bickert** 1:*11* 239:*3, 21*

**big** 200:*20* 203:*9*

**bigger** 88:*21*

Deposition of Keith Raymond Ugone, Ph.D.　　　Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

**biggest** 27:*8* 161:*1*
**Bill** 5:*10* 159:*8, 11*
**billed** 158:*15, 16*
　159:*7*
**bit** 12:*23* 16:*5*
　17:*15* 23:*25* 31:*16*
　45:*11, 24* 68:*17*
　74:*23* 75:*25* 76:*3*
　78:*1* 84:*15* 86:*14*
　87:*11* 92:*15* 93:*22*
　100:*3* 105:*13* 107:*25*
　142:*8* 151:*24* 161:*18*
　165:*8, 25* 178:*19*
　189:*17* 191:*3, 4*
**Black** 54:*3* 58:*12, 13*
　82:*25* 179:*8* 189:*4*
**Blue** 142:*24*
**Bluetooth** 43:*5* 205:*6*
**bmarkovits@msdlegal.**
**com** 2:*6*
**BMW** 142:*20* 143:*2*
**body** 233:*1*
**boil** 134:*25* 135:*1*
**bold** 119:*11*
**Book** 142:*24*
**books** 121:*7*
**boost** 174:*9*
**bottle** 69:*1, 6* 94:*24*
**bottom** 15:*4, 6, 10, 15*
　67:*15* 185:*2, 10*
　192:*8* 202:*14* 207:*1*
　226:*2*
**bought** 46:*16* 48:*11*
　113:*18* 139:*19*
　176:*20* 179:*8, 10, 19,*
　*20* 181:*8*
**Bowflex** 37:*23* 201:*6*
**Boy** 154:*25*
**brands** 223:*10* 224:*4*
**bread** 45:*16*
**break** 50:*12, 14* 64:*4*
　89:*24* 90:*2, 4, 10, 12*
　165:*14*
**breaking** 125:*12*
**brief** 141:*1*
**bring** 42:*21* 146:*6*
　178:*23*
**bringing** 9:*15*
**broad** 124:*18*

**broadly** 103:*25*
**brought** 6:*3*
**bucket** 86:*23, 24*
　174:*24*
**buckets** 24:*5* 86:*25*
　134:*24*
**budget** 108:*12*
**bullet** 200:*8* 207:*1*
**bunch** 93:*24, 25*
　140:*8*
**business** 53:*13* 95:*22*
　108:*3* 111:*21* 164:*6*
**but-for** 90:*20* 101:*23*
　102:*2, 3, 5, 6, 9, 20, 23*
　103:*4, 9, 12, 17* 104:*8,*
　*19* 105:*19, 24* 106:*14,*
　*23* 110:*22* 114:*2*
　166:*14* 172:*10*
　175:*23*
**button** 219:*17*
**buy** 27:*17* 46:*17, 21*
　48:*16* 49:*11* 50:*7*
　81:*24* 82:*19* 85:*7, 10,*
　*14, 16, 17, 18, 19* 86:*6*
　87:*8, 16* 88:*3* 93:*5*
　96:*21* 99:*3* 108:*14,*
　*18* 117:*5* 138:*12*
　143:*18* 179:*6* 192:*19*
**buyer** 221:*14*
**buying** 45:*16, 17*
　72:*22* 192:*15* 195:*23*
　196:*2, 5, 8, 10*
**buys** 139:*17, 23*
　181:*12*

**< C >**
**calculate** 95:*5*
**calculated** 33:*8, 12,*
　*19, 24* 57:*6* 110:*21*
**calculating** 29:*20*
　109:*8* 123:*3*
**calculation** 93:*10*
　95:*13*
**calculations** 172:*23*
**calculus** 52:*23* 178:*7*
**call** 8:*23* 14:*21* 56:*8*
　58:*17, 21* 63:*17*
　116:*14* 129:*3* 157:*11*
　159:*23* 184:*18, 21*

　190:*5, 8* 194:*18*
　222:*24*
**called** 6:*18* 78:*13*
　150:*25*
**capabilities** 31:*7*
　72:*20* 229:*4*
**capability** 31:*9*
**capital** 96:*4, 9*
　137:*23*
**Caption** 240:*1*
**captioned** 240:*1*
**capture** 9:*19* 10:*8*
**car** 49:*12, 17* 142:*21*
**card** 83:*12* 142:*15*
　181:*8*
**care** 43:*5* 65:*18*
　84:*12* 174:*7*
**career** 24:*9* 63:*16*
**careful** 16:*19* 31:*16*
　34:*20* 35:*7, 14* 42:*6*
　48:*22* 66:*2* 74:*8*
　75:*8* 104:*23* 105:*6*
　107:*24* 109:*14* 123:*9*
　124:*17* 138:*7* 142:*1,*
　*8* 204:*11* 212:*5, 12*
　215:*20*
**cares** 84:*9, 12*
**carries** 39:*15* 147:*7*
**carry** 237:*6, 12*
**cars** 48:*24* 173:*25*
**Case** 1:*5* 11:*10, 13*
　13:*19* 14:*23* 15:*6, 9*
　16:*17* 17:*3, 7, 24*
　19:*6, 8, 23* 21:*8, 9*
　22:*1, 17* 30:*5* 33:*7,*
　*20, 22* 34:*15* 37:*7, 14*
　43:*12* 45:*20* 47:*24*
　53:*1* 55:*20* 61:*16, 21*
　62:*20* 67:*6* 68:*12*
　70:*24* 79:*22* 80:*14,*
　*19* 90:*16* 91:*15*
　92:*13* 98:*3, 14* 103:*8,*
　*17* 105:*25* 106:*24*
　109:*9* 110:*2* 112:*18*
　116:*13* 120:*9* 121:*14,*
　*15* 122:*13, 14, 16*
　126:*23* 134:*14*
　135:*13, 15* 147:*4*
　152:*19* 160:*16*
　161:*21* 169:*21* 171:*5,*

　*7* 175:*5* 178:*12, 15*
　182:*22* 189:*17*
　206:*20* 232:*8* 240:*1*
**cases** 13:*10, 11* 14:*9*
　16:*1, 4, 7* 17:*8, 15*
　19:*2, 21* 21:*5, 13*
　22:*8, 12, 13, 18* 23:*3,*
　*13* 24:*6, 10, 12, 22*
　31:*17* 33:*10, 17, 18,*
　*23* 34:*2, 16, 18, 24*
　35:*4, 6* 63:*3* 81:*3*
　92:*4* 116:*8* 119:*5*
　120:*14, 17, 23* 122:*14,*
　*16* 126:*16, 21* 149:*17*
　160:*21, 22* 170:*13*
　171:*9, 12, 24* 232:*4, 5,*
　*6* 233:*1, 11*
**case-specific** 152:*19*
**catalog** 46:*17*
**catch** 226:*14*
**categories** 13:*20* 23:*1*
**category** 98:*9*
　193:*15* 194:*15*
　201:*22* 203:*21*
**Cause** 9:*6* 27:*22*
　29:*13* 38:*19* 43:*6*
　54:*15* 56:*8* 63:*20*
　68:*17* 72:*9* 83:*21*
　94:*15, 16* 100:*3*
　115:*19* 122:*20* 127:*1*
　136:*8* 142:*2* 154:*7*
　163:*18* 172:*19*
　188:*14* 194:*11* 198:*9*
　206:*10* 212:*16*
　231:*12*
**caused** 26:*10* 58:*2*
**causes** 136:*12* 188:*17*
**caution** 42:*11, 12*
　156:*20* 230:*8*
**cautionary** 212:*3*
**cautioned** 5:*3*
**CBC** 162:*6, 12*
　164:*20*
**cellphone** 6:*10*
**center** 159:*25*
**Center's** 29:*5*
**certain** 9:*8* 10:*9*
　25:*14* 53:*7* 55:*16*
　60:*22* 73:*25* 74:*1*
　88:*17* 103:*23* 143:*16,*

Deposition of Keith Raymond Ugone, Ph.D.　　　　Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

*21* 144:*13* 151:*14*
152:*14, 15* 174:*2*
182:*20* 188:*15*
205:*15* 211:*1* 218:*17*
231:*22*
**certainly** 232:*8*
**C-E-R-T-I-F-I-C-A-T-E** 239:*1*
**certification** 17:*21*
31:*14, 17* 92:*15*
136:*7* 157:*19* 173:*17*
**certified** 170:*8*
**certify** 40:*10* 239:*6, 16*
**certitude** 161:*4*
**Challenge** 220:*12, 21*
232:*18*
**challenged** 9:*1* 13:*4*
17:*1* 26:*11* 31:*5*
44:*3, 4, 9, 12, 14* 45:*5*
47:*25* 48:*1, 2* 49:*1*
55:*20, 25* 56:*20* 61:*4,
17* 62:*6* 70:*25* 75:*21*
76:*6, 12, 13, 24* 77:*24*
90:*17* 102:*20* 104:*5*
109:*10* 110:*22*
161:*11* 165:*21*
209:*21* 213:*5, 19*
214:*16* 215:*12, 25*
218:*11* 224:*5* 227:*17*
228:*12, 25* 232:*9*
**challenges** 231:*13, 16*
232:*7*
**challenging** 153:*6*
**change** 9:*16* 10:*9*
12:*20* 16:*20, 21, 24*
27:*13, 14, 15, 16, 19*
31:*2* 34:*7* 52:*18*
54:*12* 58:*3* 60:*6*
69:*15* 72:*7, 8, 10, 11*
73:*18* 74:*21* 81:*11*
99:*13, 14, 17* 100:*5, 6,
15, 16* 102:*11, 19, 24,
25* 103:*19* 104:*12, 16,
20* 105:*14, 18, 20*
106:*5, 6* 107:*4, 15, 18*
111:*7* 112:*6, 8, 11, 12,
13, 14* 114:*9* 123:*4*
125:*7* 128:*11* 136:*8,
9, 11* 162:*5* 163:*13*

164:*14* 166:*15*
187:*15, 17* 188:*23*
209:*1* 235:*2* 241:*1*
242:*1*
**changed** 9:*12* 11:*24*
105:*15* 107:*16, 17*
128:*22* 163:*10, 23*
164:*2, 8*
**changes** 12:*5, 7, 9*
18:*25* 25:*17, 19, 20,
22* 26:*10* 69:*9* 78:*21*
81:*7* 96:*20* 100:*4*
105:*9* 112:*9* 129:*1*
162:*25* 163:*15*
217:*24* 240:*1*
**changing** 54:*10* 74:*3*
106:*18, 20* 107:*6*
163:*2, 3*
**channel** 186:*7*
**chapter** 29:*12*
**chapters** 29:*12, 16*
**characteristics** 72:*14*
**charge** 32:*14*
**charged** 109:*2*
**charging** 55:*7*
**chart** 57:*8, 22* 59:*2,
10, 12* 181:*24* 221:*18*
**charts** 151:*4* 216:*11*
**chase** 19:*22*
**chat** 6:*22*
**cheaper** 173:*23*
**check** 81:*25*
**Chicago** 2:*14*
**China** 77:*9* 101:*18*
**choice** 143:*12*
222:*19, 24* 224:*4*
**choice-based** 133:*18*
134:*4, 9*
**choices** 208:*7, 14*
**choose** 85:*5, 6* 197:*5*
**CHP** 39:*13* 198:*11*
208:*20* 209:*17*
211:*18* 212:*9, 21*
213:*10, 25* 214:*6, 10,
17, 21* 218:*13* 219:*9*
220:*2, 13, 21* 221:*3,
20, 21* 222:*8, 11, 13,
21* 223:*22* 224:*25*
226:*4, 7, 12, 19* 227:*4*

233:*15, 19*
**Christmas** 82:*3*
**Cincinnati** 2:*5*
**Circle** 69:*7*
**circumstance** 11:*7*
**circumstances** 8:*2, 6*
10:*22* 17:*11, 24*
22:*17* 24:*19* 30:*4*
79:*11* 94:*23, 25*
149:*13* 174:*17*
178:*12* 235:*17*
**citation** 171:*8* 211:*8,
15* 230:*17, 19*
**citations** 132:*5* 170:*1*
**cite** 164:*19* 168:*3*
230:*2*
**cited** 123:*12*
**Civic** 49:*15* 173:*24*
**claim** 9:*1* 10:*20*
11:*14, 24, 25* 13:*4, 5*
15:*22* 26:*11* 27:*5*
38:*19* 39:*8* 41:*9*
47:*25* 48:*2* 49:*8*
89:*6* 103:*20* 104:*5*
115:*15* 174:*9* 176:*3*
216:*1* 220:*2* 221:*3*
**claimed** 13:*17* 14:*1*
37:*8, 15* 70:*20* 90:*16,
24* 104:*9* 161:*9*
162:*4* 179:*7, 11*
181:*4* 198:*2, 7* 199:*7,
14*
**claiming** 104:*1*
**claims** 11:*19* 17:*1*
30:*16* 32:*2* 35:*21, 22,
25* 36:*4, 8* 38:*15, 18*
39:*3* 42:*5* 44:*3, 4, 9,
12, 14* 45:*5* 48:*2, 6*
49:*1* 81:*11* 103:*1*
134:*23* 161:*11* 167:*2*
184:*4* 213:*5* 214:*16*
218:*11, 21, 24* 219:*4,
9* 222:*21*
**clarification** 22:*23*
51:*11* 134:*7*
**class** 13:*21* 16:*17*
17:*6, 20, 21* 18:*4*
19:*21* 20:*11, 14* 22:*6,
18* 23:*3, 14* 24:*12*
28:*3* 31:*14, 17* 33:*15*

34:*6, 7* 35:*17* 40:*11*
62:*19* 90:*19* 92:*15*
97:*3* 108:*9* 109:*11*
112:*25* 113:*3* 136:*6*
149:*10* 157:*18*
161:*10* 162:*2, 4, 8*
163:*16* 165:*19* 170:*7*
172:*21* 173:*17*
192:*18* 194:*23*
196:*24* 232:*3, 6*
233:*1, 11*
**classroom** 109:*3*
**classwide** 7:*24* 8:*8,
15* 10:*18* 11:*15*
12:*15* 13:*14, 16, 19*
14:*1* 15:*21* 16:*3, 6,
16* 17:*6* 18:*3, 14*
19:*2, 7, 16, 21* 20:*1,
11, 13, 23, 25* 21:*4, 11*
22:*5, 11* 23:*18* 24:*16*
26:*16* 28:*3* 33:*7, 11,
18, 23* 34:*14, 19* 40:*7*
44:*19* 67:*5* 68:*13*
70:*13* 91:*22* 103:*7*
115:*4* 147:*9* 161:*12,
21* 171:*10* 178:*8*
**clear** 26:*21* 34:*13*
154:*1* 179:*16* 180:*1,
10* 191:*10* 198:*23*
199:*5* 220:*23*
**clearing** 136:*21*
**clearly** 108:*24*
117:*10* 145:*9* 147:*23*
153:*4* 199:*3, 4*
226:*17*
**clicking** 219:*18*
**client** 153:*10, 22*
159:*11*
**close** 28:*23, 24* 76:*17*
118:*23* 126:*19*
128:*24* 206:*15*
**closely** 101:*9*
**closet** 207:*23*
**clue** 49:*15*
**clustered** 56:*25*
77:*14*
**Coast** 90:*5*
**COATES** 2:*3*
**Coco** 15:*11*

Deposition of Keith Raymond Ugone, Ph.D.     Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

**coconut** 15:*11*
**coin** 9:*9*
**colleague** 117:*9*
  122:*20* 123:*24* 124:*1,*
  *3*, *11*, *13*, *15*, *23*
**colleagues** 116:*16*
  122:*12*, *15*
**collect** 32:*23*
**college** 150:*22*
**column** 181:*24*
  182:*2* 185:*1*, *8* 188:*1*
**combination** 43:*18,*
  *20* 143:*4*
**combinations** 21:*23*
**combine** 31:*19* 96:*6*
  111:*25*
**combined** 200:*18*
**come** 22:*3* 34:*4*
  35:*11* 81:*24* 82:*21*
  83:*5* 90:*10* 121:*12*
  149:*7* 153:*24* 178:*24*
  180:*7*
**comes** 30:*3* 65:*3*
  97:*14*
**comfortable** 31:*23*
  151:*10* 204:*7*
**coming** 93:*11*
  129:*15* 156:*15* 179:*3*
  210:*18*
**commencing** 1:*14*
**comment** 71:*14*
  124:*10* 180:*4*
**Commission** 239:*22*
**commissioned** 239:*5*
**common** 8:*17* 17:*13*,
  *21* 22:*11* 33:*13*
  38:*25* 40:*7* 44:*1*, *19*,
  *23* 61:*23* 63:*5* 67:*2*,
  *19* 68:*13* 71:*15*
  91:*22* 101:*25* 147:*9*
  161:*12*, *23* 171:*11*
  197:*13* 210:*16*
  211:*15* 231:*24*
**communicate** 6:*14*
  36:*21* 60:*11*
**communicated** 6:*1*
  105:*4* 191:*19*
**companies** 35:*6*
  42:*15* 53:*21* 87:*18*
  95:*21* 106:*5* 109:*6*

111:*15*, *20* 112:*16*
  172:*7*
**company** 35:*5* 42:*10*,
  *15* 53:*12* 99:*3* 154:*4*
  168:*17*
**company's** 32:*13*
**comparability** 28:*20*
**comparable** 207:*9*
**compare** 100:*5*
  172:*19*
**compared** 198:*11*
**compares** 221:*18*
**comparing** 28:*8*
  215:*16*
**comparison** 23:*23*
  221:*19*
**comparisons** 17:*17*
  215:*20*
**compete** 87:*6*
**competing** 32:*12*, *20*,
  *21* 55:*6* 60:*2* 98:*6*
  124:*24* 141:*5*
**competition** 69:*2*
  75:*11* 207:*7*
**competitive** 32:*15*
  37:*21*, *25* 41:*1* 54:*11*,
  *21* 55:*3* 87:*15*
  137:*15* 230:*11*
**competitor** 53:*6* 55:*5*
**competitors** 207:*5*, *11*
  229:*14*, *23* 230:*6*, *14*
  231:*5*
**competitor's** 87:*17*
**complaining** 232:*23*
**complaint** 39:*7*
  134:*14*
**complementary**
  137:*22*
**complete** 103:*14*
  224:*19*
**completed** 150:*15*
**complexities** 86:*10*
**complicated** 62:*12*
  100:*3* 101:*3* 105:*10*
  106:*3* 219:*16*
**component** 34:*3*, *5*, *7*,
  *10* 170:*11*
**components** 34:*9*
  60:*22* 64:*9*, *10*

132:*18*
**comprise** 200:*19*
**computer** 6:*17* 64:*22*
**concept** 46:*9* 60:*20*
  92:*2* 99:*19*, *20* 103:*4*
  110:*17* 112:*10*
  130:*11*, *19* 141:*8*
  167:*25* 168:*1*, *3*
  169:*20* 181:*2*, *20*
  199:*3*, *5* 213:*12*
**concepts** 109:*6*, *7*
**conceptualize** 150:*12*
**concern** 161:*1*
**conclude** 215:*11*, *15*
  222:*10*
**concluded** 160:*3*
  227:*16* 238:*4*
**conclusion** 22:*3*
  159:*17*, *24* 165:*1*
  214:*20* 215:*5*, *6*, *8*, *10*
  219:*5* 220:*15*
**conclusions** 109:*19*
  127:*12*
**condition** 137:*10*, *18*
  142:*22*
**conditions** 11:*3* 12:*7*
  25:*23* 52:*19* 136:*16*,
  *24* 137:*4*, *7* 140:*5*, *17*
  162:*5* 163:*1*, *10*, *11*,
  *14*, *15* 165:*11*
**conduct** 23:*4* 61:*2*
  102:*8*, *15* 123:*20*
  225:*18*
**conducted** 63:*14*, *24*
  76:*23* 116:*22* 119:*22*
  149:*11*
**conducting** 131:*23*
  140:*13*
**conference** 5:*18*
**confident** 79:*17*
**confirm** 187:*21*
**confounding** 16:*14*
  18:*19* 24:*25* 25:*1*, *19*
  26:*5*, *15* 28:*18*
**confused** 84:*15*
  168:*4*, *6* 184:*13*, *15*,
  *18* 212:*8* 216:*17*, *19*,
  *21* 217:*10*
**confusing** 31:*19* 94:*6*

**confusion** 14:*6*
  156:*17*
**conjoint** 26:*20*, *22*
  27:*9* 66:*21* 67:*4*, *15*,
  *18* 68:*6* 111:*4* 115:*3*,
  *11*, *16*, *18*, *19* 116:*1*, *5*,
  *10*, *19* 117:*14*, *18*
  120:*19* 121:*3*, *6*, *22*,
  *25* 122:*8*, *12* 123:*21*
  124:*3*, *4* 126:*8* 127:*4*,
  *6*, *21* 128:*2*, *16*, *19*, *21*,
  *23* 129:*3*, *6* 130:*2*, *12*
  131:*2*, *10* 132:*2*, *9*, *19*,
  *24* 133:*14*, *18* 134:*4*,
  *9* 144:*20* 145:*1*, *15*
  190:*24* 191:*7* 193:*14*
  194:*9*, *14*, *17* 197:*5*,
  *14* 198:*8*, *11* 199:*17*,
  *22* 200:*3*, *5* 201:*20*
  202:*6* 204:*16* 206:*19*
  209:*14* 210:*24*
  223:*11* 231:*4*, *23*
**conjoint-based** 119:*23*
**conjunction** 130:*2*
**consider** 29:*25*
  73:*15* 79:*3* 110:*3*
  202:*16* 204:*6* 211:*2*
  223:*18*
**consideration** 35:*13*
  66:*18* 98:*4* 133:*10*
  171:*17* 177:*16*
  206:*24*
**considerations** 8:*21*
  26:*8*, *9* 97:*14* 110:*4*
  114:*1* 138:*3* 145:*16*,
  *22* 146:*8* 179:*13*
**considered** 156:*15*
  197:*16* 209:*20*
  212:*18*
**consistent** 156:*12*
**constant** 7:*17* 77:*11*
  86:*7*, *11* 87:*4* 106:*8*,
  *25* 107:*2*, *6* 115:*25*
  141:*18*, *20* 142:*5*, *6*
  208:*6*, *14*
**constraint** 32:*13*
  108:*12*
**constraints** 136:*21*
**construct** 84:*7*

**consult** 122:*11, 20*
152:*22* 153:*8*
**consulted** 170:*14*
171:*24*
**consumer** 7:*9, 11, 24*
8:*9, 15* 10:*19* 11:*10,*
*12* 12:*19* 13:*21*
16:*17* 17:*6* 18:*4*
19:*21* 20:*11, 14* 22:*6,*
*18* 23:*3, 14* 24:*12*
28:*3* 33:*15* 35:*17*
41:*12, 22* 45:*5* 47:*21*
48:*10, 18* 49:*10, 21*
62:*19* 72:*16* 74:*18*
78:*6, 7* 81:*10, 16*
84:*1, 3* 87:*16* 98:*7*
106:*11* 108:*10, 11*
117:*2* 125:*6* 138:*11,*
*13, 15* 139:*10, 16, 21,*
*22* 140:*1, 22* 145:*10*
149:*10* 166:*3* 167:*3*
168:*20* 169:*3, 15, 22*
170:*15* 172:*20* 173:*3*
174:*13* 175:*5* 177:*23*
181:*12* 192:*23*
193:*19* 195:*11* 196:*2*
202:*12, 13, 15* 203:*14,*
*22* 205:*2, 20* 206:*13*
227:*14* 228:*17, 19*
229:*5, 6* 232:*3, 6*
233:*1, 10* 234:*22, 23*
235:*5, 6* 236:*21*
237:*9*
**consumers** 7:*14, 18*
11:*20* 12:*14* 30:*20*
41:*8* 42:*19* 43:*19, 22*
44:*21* 45:*10* 46:*13,*
*21* 47:*10, 15* 48:*7*
49:*24* 55:*25* 60:*12*
73:*22* 75:*20* 76:*5*
81:*15, 21* 82:*7* 84:*22*
85:*5* 86:*12* 89:*16*
90:*17, 19* 93:*14*
97:*20* 98:*12* 104:*4, 5*
108:*15* 112:*19, 20, 23*
139:*18* 166:*18* 167:*9*
172:*13* 173:*10* 178:*5,*
*17* 182:*8* 190:*25*
193:*25* 196:*9* 200:*24*
202:*15* 209:*21*

213:*25* 214:*20*
222:*12* 226:*11*
228:*10, 23* 234:*4*
235:*11*
**consumer's** 138:*23*
139:*4* 201:*4*
**contacted** 147:*18*
148:*3, 4, 8*
**contacting** 6:*7*
**contain** 156:*14*
157:*1* 222:*21* 236:*12*
**contained** 228:*11, 24*
**contains** 156:*18*
**contemplated** 31:*22*
**contemplating** 102:*22*
**content** 12:*20*
**contention** 230:*20*
**contesting** 227:*9*
**context** 9:*23* 13:*21*
14:*6* 35:*17* 63:*14, 23*
133:*18* 143:*8* 144:*3,*
*15* 216:*20*
**contingent** 67:*24*
68:*4, 11* 70:*6*
**continue** 55:*23*
**Continuing** 126:*2*
**continuous** 44:*5*
135:*4* 218:*23, 25*
233:*15*
**contract** 120:*10*
**contracted** 99:*2*
**contribute** 151:*12*
**control** 12:*7, 11*
18:*18* 26:*4* 49:*13*
69:*18, 21* 70:*2, 7, 12*
188:*24* 218:*8* 221:*1*
**controlling** 26:*9*
**convenient** 125:*14*
**converge** 87:*3* 102:*3*
**convergence** 143:*7, 11*
**conversation** 153:*21*
155:*19* 156:*3* 190:*16*
**conversations** 153:*9,*
*12* 154:*8* 155:*20, 23*
156:*9*
**converse** 35:*8*
**cookbook** 66:*1, 3, 4*
**copy** 5:*24* 6:*1, 2, 3, 4*
14:*13* 238:*2, 3*

**correct** 13:*22* 21:*1, 7*
54:*25* 55:*20* 57:*10,*
*11* 64:*4* 66:*22, 23*
67:*7* 75:*22* 84:*6*
93:*4* 106:*17* 107:*7*
120:*11* 126:*23, 24*
133:*15* 136:*24*
137:*10* 138:*24*
146:*17* 147:*1* 153:*3*
156:*7* 181:*25* 183:*12,*
*16* 184:*5* 185:*3, 12*
186:*7, 13* 192:*10*
208:*15* 213:*2, 21*
217:*3, 22* 218:*13*
219:*24* 234:*12*
**corrections** 240:*1*
**correctly** 8:*13* 30:*25*
155:*2* 161:*15*
**corresponding**
110:*11* 114:*17* 128:*2*
**cost** 32:*19* 37:*2*
39:*19* 40:*22* 47:*17,*
*20* 51:*4, 6* 52:*6, 7, 11,*
*16* 54:*20* 72:*8* 79:*5,*
*13, 16, 17* 80:*10*
95:*16* 96:*3, 18* 98:*21*
99:*6* 100:*16, 22, 25*
101:*4, 6, 7, 9* 111:*6, 9,*
*13, 14* 114:*2, 14, 15*
142:*10* 175:*24*
235:*24*
**costs** 52:*21* 72:*5, 6,*
*12* 98:*23* 109:*1*
111:*16, 23, 24* 112:*8,*
*10, 12, 15* 114:*18*
133:*7*
**cost-side** 235:*25*
**Counsel** 239:*15*
**counter** 122:*24* 123:*1*
**COUNTY** 239:*2*
**couple** 36:*4* 81:*25*
93:*5* 102:*2* 104:*23*
155:*2* 160:*6* 199:*25*
**coupons** 82:*20*
**course** 24:*9* 164:*5*
195:*22*
**courses** 121:*5, 21, 23*
**COURT** 1:*1, 11*
40:*10* 125:*19, 20*
134:*6* 146:*12* 170:*14*

177:*15* 237:*19, 22*
238:*1* 239:*3*
**courts** 21:*15, 16*
22:*14, 15* 171:*13, 17*
**cousin** 118:*23* 126:*19*
**cousins** 76:*17*
**COVID-19** 77:*6*
162:*6* 163:*14*
**create** 37:*24* 191:*20*
212:*3, 10, 24*
**created** 92:*20*
**credit** 29:*13* 83:*8*
**criticism** 199:*16, 20,*
*21* 200:*1*
**critiqued** 63:*12*
**critiques** 127:*17*
**critiquing** 120:*3, 9*
124:*9* 152:*1* 198:*25*
**Cross** 1:*13* 3:*3* 5:*5*
**current** 29:*19*
162:*15, 18* 165:*10, 11*
182:*2*
**currently** 205:*19*
**curve** 30:*12* 96:*24,*
*25* 97:*7, 19* 98:*1, 14,*
*16* 99:*15* 101:*5, 7, 8*
107:*13, 15, 16, 18*
108:*3, 23* 110:*9, 10,*
*17, 20, 21* 111:*11*
112:*3* 137:*3, 25*
138:*1, 9, 10* 139:*14,*
*15, 18, 20* 142:*4*
158:*9*
**curves** 94:*14, 20*
97:*19* 109:*4*
**customer** 80:*3, 4*
85:*21, 23* 86:*1*
207:*15*
**customers** 131:*17*
173:*12* 190:*5, 8*
**cut** 18:*15* 19:*22*
44:*25* 152:*6, 10, 13*
214:*12*
**Cyber** 54:*3* 58:*13*
82:*24* 83:*12* 179:*8*
189:*4*

**< D >**
**daily** 118:*24*
**Dallas** 5:*15*

Deposition of Keith Raymond Ugone, Ph.D.　　　　Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

**damage** 63:*17* 103:*6, 8* 116:*9* 120:*2* 122:*3* 168:*2* 198:*22* 202:*9* 223:*13, 16* 225:*9* 232:*14*

**damaged** 79:*8, 9* 80:*4* 109:*23* 172:*15* 176:*8, 21* 177:*11, 24* 179:*2*

**damages** 7:*24* 8:*8, 15* 10:*18* 11:*15* 12:*15* 13:*14, 16* 14:*1* 15:*21* 16:*3, 6, 16* 17:*6* 18:*3, 14* 19:*2, 7, 17, 21* 20:*1, 11, 14, 23, 25* 21:*4, 12* 22:*5, 11* 23:*18* 24:*17* 26:*16* 28:*3* 29:*12, 20* 33:*8, 11, 19, 23* 34:*14, 19* 40:*7* 44:*19* 67:*6* 68:*13* 70:*14* 90:*16, 23, 24* 91:*22* 92:*5, 9* 104:*1, 9, 12* 106:*24* 109:*9* 110:*2* 113:*15* 115:*5* 116:*11, 18* 135:*18, 23* 136:*2, 3, 10, 13* 147:*9* 161:*10, 22* 171:*10* 172:*24* 176:*12* 177:*9* 178:*8* 198:*2, 8, 25* 199:*7, 15* 231:*18*

**damned** 225:*1*

**Dan** 148:*9, 14*

**danger** 6:*25*

**data** 10:*25* 11:*2* 16:*9* 24:*19* 25:*8, 10* 32:*24* 58:*20* 79:*14, 18* 129:*10, 11, 13* 155:*16* 156:*15, 19*

**data's** 12:*23*

**date** 37:*7, 14* 53:*1* 222:*1* 238:*11* 240:*1*

**dated** 146:*25* 147:*17*

**Daubert** 231:*9, 13, 16, 24* 232:*7* 233:*8*

**Dawson** 150:*1, 2, 5, 17* 159:*2*

**D-A-W-S-O-N** 150:*2*

**day** 43:*10* 85:*24*

**86:***1* 108:*5* 240:*1*

**days** 68:*23* 231:*15*

**day-to-day** 150:*14*

**dba** 1:*7* 240:*1*

**deal** 68:*18* 83:*19*

**dealing** 103:*24* 135:*10*

**deals** 8:*25* 83:*13* 143:*14*

**debate** 86:*4*

**decades** 119:*2*

**decals** 222:*10*

**December** 186:*6* 233:*16*

**decide** 52:*24* 119:*21*

**deciding** 212:*19*

**decision** 21:*25* 81:*1* 108:*4* 145:*11, 22* 173:*18* 191:*23* 193:*25* 195:*11* 197:*21* 201:*4* 202:*4* 203:*13* 212:*19* 220:*7* 228:*3*

**decision-making** 131:*15*

**Decisions** 191:*1* 193:*18* 200:*25* 214:*1, 10, 22* 222:*14*

**Declaration** 4:*2* 146:*25* 226:*21* 240:*1*

**declare** 240:*1*

**decline** 206:*12*

**decompose** 60:*21* 64:*7*

**decrease** 77:*24* 78:*9* 100:*2* 107:*19, 20*

**decreased** 76:*25*

**decreases** 99:*22, 23*

**deep** 95:*7*

**default** 71:*23* 72:*3*

**defect** 135:*13*

**defective** 135:*8* 166:*13*

**Defendant** 1:*8* 2:*12* 105:*21*

**defense** 13:*22*

**deficiencies** 20:*5* 197:*2*

**define** 44:*3* 93:*16*

**101:***24* 139:*12*

**defined** 226:*8*

**defines** 226:*19*

**defining** 167:*22*

**definitely** 124:*25*

**definition** 130:*10* 141:*1, 7* 226:*5, 11, 13* 227:*3*

**degraded** 165:*2*

**degrades** 162:*24*

**degree** 68:*24* 150:*23*

**degrees** 64:*18* 144:*14, 16*

**delta** 113:*15*

**demand** 9:*19* 27:*6, 10, 12, 23* 32:*9, 16, 17* 44:*21* 53:*10* 72:*14, 15* 76:*24* 77:*14, 24* 78:*8, 9, 21* 87:*16* 93:*20, 23* 94:*3, 6, 7, 10, 11, 14, 17, 20, 25* 96:*23, 24* 97:*19* 107:*13, 15, 17, 18* 109:*4* 110:*19* 111:*5* 115:*20* 117:*3, 4, 6* 118:*1, 6* 120:*5* 123:*8* 124:*8* 125:*2* 127:*11* 133:*5, 7* 136:*16, 18, 19, 22, 24* 137:*3, 4, 7, 12, 14, 25* 139:*14, 17, 20* 140:*3, 22* 141:*18* 142:*6, 18* 143:*4* 145:*20* 146:*8* 158:*9* 192:*24* 195:*10* 199:*2* 202:*7* 205:*25* 212:*13* 235:*13, 23*

**demanded** 94:*1, 2, 5*

**demand-side** 54:*20* 73:*1* 116:*1* 133:*10* 146:*2* 235:*25*

**DeMarco** 2:*4*

**demonstrates** 222:*11*

**demonstrative** 158:*6*

**demonstratives** 158:*14*

**denied** 232:*17*

**denying** 172:*22*

**depend** 52:*15* 80:*18* 231:*11*

**dependent** 66:*7* 98:*21*

**depending** 14:*24* 22:*16* 56:*14* 57:*2* 77:*16* 78:*20* 87:*24* 140:*7*

**depends** 8:*2* 12:*4* 70:*9* 81:*13* 135:*24* 174:*16* 235:*8, 16*

**Depo** 4:*2* 215:*22*

**deposed** 5:*13* 7:*3* 172:*3*

**DEPOSITION** 1:*10* 6:*4* 14:*17* 121:*9* 125:*24* 146:*21* 148:*20* 149:*2* 156:*11, 12* 215:*14* 216:*13* 238:*4* 239:*13* 240:*1* 241:*1* 242:*1*

**depositions** 149:*4* 156:*9*

**derived** 187:*3* 189:*20*

**describe** 28:*2* 107:*12* 134:*1* 144:*1* 151:*8, 15* 152:*16* 201:*19*

**described** 102:*7* 106:*11* 107:*24* 122:*19* 130:*15, 17* 229:*13, 16, 22, 24*

**Description** 4:*2* 79:*7* 104:*25* 105:*3* 106:*10, 14, 21* 107:*1, 2, 6* 115:*23* 122:*18* 135:*11* 146:*1* 151:*16* 224:*11* 225:*13, 22, 23, 25* 226:*1* 236:*8*

**descriptions** 123:*17* 145:*23* 221:*22* 224:*17* 230:*8* 236:*13* 237:*3*

**Description's** 105:*12*

**design** 88:*18* 117:*8* 124:*14, 19* 133:*17, 21* 134:*3, 8* 198:*18, 20* 212:*5, 12* 213:*2*

**designations** 221:*21*

**designed** 116:*22* 117:*13, 19* 119:*8*

**designing** 117:*9, 11*

119:15  122:8
**desire**  87:16
**desired**  227:19
228:13  229:1
**despite**  166:2  167:3,
16  170:16
**detail**  91:14  166:9,
17  178:20  219:18
**determinants**  27:23
53:18  66:5  75:10
117:6  118:1, 6  120:5
124:8  125:2  127:11
132:15  140:22
145:20  193:18  199:2
205:25
**determination**  21:3
56:19  70:14  74:10
129:19  133:9  137:6
170:7  178:6  193:17
**determinations**
128:18  129:8
**determine**  7:23  8:8,
15  10:18  11:15
12:15  13:13  15:20
16:3, 16  17:6  18:3,
14  19:7, 20  20:1, 11,
13  21:11  23:17
24:16  26:15  28:3
30:16  32:1  35:20
48:17, 18  61:3, 16
62:5  64:15  65:22
66:12  67:5  68:13
70:25  71:8  75:20
76:5, 11  94:17  97:17
98:13  99:7  100:11
111:10  112:3  113:2
115:4  127:20  137:12
138:14  161:21  164:1
216:3  228:20
**determined**  15:24
16:1  26:7  27:12
33:11  34:19  69:13
136:17  180:14
193:23  208:21
**determining**  20:23
34:3  44:13  53:14
77:22  110:2  195:6
**developed**  197:20
205:16

**development**  65:18
**Diageo**  15:4
**diagram**  199:9
**diametrically**  217:19
**Dick's**  54:7, 8  55:7,
10, 11, 12, 13  58:8, 9
59:23, 24  60:3, 7
81:19  82:13, 24
83:11  98:5, 12  154:3
181:12  186:11, 24
187:6, 7  188:9, 22
189:2, 6, 7  190:1
219:23  220:2, 5, 6, 7,
8, 10, 20  221:1
**dictated**  93:14
**differ**  45:4  70:5
**difference**  28:12, 13
41:19  68:20  69:8
70:21  75:8  87:5
89:5, 15  90:16  92:20
94:14, 15, 19  103:19
105:5  113:12  176:6,
13, 16  177:2, 5  179:1,
3  227:9
**differences**  29:1
41:17  70:3  86:7, 8
94:18  197:12, 21
235:12
**different**  8:21  9:2
11:19  12:2  13:2
20:17, 20  24:10, 20
26:8, 11  27:3  28:8, 9
31:3, 5, 7  34:8  35:23
36:4, 10  37:18  39:21,
25  42:4, 17, 18, 19, 20,
24  43:2, 14, 22  45:9
48:14  58:19  64:20
70:4  73:15  75:4, 18
79:23, 25  82:5  86:21
87:11  88:1, 11, 25
91:1  92:6, 16  93:25
99:4  102:2  103:17,
21  104:7, 23, 25
105:13, 22  106:7, 22
107:21  108:9  109:20,
21  110:7, 8, 13, 14
111:22  117:24
120:20, 23  129:4
143:10  149:12
160:11  168:10  170:9

172:19  173:16
174:18, 24  175:9, 16
177:7, 12  179:23
183:19  184:8, 16
191:11  194:17
195:18  201:6  219:20
221:18  225:20  226:5
227:15  228:17
234:16  236:15
**differential**  176:11
**differentials**  177:9
**differentiate**  87:14
88:13, 16, 23  207:11,
25
**differentiated**  32:18
43:13
**differentiates**  200:21
**differentiating**  89:1
235:9
**differentiation**  86:15,
18  87:13, 19, 24
88:10  89:9
**differentiators**  208:10
**differently**  30:8
227:4
**difficult**  162:19
163:9  204:18
**dimension**  106:6
**dimensions**  106:7
170:9  173:17  177:13
202:25  203:7, 17, 20
**dings**  6:19
**direct**  42:7  116:17
145:7  166:7  198:4
**direction**  85:12
87:23  105:7, 11
126:20
**directions**  88:11
**directly**  226:21
**disagree**  30:2  58:5
65:3  86:4  92:23
102:22  127:22  143:6
145:13  176:10
204:17
**disagreed**  63:11
232:16  233:7
**disagreeing**  109:17
181:2, 19
**disagreement**  103:13
**disclosed**  113:4

**disclosure**  61:5, 6, 18
62:7, 9  71:10  74:21
114:1, 13
**disclosures**  71:1
73:8, 20  75:22, 25
76:7, 14  90:21
**disconnecting**  6:24
**discounts**  82:12
**discovery**  91:11
**discuss**  224:3
**discussed**  20:10
23:17  151:24  205:1
**discussing**  22:21
**discussion**  101:16
155:5
**discussions**  154:21, 24
**dispersions**  115:13
130:23  131:4, 5
**display**  205:9
**dispute**  9:24  63:19,
20  92:11  104:17, 18
105:3
**disputed**  27:5  218:17
**dispute's**  219:3
**disputing**  172:24
**dissatisfied**  177:23
**distributed**  143:25
**distribution**  115:23
**distributor**  97:24
**DISTRICT**  1:1
**divided**  58:22
**DIVISION**  1:2
**doable**  191:17
**Doctor**  5:10  7:8
18:1  89:23  116:15
126:3  165:17  166:24
168:15
**document**  132:8
157:15  192:3  231:4
**documentary**  195:12
**documentation**
219:14  230:19, 21
**documents**  5:20, 21
123:5, 11, 13  132:6, 8
149:6  154:11  189:14
**doing**  14:12  16:12
18:18  25:12  31:22
32:4  44:15  54:9
58:8  59:23  60:3
71:17  80:17  109:5

Deposition of Keith Raymond Ugone, Ph.D.     Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

110:25  116:12, 18
118:17  119:17  120:7
121:4  122:3  125:3
144:2  145:6  155:18
159:3, 12  160:11
189:2  215:20  227:24
233:8
**dollar**  58:14  59:25
172:14  173:3  188:3
**dollar-for-dollar**
72:11
**dollars**  9:5  45:18, 19
60:12  68:25  69:5
82:8, 25  83:5  85:3
94:24  95:1  101:20
159:6  172:9, 15
179:9, 18  180:22
181:9
**dominant**  12:11
**dominated**  63:5
**dominates**  67:1
**Doris**  150:3, 20
151:6  154:13  158:25
**double**  159:4
**doubled**  77:8
**doubling**  56:13
**downward**  78:10
96:24
**Dr**  7:2  50:20  90:15
134:13  146:16
150:17  159:2  237:14
**draw**  108:3, 23
109:19
**drawn**  127:12
**drink**  15:12
**driven**  235:25  236:1
**driver**  202:7
**drivers**  27:6  44:21
66:16  195:10  212:14
**due**  10:9  31:3, 8
176:13  177:6  178:3
**duly**  5:2  239:5
**durability**  43:9
**Dyaco**  154:4
**dynamics**  35:12
37:18  40:25  41:6
176:15

< E >

**earlier**  33:5  35:19
40:17  50:21  86:14
120:22  139:19
147:22  151:25  152:6
164:16  215:18, 21
**earliest**  29:10
**early**  148:1
**earplugs**  205:7
207:18
**easier**  35:8  78:1
**easiest**  17:1  86:19
87:25
**East**  90:5
**easy**  94:21  100:17
111:13  128:8  184:14
187:18
**eating**  90:8
**ecologically-sound**
173:25
**econometric**  9:15
62:15  112:2
**econometrics**  65:10
**economic**  9:10  25:8
29:20  36:24  40:14,
17  46:9  61:21  66:25
74:13  113:6  115:5
116:9  117:25  119:11
127:24  168:1, 2
169:3  170:2, 3, 5
173:5  175:22  198:2,
7, 17, 25  199:3, 5, 6,
14  202:9  210:5, 19
212:13  228:15
232:13
**economically**  169:5
**economics**  36:19
97:3  108:6  115:2
116:18  140:25  141:3,
7, 9  145:3  150:18
168:5, 17  210:9
**economist**  42:8  46:6
51:12  63:17  69:13
75:1  77:17  84:23
108:15  113:10
116:25  117:3  120:2
131:21  172:3, 4
173:2, 3  195:9
198:22  199:11  202:1,
7  215:15

**economists**  27:15
172:4  179:3
**Edina**  2:10
**edit**  29:11  151:18
**edited**  151:10
**editing**  151:21
**education**  46:7
125:10  131:20
**Edwards**  2:4
**effect**  41:4  75:14
77:23  92:21  114:17
216:4  217:22  220:15,
16  223:12  224:7
**effective**  49:9  135:3
**effectively**  81:21, 22
82:7  237:12
**effects**  78:19, 20, 23
87:21, 22  114:20
**eight**  31:5  191:14
192:2, 9  193:13, 21
197:5  198:10  208:21
**eighties**  29:10, 11
**Eisenberg**  2:13
**either**  13:1  17:3
23:20, 21  24:13, 14,
18  25:15  28:9  31:6
39:13  46:23  47:1
48:1  49:3  57:1
62:21  71:25  79:7
87:19, 22  88:15  90:4
120:6  126:18  138:13
148:14  154:12
156:21  170:13
179:18  201:19
205:19  206:22
227:13  239:17
**either/or**  199:12
**elasticities**  99:10
109:4  112:5
**elasticity**  99:8, 11, 24
100:5, 7, 12, 24
**electronic**  49:13
**elevating**  191:22
**else's**  119:6
**em**  82:18  83:11
**e-mail**  6:18
**embarrassed**  206:14
**Embedded**  137:6, 9
**emphasis**  191:17

**empirical**  36:15
105:15, 17  155:9
**empirics**  176:25
**employ**  70:24
**employed**  19:20
68:12  161:20
**enabled**  6:21
**ends**  141:5
**engage**  87:18  172:8
**engaged**  147:4
225:17
**engagement**  147:19
160:23
**engagements**  154:19
**engine**  30:20  31:2, 3
38:20  39:5  41:13
49:14  237:10
**engineer**  49:22
114:20
**engineering**  88:20
**engines**  48:23, 24
**entire**  94:4  113:16
162:8  178:22  233:21
240:1
**entirely**  29:23
**entities**  54:10
**entitled**  221:11, 16
**entrant**  217:6, 15
**entrants**  216:16, 19
217:13
**environment**  32:15
37:21, 25  41:1  55:3
63:19, 20  69:3
102:12  116:20
151:12, 22  165:11
**environments**  182:25
**equal**  7:13  41:21
85:15, 20  89:4
113:16  139:25
141:23  167:12
175:20
**equation**  25:23  64:23
**equilibrium**  107:21
113:11  116:2  136:19
137:13  139:15, 23
**EQUIPMENT**  1:6
240:1
**ergonomics**  202:17
203:21, 23  204:7, 10,
14, 15, 22, 24

Deposition of Keith Raymond Ugone, Ph.D.     Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

**ERRATA** 240:*1*
241:*1* 242:*1*
**error** 130:*19* 143:*24*
**especially** 132:*6*
162:*4* 173:*13* 194:*10*
**Esq** 2:*3, 6, 13*
**essentially** 99:*5*
152:*5* 161:*19*
**established** 80:*13*
167:*1* 168:*1, 3* 178:*1,
2*
**estimate** 23:*12, 13*
80:*12* 142:*14* 144:*12*
145:*17* 158:*21*
**estimated** 98:*15*
**estimation** 143:*9*
144:*4*
**euphemism** 88:*6*
**evaluate** 13:*15, 25*
14:*3* 16:*8* 19:*14*
20:*25* 40:*6, 13* 91:*19*
116:*8* 121:*3* 147:*8,
11* 171:*9* 205:*21*
206:*22*
**evaluated** 62:*22, 25*
63:*10, 12* 161:*12*
171:*11*
**evaluating** 16:*5, 6*
91:*21* 125:*1* 147:*9*
202:*8*
**evaluation** 22:*10*
208:*18* 224:*19*
**event** 239:*18*
**events** 26:*6*
**everybody** 88:*2* 97:*2*
125:*16* 139:*19*
151:*12* 163:*19*
177:*10* 178:*10, 18*
179:*2, 17* 180:*2, 9, 12*
181:*6* 206:*10, 11*
**everybody's** 75:*13, 15*
**everyday** 53:*25*
210:*21*
**everything's** 114:*8*
**evidence** 16:*9* 29:*6*
38:*16* 195:*12* 215:*23*
233:*18*
**exact** 35:*1* 56:*15*
74:*5* 79:*16* 105:*12*
120:*19* 175:*4* 235:*1*

**exactly** 161:*2* 169:*11*
174:*25* 183:*24* 196:*1*
224:*16*
**Examination** 1:*13*
3:*1, 3* 5:*5*
**examine** 218:*1, 2*
**example** 20:*22* 25:*18*
30:*24* 35:*2* 39:*12*
43:*8* 56:*22* 58:*12*
71:*4* 86:*20* 91:*9*
102:*10* 142:*13, 20*
163:*17* 169:*21* 171:*4*
172:*1* 173:*19* 179:*16*
183:*3* 188:*14, 21*
189:*18* 190:*10*
192:*17* 193:*3, 11*
201:*12* 204:*12*
205:*17, 23* 206:*25*
235:*18*
**examples** 12:*13, 25*
15:*17, 19, 20* 58:*11*
**exception** 24:*3*
**excluded** 231:*22*
232:*1*
**Excludes** 190:*24*
**exclusion** 201:*17*
**executed** 117:*18*
**exercise** 42:*24* 106:*7*
**Exh** 4:*2*
**Exhibit** 4:*2* 14:*13,
14* 56:*22, 24* 146:*20,
22* 156:*14, 18, 21*
157:*1* 158:*8* 183:*23*
185:*21, 24, 25* 186:*19*
216:*10, 11*
**EXHIBITS** 4:*1*
146:*11* 156:*23, 25*
157:*11, 12, 13, 17, 20*
158:*3, 6*
**exist** 11:*3* 45:*10*
102:*6* 114:*21* 158:*7,
13*
**existed** 90:*18*
**existence** 13:*17* 14:*4*
28:*6* 142:*16* 230:*10*
**existing** 51:*2* 52:*12*
74:*15* 96:*6*
**exists** 11:*2* 17:*16*
44:*14*

**exit** 78:*18*
**expand** 33:*14* 43:*24*
**expanding** 23:*25*
25:*5* 68:*16*
**expect** 217:*9*
**expectation** 75:*6*
**expectations** 52:*16*
144:*6*
**expected** 52:*21*
**expensive** 36:*13*
45:*15* 56:*10* 235:*20*
**experience** 14:*15*
45:*12* 46:*1, 7, 8* 50:*2*
121:*13* 125:*10*
131:*21* 160:*8* 168:*15*
173:*13* 234:*5*
**experienced** 161:*10*
**experiment** 234:*18*
**experiments** 69:*18*
129:*24*
**expert** 17:*17* 23:*4,
15* 116:*5, 12, 14, 21*
135:*19* 191:*25*
227:*16* 231:*18, 19*
**expertise** 117:*7*
122:*8* 124:*3, 4*
150:*16*
**experts** 20:*4, 22, 24*
22:*4, 20* 63:*9, 10*
91:*20* 109:*18* 121:*8,
18* 135:*20* 152:*1*
158:*5* 163:*22* 170:*6*
178:*24* 179:*4* 217:*20*
**expires** 239:*22*
**explain** 26:*6* 66:*6*
86:*17* 204:*13* 206:*4*
**explained** 136:*4*
**explains** 92:*17*
**explanation** 190:*17,
18*
**explanations** 80:*2*
102:*3*
**explanatory** 65:*14, 21,
23* 66:*6, 13*
**explicitly** 147:*6*
190:*7*
**explore** 165:*25*
180:*13* 191:*4*
**exposure** 80:*13, 19*
**expressly** 239:*13*

**extant** 136:*16, 23*
137:*3, 18* 138:*6*
**extensive** 13:*9*
148:*20*
**extent** 6:*21* 10:*9, 22*
72:*22* 73:*22* 90:*23*
120:*21* 142:*4* 190:*17*
226:*4* 227:*2*
**extra** 176:*4*
**extreme** 109:*18*
**eye** 111:*18*

**< F >**
**F63** 57:*1* 183:*3, 11*
184:*1* 186:*20, 21*
192:*18* 200:*17*
216:*11*
**F65** 183:*14*
**F80** 39:*12* 44:*5*
48:*19* 57:*2, 15, 23*
83:*23* 181:*12* 183:*16,
25* 185:*22, 25* 186:*12,
16, 20* 187:*8* 188:*15*
192:*20* 194:*22* 200:*9,
17* 201:*14* 203:*1*
207:*4, 7, 10* 216:*12*
220:*12, 20* 228:*20*
**F85** 83:*22* 84:*3, 5*
**facilities** 105:*22*
**fact** 6:*17* 12:*17*
29:*9* 39:*14* 44:*6*
47:*16* 50:*2* 65:*7*
83:*25* 130:*14* 136:*1,
5* 146:*16* 149:*16*
163:*3* 166:*2* 170:*4*
173:*15, 24* 174:*23*
176:*5* 180:*19* 181:*4*
**factor** 195:*6* 208:*23*
**factors** 16:*15* 18:*19*
24:*25* 25:*2* 26:*5, 15*
28:*18* 32:*17* 52:*23*
53:*8* 54:*14* 58:*1*
72:*25* 73:*1* 146:*2, 3*
195:*7* 202:*15* 208:*21*
**facts** 8:*2, 5* 10:*21*
17:*11, 23* 22:*16*
24:*18* 30:*4* 37:*7, 13*
149:*13* 156:*15, 19*
174:*17* 177:*8* 178:*11*
235:*16*

Deposition of Keith Raymond Ugone, Ph.D.　　　　Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

**factual** 212:*20* 224:*6, 8*

**factually** 39:*5* 224:*1* 233:*20*

**Fair** 15:*1* 52:*14* 67:*4* 68:*10* 70:*11* 158:*1*

**fairly** 79:*17*

**fall** 98:*8* 134:*24*

**falls** 24:*4*

**false** 174:*9* 219:*5*

**familiar** 29:*4, 19* 67:*23* 69:*17, 21* 130:*11, 18* 134:*16* 139:*9*

**fancy** 119:*13, 16* 185:*13*

**far** 21:*2* 91:*8* 175:*25* 224:*22*

**farmer** 86:*22, 24* 87:*1*

**farmers** 86:*21*

**farther** 16:*5* 20:*24*

**fault** 225:*25*

**feasible** 147:*12*

**feature** 106:*21* 194:*8* 205:*1* 214:*8* 226:*8*

**features** 105:*20* 107:*4* 190:*25* 192:*9, 12* 193:*13, 15* 195:*15* 196:*16* 197:*6, 7* 198:*10* 202:*17, 18* 205:*2* 206:*19* 209:*13, 16, 18, 19* 214:*6*

**February** 147:*21* 148:*2*

**Federal** 29:*5*

**feel** 114:*23* 124:*9* 204:*1, 2*

**feeling** 34:*24*

**felt** 18:*23* 20:*4* 22:*8* 48:*16* 63:*10* 92:*1*

**fewer** 76:*11, 12* 105:*21*

**fictional** 172:*5*

**fifth** 15:*15*

**figure** 9:*4, 16, 21* 53:*21, 23* 65:*25* 91:*8* 95:*13* 100:*14* 110:*1* 111:*4, 7* 112:*4, 17*

**figures** 189:*17*

**figuring** 140:*10*

**filing** 158:*17, 22*

**final** 95:*10* 97:*19, 20, 24* 98:*1, 7, 12* 129:*19*

**financial** 108:*25* 151:*2*

**find** 13:*18* 151:*11* 156:*21* 184:*25* 185:*19* 187:*19* 204:*5* 211:*9, 16*

**finds** 74:*18*

**fine** 6:*12* 7:*7* 14:*8* 50:*13* 90:*4, 13* 114:*25* 125:*15, 20* 190:*12*

**finish** 63:*1* 209:*6*

**firm** 51:*14, 23, 24* 78:*5, 6, 14* 96:*8* 101:*5* 126:*6, 11* 150:*21*

**firms** 42:*16* 43:*13* 78:*11, 18, 24* 87:*6* 101:*8* 108:*23* 111:*7*

**first** 7:*8* 14:*15* 28:*1* 29:*14* 106:*12* 107:*9* 114:*5, 7, 11, 21* 143:*12* 147:*18, 22* 150:*1, 9* 151:*17* 157:*8* 159:*17* 170:*17* 181:*24* 196:*15* 200:*8* 210:*4, 5* 220:*19* 230:*18, 25* 239:*7*

**fit** 11:*6* 24:*18* 30:*4* 50:*5* 125:*9* 203:*3*

**FITNESS** 1:*6, 7* 217:*24* 240:*1*

**five** 50:*16* 63:*22* 68:*25* 69:*5* 90:*9* 94:*24* 162:*20* 163:*5, 8, 24* 164:*2* 191:*14* 192:*2* 209:*6* 232:*23*

**five-minute** 165:*14*

**five-star** 195:*1, 4*

**five-year** 165:*1*

**fix** 172:*7*

**fixed** 109:*11*

**fixing** 171:*24* 172:*8*

**flat** 226:*25*

**floor** 46:*12* 47:*18* 49:*23* 83:*18*

**flow** 72:*23* 75:*1, 6* 89:*16* 105:*16* 106:*9, 15* 107:*14* 113:*18, 23* 227:*13*

**focal** 191:*21* 210:*16*

**focus** 166:*25* 195:*20* 206:*23* 209:*15* 210:*15, 25* 212:*4, 10* 214:*8* 234:*10*

**focus-biased** 209:*15*

**fold** 207:*22*

**follow** 51:*25* 62:*4* 70:*10* 175:*25*

**following** 14:*19* 147:*15*

**follows** 5:*4*

**food** 13:*1* 235:*19*

**footnoted** 156:*2*

**footnotes** 156:*22*

**forensic** 63:*17* 120:*1* 198:*21*

**fork** 30:*6*

**form** 65:*8*

**formal** 68:*8* 130:*10*

**forth** 32:*22* 37:*24* 38:*23* 40:*11* 47:*4* 77:*17* 81:*8* 112:*22* 119:*5* 123:*18* 133:*25* 147:*10* 151:*5* 217:*20* 239:*14*

**found** 136:*3* 151:*23* 153:*14* 172:*10* 174:*12* 225:*17*

**foundational** 103:*2*

**four** 5:*21* 95:*1* 150:*4* 201:*13* 202:*15* 232:*23*

**four-star** 175:*14* 194:*25* 195:*4*

**fourth** 15:*3, 6, 7*

**Fraenkel** 2:*13*

**frankly** 23:*19* 34:*4* 36:*5* 42:*15* 87:*22* 122:*1* 123:*23* 136:*9* 156:*8* 171:*9* 191:*17* 192:*23* 197:*24*

**200:***17* 202:*1* 219:*15* 229:*3*

**fraudulent** 174:*10*

**freedom** 144:*14, 16*

**Friday** 54:*3* 58:*13* 82:*1, 25* 179:*8* 189:*4*

**friends** 47:*2*

**front** 5:*21* 12:*21* 13:*3, 8* 146:*16* 159:*25*

**full** 5:*7* 10:*8* 118:*15* 196:*15* 236:*19, 20*

**fuller** 51:*13*

**fully** 73:*23*

**function** 6:*22* 64:*2*

**functionalities** 209:*13, 20*

**further** 17:*15* 227:*15* 237:*15* 239:*16*

**future** 83:*5* 96:*19*


**< G >**

**GAMACHE** 2:*13* 6:*13* 237:*20* 238:*1, 3*

**garage** 43:*4* 203:*5*

**Gaskin** 67:*9, 14* 91:*20* 92:*25* 122:*22* 123:*22* 124:*9* 127:*2* 129:*5* 145:*14* 147:*10* 149:*17* 159:*18* 160:*20* 180:*5, 7* 192:*10* 193:*13* 197:*6* 202:*19* 208:*5, 22* 209:*15* 211:*18* 212:*20* 214:*7* 222:*19* 223:*10, 20* 224:*2, 9, 12* 226:*8, 18* 227:*6* 228:*14* 229:*14, 22* 230:*5*

**Gaskins** 102:*18* 128:*15* 206:*20*

**Gaskin's** 6:*2* 95:*4* 125:*3* 162:*6* 190:*24* 198:*8* 199:*17* 226:*5, 6*

**general** 7:*4* 8:*7* 11:*4, 6* 32:*16* 36:*24* 60:*20* 65:*11* 83:*20* 128:*19* 182:*21, 23*

Deposition of Keith Raymond Ugone, Ph.D.          Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

199:*18, 23*  216:*18*
223:*15*  225:*9*
**generally**  8:*11*  13:*23*
24:*22*  26:*19, 22*
29:*25*  30:*5, 9, 10*
47:*10*  50:*21*  56:*18*
58:*11*  59:*9*  60:*17*
78:*2*  81:*15*  82:*17*
83:*9*  85:*4, 9*  93:*17*
94:*11*  95:*20, 23*
99:*20*  100:*24*  102:*12*
111:*12*  131:*12*
134:*16*  136:*20*
141:*17*  145:*7*  150:*12*
155:*1, 19*  165:*12*
185:*7, 10*  191:*15*
232:*25*  235:*19, 22*
**generation**  153:*23*
**gentlemen**  155:*12*
**getting**  27:*23*  39:*10*
74:*4, 15*  75:*7*  83:*7,
18*  84:*15*  88:*19*
106:*15*  108:*21*
127:*10*  133:*23, 24*
135:*3*  160:*19*  162:*18*
175:*17*  197:*3*  205:*24*
229:*8*  230:*8*
**give**  12:*13, 25*  14:*11,
19, 20*  19:*13*  23:*11,
13*  28:*6, 24*  35:*1*
42:*9*  51:*9*  58:*4*
73:*11, 12*  75:*9*  82:*13,
19*  86:*19*  93:*9*  102:*2*
108:*18*  112:*24*
114:*23*  115:*12*
117:*10*  130:*9*  137:*2*
140:*20, 22*  141:*1*
142:*19*  143:*22*
151:*18*  158:*21*
162:*15*  166:*17*
169:*25*  170:*1, 5, 6*
171:*4, 7*  178:*20*
187:*1, 2, 13*  193:*4*
204:*11, 13*  206:*3*
211:*7, 24*  224:*19*
233:*6, 10*  235:*18*
**given**  10:*21*  17:*10,
23*  35:*9*  39:*20*  44:*20*
49:*18*  77:*20*  78:*25*
91:*2, 4*  104:*8, 10*

110:*11*  119:*25*  149:*4*
154:*10*  162:*3, 4*
190:*17*  226:*11*
**gives**  18:*24*  51:*19*
66:*2*  82:*5*  128:*23*
133:*4*  137:*25*  143:*19*
144:*10, 11*  162:*15*
**giving**  32:*7*  43:*7*
83:*8*  92:*8*  94:*3*
103:*11*  114:*22*  138:*9,
10*  140:*20*  163:*17*
168:*25*  170:*1, 22, 23*
173:*14*  178:*13*
179:*16*  207:*14*
231:*22*  233:*6*
**go**  13:*18*  17:*15*
29:*10*  30:*13*  32:*3*
33:*5*  37:*19*  40:*5*
44:*15*  45:*13*  47:*8*
50:*8*  60:*14*  62:*25*
66:*11*  69:*7*  77:*22*
80:*17*  81:*19*  82:*6*
83:*11*  85:*10*  87:*22,
23*  88:*10*  91:*13*
95:*21*  105:*7, 8*  108:*8,
13*  110:*25*  111:*21*
117:*4*  118:*3, 4*
127:*23*  138:*3*  147:*13*
149:*8*  167:*15*  170:*23*
176:*18*  178:*6, 7, 19*
180:*25*  194:*11*  200:*4*
201:*13*  203:*12*
206:*10, 11*  217:*10*
218:*5, 10*  219:*12, 16*
221:*9*  223:*5*  224:*22*
227:*22*  228:*9*  230:*17*
236:*16*  237:*20*
**goes**  31:*13*  53:*13*
65:*13*  74:*1*  76:*20*
97:*25*  99:*21, 25*
100:*2*  112:*1*  130:*22*
137:*24*  144:*17*  168:*5,
9*  180:*1*  182:*24*
185:*2, 8, 10*  192:*23*
194:*2*  200:*1, 5*
205:*12*  206:*6*  207:*3*
227:*11*
**going**  7:*3, 22*  9:*18*
10:*13*  14:*20*  16:*11*
18:*16*  24:*9*  28:*21*

34:*22*  35:*19*  40:*16*
44:*2, 16*  50:*10, 14*
52:*18*  54:*22*  56:*3*
58:*4*  59:*18*  62:*14*
66:*8*  70:*18*  71:*11*
74:*24*  80:*1*  83:*14*
84:*20*  85:*12*  86:*4*
87:*2, 3, 5*  89:*11, 24*
90:*8*  92:*13*  102:*4*
103:*7*  105:*10*  110:*1*
114:*18*  118:*2, 3, 5, 7*
140:*10*  143:*17*  146:*1,
15*  152:*15*  156:*2*
161:*6*  162:*15*  164:*10*
176:*10, 15*  179:*23*
180:*7, 8*  181:*2*
182:*16*  184:*12*
185:*13*  187:*14*  189:*7*
191:*10, 11*  195:*18*
199:*10*  203:*3*  206:*3,
10, 11*  210:*4*  212:*1*
213:*15*  221:*13*  223:*3,
5, 12*  224:*17, 22*
225:*3, 5, 12, 16, 25*
226:*2*  234:*6*  235:*18*
**good**  29:*2*  45:*12*
46:*2*  50:*3, 14*  77:*20*
80:*19*  89:*21*  97:*16*
125:*12*  141:*14*
173:*25*  234:*2, 5*
**goods**  45:*13*  46:*8, 9,
10*  54:*7*  55:*12*
137:*21, 22*  141:*24, 25*
142:*2*  154:*3*  173:*13*
182:*8*  186:*12*  188:*22*
**Google**  155:*16*
213:*12*  236:*7, 8*
**gotten**  40:*9*
**gradations**  206:*5*
**graph**  96:*22, 23*  97:*6*
**graphs**  151:*4*
**great**  52:*21*  89:*25*
192:*19*  209:*7*  229:*10*
**greater**  36:*11*  51:*19*
52:*11*  79:*17*  85:*14,
19*  115:*10, 13*  141:*19*
142:*5*  162:*25*  163:*10,
11*  167:*12*  173:*11*
175:*19*  198:*9*

**greatest**  108:*21*
142:*21*  143:*19*
**grocery**  108:*13*
**ground**  63:*15, 24*
**group**  35:*6*  70:*2, 3, 8,
12*  122:*7*  149:*22*
152:*23*  154:*13*
158:*25*  195:*21*
206:*23*
**groups**  69:*21*
**guess**  13:*20*  17:*14*
30:*19*  31:*15*  36:*2*
51:*21*  53:*20*  86:*4*
114:*6, 7*  127:*25*
163:*20*  167:*6*  220:*24*
225:*8*  231:*20*
**guidance**  28:*6, 25*
73:*12, 13*  115:*12*
124:*10*  170:*3, 5, 6*
**guide**  192:*3*  196:*2*
210:*11*
**guides**  195:*24*  196:*5,
8*  230:*4, 13*
**guiding**  66:*8*  131:*17*
**Guinness**  15:*5*
**Gumbel**  143:*25*
**guy**  84:*9, 12*
**guy's**  87:*9, 11*
**gym**  164:*10*

**< H >**
**half**  90:*3*  125:*16*
155:*14, 21*  174:*4, 8,
20, 21*  176:*13*  177:*6,
18*  227:*22*
**halfway**  231:*2*
**hand**  239:*20*
**handful**  155:*10*
**handle**  195:*19*
224:*22*
**handles**  204:*4, 5, 9*
**hang**  170:*9*  181:*13*
**happen**  30:*13*  51:*20*
95:*20, 24*  106:*2*
143:*20*
**happened**  12:*8*
77:*21*  79:*10*  128:*23*
129:*2*
**happening**  78:*23*

Deposition of Keith Raymond Ugone, Ph.D.     Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

158:20

happens 234:20
happy 45:21 166:19
167:10, 17
hard 54:12 63:19
108:7 163:4 207:21
211:9
harder 93:22 115:16
220:14, 22
harm 167:22 168:2
169:24 228:15
harmed 165:21
166:4 167:4, 15, 18,
20 168:21 169:5
170:16 173:5 174:13
harmony 58:9
hate 88:7
head 9:25 10:6 32:7,
24 159:3 164:12
192:6
heading 190:23
211:17
hear 6:20 158:4
207:21 235:3
heard 130:1
hearing 14:16
157:19 158:3, 5, 11
heart 205:10
heavily 98:21
heavy 99:6
hedonic 9:13 10:3,
17 18:10, 16 19:18,
25 20:6 21:18 25:2
60:14 61:2, 9, 15
62:5, 15, 18, 22 63:14,
24 64:3, 15, 22 65:6,
12 66:13
height 204:8
held 86:7 107:5
208:6
he'll 95:9
Hellmuth 2:9
help 101:19 118:9
131:15 151:14
204:13
helped 29:11
helpful 160:18
helps 18:18 133:22
150:14 151:23

208:17
hereinafter 239:14
hereof 240:1
hereunto 239:19
hesitant 20:18
hesitate 85:11 226:24
hesitating 35:4 76:2
hesitation 89:15
155:15
Hey 30:12 47:6
69:5 81:19 82:18
83:6, 17 106:13
108:19 116:15 118:5
176:16 232:11 237:6
hierarchial 118:10,
19, 25 119:7 143:8
144:3, 7, 10, 15
high 10:24 11:2
27:20, 25 28:1, 17
33:2 43:2 85:2
96:12, 17 134:1
higher 7:19 36:17,
25 37:1, 2, 4 40:22
41:10 51:6 83:23
84:2, 4, 10, 16, 19
86:13 87:20, 23
88:18 89:1, 6 96:20
138:21 139:21
141:21, 24 172:9
185:3, 9, 11 189:1, 6
217:12, 16
highest 88:3
highlighting 236:23
237:4, 8
highlights 236:4
highly 56:9 125:4
200:24 202:2
high-tech 202:17
205:2
historic 136:15, 23
137:9, 17
historical 110:5
histories 56:22
history 109:12 137:5
149:4
hit 30:12 42:17, 18
43:14
hold 6:20 52:25
106:25 208:14

Holding 7:17 52:16,
20 86:11 87:4 105:1
107:2 115:25 141:17,
19, 23 142:5, 6
holdout 130:12
home 42:21 164:11
homogeneous 8:24
Honda 49:14 173:21,
23, 24
hopefully 26:9
104:14 108:20 144:9
153:25 209:6 212:14
hoping 6:23 187:19
horizontal 97:9, 12
horrible 221:13
horsepower 30:16, 20
31:1, 3, 7, 9 32:2
35:21, 25 36:4, 6, 7,
10, 12, 13, 14, 25 37:2,
8, 15 38:8, 14, 20, 21,
22 39:3, 8, 15, 16
40:18, 21 41:10, 13,
15, 16, 23 42:4 43:21
44:6, 12 48:19, 20, 23
49:3, 9 61:5, 18 62:8
71:6, 10, 19 75:16
81:11 83:23 84:2, 4,
10, 19 88:14, 18, 22,
25 89:2, 6, 13 90:21
103:1, 19, 24 104:19
105:4 106:10 107:12
113:4 114:2, 14
134:23 135:3, 4
167:2 175:4, 23, 25
176:4, 5, 14 177:6, 18
180:17 183:25 184:2,
4, 14, 15 185:8, 11
196:9, 12 213:12
218:15, 21, 25 219:1
228:21 229:4 233:15
236:4, 12, 23 237:10
hour 50:11, 13 89:24
90:1, 3, 11 125:13, 16
155:14, 21 165:13
206:7, 11, 16 209:3, 4,
5 227:20, 21, 23
hours 158:15, 23
159:5
house 203:4

HP 39:13 227:17
228:11, 24
huge 47:17, 20 203:2
human 141:6, 11
hundred 51:3 52:4
58:14 59:24 60:12
68:24 82:25 85:3
101:20 154:17
170:12 171:21 172:3
179:9 180:21 181:9
191:10
hundred-page 232:21
hundreds 7:3 39:24
170:13
hybrid 49:15, 18, 19
173:21
hybrids 173:24
hypothetical 52:10
78:2 84:8 112:24
hypotheticals 52:3

< I >
i.e 161:13 165:21
167:20 228:12 229:1
idea 25:24 26:1, 3
46:21 53:2 101:13
133:20 140:6 168:1
169:22 170:15 175:2
181:11 189:16
204:13
identical 28:10 74:7,
15, 18 106:20 166:16
identification 17:11
146:24
identify 140:21
145:9 156:7 211:19
212:22
identifying 27:6
ii 193:4 212:2 213:4,
13 215:2, 4
iii 193:4 200:8
202:12
Illinois 2:14
imagine 139:14
impact 36:16 37:25
40:24 41:2 45:21
47:24 72:19, 24
106:12 178:16
235:14, 15

Deposition of Keith Raymond Ugone, Ph.D.  Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

**impacted** 178:*17*
223:*14*
**implants** 96:*16*
**implement** 67:*14*
103:*14* 160:*9, 19*
161:*2* 204:*25*
**implementation** 20:*5,*
*17* 21:6 30:*10* 161:*5*
200:*1, 6* 224:*20*
**implemented** 8:*4*
10:*8* 19:*12* 20:*1, 3, 8,*
*13* 21:*11* 60:*24*
117:*17* 159:*19* 160:*1,*
*5, 15, 21, 24* 161:*1*
**implementing** 122:*8*
224:*15*
**implements** 67:*16*
224:*16* 225:*2*
**implications** 51:*13*
97:*5* 116:*11*
**import** 160:*5* 182:*5*
213:*8*
**important** 35:*13*
66:*18* 97:*4* 125:*1*
131:*14* 132:*1, 10, 15*
133:*15* 140:*21*
145:*21* 146:*2* 190:*25*
192:*12* 193:*6, 17, 21,*
*22, 24* 194:*7* 195:*7,*
*14* 196:*9, 12* 200:*15*
201:*3* 205:*17* 207:*16,*
*21* 208:*23* 211:*2, 19,*
*22, 23* 212:*9, 22*
213:*10*
**impossible** 161:*20*
**inadvertently** 191:*21*
207:*13, 25* 208:*1*
212:*16, 24*
**inappropriate** 228:*15*
**incentives** 105:*8*
**inclination** 106:*13*
114:*11, 22* 176:*24*
**incline** 206:*8* 226:*25*
**include** 23:*25* 65:*14*
66:*10* 98:*4* 133:*13*
146:*3* 189:*23, 24*
196:*7* 202:*24* 205:*9*
206:*19* 211:*18*
212:*15, 21* 222:*19*

223:*14* 224:*4, 18*
225:*12, 19* 230:*5*
**included** 21:*21* 27:*8*
65:*23* 131:*13* 194:*8*
198:*10* 200:*14*
201:*21* 202:*19* 208:*2*
209:*16* 231:*6*
**includes** 208:*22*
**including** 16:*10*
37:*20* 141:*18* 153:*17*
198:*11* 200:*10*
209:*17* 212:*10* 214:*6*
222:*23* 223:*2, 10, 17*
236:*17*
**inclusions** 224:*7*
**income** 108:*21*
137:*22*
**incomes** 42:*25*
**inconsistent** 222:*17*
**incorporate** 229:*14,*
*23* 230:*14*
**incorporated** 173:*16*
**incorrect** 109:*19*
**increase** 40:*21* 43:*14,*
*23* 100:*1* 174:*3*
176:*14*
**increased** 37:*9, 10, 15,*
*16* 40:*18* 77:*6, 9*
**increases** 40:*19* 41:*5*
56:*6* 87:*15* 99:*22*
**increasing** 216:*5*
235:*14*
**increment** 177:*6*
**independent** 133:*25*
136:*10* 201:*2* 202:*5*
233:*17* 234:*3*
**independently** 156:*13*
**INDEX** 3:*1* 4:*1*
**indicate** 132:*9*
**indicated** 18:*2* 19:*19*
110:*3* 240:*1*
**indicates** 57:*23*
**indicating** 33:*7*
**indication** 133:*5*
**indicator** 132:*17*
215:*22*
**indicators** 164:*13*
193:*5*
**individual** 15:*24*
17:*12* 19:*3* 22:*9*

24:*21* 35:*10* 38:*6*
44:*17, 22* 45:*3* 47:*6*
49:*21* 61:*22* 62:*13*
63:*4* 66:*25* 67:*11, 17*
71:*15, 20* 76:*21* 92:*1*
93:*10* 95:*11* 147:*12*
159:*13* 161:*13*
171:*15* 179:*12, 15*
180:*3* 194:*2* 204:*1*
**individuals** 85:*4*
122:*7* 153:*22* 154:*10*
169:*10*
**individual's** 95:*5*
**induce** 234:*12*
**industry** 65:*21*
**inference** 123:*4*
**inferior** 174:*23*
**inflate** 209:*18*
**inflated** 39:*8, 11*
134:*23* 222:*21*
**inflation** 34:*3, 5, 6, 8,*
*10*
**influence** 7:*10* 35:*22,*
*25* 141:*15* 202:*3*
234:*23* 235:*6*
**influenced** 30:*17*
32:*2* 53:*6, 7* 54:*19*
**inform** 193:*25*
196:*15* 197:*8* 223:*21*
224:*10, 23* 225:*18*
**information** 77:*20*
91:*10, 12* 104:*3, 16*
105:*4, 16* 106:*9*
114:*6* 118:*15* 125:*6*
140:*14, 15* 153:*13*
156:*19* 173:*14* 182:*8*
192:*16, 22* 193:*6*
201:*3* 216:*10* 219:*19*
220:*20* 221:*23*
227:*13* 228:*3, 4, 5*
234:*4, 15* 235:*10*
236:*14, 17, 21*
**informed** 153:*19*
225:*4, 6* 228:*3*
**informing** 196:*22*
237:*9*
**informs** 225:*2* 235:*10*
**infrequent** 58:*14*
121:*2* 213:*11* 236:*7*

**initial** 33:*3* 151:*14*
**injury** 161:*9*
**input** 37:*2* 40:*23*
41:*4* 72:*6, 8* 96:*15*
98:*22* 100:*16* 114:*17*
121:*19* 122:*15*
124:*25* 153:*13, 23*
**inputs** 96:*7* 111:*25*
116:*10* 117:*4, 10*
120:*6* 124:*7* 127:*9,*
*17* 128:*10, 11, 14, 16*
142:*12*
**inquired** 80:*1*
**inquiries** 67:*17*
**inquiry** 15:*24* 17:*12*
19:*3* 22:*9* 24:*21*
35:*10* 44:*17, 23* 45:*3*
47:*7* 61:*22* 62:*13*
63:*5* 66:*25* 67:*11*
71:*15, 21* 74:*12*
76:*21* 92:*1* 105:*13*
147:*13* 161:*13*
179:*15* 180:*3* 194:*2*
**inside** 95:*7*
**insights** 18:*24*
**instance** 231:*21*
**instructed** 220:*1*
221:*2*
**instructions** 208:*13*
**intend** 31:*11* 73:*6*
157:*2, 18, 21*
**intended** 31:*24*
146:*11*
**intention** 60:*25*
64:*17* 65:*4*
**interact** 94:*17* 110:*19*
**interacting** 137:*14*
140:*2*
**interaction** 27:*12*
53:*10* 136:*18* 137:*11*
**interactions** 121:*16*
**interchangeably** 93:*6*
**interest** 33:*25*
**interested** 205:*19*
239:*18*
**interesting** 108:*6*
**internet** 98:*5* 124:*21*
188:*2, 11, 25* 189:*8*
**interpret** 28:*11*
227:*3, 4*

Deposition of Keith Raymond Ugone, Ph.D.  Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

**interpretation** 65:*19*
115:*14* 226:4, *22*
**interpretations** 11:*19*
24:*20* 27:4 115:*24*
**interpreted** 36:5
**interpreting** 45:*8*
66:*10*
**interrupt** 127:*16*
**intramarginal** 139:*18*
**introduced** 132:*20*
**introduction** 7:4
164:7
**intuition** 36:*19, 24*
37:*1* 39:*19* 40:*17*
46:4 165:*1*
**intuitive** 64:*25*
**invalidate** 48:2, *6*
164:*15*
**inventory** 51:*3*
**investigation** 91:*25*
**Invoices** 186:7
**involve** 103:*9* 131:*10*
**involved** 13:*10, 12*
17:4 19:*9, 24* 22:*1,*
*12, 19* 23:*12, 15* 24:7,
*8, 13, 22* 33:16 35:6
149:*16, 21*
**involvement** 22:2
**involving** 16:*17* 17:7
18:4 23:*21* 171:5
231:*21*
**iPod** 205:7
**irrelevant** 206:*13*
**Irrespective** 218:*25*
**isolate** 16:*20, 25*
26:*25* 104:6, *13*
**isolated** 18:*25* 31:2
**isolating** 16:*24*
**isolation** 27:*18* 41:3
155:*19*
**issue** 11:*4, 5* 16:*18*
21:6 24:*15* 26:*24*
28:*25* 44:*17, 22*
55:*19* 67:*13* 69:*16*
71:*20* 76:*21* 98:*14*
102:*17* 128:9, *20*
141:*9* 147:*11* 194:2
195:*13* 210:*16, 22*
222:5 224:*11* 225:*11*
233:*4*

**issued** 31:*20, 21*
148:*23*
**issues** 8:*25* 20:8, *15*
22:*9* 24:*23* 27:3, *5*
35:*16* 67:*10* 124:*22*
129:*22* 232:*14*
**issuing** 159:*15*
**item** 45:*15* 48:8
59:*9* 83:*8* 88:*3*
**items** 12:*10* 59:6, *15*
88:*1* 206:*24*
**iterations** 143:*11*
**its** 26:*23* 29:*23* 37:*8,*
*15* 38:*15* 51:6 54:*12,*
*23, 24* 60:*9* 79:*5*
80:*13* 88:*13* 98:*4*
105:*22* 108:*3* 113:*10*
153:*14* 182:*15* 183:*3*
207:5, *11* 213:*5*
219:*9* 220:2, *11, 25*
222:*4, 8* 226:*23*
227:*24* 233:*13, 14*
236:*4*
**iv** 193:*4*

**< J >**
**January** 59:*19* 186:5
233:*15*
**job** 122:5 227:*24*
**joggers** 42:*22*
**Johnson** 2:*9*
**jokingly** 204:*12*
**judge** 158:4 173:*18*
232:*11, 16, 20, 24*
**judges** 31:*18* 233:7
**judgment** 65:*2, 12*
**Judicial** 29:*5*
**jury** 136:5

**< K >**
**keep** 7:*22* 44:*16*
48:*24* 58:*8* 78:*15, 17*
106:*8* 111:*17* 142:*22*
153:*18* 212:*1* 219:*18*
237:*12*
**keeps** 123:*2* 207:*3*
**KEITH** 1:*10* 4:*2*
5:*1, 8* 238:*9* 239:*7*
240:*1* 241:*1* 242:*1*
**Kelley** 142:*24*

**Kind** 8:*17* 13:*1*
20:*18* 26:2 28:*7*
31:*18* 39:7 40:*20*
41:*3* 53:*11* 78:*2*
93:*4* 98:*1* 99:*5, 19*
107:*8* 114:*10* 118:*22*
128:*11* 129:*9, 21*
131:5 140:*24* 141:*11*
150:*9* 158:*18* 163:*18*
189:*10* 194:*1* 219:*15*
231:*13, 19*
**kinds** 41:*2*
**knew** 63:*6* 122:*23*
156:*1* 169:*9*
**knock** 190:*10*
**knocking** 231:*17, 18*
**know** 5:*10* 6:*17* 7:2
8:*22* 9:*4, 7, 11, 13, 19,*
*22, 23* 10:6, *7, 24*
11:*1, 3, 7* 12:4, *6, 10,*
*18, 21, 22, 24* 13:2, *9,*
*20* 14:*12, 18, 24* 16:5,
*7* 18:*24* 19:*13, 15*
20:*18, 21* 21:*14, 15,*
*16* 22:*12, 13, 15*
23:*12* 24:2, *9* 25:4, *6,*
*7, 16, 20, 21, 22* 26:*17,*
*18, 24* 27:*11, 17, 22*
28:*8* 29:*2, 14* 30:3, *7,*
*12* 31:*13, 15* 32:*10,*
*12, 13, 14* 33:*2, 16*
34:*14* 36:*17* 37:*21*
38:*1, 3* 39:*9, 20, 22,*
*24* 41:*8, 14, 18* 42:*10,*
*14, 17, 20, 21, 22, 24*
43:*3, 6, 9, 21, 24*
44:*21* 45:*11, 12, 14,*
*15, 16, 17* 46:6, *13, 14*
47:*3, 4, 13, 14* 48:*13*
49:*10, 12, 13, 14, 18,*
*22* 52:*19, 24* 53:4, *10,*
*11, 24* 54:*2, 3, 6, 8, 13,*
*19* 55:*2, 4* 56:4, *6, 7,*
*10, 11, 12, 15, 25* 57:*2,*
*5* 58:*11, 12* 59:*17*
61:*1* 62:*13* 63:*12*
64:*19, 21* 65:*2, 11, 16,*
*17* 66:*9, 16, 17, 18, 24*
68:*2, 3, 25* 70:*9, 18,*
*20* 71:*23* 72:*5, 14, 25*

73:*12, 14* 74:*11*
75:*14* 76:*20* 77:*5, 7,*
*8, 10, 12, 14, 20* 78:*3*
79:*7, 12* 80:*4, 9, 11,*
*20, 21, 22* 81:*1, 6, 20*
82:*2, 7, 9, 16* 83:*18*
84:*22* 85:*9* 86:*8, 10,*
*24, 25* 87:*8, 25* 88:*4,*
*7, 20, 22* 89:*2, 12*
91:*18, 20, 23* 92:*14,*
*16, 17, 18, 19, 24*
93:*24* 94:*21, 22*
95:*12* 96:*14, 15*
97:*25* 98:*22, 23, 24*
99:*2, 3* 100:*21, 22*
101:*15, 17, 18* 103:*13,*
*18* 106:*4* 107:*4, 12,*
*24* 108:*10, 16, 17*
111:*3, 14, 23* 112:*7,*
*12, 15, 17, 21* 114:*11,*
*18, 20, 21, 24* 116:*8*
117:*25* 118:*1, 12, 16,*
*21, 23* 119:*4, 10*
120:*3, 7, 16, 22* 121:*7,*
*12, 17, 18, 20* 122:*18,*
*23* 123:*7* 124:*6, 17,*
*20* 125:*1, 2, 7* 126:*5,*
*6, 7* 127:*7, 8, 12, 13,*
*19* 128:*8, 10, 22*
129:*1, 9, 14, 19, 21, 23*
130:*5, 9, 23* 131:*3, 6,*
*17, 22* 133:*6, 7, 19, 23*
135:*3, 22* 136:*4, 6*
138:*19, 20, 23, 25*
139:*2, 3, 8* 140:*22, 23*
142:*9, 15, 17, 18, 25*
143:*1* 144:*1, 6, 17*
145:*9* 146:*4, 5, 9*
147:*11* 148:*17*
149:*13* 150:*12, 14, 22*
151:*2, 3, 16, 21*
152:*11, 13, 14* 153:*5,*
*17* 154:*12* 155:*8, 13,*
*14* 156:*3* 157:*16*
158:*8* 159:*6, 7, 10, 12,*
*14, 24* 160:*11, 20*
161:*2, 3, 5* 162:*20*
163:*21* 164:*3, 4, 6, 9,*
*13* 166:*7, 10, 19, 22*
168:*15, 24* 170:*9, 20*

Deposition of Keith Raymond Ugone, Ph.D.          Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

171:*8, 12, 14*  172:*20, 24*  173:*16, 17, 20, 21*  174:*1, 21*  175:*10, 11, 13, 20*  176:*6, 9, 16*  177:*1, 3, 7, 15*  178:*7, 12*  179:*9*  182:*13, 14, 18, 19*  183:*1, 18, 25*  184:*8, 22, 25*  187:*20*  188:*18*  189:*19, 25*  190:*12*  191:*9, 16, 18, 21, 24*  192:*15, 22, 23, 24*  193:*1, 2, 4, 5, 7*  194:*1, 3, 20, 22*  195:*3*  199:*9, 13*  200:*19*  201:*4, 13, 24*  202:*25*  203:*10, 11*  204:*1, 2, 3, 6, 9, 10, 17, 18, 19, 20, 21*  205:*7, 13, 18, 23*  206:*6, 13*  207:*18*  215:*20, 24*  216:*13*  218:*6*  219:*8, 10, 13, 15*  220:*1, 4*  221:*2, 20, 24*  222:*1*  223:*2*  224:*21*  225:*15*  227:*15*  231:*8, 12, 13, 15, 24*  232:*4, 7, 8, 25*  233:*2, 4, 18, 19, 21*  234:*2, 6, 18, 19*  235:*9*  236:*17*  237:*5*

**knowledge**  46:*7*  47:*9*  55:*24*  79:*4*  121:*11*  125:*10*  129:*7*  131:*20*  190:*18*  192:*6*  196:*8*  203:*15*  221:*4*
**knowledgeable**  223:*9*
**known**  109:*16*  149:*19*  150:*21*  192:*25*  202:*2*
**knows**  96:*11*  117:*3*  164:*9*

**< L >**
**label**  11:*22, 23*  12:*21*  13:*3*  39:*12*  50:*3*  146:*19*
**labeled**  39:*16*
**labeling**  12:*9, 19*  18:*25*  25:*17, 19*  114:*9, 10*

**labor**  96:*4, 8, 12*  114:*14*  137:*22*
**language**  38:*19, 25*  49:*5*  131:*7*
**large**  1:*13*  173:*12*  239:*5*
**largest**  219:*23*  220:*10*
**Larsen**  153:*3, 12*  154:*14, 22*
**late**  29:*11*  159:*12*
**laundry**  181:*13*
**LAURA**  1:*3*  240:*1*
**law**  104:*10*  168:*17, 20*
**lawful**  5:*2*
**lawsuits**  223:*19*
**lawyer**  173:*1*
**layers**  219:*20*
**layman's**  49:*5*  93:*19*
**leader**  150:*10*
**leads**  189:*9*  214:*20*
**Leahy**  2:*13*
**leap**  146:*4*
**leave**  124:*22*  173:*18*
**legal**  168:*25*  170:*1, 22, 23*  182:*17*
**legalese**  173:*1*
**legally**  168:*21*  169:*4*
**length**  34:*7*  93:*18*  162:*2, 3, 8*  203:*8*  204:*8*
**lesser**  36:*11*  88:*7*  141:*21*
**letting**  74:*11*  119:*13, 18*
**level**  10:*24*  11:*2*  27:*20, 25*  28:*1, 18*  33:*2*  49:*9*  51:*17, 20*  55:*16*  74:*1*  77:*15*  96:*6*  134:*1*  151:*3*  229:*6, 7, 8*  237:*13*
**levels**  64:*20*  124:*24*
**level's**  74:*3*
**Li**  150:*3, 20*  159:*2*
**L-I**  150:*3*
**liability**  80:*13*  91:*15, 18, 24*  92:*5, 10, 22*  134:*20*  135:*21, 23*  136:*2, 14*  172:*10*

174:*12*  227:*9, 16, 25*  231:*19*
**license**  126:*3, 7*
**Lieutenant**  150:*9*
**likelihood**  75:*17*  130:*2*
**likelihoods**  87:*1*
**limit**  191:*15*
**limited**  71:*7*  79:*25*  210:*8*  232:*1*
**line**  33:*5*  47:*17*  55:*9*  57:*22*  67:*15*  155:*17*  195:*14*  207:*1*  212:*23*  220:*19*  229:*20, 21*
**lines**  189:*21*
**linkages**  40:*21*
**list**  13:*9*  59:*12, 16, 18*  66:*9*  187:*5*  201:*11, 17*  208:*6*
**listed**  57:*17, 25*  58:*3*  147:*15*  188:*16*
**listened**  121:*8, 9, 18*
**lists**  202:*15*
**literally**  48:*4*
**literature**  121:*17*  123:*5*  131:*23*  132:*1, 3*  164:*18, 25*  165:*6, 7*  191:*5, 6, 9, 13, 15*  192:*2, 4, 7*  210:*1, 10, 15, 21, 23, 24*  211:*11, 12, 16*  219:*9*
**litigation**  63:*13, 23*  66:*21*  102:*5*  171:*22*  225:*16*
**little**  11:*17*  16:*5*  17:*15*  20:*17*  23:*25*  30:*8*  31:*16*  33:*14*  34:*23*  35:*14*  45:*11, 24*  58:*2*  68:*17*  74:*23*  75:*8, 25*  76:*3*  78:*1*  84:*15*  85:*1*  86:*14*  87:*11*  91:*14*  92:*15*  93:*22*  94:*5*  100:*3*  105:*13*  107:*25*  117:*23*  136:*6*  141:*16*  142:*1, 8*  147:*21*  151:*24*  155:*15*  161:*18*  165:*8*  168:*4*  178:*19*  184:*7*  189:*17*

191:*3, 4*  216:*17*  219:*17*  233:*4*
**lives**  108:*6*
**LLC**  1:*7*  2:*4*  240:*1*
**loaf**  45:*16*
**located**  68:*22*
**long**  57:*15*  95:*18*  103:*11*  155:*11*  183:*6*  231:*1*
**longer**  27:*2*  218:*9*  222:*4*  233:*19*
**long-run**  78:*20*
**long-winded**  43:*15*
**look**  9:*11*  12:*21, 24*  13:*6*  16:*8*  28:*6*  29:*22, 24*  30:*8*  32:*9, 10, 11*  33:*3*  46:*24*  49:*24*  55:*3*  56:*15, 23*  66:*14*  72:*5, 6, 7, 25*  73:*22*  75:*11*  77:*18*  78:*23*  79:*20*  98:*22*  99:*5*  100:*25*  101:*4*  102:*7, 11*  103:*4*  104:*24*  108:*25*  109:*1, 2, 6*  111:*5, 16, 23*  112:*7, 14*  113:*12*  117:*11, 25*  119:*10*  120:*5*  129:*9, 10, 12, 17*  130:*6*  131:*4*  132:*4*  133:*6*  142:*24*  146:*15*  149:*6*  158:*19, 21*  159:*10*  161:*8*  166:*9*  171:*17*  177:*13*  178:*3, 11*  179:*15, 24*  184:*2*  185:*1, 18, 20, 21*  186:*11*  187:*15*  194:*1*  196:*4*  199:*11, 12, 13*  202:*11*  211:*9*  216:*2, 24*  234:*4, 7, 14*  236:*2*  237:*2*
**looked**  15:*9, 12, 16*  31:*4*  77:*4*  102:*14*  120:*21*  122:*21*  219:*11, 13*  236:*9*
**looking**  9:*3*  11:*7*  21:*22*  25:*13*  27:*4*  42:*9*  53:*15*  94:*18*  96:*25*  100:*21*  103:*12*  105:*20, 23*  112:*21*  130:*21*  164:*6, 8, 9*

Case: 1:19-cv-00726-KLL Doc #: 52-1 Filed: 06/15/21 Page: 88 of 104 PAGEID #: 1027

Deposition of Keith Raymond Ugone, Ph.D.      Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

165:*18* 183:*21* 187:*23* 190:*14, 23* 199:*14* 209:*9* 216:*7, 9* 229:*5*
**looks** 97:*3*
**L'Oreal** 15:*8*
**loss** 52:*20* 113:*6*
**losses** 51:*15, 24*
**lost** 39:*23* 185:*23* 209:*3*
**lot** 12:*25* 16:*7* 17:*14* 23:*13* 27:*22* 41:*16* 46:*12* 62:*16* 65:*10* 66:*14* 68:*17* 73:*14* 79:*24* 88:*10* 99:*4* 112:*21* 133:*3* 136:*1* 142:*23* 143:*1, 2, 16* 148:*12* 160:*6, 10* 169:*9* 170:*21* 171:*1, 9* 177:*1* 179:*12* 198:*24* 219:*13* 231:*16* 234:*15* 236:*9*
**loud** 207:*21*
**low** 79:*10* 143:*3*
**lower** 7:*18* 51:*19* 56:*8, 9* 61:*4, 17* 62:*7* 84:*17* 86:*12* 87:*23* 88:*8* 141:*20* 142:*6* 185:*2, 11* 227:*2*
**lowest** 185:*9*
**loyalty** 83:*4* 179:*19*
**lunch** 90:*2, 11* 125:*16, 25*

**< M >**
**M5** 142:*20*
**M5's** 143:*2*
**Macfarlane** 153:*2, 12* 154:*14* 215:*14* 216:*14*
**Macfarlane's** 234:*17*
**machine** 52:*24* 85:*1* 129:*4* 169:*13* 203:*2* 207:*6*
**machines** 203:*8*
**macroeconomic** 25:*22*
**magic** 54:*18*
**magnitude** 129:*15*

209:*1*
**magnitudes** 219:*7*
**maintain** 226:*23*
**maintains** 226:*20*
**major** 26:*14* 222:*9*
**making** 33:*25* 92:*8* 96:*18, 20* 103:*23* 108:*3* 111:*16* 129:*11, 14, 20* 133:*11* 135:*25* 136:*2, 13* 145:*10* 160:*1* 175:*11* 202:*16* 205:*18* 212:*19* 214:*1, 10, 21* 222:*13* 223:*1* 229:*2*
**mall** 124:*21*
**manifest** 37:*4*
**manner** 239:*18*
**Mantle** 142:*14*
**Manual** 29:*5*
**manuals** 219:*22*
**manufacture** 51:*5* 107:*3*
**manufacturer** 97:*16, 23* 154:*5* 221:*12, 16, 22* 222:*3* 234:*7*
**manufacturers** 222:*20*
**manufacturer's** 182:*9*
**March** 4:*4* 147:*1, 17, 23* 148:*20, 23* 214:*18* 218:*4, 7*
**margin** 53:*12* 101:*14*
**marginal** 101:*4, 6, 9* 112:*10* 139:*10, 16, 21, 25*
**margins** 41:*1* 54:*20* 72:*10* 101:*16*
**mark** 118:*2* 226:*17*
**marked** 146:*23*
**marker** 54:*18*
**market** 7:*10* 9:*17, 20, 21* 12:*7* 15:*11* 25:*22* 27:*20* 32:*17* 42:*18* 43:*14, 25* 51:*4* 52:*4, 5, 12, 19, 22* 53:*13, 18* 69:*3, 9, 12* 78:*7, 8, 16, 18* 84:*13, 20, 22* 85:*15, 17, 19, 20* 94:*15, 17* 95:*17, 25* 97:*16* 99:*15* 101:*8* 102:*11, 19* 107:*20*

111:*5* 113:*10, 11* 115:*21, 22* 116:*2, 23* 119:*23* 120:*10* 123:*3* 128:*3* 132:*21* 133:*1* 136:*15, 17, 19, 21, 23* 137:*3, 9, 12, 13, 15, 17, 24* 138:*21* 139:*15, 24* 141:*15* 162:*5* 182:*7* 229:*13, 21* 230:*10, 15* 231:*4, 6* 234:*23* 235:*6*
**market-determined** 53:*5* 54:*6, 13* 68:*20* 95:*3*
**marketed** 39:*14*
**marketed-based** 204:*23*
**marketing** 121:*9, 11, 14* 228:*11, 25* 233:*14*
**marketplace** 46:*10* 75:*11* 76:*24* 77:*25* 78:*10* 109:*16* 198:*13* 200:*23* 216:*16* 217:*6*
**markets** 149:*13*
**marketwide** 178:*16*
**MARKOVITS** 2:*3, 4* 3:*3* 5:*6, 11* 126:*2* 146:*9, 14, 19* 237:*25*
**married** 145:*15*
**marvelous** 84:*23*
**masking** 197:*23*
**masks** 197:*11*
**match** 189:*5*
**matches** 189:*1*
**material** 98:*22* 228:*12, 25*
**materials** 96:*5, 10* 122:*21* 137:*23* 220:*3*
**math** 65:*16*
**matrix** 81:*6*
**matter** 8:*6* 71:*6* 109:*11* 115:*2* 119:*16* 148:*21* 158:*16* 159:*21* 168:*19* 181:*4* 207:*19* 227:*12* 240:*1*
**matters** 224:*5*
**maximize** 42:*16* 50:*22, 23* 51:*1, 14, 21, 23* 52:*6* 78:*12*
**maximized** 108:*19*

**maximizing** 51:*16, 17, 18* 108:*11*
**maximum** 138:*23* 139:*4* 206:*6*
**Mcfarlane** 154:*22*
**mean** 10:*23* 15:*16* 19:*14* 25:*24* 29:*21, 22* 32:*14* 39:*18* 44:*16* 45:*6* 46:*6, 24* 49:*14* 53:*21* 55:*15* 56:*21* 63:*7, 8* 64:*18* 66:*14* 70:*8, 15* 72:*1* 73:*24* 77:*4, 6* 78:*14* 85:*9* 86:*18* 87:*12, 24* 88:*10* 92:*18* 95:*23* 96:*2* 106:*1, 3* 107:*22* 108:*24* 109:*22* 116:*7* 117:*23* 119:*24* 120:*21* 124:*6, 19, 20, 22* 127:*6, 22, 23, 25* 130:*4, 5, 19, 21* 131:*1* 132:*4* 137:*25* 140:*6, 7, 20* 142:*19* 143:*8, 25* 144:*4* 152:*12* 155:*25* 159:*10* 160:*17* 162:*9* 164:*11* 166:*11* 170:*17* 171:*8* 172:*18* 173:*7* 175:*7* 176:*25* 179:*22* 180:*23* 182:*7* 184:*2* 185:*4, 18* 189:*25* 190:*7, 15* 191:*8* 194:*2, 16* 196:*1, 5* 198:*19, 23* 199:*9* 202:*22* 203:*10, 11, 23* 204:*13, 22* 205:*5* 206:*2* 210:*3* 214:*11* 215:*19* 216:*9* 220:*23* 231:*13* 233:*5* 234:*15* 235:*8* 236:*6, 19* 237:*4, 8*
**meaning** 163:*8*
**meaningful** 197:*11, 12, 20*
**meaningfully** 70:*4*
**means** 6:*6, 8* 37:*2* 42:*17* 47:*18* 130:*22*
**measure** 27:*15* 80:*19* 90:*24* 93:*2* 102:*19* 113:*6* 125:*3* 130:*6, 8,*

*21* 155:*9* 177:*9* 204:*19* 227:*6* 228:*15*
**measured** 27:*14*
**measures** 27:*10, 17* 127:*4, 5, 20* 128:*17*
**measuring** 27:*13* 127:*8, 9, 24* 227:*5*
**mechanic** 114:*19*
**mechanical** 64:*24*
**mechanically** 64:*21*
**mechanics** 120:*7* 124:*5*
**mechanism** 107:*25* 141:*12*
**meet** 49:*25*
**meeting** 237:*17, 18*
**members** 109:*11* 161:*11* 165:*19*
**memory** 14:*25* 38:*6* 56:*3*
**mentally** 149:*7*
**mentioned** 12:*10, 16* 24:*24* 46:*1* 111:*9* 122:*6* 153:*22, 25* 171:*25*
**mentioning** 125:*4* 144:*20* 145:*1*
**mere** 47:*16*
**merit** 231:*15*
**merits** 31:*18* 40:*10* 92:*16*
**method** 67:*19*
**methodologies** 11:*5, 6* 22:*14, 21* 23:*17* 24:*14* 30:*4, 6, 9, 11* 159:*19* 160:*22*
**methodology** 11:*15* 16:*2* 17:*21* 18:*2, 13* 19:*6, 20, 25* 20:*9* 67:*15, 16, 24* 70:*23* 91:*21* 102:*18* 147:*8* 161:*20* 181:*5* 199:*22*
**methods** 7:*23* 8:*1, 3, 7, 14* 10:*12, 14, 16* 102:*17*
**MIAMI** 239:*2*
**Mickey** 142:*14*
**microeconomics** 78:*4, 5* 79:*1*

**middle** 202:*13* 229:*21*
**mile** 227:*23*
**miles** 206:*6, 11, 16* 227:*20, 23*
**mimic** 190:*1*
**mimicking** 131:*16*
**mind** 23:*9* 50:*11* 66:*24* 220:*17*
**minimize** 51:*15, 23*
**minimum** 146:*6*
**Minnesota** 2:*10*
**minus** 94:*10* 189:*18, 19*
**minute** 33:*6*
**minutes** 50:*9, 16* 79:*1* 209:*6*
**misinterpreting** 34:*1*
**mislabeling** 12:*14* 15:*21* 16:*17* 17:*7* 18:*4* 135:*14*
**misleading** 10:*20* 11:*13*
**misrepresentation** 113:*14* 178:*4*
**misrepresented** 115:*15*
**missed** 62:*1* 118:*2* 144:*22* 198:*3* 232:*2* 234:*25*
**missing** 27:*19* 70:*17* 77:*1* 118:*5* 157:*5* 226:*17*
**mix** 39:*23*
**Mm-hmm** 230:*24*
**model** 65:*1, 2, 18* 83:*18* 143:*21* 181:*24* 184:*24* 186:*15*
**modeler** 65:*13*
**models** 30:*24* 32:*12* 38:*7* 42:*9* 56:*8, 9, 10* 60:*2* 119:*4* 174:*2* 185:*4, 5* 194:*21* 207:*9* 236:*11*
**modifications** 115:*18*
**modified** 115:*12* 133:*10*
**modify** 165:*7*
**moment** 34:*9, 12*

**Monday** 54:*3* 58:*12, 13* 82:*24* 179:*8* 189:*4*
**money** 7:*15* 142:*23*
**monitor** 58:*7* 60:*3*
**monitoring** 205:*10*
**monitors** 54:*8* 188:*21*
**monotonically** 185:*14*
**Monroe** 2:*14*
**month** 81:*25* 186:*13* 189:*15* 217:*12*
**Monthly** 57:*9* 186:*6, 9, 12* 188:*2*
**months** 81:*25* 155:*2* 187:*9* 188:*15* 189:*12, 14*
**motions** 231:*9, 24*
**motor** 36:*7, 13, 14, 18* 38:*20, 21, 22* 39:*15, 19* 40:*21* 41:*15, 16, 24* 50:*4* 71:*6* 75:*16* 89:*14* 106:*11* 135:*2, 11* 154:*5* 175:*4* 183:*25* 184:*2, 9, 18, 21, 24* 218:*19* 220:*13, 21* 226:*19* 227:*23, 24* 236:*8, 13* 237:*10*
**motors** 36:*9* 38:*8* 48:*23, 25* 71:*19* 98:*24* 103:*2* 183:*19* 184:*17*
**mouth** 47:*1* 96:*16*
**move** 75:*16* 173:*20* 227:*7, 18*
**movements** 112:*5*
**Moving** 29:*4* 158:*10* 189:*10*
**MSRP** 182:*3, 5, 12, 15* 185:*1, 3*
**multiply** 80:*22*
**murky** 136:*6*
**music** 205:*8*

**< N >**
**N-A** 150:*2*
**nailed** 83:*10*
**name** 5:*7, 8, 10* 148:*17* 150:*1*
**named** 38:*23*
**names** 149:*19*

**narrative** 156:*22* 157:*10, 12, 13*
**narrow** 115:*8, 9* 214:*24*
**narrowly** 53:*15, 16*
**NATHAN** 2:*6*
**naturally** 152:*15*
**nature** 8:*2* 9:*2* 63:*3* 65:*22* 69:*24* 135:*24* 140:*7* 149:*15* 167:*11* 207:*6* 235:*17*
**Nautilus** 37:*23* 201:*7* 225:*14*
**Nautilus/Bowflex** 223:*7*
**necessarily** 69:*14* 70:*8* 72:*10* 88:*2* 108:*16* 137:*2*
**necessary** 67:*17* 122:*17* 144:*2*
**need** 6:*13* 9:*17* 12:*11* 31:*16* 34:*23* 35:*7, 10* 37:*12* 47:*6* 51:*9, 11* 55:*9* 61:*22* 62:*13* 65:*17* 66:*4, 5* 71:*14, 20* 72:*12* 75:*24, 25* 76:*3* 79:*2* 91:*23* 94:*16* 116:*15* 131:*10* 132:*15* 145:*19, 23* 147:*12* 154:*9* 178:*11* 180:*3* 192:*13* 204:*5* 225:*21* 235:*2* 237:*23*
**needed** 91:*23* 124:*15* 227:*18*
**needle** 75:*17* 115:*7*
**needs** 44:*22* 45:*1, 2* 50:*5* 53:*12* 115:*18* 150:*13* 178:*3*
**negative** 129:*17*
**negotiate** 81:*15, 22* 82:*6* 83:*11* 84:*10* 190:*5, 8*
**negotiating** 35:*12* 58:*18* 84:*16*
**neither** 159:*18* 206:*17*
**never** 21:*2* 39:*4* 92:*5* 117:*13* 135:*9, 13* 176:*6* 181:*13*

new 107:20 113:10 133:14 153:5 164:7 216:16, 19, 22 217:6, 13, 15

next-layer-down 129:18

nice 237:17, 18

No._____Change 241:1 242:1

No._____Line 241:1 242:1

nobody's 163:22

nonorganic 235:20

NordicTrack 37:23 201:7 223:6 225:14

normal 78:13, 14 164:5

Notary 1:12 239:4, 22

note 77:11 192:9 202:12 212:3

noted 197:2

notes 155:22, 25 156:4, 5

Notice 6:4 177:2 239:15

noting 223:16

notion 211:6

nowadays 231:25

nprosser@hjlawfirm.c om 2:11

nuggets 77:19

number 9:8 13:6 26:7 35:11 40:11 79:25 80:23 85:22 95:9, 11 106:6 107:3 109:10, 15, 20 110:5 145:6 146:22 164:13 177:12 185:18 190:24 191:7, 16 221:10 232:7 237:2

numbers 56:15 57:4 129:15 184:24 189:20

numerous 181:18

< O >

oath 5:3 240:1

objective 42:15 51:14, 24 127:3, 5, 18, 20 128:17

objectives 52:1

observation 159:24

observe 16:24

observed 46:10, 12

obtain 228:5

obtained 121:12 228:14

obvious 163:18

obviously 65:2 72:12 77:5 103:18 142:9 153:18

occasion 115:3

occasionally 79:22 80:2 81:3 221:9

occur 55:17 152:16 154:22, 24 191:22

occurrence 83:20 211:15 233:10

occurrences 83:15

o'clock 1:14 125:25 126:1 238:5

Offenbach 148:9, 13

offending 11:24, 25

offer 73:6 240:1

offered 85:6 189:15 222:20

offering 60:7, 9 73:5

offers 59:3

office 5:15 239:20

oh 113:20 184:10 225:3, 5

OHIO 1:1, 13 2:5 239:1, 4, 22

okay 7:1 22:24 23:9 26:13 42:3 44:25 45:23 46:19 51:2 52:2, 15 57:14, 20 59:17 60:14, 16 80:24 83:24 91:13 108:14 118:24 138:11 152:22 156:25 157:23 162:11 168:14 172:6, 12 174:6 176:19 179:1 180:20 184:7 186:2, 9, 17 190:6 194:13 197:19 198:6

203:2 209:7 214:25 215:11 217:17, 21 229:10 230:1, 20 231:8

old 142:22

omitting 209:12

once 72:15, 19 83:15 154:23 177:25 178:2 232:18

one-off 83:19

ones 10:5 36:11 43:3 62:25 163:20 201:16 206:20 223:8 237:7

one's 171:21 184:14

ongoing 153:16

online 58:9 140:5

on-sale 179:11

open 91:17 226:22

operate 227:18

operation 207:4

opining 160:14

opinion 17:10, 22 35:9, 24 38:13 40:9 42:3 62:12 63:4 67:11 71:14 73:5, 6 74:20 154:9 170:22, 23 232:16

opinions 91:7 92:9 93:1 153:7, 24 156:16 157:3, 8, 22 166:8 168:25 170:21 178:13 231:23, 25 233:5

opportunity 47:17, 20 111:14, 23

opposed 28:15 44:23 68:19 69:15 70:21 71:15 103:18 104:4 135:5, 12 170:18 180:17 188:8 217:19

opposing 121:18

options 140:23

order 107:9

ordered 185:5

organic 235:19

original 80:6 114:10 115:17

Orme 132:8 192:3

211:11 231:4

Orme-related 123:18

orthogonal 133:17, 21 134:3, 8

outcome 62:17 143:18, 22

outcomes 80:25

outlet 97:25

outlets 81:16

output 51:17 72:9, 20 96:7 111:25 112:8, 12 124:7 135:1, 12 227:17

outputs 116:11 120:6 127:10, 17

outside 63:20, 23 65:11 152:23

overall 67:10 233:5

overcharge 169:24 170:16, 18, 19 172:14, 22 173:4 179:7, 12 180:2 181:5

overcharged 168:20 169:4 180:12

overlap 156:10 199:10

overpaid 175:6 179:17 181:6

overplay 46:14

overwhelm 191:12

overwhelming 132:14

< P >

p.m 125:25 126:1 238:5

package 80:4

packaging 79:9

Page 3:2 4:2 14:17 15:3, 6, 7, 10, 14 40:2 147:7, 13, 15 159:16 161:8, 25 165:17 166:9, 17 181:21 185:21, 25 186:16 190:20 192:8, 9, 17 196:14, 15 198:1, 5 200:7 202:11 206:25 209:2, 9 213:4 222:18 226:2, 3 227:7 229:10, 20 230:23 241:1 242:1

Deposition of Keith Raymond Ugone, Ph.D.　　　　Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

**pages** 4:4 14:15 157:11 219:20 222:2
**paid** 7:10 48:12 50:5 55:25 56:20 74:16 85:21, 23, 25 90:17, 19 104:5 113:12, 16, 21 165:22 167:13, 21, 24 168:13 169:6, 9, 12, 14, 16 171:2 172:13 173:3, 10, 11 174:13, 20 175:20 176:4, 7 177:17, 19 179:17, 25 180:2, 16, 18, 22 181:15 186:24 202:4 234:23 235:6
**pandemic** 77:6, 21 162:6 218:5, 7
**paragraph** 147:6, 14, 16 151:18 193:3 198:1, 5 199:21 213:8 227:8 228:8, 9 229:11, 20 230:18, 21, 23 232:19, 21
**paragraphs** 151:15
**paraphrase** 10:2 214:15
**parent** 154:4
**parenthetical** 18:21 167:20 170:20
**part** 11:20 40:15 41:13 47:13 67:13 82:13 88:16 95:21 103:15 108:7 120:10 127:19 132:2, 10 136:22 137:7, 17 138:5 144:17 163:20, 22 168:17 179:24 189:12 210:5 219:2 222:12 223:2 224:14 225:13 236:2
**participant** 132:14 191:12
**participants** 95:9 198:9 223:21 224:10, 24 225:3, 4, 6
**particular** 11:6 27:1, 7 31:9 34:5 38:4 47:24 64:16 72:23 78:9, 16, 17 85:12, 24

93:21 111:17 121:23 123:13 128:20 164:25 175:21 199:2, 25 208:19 211:5, 14 229:6
**particularly** 163:9
**parties** 201:2
**parts** 210:4
**party** 239:17
**paste** 152:6, 10, 13
**patterns** 12:22 13:7 77:5 140:12
**pause** 74:11 216:7
**pay** 7:18 41:9, 12, 22 49:17 68:5, 19, 24, 25 69:2, 5, 6, 9, 10, 15 70:22 81:11, 20 84:13, 20, 21 85:5 88:8 93:3, 7, 10, 13, 17 94:12, 13, 19, 24 95:1, 2, 6 118:8 119:19 123:7 125:8 138:15, 19, 20, 23 139:1, 2, 4, 6, 10, 20, 25 169:18 174:2, 4, 8 175:3 180:23 181:3, 18 209:18 226:7
**paying** 7:15 50:1 74:8 86:1 119:20 167:3, 16 175:2 181:9 187:7 229:7
**pays** 84:4
**PENALTY** 240:1
**pending** 6:15
**people** 42:23 43:1, 2, 10 45:13, 19 46:2 47:14 53:4 68:5 72:22 74:7 88:3, 8 94:23 96:13, 21 106:15 113:20 117:5 118:12 119:12 120:23 124:20 126:16, 19 143:17, 18 163:5 169:18 174:4, 7 175:12, 14, 17 179:5, 7, 10, 18, 19 181:3, 7, 8, 18 188:20 192:15 197:22 202:5 204:3 205:19 207:18,

19, 22 218:6 221:9 234:2, 7
**people's** 137:20
**percent** 63:18, 23 65:9 76:25 77:23 82:19 83:15 152:18 154:16, 18 171:21 175:12, 14 200:19, 20 206:8, 12
**percentage** 46:21 47:10 100:4, 5, 6 173:12
**perceptions** 64:19 89:15 115:10, 24 162:22
**perfect** 142:19, 22
**perfectly** 45:20 166:19
**perform** 13:25 123:21 128:2 129:1
**performance** 47:4 48:8 49:16, 25 73:23 74:1, 3, 7 89:17 106:19 107:10 130:12 165:20 166:15, 20, 22 168:11, 12 169:12 172:16 174:14, 18 175:16 177:4 228:13, 16 229:2, 6, 7, 8 237:12
**performance-price** 48:15
**performance-to-price** 48:9
**performed** 13:12, 13 62:18, 21 63:1 64:3, 15 75:19 76:4, 22 128:14 159:19
**performing** 124:5
**period** 34:6, 8 54:11 57:3, 15 59:19 162:3, 4, 8, 12, 24 163:16 164:17 165:1 182:19 183:6 214:19 215:17, 18 216:6, 25 217:2, 7, 12 218:4, 5, 9
**periods** 90:19 164:21 183:6
**PERJURY** 240:1

**permutations** 12:2
**perpetual** 52:18
**person** 49:4 116:7, 25 135:1 139:17 153:8 177:11 199:11 227:25 232:10 237:7, 11
**personally** 126:13 158:16, 23 183:1 236:9
**perspective** 66:25 74:14 76:7, 15 116:9 117:25 119:11 144:12 171:10 198:2, 8, 17, 18, 21 199:1, 7, 8, 15 202:10 210:6, 9, 19 212:13 223:13 233:8
**Ph.D** 1:11 4:2 5:1 150:18 238:9 239:7 240:1 241:1 242:1
**phase** 34:14 92:17
**phenomenon** 69:22 101:19
**philosophy** 55:9
**phone** 148:6
**phrase** 34:20 139:9
**phrased** 64:5
**phraseology** 36:8 39:3 53:23 55:21 69:20
**phrasing** 108:1
**physically** 89:13, 18
**pick** 25:23
**picking** 27:16 124:19
**picture** 96:22
**piece** 125:5
**place** 26:23 198:9 213:25 214:9, 20 222:13 239:14
**placement** 204:8
**places** 30:14 82:13
**plaintiff** 20:4, 22 49:2 73:7, 19 91:19 109:18 170:6 178:24 179:3
**Plaintiffs** 1:4, 15 2:2 5:12 38:23 44:7 49:8 71:2, 5 76:14 80:21 92:10, 12

103:*23, 25*  104:*2*
134:*19*  135:*7, 20*
152:*1*  163:*22*  181:*5*
232:*22*  233:*22*
**plaintiff's**  14:*1*
  17:*17*  22:*3, 4, 19, 20*
  23:*4, 15*  76:*7*
**plans**  61:*2, 8*
**play**  65:*3*  205:*8*
**please**  5:*7, 23*
  181:*21*  190:*21*
  237:*21*  238:*3*
**pleasure**  237:*14*
**PLLC**  2:*9*
**Plus**  131:*21*  144:*13*
  157:*13*  165:*4*  215:*2*
**point**  12:*4*  13:*10*
  14:*9*  19:*5, 8, 23*
  31:*21*  32:*23*  39:*11*
  40:*3*  43:*11*  47:*13*
  61:*9*  65:*5*  69:*4, 11*
  88:*19*  89:*3*  103:*2*
  110:*10*  125:*13*
  131:*25*  133:*6, 11*
  138:*10*  147:*21*
  162:*23*  163:*5, 21*
  166:*2*  167:*22*  168:*9*
  171:*15*  173:*5, 7*
  175:*10*  187:*21*  191:*5*
  201:*20*  202:*7*  205:*22*
  207:*1, 8, 25*  208:*9*
  210:*1, 12*  211:*4*
  212:*7*  217:*14*  223:*1*
  224:*20*  228:*6*  229:*9,
  18*
**points**  82:*5*  83:*4, 12*
  179:*19*  234:*10*
**portion**  34:*6*  151:*7*
**positing**  163:*14*
**position**  45:*2*  115:*17*
  122:*23*  145:*13*
  150:*22*  225:*18*
**positions**  72:*3*
**positive**  129:*17*
**possibility**  41:*21*
**possible**  10:*3*  28:*23,
  24*  106:*9*  197:*7*
  201:*5*
**post**  93:*2*
**posterior**  144:*8*

**potential**  11:*18*  24:*1,
  13*  43:*25*  97:*11*
  234:*11*
**potentially**  11:*8*  18:*3*
  24:*14*  26:*5*  45:*4*
**pounds**  203:*11*  237:*7*
**power**  226:*19*
**powerful**  220:*13, 21*
**practice**  197:*13*
**practitioners**  131:*2*
**precious**  233:*7*
**precise**  141:*16*
**precisely**  107:*25*
**predict**  223:*4*
**prediction**  130:*16*
**predictive**  77:*18*
**predominant**  58:*6*
**predominantly**  101:*1*
**prefacing**  71:*13*
**prefer**  7:*18*  86:*6, 12*
  169:*18*  177:*20*  181:*3,
  18*
**preference**  84:*3, 6*
**preferences**  42:*20*
  137:*20*  163:*2, 3, 23*
  164:*1, 15*  205:*13*
**premium**  13:*17*  14:*4*
  16:*10*  17:*16*  26:*25*
  28:*7*  38:*14, 17*  39:*15,
  22*  40:*3, 12*  43:*7*
  44:*13*  45:*3, 9*  70:*21*
  88:*4*  90:*24*  104:*1, 11,
  13*  166:*3*  167:*1, 3, 16*
  177:*25*  178:*10, 16, 17*
  179:*21*  180:*8, 16*
  181:*10*
**premiums**  19:*15*
**premium's**  178:*2*
**preparation**  148:*21*
  149:*4*
**prepared**  148:*19*
  149:*7, 9*
**preparing**  149:*1*
**preponderance**  55:*15*
**presence**  239:*11*
**present**  27:*2*
**presentation**  135:*25*
**presented**  104:*4*
  126:*18*  194:*18*

196:*18*
**president**  150:*11*
**pressure**  41:*5*  78:*11*
**pressures**  215:*24*
**presumably**  54:*24*
**presurvey**  195:*17, 20*
  206:*23*
**presurveys**  205:*24*
**pretty**  100:*25*  122:*17*
  191:*9*
**prevailing**  51:*4*  52:*5*
  141:*15*
**prevalently**  233:*13*
**prevented**  22:*10*
**previously**  61:*21*
  131:*6*  166:*13*  188:*21*
  228:*23*
**price**  7:*10, 18, 19*
  9:*17, 22, 23*  10:*9*
  11:*18*  12:*21*  13:*6, 17*
  14:*4*  16:*20, 21, 24*
  17:*16*  19:*15*  25:*13*
  26:*10, 25*  27:*13, 14,
  16, 19*  28:*7, 12*  30:*17*
  31:*2, 8*  32:*3*  34:*4*
  35:*22*  36:*1, 17, 25*
  37:*4, 16*  38:*14, 17*
  39:*15*  40:*3, 19, 25*
  41:*5, 6, 18*  44:*13*
  45:*3, 9*  47:*5*  48:*12*
  49:*17*  50:*1, 6*  51:*4, 8*
  52:*5, 8, 12*  53:*2, 5, 14,
  22, 24, 25*  54:*5, 7, 8,
  15, 16, 18, 19, 25*  55:*2,
  11, 14, 15*  56:*20*
  57:*10, 23, 25*  58:*3, 15,
  19, 21*  59:*5, 9, 12, 16,
  18, 23*  60:*21*  61:*3, 17*
  62:*6*  64:*7*  66:*16*
  68:*5, 20*  69:*9, 14, 15*
  70:*21, 25*  71:*9, 18*
  72:*9, 19*  73:*7, 18*
  74:*2, 16, 20*  75:*17*
  78:*3, 11, 19, 23*  80:*8*
  82:*6, 10, 14, 21*  83:*1*
  84:*11, 13, 16, 17, 20,
  21*  85:*1, 5, 15, 17, 19,
  20*  87:*3, 20, 21, 22, 23,
  24*  88:*8*  90:*24*  92:*21*
  94:*4, 15, 17*  95:*3*

96:*4, 5, 11, 14, 15, 17,
  20*  97:*11*  98:*24*  99:*7,
  11, 14, 16, 21, 22, 25*
  100:*1, 6, 11, 16, 24*
  104:*1, 11, 13, 19*
  105:*7, 14, 17*  107:*16,
  19, 21*  110:*11, 15*
  111:*8*  112:*6, 11*
  113:*10, 11, 12, 13, 15*
  115:*14*  116:*2*  118:*8*
  123:*3, 4*  125:*8*  136:*9,
  12, 16, 17, 19, 20, 21,
  23*  137:*3, 7, 10, 12, 13,
  17, 19, 21, 22, 23, 24*
  138:*4, 21*  139:*1, 7, 16,
  23, 24*  141:*12, 15, 20,
  22, 25*  142:*5, 7*  143:*3*
  166:*3*  167:*1, 3, 16*
  169:*9*  171:*2, 24*
  172:*7, 8*  173:*10, 11*
  175:*20*  176:*11, 24*
  177:*8, 25*  178:*2, 10,
  16, 22*  179:*11, 22, 25*
  180:*8, 16*  182:*9, 10,
  13, 20, 21*  183:*11*
  185:*2, 3, 6, 8, 9*  186:*6,
  10, 12, 23, 25*  187:*5*
  188:*3, 6, 8, 17, 23, 25*
  189:*6, 8, 9*  190:*11*
  192:*18, 19*  193:*2*
  196:*24, 25*  197:*22*
  200:*10*  201:*8*  202:*4*
  207:*16*  215:*24*
  234:*23*  235:*6, 14*
**price-fixed**  172:*14*
  173:*4*
**prices**  25:*15*  26:*7*
  27:*11*  28:*11*  31:*4*
  32:*21*  37:*9*  38:*1*
  53:*5, 7, 8, 17*  54:*3, 10,
  12*  55:*16, 25*  56:*5*
  58:*6, 8, 9*  60:*4*  69:*13*
  77:*11, 14*  79:*10, 22,
  24*  81:*7, 15*  86:*12, 13*
  87:*2, 5*  93:*25*  94:*2*
  97:*11*  101:*20*  109:*2*
  110:*7, 13*  120:*5*
  142:*12*  180:*10*
  185:*10*  199:*4*  207:*8*
**pricewise**  60:*2*

Deposition of Keith Raymond Ugone, Ph.D.          Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

**pricing** 23:*23* 37:*19*
192:*24*
**primarily** 13:*21*
**primary** 163:*13*
**primed** 94:*8, 10*
**principle** 66:*8* 131:*18*
**principles** 30:*3*
**prior** 16:*22* 23:*25*
59:*18* 73:*14* 144:*6*
160:*21* 162:*24*
214:*19* 216:*21* 217:*1*
**priori** 75:*5*
**priors** 144:*4, 5, 9, 13*
**probabilistic** 14:*21*
80:*24*
**probabilistically**
40:*24* 75:*1, 3, 14*
**probability** 40:*23*
43:*24* 80:*25* 87:*15*
115:*11*
**probably** 21:*21*
27:*21* 32:*11* 35:*7*
37:*2* 52:*19* 95:*12*
120:*16, 18* 122:*1*
124:*22* 131:*4* 150:*11*
155:*13* 158:*5* 165:*5*
168:*16* 170:*13* 172:*3*
225:*18* 227:*11*
231:*17*
**problem** 20:*16*
24:*19* 44:*16* 116:*1*
224:*14* 225:*14*
232:*20*
**problems** 16:*14*
24:*25* 25:*2, 9* 26:*14*
28:*18* 226:*24* 227:*1*
**procedure** 229:*13, 15,*
*22, 24*
**procedures** 70:*9*
118:*14*
**process** 89:*1* 131:*15*
153:*16* 197:*25*
225:*16*
**processing** 168:*7*
**produce** 86:*21* 108:*4*
111:*25*
**produced** 79:*21*
91:*11* 95:*16, 19, 24*
**producer** 88:*13*

**product** 7:*9, 11, 16*
8:*16, 23* 9:*2, 12*
10:*19* 11:*17, 20*
23:*24* 25:*14, 19, 21*
27:*2, 7, 10, 24* 28:*16,*
*21, 23* 32:*17* 35:*1*
39:*25* 46:*25* 48:*16*
49:*25* 50:*7* 54:*22*
55:*4, 8, 10* 60:*21*
64:*4, 8, 9, 11, 16*
70:*25* 72:*23* 74:*14*
77:*24* 78:*10, 22* 80:*6*
81:*12, 23* 85:*10, 13*
86:*15, 18* 87:*10, 11,*
*12, 13, 14, 15, 17, 18,*
*19* 88:*13* 89:*9* 93:*21,*
*23* 94:*7, 8, 10, 11*
95:*16, 19, 24* 96:*12,*
*13, 19, 20, 21* 97:*11,*
*19* 99:*3, 16* 105:*1*
106:*18, 19, 20* 107:*1*
108:*4* 111:*17, 22*
113:*9, 21, 22, 24*
115:*9, 10, 24* 117:*4, 5*
125:*8* 126:*8, 9*
127:*11* 131:*11*
132:*18* 133:*2, 5*
138:*12* 139:*24*
140:*20* 141:*19* 143:*4,*
*5, 19* 144:*19, 25*
145:*18* 151:*23*
168:*10* 169:*11* 171:*5*
173:*4, 6* 174:*18, 23*
175:*1, 5, 13, 15, 16, 21*
179:*20* 181:*8* 182:*19*
192:*15, 24, 25* 197:*18*
201:*2* 202:*18* 208:*7,*
*14* 220:*19* 234:*12, 24*
235:*7, 9, 11*
**production** 32:*19*
52:*11* 54:*20* 72:*6*
77:*10, 13* 79:*16* 96:*3*
97:*22* 98:*2, 21* 99:*6*
100:*15, 22, 25* 101:*5,*
*6, 9* 109:*1* 111:*6, 10,*
*13, 24* 112:*16* 114:*3*
133:*8* 142:*11*
**productive** 78:*18*
**products** 7:*24* 8:*3, 9*
9:*11, 10, 13* 12:*19* 13:*1,*

2 21:*21, 22* 24:*1*
25:*12, 16, 18* 28:*9, 14,*
*15, 21, 24* 29:*1* 31:*4,*
*6* 32:*20, 21* 43:*13*
47:*19* 54:*21* 55:*6, 20*
56:*1, 20* 58:*10* 76:*25*
79:*5, 8, 9* 81:*16* 88:*4,*
*5, 6, 7* 94:*20* 101:*18*
102:*20* 108:*18* 117:*5*
124:*24* 125:*5* 132:*20,*
*25* 149:*14* 164:*7, 8*
165:*21* 179:*6* 192:*25*
193:*1* 194:*11, 12*
199:*3* 200:*16, 22, 24*
201:*1, 13* 202:*2, 3*
203:*1* 204:*22* 209:*22*
213:*19* 215:*12*
221:*11, 15* 222:*23, 25*
223:*2, 19, 23* 224:*5,*
*25* 227:*17* 228:*12, 13,*
*16, 25* 229:*1, 15, 23*
230:*6, 11, 14* 231:*5*
234:*22* 235:*5, 13, 19*
236:*4*
**product's** 32:*18*
74:*17* 105:*2* 106:*14*
174:*25*
**profession** 63:*16*
**professor** 121:*15*
**professors** 121:*10, 11*
**profiles** 222:*25*
**profit** 41:*1* 51:*6, 16,*
*18* 53:*12* 54:*20* 72:*9*
101:*14, 16*
**profitability** 78:*22*
**profits** 42:*16* 50:*23*
51:*15, 19, 21, 23* 52:*6*
78:*12, 24*
**ProForm** 37:*24*
**program** 82:*4*
119:*14, 18*
**progress** 153:*19*
**project** 150:*10*
159:*14*
**promoted** 150:*25*
**promotional** 220:*3*
**promotions** 82:*11*
**proof** 8:*17* 17:*13, 21*
22:*11* 33:*13* 40:*7*
44:*20, 23* 61:*23* 63:*5*

67:*2, 19* 68:*13* 71:*15*
91:*22* 147:*9* 161:*13,*
*23* 171:*11*
**proper** 64:*25* 66:*5,*
*12* 78:*15* 90:*20*
127:*11* 128:*11*
145:*10* 146:*1, 7*
151:*13* 170:*7* 191:*19*
225:*22, 23, 25* 226:*1*
**properly** 8:*4* 10:*7,*
*14* 60:*24* 61:*20* 64:*3,*
*14* 65:*1* 66:*11*
115:*11* 162:*17*
197:*19*
**proposal** 16:*6, 12*
23:*2, 21* 67:*9* 160:*1,*
*4, 8*
**proposals** 16:*8*
**propose** 120:*24*
**proposed** 17:*9* 23:*16*
91:*21* 102:*18* 109:*11*
120:*10* 122:*12*
123:*21* 128:*16* 146:*5*
147:*8* 159:*20* 160:*7,*
*22* 162:*6* 193:*21*
198:*8* 199:*17, 22*
202:*19* 209:*14* 214:*7*
226:*6*
**proposes** 67:*14*
128:*17* 145:*14*
192:*10* 193:*14* 197:*6*
206:*21* 224:*4* 230:*5*
**proposing** 121:*1*
160:*12, 15* 224:*14*
**PROSSER** 2:*6*
**prove** 92:*10, 18*
**proved** 170:*19*
**provide** 21:*3* 124:*10*
146:*10* 151:*23* 162:*7*
169:*21* 195:*13*
224:*12* 227:*17* 228:*4*
**provided** 33:*6* 79:*18*
104:*17* 146:*10* 149:*9*
**provides** 220:*13, 22*
235:*10*
**providing** 14:*7*
170:*3* 182:*8* 192:*21*
236:*19, 20*
**proxies** 145:*5*

**proxy**  128:*25*  145:*8*
**Public**  1:*12*  239:*4, 22*
**publish**  122:*5*
**published**  121:*24*
122:*2*
**punch**  212:*23*
**punctuation**  69:*11*
**purchase**  45:*21*
46:*22*  47:*11*  83:*5*
109:*24*  131:*16*
132:*16*  145:*11, 22*
166:*4*  167:*5, 11*
168:*22*  169:*7, 11, 23*
190:*25*  191:*23*
193:*18, 25*  194:*12*
195:*11*  197:*21*
198:*12*  201:*4*  202:*4,
16*  203:*12*  212:*19*
214:*1, 10, 21*  222:*13*
234:*12*
**purchased**  75:*21*
76:*6*  97:*20*  109:*10*
166:*23*
**purchaser**  167:*16*
234:*11*
**purchasers**  233:*24*
**purchases**  165:*20*
**purchasing**  140:*9, 12,
18*  200:*25*  209:*21*
233:*25*
**pure**  120:*3*  237:*2*
**purpose**  31:*24*
**purposes**  109:*8*
110:*2*  135:*18*  146:*23*
**pursuant**  239:*15*
**push-through**  72:*11*
**put**  9:*5*  18:*20*  23:*1*
39:*24*  40:*11*  43:*6*
52:*23*  69:*11*  71:*16*
79:*6*  81:*17*  86:*22, 24*
93:*19*  96:*12, 16*
98:*25*  99:*6*  109:*3*
111:*18*  119:*4, 16*
134:*21*  140:*8*  147:*10*
151:*19*  155:*24*  158:*5,
10*  170:*19*  194:*23, 25*
195:*2*  201:*16*  202:*5*
203:*9*  205:*11*  207:*12*
208:*1*  212:*17*  223:*12*
225:*12*  233:*1*

**putative**  161:*10*
162:*8*  165:*19*
**puts**  32:*13*  145:*10*
174:*24*
**putting**  38:*23*  71:*21*
89:*17*  151:*3*  153:*9*
159:*25*  212:*24*
217:*20*  234:*9*

< Q >
**qualification**  170:*25*
**qualifications**  152:*7*
**qualified**  232:*12*
239:*5*
**qualitative**  99:*20, 23*
100:*8*  218:*16*
**quality**  86:*7*  88:*1, 3,
7*  106:*18*  107:*11*
192:*20*  193:*1*  196:*25*
200:*10*  201:*2, 7*
202:*3*
**quandary**  223:*3*
**quantification**  116:*9*
122:*4*  202:*10*  223:*13,
16*  225:*9*  232:*14*
**quantifier**  63:*18*
120:*2*  198:*22*
**quantitative**  99:*25*
100:*7*
**quantities**  94:*1*
99:*13*  110:*8, 14*
**quantity**  94:*5*  97:*12*
99:*21, 22*  100:*1, 2, 6*
107:*17, 22*  109:*16*
110:*12, 15*  112:*6*
**quantum**  146:*4*
**question**  6:*15*  7:*8*
8:*12, 18*  10:*1, 12*
11:*9*  18:*1, 5*  19:*5*
22:*7*  23:*10*  25:*14, 20*
27:*21*  30:*24*  32:*18*
33:*1*  34:*22*  35:*24*
36:*3, 22*  37:*12*  42:*7*
43:*16*  45:*8*  47:*8*
48:*4*  51:*11*  57:*7, 8*
61:*8, 10, 20*  62:*1*
66:*10*  70:*17*  71:*16,
22*  76:*1, 3*  82:*23*
84:*15*  91:*17, 18*  92:*6,
19*  98:*11*  99:*16*

100:*11*  104:*7, 14*
105:*15, 17*  114:*4*
118:*3, 4*  128:*1*  129:*3*
132:*18*  133:*25*
134:*11*  136:*3, 10*
137:*1*  140:*9*  144:*22*
153:*6*  157:*8, 16*
158:*2*  162:*17*  164:*12*
166:*25*  167:*8*  168:*5,
6, 8*  173:*9*  177:*10*
179:*1*  181:*11*  182:*7*
184:*7, 15, 19*  196:*1*
199:*19*  200:*21*
216:*19, 22*  224:*23*
226:*16*  227:*12*  236:*3*
**questions**  68:*7*  76:*16*
144:*24*  149:*12, 15*
152:*4*  198:*24*  216:*21*
237:*16*
**question's**  118:*5*
**quick**  158:*20*  187:*14*
**quickly**  184:*25*
**quiet**  207:*17*
**quieter**  207:*4*
**quite**  12:*23*  18:*19*
23:*3*  37:*12*  39:*4, 8*
81:*18*  82:*16*  171:*12*
199:*19*  202:*5*  203:*9*
229:*19*  230:*17*
**quote**  97:*15*  220:*17*
**quoted**  215:*1*
**quoting**  226:*21*

< R >
**Raffi**  150:*2, 19, 20*
151:*6*  154:*13*  158:*25*
**R-A-F-F-I**  150:*3*
**raise**  101:*19*
**raised**  45:*24*
**randomized**  143:*12*
**range**  45:*17*  55:*24*
56:*13, 15*  100:*14*
129:*16*  131:*6*  192:*19*
196:*24*  236:*19, 20*
**ranges**  131:*8*
**rank**  185:*5*
**rarely**  106:*4*
**rate**  53:*11*  78:*13, 14*
205:*10*  211:*23*

**rated**  36:*10, 18*  49:*8*
50:*3*  56:*9*  125:*4*
192:*18*
**rating**  36:*12*  39:*5*
40:*22*  175:*11, 13*
195:*3*  228:*11, 24*
**ratings**  112:*22*  193:*9*
194:*4*  197:*3*  229:*5*
**ratio**  48:*10, 15*
**raw**  96:*5, 9*  98:*22*
137:*23*
**RAYMOND**  1:*10*
5:*1, 8*  238:*9*  239:*7*
240:*1*  241:*1*  242:*1*
**reached**  74:*10*
**reaching**  91:*7*
**read**  29:*8, 23*  121:*7,
8, 17*  161:*15*  172:*4*
215:*4*  223:*24*  224:*2*
232:*11*  240:*1*
**reader**  198:*23*  199:*6*
**reading**  214:*3*  220:*17*
**reads**  229:*12*
**real**  27:*6*  103:*18*
128:*24*  140:*4, 17*
187:*14*  212:*13*
**realistic**  85:*22*
**reality**  213:*24*  214:*9*
**realize**  72:*19*  104:*24*
207:*15*
**really**  15:*4, 11*  27:*16*
28:*7*  40:*9*  49:*2*  62:*1*
71:*11*  75:*5*  106:*4*
115:*19*  119:*17*  121:*1*
125:*2*  144:*22*  145:*25*
225:*20, 24*
**reason**  57:*17*  76:*2*
84:*24*  88:*17*  145:*8*
175:*7*  189:*3*  203:*18*
205:*23*  241:*1*  242:*1*
**reasonable**  160:*20*
193:*2*  233:*23*
**reasons**  13:*4, 6*
16:*21*  17:*12*  24:*21*
49:*3, 7*  54:*4*  58:*18,
25*  66:*23*  70:*15*
117:*15, 22*  119:*9*
120:*12*  140:*19*
143:*20*  145:*6*  175:*18*

Deposition of Keith Raymond Ugone, Ph.D.    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

235:23

**rebate** 179:5
**rebates** 82:20
**rebound** 52:22
**rebranded** 99:4
**recall** 33:22 38:10
152:25
**received** 146:13
165:22 166:21
167:12, 21 169:5, 8,
14 171:2 173:9, 11
175:19 176:3 179:25
187:3, 4 190:19
200:9
**recess** 50:19 90:14
165:16 209:8
**recessed** 125:24
**recognize** 31:5
**recognized** 165:5
201:1
**recollection** 14:22
15:23 148:7 187:11
**recommendations**
194:20
**recommended** 134:3,
8
**reconstruction** 102:10
**reconvened** 125:25
**record** 99:9 237:24
**reduced** 80:7 239:10,
11
**reductions** 58:15
**reference** 15:8, 15
29:5 122:21 156:11
192:4
**references** 123:17
171:1, 3, 6
**referred** 39:7 55:19
**referring** 39:9 44:9
**reflect** 59:10 136:23
137:4 165:9, 10
186:25 188:4 229:15,
24
**reflects** 96:23 136:16
137:17 138:5 226:7
**refused** 51:7
**refusing** 52:7
**regard** 24:25 25:2
26:13 28:18 47:23
54:23 88:14 91:15

92:9, 25 126:23
127:17 164:19 174:1
188:2 221:17
**regarding** 122:12
152:23 191:6 231:23
**regardless** 14:2
33:19 67:16 71:20
84:18 91:17 161:19
173:5 177:22 203:6
208:22 211:18
212:21 229:3
**regards** 45:5
**regression** 9:13 10:4,
17 18:10, 17 19:19,
25 21:18 23:5, 22
25:3, 4, 7 26:1, 4, 6
60:15 61:3, 9, 15
62:5, 15, 19, 22 63:15,
24 64:3, 15, 22 65:6,
12 66:13 118:10, 20,
25 119:7 144:15
**regressions** 65:11
118:22 119:8
**regular** 88:5
**rela** 239:16
**relabeling** 75:15
**Related** 35:23 101:9
167:2 216:20 218:7,
19
**relating** 15:21
223:22 224:24 230:4
**relationship** 110:15,
18
**relative** 25:15 47:5
55:5 96:13 100:4, 14
112:13, 14 133:7
141:25 174:19
197:24 200:25
209:19 210:19 219:7
**relatively** 79:10
141:24 205:16 207:9
233:3
**relevant** 98:14
**reliability** 163:12
165:2 224:8
**reliable** 17:10 22:10
91:21
**reliably** 33:12
161:12, 23 163:7

171:11
**relied** 122:15 156:19
**rely** 65:1 91:3, 6
233:24
**relying** 47:1 122:22
123:6, 11, 14, 15
156:24 164:24 165:3
216:12
**remain** 54:11
**remainder** 130:17
**remained** 77:11
**remaximize** 78:24
**remember** 30:25
38:5 81:2 83:22
91:4 152:20 155:2, 3
184:23 196:12 201:9,
25 232:10, 22
**Removal** 213:5, 20
215:25 220:15
222:11
**remove** 220:2 221:3,
21 222:8
**removed** 26:2
213:13, 16, 18 214:15
218:11, 13, 14 219:8
220:24
**repeated** 134:11
**re-perform** 128:10
**replacement** 80:5
**replicate** 140:4, 14, 17
**report** 6:2, 3 13:8
14:13, 14 31:21, 23
33:7 40:6, 8 45:11
55:18 56:3, 23, 24
66:15 73:10 91:2
95:12 97:14 119:17
123:12 132:5 133:12
146:16, 18 147:7, 17
148:19, 23 151:7, 9,
17 152:5, 21, 24
153:1, 9, 14 155:25
156:6, 14 157:1, 9, 10,
14, 20, 22 158:14, 17,
22 159:17 165:18
173:15 179:14
183:22 184:11, 23
185:19 187:20
190:21 192:4 195:13
203:19 209:9 215:3

218:15 222:16
232:11, 18, 21
**Reporter** 1:12
125:19, 20 134:6
146:12 237:19, 22
238:1 239:3
**reports** 151:25 152:3,
6 171:23 172:4
196:3 202:12, 13, 15
203:14, 22 205:2, 20
216:8
**represent** 97:7, 12
**representations**
103:24
**represented** 233:13
**represents** 109:23
**repurposes** 105:22
**request** 5:25 158:18
**requested** 147:14
**requests** 150:15
**require** 88:21 89:1
**required** 15:25 19:3
20:21 67:11 92:1
122:20 161:14
**reread** 149:5
**rerun** 62:22, 25
119:4, 6
**research** 30:15, 18
35:20 46:3 76:23
116:23 164:25 183:2
195:23 210:10
228:20 234:3
**researched** 182:22
228:10, 23
**reserve** 237:20
**resonate** 234:11
**resources** 78:16, 17
111:18, 22 141:4, 7,
10
**respect** 24:16 38:11
121:6, 22, 25 127:24
130:12, 16 192:14
197:7 235:11 236:23
**respects** 21:20 136:7
**respond** 33:1 99:18
100:15 111:7
**respondent** 208:1, 13
227:14
**respondents** 131:17
196:16, 22 197:8, 14

Deposition of Keith Raymond Ugone, Ph.D.  Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

209:*16* 211:*19*, *23*
212:*21*, *24* 214:*8*
224:*12* 226:*4* 227:*3*
228:*2*
**responder** 212:*16*
**responds** 138:*13*
**response** 9:*25* 51:*22*
101:*11* 114:*5* 164:*12*
**responsibility** 150:*6*
**responsiveness** 99:*12*
**rest** 84:*25* 221:*6*
**restrict** 232:*5*
**result** 37:*10*, *16*
64:*24* 72:*8* 75:*4*
143:*11* 161:*11* 162:*7*
164:*16* 226:*6* 227:*5*
**resulting** 173:*4*
**results** 64:*25* 65:*19*
70:*4* 93:*15* 95:*4*, *8*,
*11* 116:*19* 118:*16*
129:*2*, *11*, *13*, *18*
130:*25* 144:*8*, *13*
162:*24* 163:*6* 164:*16*
165:*2*, *8* 178:*16*
224:*8* 230:*9*
**retail** 7:*9*, *25* 8:*9*, *16*
10:*19* 11:*11*, *13* 32:*3*
35:*22* 36:*1* 53:*2*, *17*
54:*25* 81:*12*, *16*
82:*18*, *21* 97:*25*
182:*9* 234:*22* 235:*5*
**retailers** 80:*9* 222:*9*
**retained** 17:*8* 22:*8*
40:*13* 63:*4* 120:*1*
**return** 53:*11* 78:*13*,
*15*, *17*
**returned** 79:*8*
**reveal** 154:*9*
**revealed** 200:*23*
**revenue** 50:*22*, *24*
51:*1*, *16*, *20* 58:*22*
112:*13*, *14* 187:*3*, *4*, *7*
188:*5*, *7*, *10*
**revenues** 59:*15* 109:*1*
**review** 22:*2* 37:*6*, *13*
112:*18* 195:*22*, *23*
**reviewed** 22:*1*
134:*13* 189:*14*
**reviewer** 29:*16* 201:*6*

**reviewing** 118:*12*
166:*5*
**reviews** 46:*24* 47:*3*
112:*21* 195:*1*, *12*
197:*2* 201:*22* 206:*18*,
*24*
**revolving** 106:*9*
**reward** 83:*5* 179:*18*
181:*8*
**rewards** 82:*4*
**rid** 83:*18*
**right** 7:*5*, *6* 9:*6*
10:*11* 11:*12* 14:*8*, *11*
15:*18* 18:*22* 19:*4*
22:*4*, *5* 27:*23* 28:*17*
42:*12* 44:*7* 50:*15*, *18*
56:*16* 62:*24* 63:*22*
71:*12* 76:*18* 77:*3*
81:*9* 82:*14* 83:*2*, *25*
85:*7* 97:*6* 125:*18*, *22*
127:*3* 128:*4* 130:*10*
132:*7* 138:*2* 145:*20*
148:*2* 150:*22* 158:*24*
172:*6*, *11* 174:*6*, *11*
175:*25* 176:*2* 180:*19*
181:*23* 184:*20*
185:*20* 186:*23*
187:*25* 193:*12*
197:*10* 205:*3*, *25*
209:*2* 213:*4*, *16*
214:*5* 217:*11*, *14*, *21*
230:*1*, *12* 231:*3*
**righty** 6:*5*
**rigorous** 65:*17*
**Road** 2:*4* 30:*7*, *13*
**roll** 207:*23*
**rolling** 207:*2*
**romanette** 161:*25*
200:*8* 202:*11* 209:*10*
212:*2* 213:*4*, *11*, *13*
215:*1*, *2*, *4*
**room** 5:*18*
**root** 130:*2*
**rough** 23:*11*, *13* 57:*5*
158:*21*
**Roughly** 56:*2*, *4*
101:*20* 147:*20* 148:*2*
155:*11* 159:*14*
214:*18* 217:*1* 218:*6*

231:*10*
**routine** 220:*14*, *22*
**row** 188:*1*
**rule** 223:*15*
**ruling** 41:*20*
**run** 64:*21* 95:*18*
114:*7* 118:*10*, *19*, *23*,
*24* 119:*7* 120:*4*
129:*7*, *23* 154:*19*
**runners** 220:*13*, *22*
**running** 119:*14*, *15*
124:*11*, *12* 132:*9*
143:*10* 170:*23* 194:*3*
203:*16*

**< S >**

**safer** 220:*14*, *22*
**sale** 54:*2* 59:*25*
81:*23* 82:*2* 85:*2*
179:*10*, *20*, *21*, *22*
180:*21* 182:*21*
183:*10* 189:*3*
**sales** 43:*14* 57:*10*, *23*
77:*4*, *6*, *13* 79:*13*, *25*
91:*10* 98:*5* 182:*10*
186:*6*, *7* 200:*20*
213:*19* 214:*17*
215:*12*, *16*, *17*, *24*
216:*2*, *5*, *8*, *15*, *18*
217:*1*, *8*, *9* 220:*16*
235:*15*
**satisfaction** 108:*18*,
*22* 113:*2* 173:*6*
**satisfied** 165:*19*
166:*4*, *20* 167:*4*
168:*12*, *21* 169:*6*, *16*,
*23* 170:*15* 172:*16*
174:*14* 175:*12*, *15*
176:*7* 177:*23*
**satisfy** 141:*6*
**save** 240:*1*
**saw** 39:*6* 129:*2*
195:*17* 197:*1* 219:*19*
232:*16*
**Sawtooth** 123:*17*
126:*4*, *8*, *13*, *23* 132:*6*,
*8* 165:*6* 192:*3*
210:*11* 211:*11*
229:*11*, *16*, *25* 230:*3*,
*7*, *13*

**Sawtooth-related**
123:*18*
**saying** 13:*24* 14:*2*
17:*18* 20:*6*, *7* 26:*21*
39:*6*, *12* 40:*2*, *6*
41:*25* 43:*16* 45:*1*
48:*24* 49:*10* 54:*14*
60:*8* 66:*3* 74:*6*
75:*12* 80:*21* 83:*6*
100:*17* 102:*23*
108:*19* 109:*19*
115:*21* 116:*24* 117:*9*
118:*24* 119:*20*
122:*25* 123:*2*, *9*, *14*
128:*3* 129:*25* 133:*9*
135:*17* 138:*25*
142:*11* 148:*22*
160:*25* 161:*3*, *4*, *19*
166:*2*, *6*, *11* 167:*2*, *6*,
*9*, *13*, *15* 168:*19*
170:*10*, *23* 171:*14*, *19*
175:*19* 176:*15* 177:*3*,
*4*, *5* 178:*11*, *21*
179:*13*, *24* 180:*7*
181:*6* 182:*12* 193:*17*
196:*12* 200:*13*, *15*
201:*17*, *18* 202:*6*
205:*20* 208:*11*
210:*17* 211:*14* 212:*9*
214:*14* 216:*23* 217:*3*,
*5* 224:*21* 225:*8*, *20*,
*21*, *24* 227:*2* 230:*7*
231:*3* 232:*11*, *24*
237:*7*, *11*
**says** 15:*4* 39:*13*
47:*6* 48:*6* 51:*12*
57:*9* 81:*19* 82:*24*
153:*1* 165:*18* 167:*20*
180:*8* 187:*21* 198:*1*
205:*2* 214:*6* 220:*12*
226:*3* 227:*15* 230:*4*
**scarce** 141:*4*, *24*
**scarcity** 141:*1*, *9*, *14*
142:*10*
**scare** 141:*10* 142:*2*
**schedule** 94:*4*
**Scientific** 29:*6* 65:*7*
**score** 83:*12*
**scratch** 63:*3*

Deposition of Keith Raymond Ugone, Ph.D.    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

scratched 83:*17*
screen 205:*10*
screw 96:*17*
seal 239:*20*
seasonality 53:*7*
  77:*16*
second 6:*20* 14:*12*
  44:*2* 45:*25* 107:*9*
  166:*5* 168:*7* 174:*4, 8,*
  *20, 21* 180:*14* 187:*2*
  194:*5* 211:*24* 213:*7*
  217:*7, 12* 226:*14*
seconds 187:*13*
second-year 29:*14*
section 29:*19* 152:*8*
  157:*10* 212:*2, 7*
  213:*9* 221:*11, 16, 18*
sections 152:*20*
securities 33:*17* 34:*2,*
  *16*
see 12:*5* 13:*1* 16:*9,*
  *20* 17:*15* 26:*18, 19*
  28:*10* 40:*13* 41:*14,*
  *15* 48:*14* 51:*10* 53:*8*
  54:*1, 9* 56:*24* 57:*21*
  66:*7* 70:*3* 77:*19*
  79:*22* 87:*4, 5* 112:*8*
  115:*13* 121:*3* 125:*22*
  128:*11, 22, 24* 129:*11,*
  *13, 18* 131:*4* 136:*11*
  137:*24* 138:*4* 151:*2*
  158:*8, 13* 159:*22*
  160:*19* 165:*6, 23*
  171:*23* 182:*3* 183:*10*
  189:*8* 191:*1* 195:*12*
  196:*19* 198:*14*
  200:*11* 202:*20*
  209:*23* 213:*6* 214:*2,*
  *3* 216:*2* 222:*21*
  224:*16* 226:*9* 229:*17,*
  *19* 230:*1, 19* 231:*16,*
  *19* 234:*19*
seeing 130:*23* 175:*8*
  218:*6*
seeks 50:*22*
seen 11:*21* 12:*16*
  18:*5, 7, 12* 19:*16*
  20:*3, 4, 7, 12, 22* 21:*2,*
  *23, 24* 29:*21* 38:*3, 9,*
  *12, 16* 47:*2* 79:*14*

108:*2* 131:*22* 160:*23*
  170:*21* 171:*1, 2, 6*
  191:*8, 13* 192:*1*
  196:*2, 3* 202:*25*
  210:*17*
segments 42:*18, 19*
  43:*15*
self-contained 157:*15*
sell 51:*7* 52:*7, 20, 25*
  54:*22* 79:*5* 87:*19*
  98:*12*
seller 97:*15* 98:*8*
  219:*23* 220:*10*
sellers 47:*20* 200:*18,*
  *21*
selling 43:*25* 47:*19*
  52:*7* 54:*23* 55:*10*
  58:*10* 187:*6*
sells 42:*4* 55:*12*
  105:*21* 182:*14* 183:*3*
semester 79:*1*
send 117:*9*
senior 150:*21, 25*
  151:*1*
sense 8:*24* 12:*3*
  26:*12* 31:*25* 34:*12*
  38:*19* 40:*14* 50:*25*
  55:*6* 60:*1, 3* 64:*20*
  68:*21* 69:*16* 74:*14*
  82:*7* 84:*23* 112:*15*
  116:*14* 118:*11* 121:*2*
  129:*12, 14, 20* 132:*17*
  133:*23* 166:*21*
  169:*12, 13* 172:*20, 21*
  212:*4*
sensitive 35:*15*
sensitivities 126:*17*
sensitivity 99:*13*
sent 80:*6*
sentence 187:*20, 21*
  196:*15* 223:*24* 224:*2*
  226:*3* 229:*12* 230:*18,*
  *25* 231:*1*
sentences 25:*25*
  171:*15*
separate 53:*21* 54:*13*
  73:*2* 156:*5* 188:*14*
separately 154:*23*
September 214:*17*

series 52:*10* 68:*7*
  185:*15*
serve 172:*23*
service 141:*14*
SERVICES 1:*6* 75:*2,*
  *6* 107:*14* 113:*19, 23*
  240:*1*
session 90:*11*
set 28:*23* 43:*22*
  53:*9, 18* 55:*11* 92:*13*
  93:*21* 94:*23, 25*
  177:*7, 8* 206:*14*
  207:*7, 10* 239:*14, 19*
sets 53:*2, 17, 18*
  54:*25* 55:*1* 222:*19,*
  *24* 224:*4*
setting 53:*4* 54:*14,*
  *15* 109:*3*
settle 54:*21*
settles 54:*6, 7*
seven-month 215:*17,*
  *18* 216:*25* 217:*2, 7*
  218:*4*
shares 34:*11*
SHEET 240:*1* 241:*1*
  242:*1*
sheets 79:*21* 151:*5*
shelf 82:*21* 85:*6*
shift 44:*1* 107:*19*
shipped 80:*3* 86:*9*
shipping 59:*3, 11*
  114:*15* 189:*19, 23*
shocked 154:*20*
short 90:*4* 104:*16*
  209:*4*
shorter 101:*11*
shorthand 134:*22*
  135:*16*
shortly 50:*14*
short-run 78:*20*
show 59:*2* 158:*9*
  175:*23* 176:*11*
showing 58:*20, 23*
shown 196:*17*
shows 186:*5*
side 9:*9, 20* 13:*22*
  14:*3* 27:*10, 20* 32:*10,*
  *11, 19* 53:*10* 71:*17,*
  *21* 72:*14* 78:*7, 8*
  88:*20* 89:*18* 96:*8*

98:*3* 111:*5* 112:*1*
  115:*20, 22* 121:*10, 14,*
  *15* 123:*8, 10* 136:*19*
  142:*10, 18, 19* 146:*6*
  170:*20* 227:*25*
  235:*23, 24*
sight 46:*24*
sign 80:*5* 82:*3*
Signature 237:*19*
  239:*12*
SIGNATURE:_____
_____DA
TE 241:*1* 242:*1*
Signed 240:*1*
significant 209:*19*
similar 28:*10, 14*
  149:*9, 12* 151:*25*
Similarly 76:*10*
  192:*20* 200:*9*
simple 61:*10* 96:*10*
  201:*12*
simpler 61:*7*
simply 215:*16*
simulation 120:*10*
  229:*13, 22* 230:*4, 15*
  231:*6*
simulations 119:*23*
  128:*3* 230:*10*
Simulators 231:*4*
single 11:*17* 177:*11*
sit 73:*17* 74:*19, 24*
  130:*10* 187:*10, 24*
  196:*11* 220:*11*
situated 55:*4*
situation 38:*3*
  158:*13* 166:*16*
  176:*12*
situations 11:*21, 22*
  58:*16* 160:*24* 178:*9*
six 205:*14*
size 202:*17, 22, 24*
  203:*5, 6, 7, 9, 15, 19*
skills 46:*7* 125:*10*
  131:*20*
skip 7:*4*
slightly 35:*23* 58:*19*
  92:*6* 178:*21*
sloping 96:*24, 25*
small 112:*5*
smaller 88:*22* 141:*21*

Deposition of Keith Raymond Ugone, Ph.D.    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

**Snow** 150:*3, 19, 20*
159:*2*
**socioeconomic** 42:*25*
**soft** 219:*17*
**software** 123:*17*
124:*12* 126:*4, 13, 14,*
*23* 174:*2* 210:*11, 12*
229:*12, 16, 25* 230:*3,*
*8, 13*
**sold** 7:*9, 24* 8:*9, 16*
9:*5* 10:*19* 11:*11, 13*
51:*6* 54:*1* 59:*16*
76:*13* 79:*9, 15, 24*
80:*7, 10* 95:*25*
109:*21, 22* 110:*5*
113:*7* 182:*20* 234:*22*
235:*5*
**SOLE** 1:*7* 35:*25*
36:*8* 37:*22* 38:*1*
42:*4* 44:*4* 50:*21*
51:*2, 5* 54:*6, 8, 10, 23,*
*25* 55:*8* 58:*7, 17*
59:*25* 60:*8* 76:*23*
79:*4, 19* 80:*10, 12, 16*
81:*10* 82:*16* 83:*22,*
*23* 98:*4, 12* 113:*4*
153:*18* 182:*10, 14*
183:*2* 186:*24* 187:*4,*
*7* 188:*6, 10, 13, 21, 23*
189:*1, 5* 192:*15, 25*
200:*16, 25* 203:*1*
207:*4* 213:*14, 18*
219:*8, 23* 220:*1, 6, 8,*
*11, 24* 221:*2, 17, 19,*
*20* 222:*3, 7* 227:*8*
233:*12, 24* 236:*3*
240:*1*
**solely** 176:*13* 177:*5*
178:*3*
**Sole's** 30:*16* 32:*2*
35:*21* 37:*8, 14* 38:*14*
39:*2* 51:*4* 53:*3, 17*
57:*10* 77:*25* 99:*7*
100:*11* 101:*13*
183:*11* 188:*6* 189:*16*
213:*5* 222:*11* 228:*11,*
*24* 233:*24* 234:*9*
236:*10*
**solution** 51:*19*

**somebody** 29:*11*
30:*12* 54:*17, 24* 55:*2*
97:*3* 102:*4* 119:*6*
128:*1* 154:*3* 158:*20*
162:*20* 224:*16*
**somebody's** 151:*15*
**sophisticated** 9:*14*
18:*9, 17* 21:*19* 49:*22*
**sorry** 18:*15* 44:*25*
58:*13* 66:*11* 75:*24*
100:*20* 127:*16* 142:*6*
148:*4, 22* 162:*9*
176:*18* 184:*10*
185:*23* 186:*14, 17, 22*
198:*5* 214:*11* 219:*11*
229:*18* 230:*21*
**sort** 8:*10, 20* 16:*11*
23:*1, 23* 31:*12* 32:*16*
41:*4* 44:*19* 53:*24, 25*
54:*5* 65:*15* 68:*3, 4,*
*18* 71:*17* 72:*3* 91:*16*
93:*12* 94:*19* 95:*13*
100:*16* 106:*5* 120:*25*
135:*3* 140:*11* 143:*22*
144:*7* 155:*25* 159:*9*
160:*22* 185:*5* 192:*20*
223:*15* 232:*13*
**sound** 14:*20* 102:*4*
221:*13*
**sounded** 144:*23*
**Sounds** 52:*14*
**source** 154:*11*
**sources** 188:*12*
**SOUTHERN** 1:*1*
**space** 46:*12* 203:*4*
**speak** 21:*13, 15*
47:*12* 63:*19* 88:*16*
126:*10* 155:*12* 169:*1*
219:*10, 21* 220:*5*
221:*25* 222:*5*
**speaking** 26:*19*
38:*18* 56:*2, 4* 82:*17*
83:*4, 9* 85:*4, 9* 99:*21*
101:*20* 141:*17*
147:*20* 173:*2* 232:*25*
235:*22* 237:*15*
**special** 59:*3* 122:*19*
**specialization** 63:*21*
117:*23*
**specialize** 116:*16*

**specific** 9:*4* 57:*12*
74:*23* 211:*8* 227:*19*
233:*14*
**specifications** 236:*15*
**specificity** 76:*1*
**specified** 65:*1*
**spectrum** 115:*7*
206:*10*
**speculating** 222:*5*
**speed** 72:*17* 174:*22*
226:*23* 227:*1, 2, 19*
**speeds** 48:*14*
**spelled** 5:*9* 150:*2*
**spend** 43:*1* 85:*14, 16*
96:*13, 21* 101:*3*
108:*20*
**spent** 155:*15* 236:*9*
**spillover** 114:*17, 20*
**spirit** 34:*21* 64:*6*
**spit** 64:*22*
**spoken** 112:*19, 20, 22*
**sporadically** 43:*11*
**sporting** 45:*13* 46:*10*
54:*7* 55:*12* 154:*3*
186:*11* 188:*22*
**spread** 79:*21* 151:*4*
**sprinters** 42:*22*
**squarely** 125:*9*
**squeezed** 101:*17*
**SS** 239:*1*
**stability** 163:*10*
**stage** 16:*12* 31:*14,*
*17* 80:*18* 92:*15*
136:*7* 160:*15, 23*
**stages** 97:*21* 98:*2*
**stagnated** 216:*6*
**stand** 190:*14*
**standard** 65:*22*
122:*18* 191:*13*
**standpoint** 89:*10*
**star** 112:*22* 195:*3*
**start** 63:*1* 100:*21*
114:*23*
**started** 218:*6*
**starts** 99:*25* 147:*13*
**State** 1:*12* 5:*7, 22*
159:*17* 161:*9* 165:*10*
213:*18* 223:*20, 21*
239:*1, 4, 22*

**stated** 49:*9* 57:*17*
67:*21* 147:*6*
**statement** 89:*20*
109:*14* 183:*8* 208:*17*
209:*1* 210:*13* 212:*20*
213:*24* 214:*4, 23*
218:*10* 224:*6, 9*
**statements** 77:*18*
89:*22* 99:*24* 108:*25*
204:*20, 21* 213:*23*
218:*16, 18, 19*
**STATES** 1:*1*
**stating** 224:*1*
**statistic** 236:*12*
**statistical** 25:*8* 130:*5,*
*6, 8, 20* 131:*7* 144:*17*
145:*4*
**statistics** 65:*16*
130:*22*
**stay** 31:*20* 53:*12*
103:*25*
**stayed** 38:*8*
**staying** 84:*7* 98:*10*
**steel** 96:*15*
**stenographically**
239:*10*
**step** 26:*2* 35:*3*
40:*13* 117:*8* 157:*9*
**steps** 102:*21*
**stick** 18:*12* 115:*17*
194:*4* 205:*7*
**Stock** 2:*4* 34:*3*
**stop** 26:*1* 69:*12*
98:*2* 180:*4*
**stopped** 167:*19*
**storability** 207:*6*
**storable** 207:*6*
**store** 45:*13* 49:*24*
82:*18* 83:*8* 85:*24*
108:*13*
**stores** 46:*11*
**straight** 26:*2* 68:*23*
**strange** 14:*20* 102:*4*
**Street** 2:*9* 69:*1*
**strike** 83:*19*
**structure** 194:*14*
**struggle** 203:*11*
**stuck** 82:*10*
**studied** 131:*11*

Deposition of Keith Raymond Ugone, Ph.D.        Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

175:9  183:9
**studies**  116:23
**study**  36:20  41:11
  73:2  74:11  75:13
  114:7  132:19, 24
  144:19, 25  164:25
**studying**  117:5
**stuff**  143:15  153:7
  173:1
**subject**  10:23, 25
  30:1  32:24  108:12
  114:12  176:25  231:9
**subjective**  127:18
**subjective/objective**
  127:23
**submit**  159:11
**subparagraphs**
  147:16
**subsequent**  148:24
**subset**  130:16
**subsets**  129:23
**substance**  7:5  152:9
**substantially**  77:7
**substitute**  137:21
  193:15
**substitutes**  143:2
**success**  64:19
**successful**  58:18
**suffer**  179:6
**suffered**  169:23
**suggest**  50:14  132:1
  196:8  231:5
**suggested**  82:9
  182:9  208:5  221:20
**suggesting**  169:2
  177:12  228:19  230:3,
  12
**suggestion**  210:24
**Suite**  2:4, 14
**sum**  101:7
**summarize**  157:2, 21
**Summary**  166:8, 10
**supplied**  97:12
  99:13  100:7  110:8,
  12, 14, 15  113:4
**suppliers**  47:16
  99:17
**supply**  9:20  27:12,
  19  32:11, 19  78:7
  94:16  96:23, 25  97:7,

18  98:1, 3, 14, 15, 20
  99:8, 12, 15, 19, 21, 23
  100:1, 2, 8, 12, 24
  101:5, 8  107:16
  108:3, 23  109:3, 25
  110:1, 7, 9, 10, 12, 13,
  14, 17, 19, 20, 21
  111:10  112:1, 3, 5, 6
  113:1  115:21  123:10
  136:18  137:10, 11, 14,
  18  138:1, 6, 8, 9, 10
  139:15  140:2  141:19,
  21  142:4, 5, 10, 19
  143:5  146:6  158:8
**supply-side**  72:13, 25
  97:13  110:3  113:25
  145:16  146:3
**support**  123:5  157:2,
  15, 21
**supported**  122:22
**supportive**  214:12
**supports**  169:22
  210:12  211:5
**suppose**  71:5  112:25
  113:1  129:5  145:4
  167:1  174:9  175:22
  176:2  180:14, 16
  217:5
**Sure**  8:7, 11, 13  10:8
  16:23, 25  23:6, 11
  26:21  29:24  32:1, 8
  33:25  35:1  38:7, 18
  39:1, 4, 8  43:23  47:1
  52:9  55:3, 22  60:1,
  19  61:19  62:2  68:8,
  22  69:19, 25  82:23
  83:3  85:11  98:10
  100:10  101:23  102:1
  103:16  106:17
  120:12, 20  132:23
  133:16, 22  135:17
  136:25  145:10, 12, 19,
  23  146:7  150:14
  153:5  154:17  160:13
  161:17  165:15  166:1
  186:10  188:25
  191:18  194:6  196:1
  205:18, 24  210:18
  212:15, 23  213:3, 22
  217:23  223:3, 4, 11

225:11, 21  228:1
  229:2  234:1  235:22
  236:5
**surface**  194:3  203:16
**surprise**  192:7
  211:13
**surrounding**  9:1
  11:20
**survey**  9:18  10:3, 16
  20:10, 12, 19, 20, 23
  21:9, 10, 17  23:5, 22
  26:13, 17  43:8  46:15,
  18  67:23  68:3  70:2
  92:25  93:2, 9, 14
  95:4, 9  116:7, 14, 15,
  25  117:8, 10, 12, 14,
  18, 24  118:2, 15, 16,
  17, 18  120:3, 8
  124:11, 14, 20, 21
  129:16  132:14
  133:20  140:5, 7, 11,
  13, 15, 18  143:15
  145:1  162:14, 18, 21
  163:4  165:8  179:4
  190:24  191:12, 17, 20,
  24  193:6, 14  194:9,
  14, 17  195:18  196:16,
  17  197:14, 20, 25
  198:9, 11, 17, 20, 24
  199:8, 11, 17, 22
  201:20  202:19
  204:11, 16  206:20
  207:12  208:1  209:14,
  15, 17  210:14, 21, 24,
  25  212:6, 12  213:2
  214:7, 8  223:11, 21
  224:10, 12, 16, 20, 24
  225:2, 4, 6  226:4, 6
  227:3, 14  228:2, 4
  231:23  232:10, 19
**surveyor**  70:10
**surveys**  120:4
  131:24  164:5  165:9,
  12  210:16, 22
**Susan**  1:11  118:9
  146:9  239:3, 21
**suspect**  127:13
**switch**  50:10  81:9
  86:25

**Switching**  95:15
**sworn**  5:3  239:7
**synonymous**  203:25
**system**  175:11, 13

**< T >**
**Table**  181:23
**tag**  54:18
**tag@lefltd.com**  2:15
**taint**  222:24
**tainted**  223:2, 14
  225:10, 12
**take**  9:17  11:12
  17:13  19:1  20:21
  21:2  25:6  32:15, 19
  35:3  40:12  41:7, 18
  53:5  62:16, 24  65:17
  70:19  71:4, 7, 16
  72:12  74:9  78:3
  80:23  85:22  86:22,
  23  89:23  90:2, 4, 5, 9,
  11  98:19  102:16, 21,
  24  109:18  111:6, 12,
  21  113:15, 20  117:7
  118:14  120:22
  123:10  149:3  155:22
  156:4  157:9  158:19
  163:6  165:14  170:4
  177:16  178:15  180:6,
  11  186:9  193:8
  204:14  207:2  209:5
  217:15  222:15
  234:19
**takeaway**  236:20
**take-it-or-leave-it**
  82:14
**taken**  1:11  11:25
  13:5  17:18  20:23
  50:19  59:15  90:14
  121:5, 21  128:18
  135:13, 14  165:16
  209:8  217:16  239:14
  240:1
**taker**  191:20
**takes**  38:2  80:5
**talk**  6:14  44:3, 8
  45:11, 23  47:25  53:4
  78:2  87:7  88:1  94:3
  97:13  99:19, 24
  102:1, 9  108:9, 10, 11

Case: 1:19-cv-00726-KLL Doc #: 52-1 Filed: 06/15/21 Page: 100 of 104 PAGEID #: 1039

Deposition of Keith Raymond Ugone, Ph.D.                    Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

110:*6, 7, 16*  123:*6, 8*
131:*8*  132:*12*  139:*16,
21*  153:13  156:*1, 2*
157:9  182:*21*  200:7
210:*15*  227:*8*  228:9
232:*3, 12*
**talked**  54:*17*  65:20
66:*19*  67:22  71:24
86:*14*  113:*25*  120:*23*
131:6  135:*22*  153:*2*
154:*3, 14*  166:*12*
180:*10*  191:3  205:*13*
228:22  236:7
**talking**  6:6, *12*  10:*23*
11:*1, 16*  23:6  30:*19*
33:*15*  39:*2, 4*  45:7
50:2  56:*12*  58:*16*
64:*11*  68:*18*  69:*25*
75:2  77:*19*  87:7
92:20  93:*23, 24*
94:*12, 13*  96:*10*
98:*20*  99:*10, 11, 12,
15*  100:*4*  102:*12*
108:8  110:9, *16*
112:9  127:7, *15*
136:*1*  139:*22*  140:*9,
12, 24*  142:*2, 9*  145:*5*
154:*2*  155:*3*  157:*24*
173:*1*  193:9  194:*10*
198:*19*  199:*1, 4*
203:*14, 16*  229:*11*
232:*13*
**Talks**  162:2  206:*25*
213:*11*
**tall**  203:*8*
**tariff**  56:*5*  77:*9, 10*
**tariffs**  57:*16*  101:*17*
**tasked**  44:*13*
**taste**  164:*1, 14*
205:*13*
**tastes**  42:*20*  137:*20*
163:*1, 2, 23*
**tautological**  89:*12, 19,
21*  144:*24*  206:*3*
**tautologically**  89:*12*
**tautologies**  147:*24*
**taxes**  59:*3, 11*  189:*19*

**tcoates@msdlegal.com**

2:*6*
**teach**  108:*9*  172:*2*
**team**  150:*4*  151:*12,
22*  153:*25*
**tease**  68:*6*
**tech**  43:*3*
**technical**  49:*4, 7*
114:*4*  135:*1*  227:*25*
**technicalities**  49:*11*
**technique**  9:*18*
20:*10, 12*  21:*10*
23:*22*  60:*18*  65:*4*
68:*3*  69:*24*  118:*17,
19*
**techniques**  9:*15*  10:*3,
17*  11:9  14:*5*  20:*19,
20, 24*  21:*16, 17*
26:*14, 18*  68:*18*
69:*14, 22*  70:2  111:*3*
118:*13*  145:*4*  195:*19*
225:*9*  232:*20*
**technological**  96:*19*
**technologically**  89:*19*
**technologies**  205:*15*
**technology**  96:*6, 8*
111:*24*  207:*2*
**tell**  14:*23*  25:*5*
30:*20*  79:*16*  82:*18*
114:*6*  118:*5, 7*
134:*18*  162:*16*
183:*20, 24*  184:*16*
197:*14, 22*  220:*5*
225:*10*  226:*17*
230:*13*  231:*9*
**telling**  36:*19*  74:*3*
115:*20*  124:*7*  184:*17*
202:*1*
**tells**  39:*19*  61:*22*
110:*18, 19*  111:*25*
163:*7*  220:*8*
**ten**  24:*9*  82:*19*
122:*2*  172:*9, 13, 15*
173:*3*
**tenants**  78:*4*
**tend**  231:*24*
**ten-minute**  90:*10*
**TERENCE**  2:*3*
**term**  93:*16*  101:*22,
24*  130:*1*  141:*3*
143:*7, 24*

**terminology**  44:*2*
48:*22*
**terms**  9:*15*  12:*20*
20:*24*  36:*9*  42:*23*
53:*17*  58:*6*  66:*15*
72:*2*  100:*15*  106:*24*
112:*16*  116:*10, 17, 18*
119:*13, 25*  124:*18*
127:*8*  129:*14*  130:*22*
140:*25*  142:*3*  146:*4*
152:*1*  153:*7, 8, 23*
154:*21*  156:*25*  159:6
166:*15*  168:*2*  169:*5*
174:*18*  185:*5*  188:*1*
195:*1, 15*  197:*4*
206:*1*  216:*5*  227:*13,
14*  228:*5*
**Tesla**  173:*22*  174:*1,
15*
**test**  46:*22, 23, 25*
47:*10*  48:*13*  70:*3*
128:*4, 13, 18*  129:*7*
144:*17*  234:*5*
**tested**  47:*22*  48:*13*
169:*10*  195:*17*
**testified**  33:*6, 18, 23*
61:*13*  170:*14*
**testify**  5:*3*  239:*8*
**testimony**  14:*15, 16,
17*  158:*4*  189:*13*
215:*14*  216:*13*
234:*17*  239:*9*
**testing**  47:*24*  48:*1, 5,
7, 17, 18*  49:*23*
163:*21, 25*
**Texas**  5:*16*  68:*23*
**Thank**  6:*5*  10:*2*
50:*15, 18*  125:*20*
209:*7*  237:*22*
**Thanks**  61:*10*  125:*23*
**Thanksgiving**  82:*1*
**theoretically**  45:*6, 7*
**theories**  108:*9, 17*
**theory**  78:*5, 6, 7*
104:*2*  108:*8, 11, 16*
117:*1, 2*  127:*24*
134:*19*  217:*19*
**thing**  27:*8*  49:*20*
64:*24*  70:*1*  93:*7*
98:*19*  99:*18*  108:*6,

22*  114:*18*  117:*3*
129:*22*  142:*23*  166:6
187:*14, 16*  203:*10*
231:*17*
**things**  6:*24*  11:*1, 8*
30:*8*  33:*3*  40:*8*  41:*2,
21*  65:*15*  66:*15*  73:*1,
3, 15*  79:*2*  80:*22*
81:*2, 5*  84:*23*  89:*4*
99:*1, 4*  100:*17*
103:*16*  106:*8*  107:*9*
114:*14*  120:*1, 5*
122:*25*  123:*11*  124:*8,
23, 24*  125:*9*  127:*7*
129:*25*  130:*24*
140:*24*  142:*18*  147:*6*
158:*19*  160:*7, 9*
171:*14, 18*  178:*6*
179:*23*  196:*4*  199:*13*
202:*8*  203:*12*  205:*8*
207:*7*  218:*6, 17*
232:*23*
**think**  5:*24*  7:*1*  8:*1,
20, 21*  10:*21*  14:*22*
15:*1, 12*  16:*21*  18:*7*
24:*1, 2, 3, 4, 8*  29:*21*
30:*24, 25*  31:6  32:*5,
22*  34:*22, 23, 24*  35:*8,
9, 14, 15*  37:*17*  38:*1,
5, 7, 9, 16, 24*  39:*6, 13*
40:*17*  42:*7*  46:*17*
47:*21*  48:*3, 25*  49:*21,
24*  52:*13*  53:*21*  54:*5,
10, 15*  55:*5, 8, 13, 14*
56:*4, 8, 18, 21, 22*
57:*4*  58:*7, 17*  60:*24*
61:*13*  62:*11, 15, 16*
66:*14*  67:*20, 22*  68:*2,
9, 21*  70:*8*  71:*13, 22,
23*  73:*2, 4, 9*  74:*2*
77:*7, 19*  79:*14, 20, 22*
80:*18*  82:*15*  83:*10*
84:*14, 24*  85:*1*  86:*20*
87:*25*  88:*5*  90:*8*
91:*5, 16, 23*  92:*2*
93:*11, 12, 20*  94:*6, 7*
95:*7*  96:*2*  97:*21*
98:*19*  100:*8*  101:*22*
103:*2, 10, 22*  104:*6,
12*  105:*6, 11*  106:*4, 7*

Case: 1:19-cv-00726-KLL Doc #: 52-1 Filed: 06/15/21 Page: 101 of 104 PAGEID #: 1040

Deposition of Keith Raymond Ugone, Ph.D. Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

108:5, *13*  109:*17, 25*
114:*8*  115:*6*  123:*16,
23, 25*  125:*12, 17*
126:*15*  127:*14*  128:*8*
130:*5*  131:*14*  132:*3,
12, 15, 22*  133:*3, 19,
21, 25*  134:*21, 22, 23,
24*  135:*16*  136:*12*
140:*6, 12*  143:*10, 14*
145:*7*  147:*25*  148:*1,
6*  152:*11, 21*  154:*25*
155:*1, 3, 10, 17, 18, 20*
158:*22*  159:*2, 4*
160:*17*  161:*1*  165:*4,
5, 9, 11*  168:*5, 7, 9, 23*
170:*2*  171:*24*  172:*18*
174:*24*  176:*12, 16*
177:*2, 8, 25*  181:*17*
182:*17, 23*  183:*8*
184:*23*  185:*14, 16, 17*
188:*19*  190:*4, 9*
191:*8, 12, 14, 17, 24*
192:*1, 5, 14, 16, 25*
193:*20, 22*  194:*7*
195:*17*  197:*10*
200:*18*  204:*23*
205:*11, 12, 22*  206:*8*
208:*16, 17, 25*  211:*7,
8*  214:*23*  215:*13, 19*
218:*5, 7, 15, 18*  219:*1,
15, 19*  220:*7, 8*  221:*8*
223:*5, 7*  225:*23*
226:*20*  228:*6, 8, 22*
232:*7, 17, 18, 21*
233:*2, 9*  234:*4, 13*
235:*8, 16, 21*  236:*5,
18*  237:*3, 5, 9*
**thinking**  21:*19*  36:*3,
9*  48:*24*  74:*13*  142:*3,
22, 25*  152:*16*
**third**  15:*10*  20:*9*
201:*2*  207:*1*
**THOENEES**  1:*3*
240:*1*
**THOMAS**  2:*13*
92:*23*
**thought**  31:*12*  50:*6*
100:*10*  135:*9, 10*
160:*10*  167:*8*  183:*5*
**thoughts**  33:*3*  162:*20*

**thousand**  45:*18*  51:*3*
52:*5*  124:*20*  172:*4*
**three**  24:*4*  31:*6*
45:*18*  150:*24*  153:*22*
154:*10, 23*
**three-plus**  24:*5*
**three-quarters**  120:*18*
**three-star**  195:*4*
**throw**  119:*13*
**thrust**  62:*1*  235:*1*
**tie**  18:*16*
**till**  59:*20*  82:*1, 3*
**time**  12:*8, 22*  25:*6*
26:*23*  28:*16*  29:*15,
22, 23*  34:*9, 23*  39:*24*
53:*9*  54:*11*  55:*16*
56:*22*  57:*3, 15*  59:*19*
61:*9*  72:*7*  77:*5*
82:*12*  109:*7*  120:*22*
125:*16*  137:*4*  142:*24*
143:*22*  148:*2*  155:*1,
14, 15, 20*  162:*12, 24*
163:*2, 3*  164:*8, 17, 21*
174:*3*  182:*19*  183:*6,
7*  188:*23*  190:*2*
193:*8*  198:*12*  205:*12,
16, 17*  210:*8*  215:*21*
218:*9*  221:*7*  233:*6,
21*  236:*10*  237:*16*
239:*14*
**times**  7:*3*  12:*9, 12,
18, 25*  16:*7*  18:*24*
21:*17*  35:*2, 12*  58:*7*
93:*5*  119:*3*  120:*20*
129:*12*  133:*4*  136:*1*
143:*16*  148:*12*
149:*10*  160:*6, 10*
172:*21, 22*  176:*11*
181:*14, 18*  188:*19*
190:*4*  226:*24*  231:*10*
233:*7*
**timing**  222:*5*
**titanium**  96:*17*
**tive**  239:*17*
**today**  73:*17*  74:*19*
81:*24*  108:*20*  118:*25*
162:*23*  163:*4*  187:*24*
205:*14*  210:*9*  220:*11*
237:*15*

**today's**  162:*24*  163:*6*
164:*15*  182:*13*
183:*10*
**told**  72:*2*  154:*7, 20*
156:*11*  189:*22*  190:*7*
**Tom**  148:*13, 15*
**ton**  236:*14*
**tools**  112:*2*
**tooth**  96:*17*
**top**  9:*25*  10:*6*  15:*8*
32:*7, 24*  147:*15*
159:*3*  164:*11*  185:*2,
9*  196:*14*
**topic**  91:*1*
**topics**  81:*9*  95:*15*
**Toshiba**  15:*15*
**total**  159:*1, 7, 14*
202:*24*  203:*7, 17, 20*
**totality**  171:*13*
173:*14*  179:*14*
222:*15*
**totally**  219:*21*
**touch**  45:*25*
**touched**  50:*20*
**tough**  162:*21*  163:*6*
**track**  209:*3*
**tradeoff**  132:*13*
**tradeoffs**  164:*10*
226:*13*
**training**  46:*6, 8*
61:*22*  125:*11*  131:*21*
195:*9*
**transacted**  34:*11*
109:*15*
**transcribed**  237:*23*
**transcript**  240:*1*
**transcripts**  121:*9*
**translate**  199:*24*
**treadmill**  30:*21*  37:*3,
5, 9, 16*  38:*4, 6, 15*
41:*23*  42:*9*  43:*1, 4*
45:*14, 17*  46:*13, 16*
47:*3, 10*  48:*9*  61:*17*
72:*17*  73:*25*  74:*2, 4,
5*  75:*2*  80:*3*  85:*23,
25*  87:*8, 9, 12*  88:*13*
89:*6, 17*  101:*14*
105:*12*  107:*11*
113:*17, 19*  128:*22*
135:*2*  166:*20, 23*

167:*17*  175:*24*  176:*4,
6, 21*  178:*22, 23*
180:*18*  181:*12, 14, 16*
187:*8*  195:*23*  196:*10*
201:*7*  202:*16*  203:*3*
204:*2*  206:*15*  207:*20*
222:*10*  223:*6*  226:*19*
233:*24, 25*
**treadmills**  30:*17*
32:*3*  35:*23*  36:*1, 6,
18*  37:*9, 15, 19, 22*
39:*21*  41:*9, 14, 15, 17*
42:*4*  43:*3*  44:*11*
45:*12*  46:*11, 22*
47:*18*  48:*25*  49:*20*
51:*3, 5, 7*  52:*5, 11*
53:*3*  54:*1, 24*  55:*19*
56:*14*  61:*4*  62:*6*
71:*9, 19*  73:*7, 19, 23*
75:*21*  76:*6, 12, 13*
80:*10*  81:*11*  84:*2, 10*
87:*7*  88:*17, 19, 21, 22*
90:*18*  98:*25*  99:*1*
100:*24*  101:*21*  105:*9,
21, 23*  107:*3*  109:*10,
15, 21*  110:*22*  113:*1,
3, 5, 7*  135:*7*  166:*12,
13, 14, 18*  175:*10*
182:*15*  196:*18*  197:*9,
17*  219:*24*  220:*9, 11*
221:*17, 19*  222:*19*
223:*7*  227:*18, 22*
233:*14*  236:*21*  237:*6*
**treatment**  69:*17*
70:*12*
**tree**  81:*1*
**trends**  216:*3*  217:*24*
**trial**  14:*16*
**tried**  36:*21*  46:*15*
50:*3, 5*  63:*9*  73:*11*
106:*13*  156:*7*  193:*3*
215:*3*  218:*4*  233:*9*
**trier**  135:*25*  136:*5*
170:*3, 4*  173:*15*
**tries**  26:*6*  189:*5*
**tripled**  77:*8*
**tripling**  56:*13*
**TROY**  1:*3*  240:*1*
**true**  61:*5, 18*  62:*8*
65:*10*  82:*16*  85:*13,

Deposition of Keith Raymond Ugone, Ph.D.  Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

*18* 86:*3*, 5 113:*4*
114:*1*, *13* 181:7
208:*8*, *9*, *12* 240:*1*
**truism** 169:*17*
**Trust** 92:*22*
**truth** 239:*8*, 9
**try** 16:*19* 26:4
28:*22* 31:*20* 32:*9*, *10*,
*23* 43:*13* 45:*14*, *19*
46:*2* 58:*8* 62:*14*
65:*24* 72:*4* 92:*13*
104:*13* 106:*8* 111:*4*,
*6* 112:*4*, *17* 119:*16*
140:*13*, *17*, *21* 153:*16*
162:*22* 168:*14*
173:*19* 185:*19*
188:*25* 195:*21* 218:*2*
224:*25* 228:*7*
**trying** 9:*16* 12:*24*
17:*14* 24:*3* 33:*9*, *14*
43:*12*, *23* 46:*13*
51:*22* 53:*22* 64:*6*, *7*
65:*25* 68:*5* 69:*4*
91:*8*, *19* 93:*19* 97:*17*
103:*3*, *4* 104:*6* 125:*6*
130:*16* 131:*8* 136:*7*,
*11* 154:*25* 155:*16*
172:*25* 173:*8* 178:*8*,
*14* 190:*1* 203:*24*
204:*13* 210:*17* 218:*8*
228:*5*, *8* 234:*10*
**Tuesday** 1:*14*
**turn** 6:*11*, *18* 19:*18*
43:*6* 123:*24* 124:*1*, *2*
158:*14* 159:*16*
161:*25* 165:*17*
181:*21* 190:*20*
192:*17* 206:*25*
209:*11*
**turned** 14:*18* 183:*23*
**turning** 14:*13*
**turns** 107:*10*
**tutorial** 78:*25*
**TV** 43:*4*, *6* 207:*19*
**tweak** 70:*18*
**Two** 7:*20* 8:*20*
13:*20* 18:*16* 21:*23*
23:*1* 25:*25* 28:*8*, *13*
30:*14* 31:*6* 45:*18*
46:*18* 58:*10* 64:*20*

67:*7* 76:*16* 79:*1*
86:*21* 94:*20* 113:*8*
134:*24* 142:*17* 147:*5*
150:*24* 155:*8*, *10*, *20*
172:*7* 173:*24* 210:*4*
213:*23* 214:*12*
223:*17* 224:*3*
**two-stage** 118:*22*
**type** 8:*17* 17:*22*
21:*10* 27:*17* 33:*19*
46:*25* 55:*2* 66:*21*
67:*18* 70:*13*, *23* 81:*1*
118:*22* 122:*18*
126:*20* 133:*20*
135:*13*, *15* 151:*17*
173:*13* 201:*3* 204:*12*
207:*9* 219:*18* 231:*21*
234:*2*
**types** 69:*21* 73:*3*
81:*5* 98:*25* 131:*23*
171:*16* 182:*24*
192:*21* 196:*4* 205:*8*
232:*5* 233:*5*
**typewriting** 239:*12*
**typical** 96:*22* 97:*6*
101:*13*
**typing** 151:*14*

**< U >**
**UGONE** 1:*10* 4:*2*
5:*1*, 8 7:*2* 50:*20*
90:*15* 134:*13* 146:*16*
156:*18* 216:*10*
237:*14* 238:*9* 239:*7*
240:*1* 241:*1* 242:*1*
**U-G-O-N-E** 5:*9*
**ultimate** 62:*12* 71:*14*
97:*18*
**ultimately** 54:*17*
93:*12* 95:*10* 133:*8*
229:*3*
**uncertain** 62:*17*
**uncertainty** 14:*24*
15:*14*
**uncomfortable** 114:*23*
**uncommon** 25:*10*
45:*19* 46:*2* 70:*1*
97:*22* 151:*13*
**uncontroversial**

212:*14*
**uncover** 160:*9*
**undergraduate**
150:*23*
**underlying** 25:*10*
129:*10*, *11*, *13*, *15*
162:*5*, *25* 163:*9*, *11*
164:*14*
**underneath** 214:*5*
**understand** 15:*2*
17:*25* 21:*1* 22:*7*
24:*11* 30:*23* 31:*14*
37:*18* 38:*23* 40:*1*
45:*2* 48:*3*, *5* 64:*6*
69:*23* 71:*13* 73:*24*
75:*5* 93:*1* 101:*24*
102:*16*, *25* 108:*7*
118:*13* 127:*25*
134:*19* 137:*1* 139:*13*
145:*12*, *13* 155:*16*
157:*7* 161:*18* 163:*19*
166:*1* 170:*24* 178:*14*
182:*6*, *11* 184:*1*
186:*11* 187:*24* 188:*3*
202:*22* 203:*22* 205:*4*,
*18* 206:*2* 210:*18*
217:*3*, *20* 223:*5*
226:*16* 227:*16* 229:*8*
**understanding** 36:*12*
38:*2* 44:*1*, *20* 49:*1*
53:*16* 55:*24* 57:*14*,
*24* 58:*20*, *24* 59:*6*, *22*,
*25* 60:*5* 93:*9* 101:*25*
103:*22* 104:*2*, *8*, *10*,
*15* 130:*7* 131:*22*
135:*6* 143:*23* 154:*7*
161:*6* 182:*23* 183:*8*
186:*24* 187:*11* 189:*1*,
*4*, *13* 190:*15* 195:*10*
200:*16* 210:*20* 212:*6*
213:*17*, *22* 217:*4*
218:*12*, *20*, *22* 219:*2*
234:*17* 240:*1*
**understands** 72:*16*
**understood** 36:*23*
127:*16* 162:*16*
228:*10*, *24*
**unfortunately** 78:*25*
231:*1*

**unimportant** 195:*15*
**unique** 79:*11* 152:*12*
**unit** 49:*13* 176:*14*
186:*6* 200:*19* 215:*24*
235:*15*
**UNITED** 1:*1*
**units** 9:*5* 51:*6*
52:*20* 58:*23* 76:*11*,
*12* 79:*24* 81:*7* 110:*5*
**unlimited** 141:*6*, *8*, *11*
**unquote** 97:*15*
**unrelated** 218:*17*
232:*19*
**unreliable** 17:*23*
**unscathed** 233:*3*
**unseen** 46:*25*
**updated** 222:*2*
**upgrade** 174:*3*, *10*
**upward** 41:*5* 96:*24*
**usable** 127:*13*
**use** 6:*21* 9:*18* 11:*9*
14:*4* 19:*1* 20:*4*
22:*20*, *25* 23:*16*
24:*16* 26:*15* 28:*19*,
*21* 43:*18*, *20* 53:*23*
112:*3* 124:*21* 128:*15*,
*21* 129:*3* 144:*8*
145:*4*, *8* 146:*11*
152:*15* 157:*2*, *18*, *21*
162:*23* 172:*1*, *2*, *5*
180:*15* 184:*17*, *20*
185:*13* 192:*10* 204:*4*
**user** 227:*19*
**user's** 219:*22*
**uses** 10:*19* 141:*5*
181:*13*
**usually** 20:*7* 21:*6*
24:*4* 26:*18* 34:*4*
46:*24* 82:*2* 96:*23*
102:*7* 141:*11* 149:*12*
165:*8* 223:*14*
**utilities** 108:*12*
**utility** 108:*14*, *20*
143:*19*

**< V >**
**valid** 92:*12*
**validate** 48:*1*, 6

Case: 1:19-cv-00726-KLL Doc #: 52-1 Filed: 06/15/21 Page: 103 of 104 PAGEID #: 1042

Deposition of Keith Raymond Ugone, Ph.D.      Laura Bechtel vs. Fitness Equipment Services, LLC dba Sole Fitness

**valuable** 47:*21*
140:*15* 192:*16*
208:*20*
**valuation** 67:24 68:*4,*
*12* 70:*6* 197:*24*
**value** 27:*14, 15*
64:*16* 68:7 88:*6*
95:*17, 25* 97:*16*
102:*19* 113:*9* 132:*17*
142:*14* 145:*17*
165:*22* 167:*12, 21, 23*
168:*11, 12* 169:6, *8,*
*13, 14* 171:*2* 173:9,
*11* 175:*19* 179:25
207:*24* 208:*18* 226:*6*
228:*14*
**valued** 200:*24* 202:2
**values** 69:*12* 197:*25*
**valuing** 207:*13*
**variability** 8:*25*
11:*18* 22:*16* 39:20
53:8 56:*25* 57:3, *22*
58:*23, 25* 59:2 66:*17*
77:*16* 115:*14*
**variable** 101:7
**variables** 24:*20*
65:*13, 14, 21, 23* 66:*6,*
*7, 13*
**variances** 130:*22, 24*
**variation** 189:*7, 8*
**variations** 54:*2*
55:*17* 66:7 180:*9*
**varies** 107:*2*
**variety** 13:*4* 49:*3*
58:*18* 234:*4* 235:*22*
**various** 9:*1* 11:*19*
21:*16* 37:20 64:*9*
80:*25* 81:7 132:*18*
164:*10* 200:*9* 206:*5,*
*23*
**vary** 34:*25* 54:*5*
55:*14* 58:*2*
**varying** 64:*18*
**Venn** 199:*9*
**veracity** 71:*2*
**versed** 63:*8* 117:*1*
**versions** 29:*10*
**versus** 36:*18* 38:*22*
41:*12* 43:*3* 54:*14*
68:5 71:*19* 73:*24*

84:*17* 107:*13* 128:*23*
159:7 171:*2* 172:*20*
173:*10* 175:*3* 179:*25*
205:*14* 224:*15*
226:*25* 227:*1* 232:*5*
**vertical** 97:*8, 9*
**vi** 209:*10*
**vice** 150:*11*
**view** 17:*4* 18:*6*
19:*24* 21:*3* 45:*4*
48:*18* 62:*5* 67:*17*
68:*3* 70:*24* 92:*12, 15*
110:*5* 161:*21* 162:*13,*
*14* 173:*5* 202:*7*
223:*23* 224:*25*
**viewpoint** 169:*3*
**viewpoints** 152:*14*
162:*19* 165:*10*
**views** 227:*15*
**virtually** 116:*13*
**Vita** 15:*11*
**vote** 82:*8* 140:*10*
**vs** 1:*5* 240:*1*

**< W >**
**W.B** 2:*3*
**wait** 52:*4* 81:*23*
82:*1, 3* 85:*2, 3*
**waived** 239:*13*
**walk** 82:*18, 23* 83:*17*
108:*19* 234:*6*
**walkers** 42:*23*
**walking** 69:*1*
**want** 12:*6* 13:*18*
16:*25* 23:*19* 25:*6*
26:*4, 20* 28:*22* 34:*20*
35:*13* 38:*18, 24* 42:*6,*
*17, 18* 43:*1, 2* 46:*14,*
*16* 48:*16, 21* 52:*9*
56:*7* 57:*20, 21, 24*
61:*19* 65:*24* 66:*2*
75:*5, 8* 81:*20* 82:*22*
83:*21* 84:*18* 87:*6, 8*
88:*8, 9* 89:*23* 90:*2, 3*
96:*21* 98:*10* 104:*11*
107:*23* 124:*17*
132:*13* 136:*25* 139:*6*
142:*1, 15, 17, 18*
147:*20* 153:*5* 160:*13*
161:*17* 165:*14, 25*

166:*1* 175:*18* 178:*23*
184:*3* 186:*10* 187:*15*
191:*4* 195:*25* 196:*4*
198:*22* 199:*5* 201:*9*
203:*9* 205:*22* 207:*19,*
*22* 210:*20* 212:*15*
214:*2* 228:*1* 232:*4*
237:*23*
**wanted** 32:*1* 34:*13*
67:*12* 77:*17* 103:*14*
158:*4* 166:7 198:*4*
**wants** 60:*1* 70:*10*
80:*5* 88:*3* 105:*7*
128:*15* 141:*6, 11*
**wash** 114:*10*
**washing** 129:*21*
**watch** 207:*19*
**water** 69:*1, 6* 94:*24*
**wave** 93:*18*
**way** 10:*15* 12:*1*
13:*7* 15:*19* 17:*1*
18:*17* 20:*8* 21:*19*
29:*18* 38:*12, 13* 42:*1,*
*11* 43:*15* 56:*11* 64:*5*
65:*25* 68:*21* 70:*18*
71:*25* 74:*25* 78:*3*
80:*11* 86:*19* 87:*25*
88:*12, 15, 23* 93:*20*
94:*21* 96:*10* 100:*8*
101:*18* 107:*25*
108:*13* 121:*4* 128:*8*
134:*22* 135:*10, 17*
151:*8* 153:*14, 16*
154:*19* 160:*14*
168:*14* 170:*2* 184:*14*
195:*19* 201:*25*
204:*24* 209:*15*
216:*20* 221:*4, 24*
222:*6* 223:*4, 11, 13*
228:*7*
**ways** 9:*25* 10:*3*
18:*9* 36:*5* 81:*21*
82:*8* 104:*24* 113:*8*
**wealth** 121:*19*
234:*14* 236:*16*
**weapon** 231:*14*
**weather** 68:*24*
**website** 54:*24* 57:*10,*
*13, 18, 25* 59:*13, 18*
60:*7, 9* 82:*16* 182:*10*

183:*3, 11* 188:*11, 16*
189:*16* 213:*6, 14, 18*
214:*16* 216:*4* 218:*12,*
*13* 219:*14, 16, 21*
220:*2, 12, 20, 25*
221:*8* 222:*2, 4, 8*
236:*10, 11, 16*
**websites** 222:*9*
233:*20* 234:*14*
**weeks** 101:*3, 12*
**weighs** 203:*10*
**weight** 99:*6* 145:*11*
198:*10* 207:*15, 24*
208:*2* 212:*17, 25*
213:*25* 214:*9, 21*
222:*13* 237:*11*
**weighted** 58:*21* 189:*9*
**weighting** 210:*19*
**Weir** 91:*20* 147:*10*
149:*17* 159:*18*
160:*20* 180:*5, 6, 8*
**Weir's** 6:*1*
**Well** 10:*11* 11:*16*
13:*20* 14:*11* 15:*19*
16:*13* 21:*22* 25:*13*
27:*24* 32:*5* 40:*5, 19*
41:*7, 17* 42:*6* 46:*5, 8*
47:*8* 49:*19* 54:*12*
59:*8, 14* 63:*8* 64:*24*
65:*3, 24* 66:*4* 72:*10*
78:*19* 79:*14* 87:*5*
97:*8* 98:*5, 19* 102:*21*
103:*22* 104:*20, 21*
108:*12* 111:*2, 12, 18*
116:*16* 117:*1* 119:*21*
121:*15* 123:*2, 16*
124:*16* 127:*6, 15*
128:*8* 129:*1, 9*
134:*21* 137:*11*
138:*18* 141:*3* 144:*16,*
*18* 146:*8* 148:*13*
149:*5, 19* 157:*17*
160:*3* 164:*3* 167:*19*
175:*1* 177:*25* 178:*18*
179:*4* 184:*13* 188:*20*
189:*9* 192:*14* 200:*15*
201:*11, 15* 206:*22*
207:*17* 213:*9* 214:*13*
215:*1, 13* 216:*13*
221:*15* 223:*8* 228:*7*

232:*8* 234:*3* 235:*24*
236:*14* 237:*14*, *17*
**went** 16:*4* 57:*17*
77:*12*
**we're** 7:*1* 9:*2* 10:*13*,
*23, 25* 11:*7, 16* 15:*1*
31:*14* 34:*1* 38:*18*
46:*20* 47:*5* 56:*12*
58:*20* 68:*18* 69:*25*
71:*17* 75:*2* 83:*3*
93:*17* 102:*12* 105:*10*
110:*16* 124:*18* 140:*9*,
*12* 142:*9* 146:*15*
154:*17* 159:*12*
185:*23* 198:*19* 199:*1*,
*4*
**West** 2:*9, 14*
**WESTERN** 1:*2*
**we've** 58:*15* 67:*22*
83:*10* 89:*24* 125:*12*
140:*24* 161:*18*
169:*17* 181:*17* 210:*8*
**whatsoever** 168:*25*
188:*24*
**wheat** 86:*22, 23* 87:*1*,
*2, 7*
**WHEREOF** 239:*19*
**W-H-E-T-H-E-R**
236:*6*
**wholesale** 152:*20*
188:*8*
**wholesaler** 97:*23*
**wide** 130:*23* 131:*5*
**widget** 172:*5, 8, 14, 17*
**width** 203:*8*
**willing** 41:*9, 12, 22*
49:*17* 68:*24, 25* 69:*5*
94:*23* 95:*1* 97:*15*
138:*12* 139:*1, 2*
**willingness** 27:*17*
68:*19* 69:*8, 10, 15*
70:*22* 85:*13, 14, 16,*
*19* 93:*2, 5, 7, 10, 13,*
*17* 94:*12, 13, 19* 95:*2,*
*5* 118:*8* 123:*7* 125:*8*
138:*15, 19, 20, 23*
139:*4, 10, 20, 25*
209:*18* 226:*7*
**winds** 96:*25*

**winning** 125:*5*
**wipe** 179:*11*
**wiped** 179:*22*
**witness** 5:*2* 239:*11*,
*12, 19*
**wonder** 75:*7*
**wondering** 6:*19*
**word** 47:*1* 133:*20*
144:*4* 185:*14* 203:*25*
**words** 14:*22* 16:*23*
25:*10* 30:*5* 48:*4, 5,*
*11, 13* 49:*11* 51:*17*
52:*17* 53:*6* 55:*7*
58:*22* 59:*24* 68:*21*
94:*1* 99:*14, 20*
102:*10, 23* 105:*2*
108:*17* 111:*15*
119:*16* 127:*10*
134:*18* 138:*16, 17*
145:*20* 151:*9, 19, 22*
152:*15, 19* 156:*1*
163:*1* 167:*14* 174:*20*
178:*20* 185:*14*
199:*25* 226:*23* 235:*1,*
*2*
**work** 16:*13* 23:*21*
29:*17* 50:*17* 53:*1*
62:*16* 63:*18* 115:*16*
121:*13* 125:*17*
126:*20* 148:*21, 24*
149:*14* 151:*11, 23*
165:*15* 207:*18* 233:*1*
236:*2*
**worked** 19:*3* 21:*5, 8,*
*14* 33:*10* 34:*2*
120:*17* 121:*10*
148:*11, 14* 150:*11*
**working** 130:*15*
164:*10*
**workout** 175:*17*
226:*20*
**workouts** 227:*20*
**works** 49:*16* 90:*12*
125:*19* 135:*12*
**world** 86:*11* 90:*20*
101:*23* 102:*4, 5, 6, 7,*
*13, 20, 23, 24* 103:*4, 9,*
*12, 17, 18* 104:*8, 19*
105:*19, 24* 106:*14, 23*
110:*22* 114:*2* 128:*24*

140:*4, 17* 142:*21*
166:*14* 171:*22*
172:*10* 175:*23* 221:*7*
**worth** 142:*23*
**write** 54:*18* 118:*3*
151:*6*
**writing** 91:*1* 151:*20*
239:*10*
**written** 151:*25*
**wrong** 186:*18*
196:*21* 197:*6, 11*
**wrongful** 102:*8, 14*
225:*17*

**< Y >**
**Yeah** 8:*14* 10:*5*
12:*17* 13:*16, 19* 14:*8*
15:*3* 19:*11* 21:*13*
25:*4* 26:*17* 28:*5*
30:*2* 36:*2* 39:*18*
41:*25* 49:*6* 51:*15*
53:*20* 56:*23* 58:*4*
59:*14* 62:*10* 63:*2*
64:*23* 71:*3* 74:*22*
76:*19* 85:*8* 86:*3, 5,*
*19* 89:*11, 25* 90:*10*
98:*6* 101:*2, 4* 113:*8*
115:*1* 116:*6* 117:*22*
118:*11* 119:*3, 9*
125:*17* 127:*22* 130:*4,*
*9, 14* 132:*12* 133:*3,*
*19* 136:*25* 140:*19*
141:*10* 142:*1* 143:*10,*
*14* 144:*5, 16* 150:*7*
153:*11, 20* 154:*8*
158:*18* 159:*9* 164:*22*
167:*6, 19* 168:*23*
170:*17* 171:*7, 21*
172:*18* 176:*9* 177:*21*
181:*17* 183:*5, 23*
184:*22* 187:*19*
189:*12* 193:*16*
199:*24* 201:*24*
203:*18, 24* 209:*11*
211:*7* 213:*22* 216:*9*
217:*23* 220:*23*
221:*24* 223:*1* 224:*1*
225:*8* 230:*16* 232:*2*
**year** 77:*13* 147:*22*
214:*19* 215:*18* 217:*1*

**years** 24:*10* 122:*2, 4*
142:*21* 150:*12, 24*
162:*21* 163:*5, 8, 24*
164:*2* 168:*15, 24*
205:*14*
**yesterday** 158:*19*
163:*8*
**yield** 67:*19* 69:*14*
70:*13, 20* 93:*12*
**yields** 67:*2*

**< Z >**
**zero** 47:*14* 63:*15, 25*
114:*6* 174:*22*
**zero-to-60** 174:*3*
**zone** 54:*22*
**ZOOM** 1:*10* 6:*6*
**Zooming** 5:*14*